IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FEDERAL CAPITAL HABEAS PROJECT; KENNETH BARRETT; DUSTIN HIGGS; NORRIS HOLDER; and REJON TAYLOR<br><br>                    Plaintiffs,<br><br>     v.<br><br>WILLIAM P. BARR, in his official capacity as Attorney General of the United States; and MICHAEL CARVAJAL, in his official capacity as the Director of the Federal Bureau of Prisons<br><br>                   Defendants. | Case No. 20-cv-03742 |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SECTION 705 RELIEF AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................... 1

II.     BACKGROUND ...................................................................................................... 4

      A.     DOJ IMPLEMENTS FEDERAL EXECUTIONS AT AN UNPRECEDENTED PACE AND IN CONTRAVENTION OF HISTORICAL TRADITION .................................................................... 4

      B.     IN AUGUST 2020, DOJ PROPOSES A REVISED "MANNER OF FEDERAL EXECUTIONS" RULE TO GRANT ITSELF NEW, SWEEPING AUTHORITY AND DISCRETION .............................. 6

      C.     DOJ FINALIZES THE RULE IN NOVEMBER 2020, PROVIDING FOR A DECEMBER 28, 2020 EFFECTIVE DATE .................................... 8

III.    LEGAL STANDARD ............................................................................................ 11

IV.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ................................. 12

      A.     THE FINAL RULE IS CONTRARY TO LAW AND EXCEEDS STATUTORY AUTHORITY ........................................................... 12

            a.     Section 26.1(b) Is Contrary to the APA's Rulemaking Requirement ...... 13

            b.     Section 26.1(c) Is Contrary to the APA's Rulemaking Requirement and the Specific Delegation of Authority in the FDPA .......................... 17

      B.     THE FINAL RULE VIOLATES THE SEPARATION OF POWERS ............. 22

V.      THE OTHER PRELIMINARY INJUNCTION AND SECTION 705 FACTORS WEIGH IN FAVOR OF RELIEF ............................................................................. 31

      A.     THE FINAL RULE INFLICTS IRREPARABLE HARM ON PLAINTIFFS ................................................................................. 31

      B.     THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGHS IN FAVOR OF RELIEF ............................................................................. 37

VI.     THE COURT SHOULD ENJOIN IMPLEMENTATION OF OR STAY THE FINAL RULE TO POSTPONE IT FROM TAKING EFFECT ...................................... 38

VII.    CONCLUSION ..................................................................................................... 39

# TABLE OF AUTHORITIES

**Page**

## Cases

*Alaska Pro. Hunters Ass'n, Inc. v. FAA*,
   177 F.3d 1030 (D.C. Cir. 1980) ........................................................................................... 14

*Bank Markazi v. Peterson*,
   136 S. Ct. 1310 (2016) .......................................................................................................... 23

*Bond v. United States*,
   564 U.S. 211 (2011) ............................................................................................................... 29

*Cent. United Life, Inc. v. Burwell*,
   128 F. Supp. 3d 321 (D.D.C. 2015), *aff'd*, 827 F.3d 70 (D.C. Cir. 2016) ........................... 37

*Chandler v. United States*,
   218 F.3d 1305 (11th Cir. 2000) ............................................................................................ 28

*City of Idaho Falls v. FERC*,
   629 F.3d 222 (D.C. Cir. 2011) .............................................................................................. 13

*D. Ginsberg & Sons, Inc. v. Popkin*,
   285 U.S. 204 (1932) ............................................................................................................... 19

*District of Columbia v. U.S. Dep't of Agric.*,
   444 F. Supp. 3d 1 (D.D.C. 2020) .......................................................................................... 38

*Dunn v. Ray*,
   139 S. Ct. 661 (2019) ....................................................................................................... 34, 35

*Duvall v. Keating*,
   162 F.3d 1058 (10th Cir. 1998) ............................................................................................ 32

*In re Fed. Bureau of Prisons' Execution Protocol Cases*,
   No. 19-mc-145, 2020 WL 5594118 (D.D.C. Sept. 20, 2020) ................................................. 7

*In re Federal Bureau of Prisons' Execution Protocol Cases*,
   955 F.3d 106 (D.C. Cir. 2020) .............................................................................................. 18

*Gordon v. Holder*,
   721 F.3d 638 (D.C. Cir. 2013) .............................................................................................. 34

*Greatness v. FEC*,
   831 F.3d 500 (D.C. Cir. 2016) .............................................................................................. 11

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
    920 F.3d 1 (D.C. Cir. 2019) ...........................................................................11

*Holden v. Minnesota*,
    137 U.S. 483 (1890)...........................................................................................29

*Hudson v. Zinke*,
    453 F. Supp. 3d 431 (D.D.C. 2020) ................................................................12

*Ill. Com. Comm'n v. ICC*,
    749 F.2d 875 (D.C. Cir. 1984).........................................................................12

*Karem v. Trump*,
    960 F.3d 656 (D.C. Cir. 2020).........................................................................34

*League of Women Voters of United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ......................................................11, 32, 36, 37

*LeCroy v. United States*,
    975 F.3d 1192 (11th Cir. 2020) ...........................................................7, 30, 31

*Mittleman v. Postal Regul. Comm'n*,
    757 F.3d 300 (D.C. Cir. 2014).........................................................................12

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992)...........................................................................................19

*Murray's Lessee v. Hoboken Land & Improvement Co.*,
    59 U.S. 272 (1855).............................................................................................23

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
    440 F.3d 459 (D.C. Cir. 2006).........................................................................36

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
    538 U.S. 803 (2003)...........................................................................................36

*Nken v. Holder*,
    556 U.S. 418 (2009)...........................................................................................11

*Oil States Energy Servs., LLC v. Greene's Energy Group*,
    138 S. Ct. 1365 (2018)......................................................................................23

*Open Communities All. v. Carson*,
    286 F. Supp. 3d 148 (D.D.C. 2017) ................................................................36

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015).....................................................................................13, 14

*Plaut v. Spendthrift Farm, Inc.,*
  514 U.S. 211 (1995)........................................................................................................29

*Playboy Enters., Inc. v. Meese,*
  639 F. Supp. 581 (D.D.C. 1986)...................................................................................37

*R.I.L-R v. Johnson,*
  80 F. Supp. 3d 164 (D.D.C. 2015)................................................................................37

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
  566 U.S. 639 (2012).............................................................................................19, 20, 21

*Ray v. Commissioner, Alabama Department of Corrections,*
  915 F.3d 689 (11th Cir. 2019) ......................................................................................33

*Shalala v. Guernsey Mem'l Hosp.,*
  514 U.S. 87 (1995)........................................................................................................13

*Sierra Club v. Jackson,*
  833 F. Supp. 2d 11 (D.D.C. 2012) ...............................................................................12

*Stern v. Marshall,*
  564 U.S. 462 (2011).....................................................................................................23

*Teva Pharms. USA, Inc. v. Sebelius,*
  595 F.3d 1303 (D.C. Cir. 2010) ...................................................................................36

*Thrivent Fin. for Lutherans v. Acosta,*
  No.16-cv-03289, 2017 WL 5135552 (D. Minn. Nov. 3, 2017)...............................33

*United States v. Chandler,*
  950 F. Supp. 1522 (N.D. Ala. 1996).............................................................................28

*United States v. Chandler,*
  No. 90-cr-00266 (N.D. Ala. Feb. 17, 1995)..................................................................28

*United States v. Giordano,*
  416 U.S. 505 (1974).................................................................................................20, 21

*United States v. Lee,*
  No. 4:97-cr-00243, 2020 WL 3921174 (E.D. Ark. July 10, 2020)..............................7, 30, 31

*\*United States v. Picciotto,*
  875 F.2d 345 (D.C. Cir. 1989) ......................................................................... *passim*

*United States v. Sampson,*
  300 F. Supp. 2d 278 (D. Mass 2004) ...........................................................................29

*Wainwright v. Booker*,
    473 U.S. 935. (1985)..................................................................................32

*Winter v. NRDC, Inc.*,
    555 U.S. 7 (2008)....................................................................................37

*\*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)............................................................................24, 27

**Statutes**

5 U.S.C.
    § 551(5).................................................................................................13
    § 553.................................................................................................*passim*
    § 705.................................................................................................*passim*
    § 706(2)............................................................................................12, 23

18 U.S.C.
    § 2516(1).................................................................................................20
    § 3596(a)..........................................................................................*passim*
    § 4041.......................................................................................................22
    § 4042(a)..................................................................................................22

28 U.S.C.
    § 509..............................................................................................19, 20, 21
    § 510..............................................................................................19, 20, 21
    § 561(a)....................................................................................................22
    § 561(c)....................................................................................................22
    § 566(a)..............................................................................................22, 27

*\*Administrative Procedure Act*....................................................................*passim*

Ala. Code § 15-18-83....................................................................................34

All Writs Act, 28 U.S.C. 1651(a)..............................................................2, 27

Crimes Act of 1790, Pub. L. No. 2-9, 1 Stat. 112.........................................25

Federal Death Penalty Act ......................................................................*passim*

Freedom of Information Act.........................................................................26

Judiciary Act of 1789....................................................................................25

**Other Authorities**

*\*28 C.F.R. § 26*.....................................................................................*passim*

58 Fed. Reg. 4898, 4899 (Jan. 19, 1993) .............................................................................3, 11, 27

85 Fed. Reg. 43,324, 47,325 (Aug. 5, 2020).........................................................................7, 10

*85 Fed. Reg. 75,846 (Nov. 27, 2020)................................................................................. *passim*

1 U.S. Op. Atty. Gen. 228 (1818) ............................................................................................24

2 U.S. Op. Atty. Gen. 344 (1830) ............................................................................................26

7 U.S. Op. Atty. Gen. 561 (1855) ............................................................................................26

First Amendment ...............................................................................................................33, 34

Following a wave of federal executions that has made 2020 the deadliest year in more than a century, the Department of Justice ("DOJ") recently published a "Manner of Federal Executions" regulation ("Final Rule") that claims sweeping and unprecedented authority over the implementation of the federal death penalty in conflict with the Administrative Procedure Act ("APA"), the Federal Death Penalty Act ("FDPA"), and the U.S. Constitution.  The Final Rule is scheduled to take effect on December 28, 2020—shortly before a rush of additional executions the U.S. Government plans to carry out in January, days before Inauguration Day.  Plaintiffs are individuals who have been sentenced to death under federal law, including one whose execution date has been set for January 15, 2021, as well as the Federal Capital Habeas Project, which was created by the United States Judicial Conference Committee on Defender Services to assist with training for counsel and representation of federal death row inmates in post-conviction proceedings.  Plaintiffs face imminent irreparable harm from the Final Rule.  Pursuant to Local Civil Rule 65.1(d), Plaintiffs seek immediate injunctive relief to prevent the unlawful Final Rule from taking effect or a stay of the Final Rule during the pendency of this litigation.  Given this exigency, Plaintiffs request that this motion be heard on an expedited basis, within the 21 days provided for by Local Civil Rule 65.1(d).

## I.    Introduction

On November 27, 2020—the day after Thanksgiving—DOJ issued the Final Rule revising its manner of execution regulations.  Final Rule, 85 Fed. Reg. 75,846 (Nov. 27, 2020).  (*See* Compl., Ex. 2.)  The Final Rule eliminates critical safeguards restricting how the federal government executes individuals and grants wide-ranging powers to the Attorney General to depart from the regulations without notice or further rulemaking; to delegate responsibility for implementing death sentences without regard to statutory constraints; and to insulate DOJ's

actions in setting execution dates from judicial review in conflict with nearly 200 years of precedent.

First, the Final Rule adds new subsection (b) to 28 C.F.R. § 26.1, which grants the Attorney General authority to "vary" from *any* of the regulations governing implementation of federal death sentences if he believes there is a "conflict" with "applicable law." That provision empowers the Attorney General literally to rewrite the rules governing executions on an ad hoc basis and in his sole discretion, with no requirement that he engage in ordinary rulemaking processes or even provide notice to an affected death-sentenced individual or that individual's counsel.

Second, the Final Rule adds new subsection (c) to 28 C.F.R. § 26.1, which authorizes the Attorney General to delegate or reassign any task involving implementation of a death sentence from any DOJ officer or employee to any other DOJ officer or employee. That provision appears to have been designed to preempt litigation that had challenged the Attorney General's action in vesting certain authority in employees of the Bureau of Prisons ("BOP"), notwithstanding Congress's specification in the Federal Death Penalty Act that "the United States marshal . . . shall supervise implementation of the [death] sentence." 18 U.S.C. § 3596(a).

Third, the Final Rule wholly repeals 28 C.F.R. § 26.2, which had required the federal government to seek the approval of the courts in setting execution dates by filing a "proposed Judgment and Order" stating the date and place of the execution and specifying that "[t]he sentence shall be executed by a United States Marshal." In first promulgating the manner of execution regulations in 1993, DOJ had recognized that its authority to set execution dates derives from "the authority of the federal courts, acting pursuant to the All Writs Act, 28 U.S.C. 1651(a), to order that their sentences be implemented"—thus explaining the requirement in 28 C.F.R. § 26.2 "direct[ing] the government's attorney in a capital case to file with the court a proposed Judgment

-2-

and Order consistent with the regulations [setting an execution date]."  Implementation of the Death Sentence in Federal Cases, 58 Fed. Reg. 4898, 4899 (Jan. 19, 1993).  In an effort to avoid that judicial oversight now, the Final Rule eliminates this provision and newly asserts a sweeping authority for BOP to set execution dates unilaterally.

Based on these and other changes, the Final Rule violates the APA, the FDPA, and the constitutional separation of powers.  The end result is to impermissibly concentrate power over executions in the Attorney General by purporting to provide the authority to unilaterally decide when an individual's judicial remedies are exhausted; to choose an individual's execution date without court involvement; to determine whether and how to vary from execution procedures in implementing death sentences in individual cases; to select who will supervise the execution without regard to Congress's delegation of that duty; and to decide whether to provide any notice of any changes to the affected death-sentenced individuals.  Plaintiffs are likely to succeed on their claims that the Final Rule is unlawful.

Plaintiffs will be irreparably harmed if the status quo is altered and the unlawful Final Rule is permitted to take effect before these legal challenges can be adjudicated.  Plaintiff Dustin Higgs is scheduled to be executed on January 15, just weeks after the effective date of the new regulations.  Mr. Higgs faces imminent harm because, given the massive discretion conferred upon the Attorney General under the Final Rule, Mr. Higgs has no way of knowing when and how the Attorney General may decide to vary from the regulations or eliminate the United States Marshal's role in carrying out his death sentence—and there is no guarantee that notice will be given of any decision to stray from binding law in the short time leading up to the scheduled execution.  The other individual Plaintiffs—all of whom are federal death row inmates—face similar risks of statutory and constitutional violations under the Final Rule with respect to how their execution

dates are set and how the Attorney General may vary from the regulations in implementing their death sentences.  And the Final Rule will further irreparably interfere with the Federal Capital Habeas Project's mission to assist in the representation of federal prisoners who have been sentenced to death, including by granting broad authority to the Attorney General to ignore the regulations in individual cases, making it impossible to determine how and when the regulations will apply.

On the other side of the balance, Defendants will face no harm from preserving the status quo during the pendency of this suit, which would simply allow the prior regulations to remain in place.  And it is in the public interest to prevent an unlawful regulation from taking effect, particularly in the context of the implementation of federal death sentences, which cannot be undone when carried out in an unlawful manner.  Because all factors favor preliminary relief, Plaintiffs respectfully ask this Court to preliminarily enjoin the Final Rule, postpone its effective date, and/or enter a stay of the Final Rule under Section 705.

## II.    Background

### A.    DOJ Implements Federal Executions at an Unprecedented Pace and in Contravention of Historical Tradition

In the history of the federal death penalty, 2020 has been the deadliest year since 1896. (Declaration of Ruth Friedman at ¶ 4).  The United States government executed ten people between July and December 2020, including two individuals put to death last week.  (*Id.*)  The federal government has set execution dates for three additional individuals, including Plaintiff Dustin Higgs, in January, right before Inauguration Day.  (*Id.* at ¶ 5).  It appears DOJ is rushing to execute as many people on federal death row as possible before a new administration assumes power. Indeed, this is the first time in over a century that executions have occurred during a presidential transition period.  (*Id.* at ¶ 6).  If the executions in January proceed, the federal government will

have executed more than three times as many people in the seven-month period between July 2020 and January 2021 than were executed in the last *six decades combined*.  (*Id.* at ¶ 7).

In addition to scheduling far more executions in 2020, DOJ has been giving individuals on death row less advance notice of their scheduled execution dates.  (*Id.* at ¶ 13).  For the last two decades, every individual who received an execution notice from BOP was given at least 120 days' notice.  (*Id.*)  This year, in sharp contrast, BOP has routinely given individuals fewer than 60 days' notice.  (*Id.*)  For example, Orlando Hall received his notice of execution on September 30, 2020, and he was put to death 50 days later, on November 19, 2020.  *Id.*  Brandon Bernard received his notice on October 16, 2020, and he was executed 55 days later, on December 10, 2020.  (*Id.*)  And Plaintiff Dustin Higgs received only 56 days' notice of his execution date.  (*Id.*)

Recent executions have illustrated even more serious issues—and likely constitutional violations—arising from the failure to provide adequate notice for rescheduled executions.  For example, when Wesley Purkey's July 15, 2020 execution date was postponed due to a preliminary injunction, Mr. Purkey's counsel received an email from DOJ at 2:03 a.m. on July 16, 2020, stating that Mr. Purkey would be executed that same day, and that counsel was being notified of the new execution date only "as a courtesy."  (*See* Compl., Ex. 1.)  That email stated that the execution would be carried out in less than two-and-a-half hours—at 4:30 a.m.  (*Id.*)  DOJ further stated that it was aware that Mr. Purkey had a pending stay motion in district court but that it "w[ould] not delay the execution" to permit that legal process to conclude.  (*Id.*)  DOJ proceeded with the execution, mooting Mr. Purkey's pending legal challenges.

Another striking example arises from Daniel Lee's execution.  On July 14, 2020, counsel for Mr. Lee, including the Federal Capital Habeas Project, received an email from DOJ sent at 2:34 a.m. stating that the execution had been scheduled to occur that same day, but not specifying

that DOJ intended to put Mr. Lee to death at 4 a.m.—*a mere 90 minutes after the email was sent*.
(Friedman Decl. at ¶ 14).  After sending the middle-of-the-night email, DOJ made no attempt to
reach counsel by phone or otherwise ascertain whether counsel knew that the federal government
intended to execute their client imminently.  (*Id.*)  At the time DOJ sent the email to Mr. Lee's
counsel stating that his execution date had been set for the same day, Mr. Lee had unaddressed
legal claims still pending in the U.S. District Court for the District of Columbia.  (*Id.*)  Mr. Lee
and his counsel were not provided with adequate time to pursue available legal remedies.  (*Id.*)  In
addition, another stay prohibiting Mr. Lee's execution, issued by the U.S. District Court for the
Eastern District of Arkansas, remained in place.  (*Id.*)  Mr. Lee's counsel warned DOJ that it had
to comply with the stay, but it was only under the threat of being held in contempt of court that
DOJ paused the execution until the stay issued by the Eastern District of Arkansas could be
addressed.  *Id.*  BOP left Mr. Lee strapped to the gurney for nearly four hours, with the IV lines
inserted to start the execution process still in his arms, before finally killing him on the morning
of July 14, just hours after telling him and his counsel that he would die that day.  (*Id.*)  DOJ did
not notify counsel when the federal government actually proceeded to execute Mr. Lee at 7:30
a.m., while legal claims were still pending; counsel learned that information only because
journalists who were on site to witness the execution posted it on Twitter.  (*Id.*)

  This rush of executions—and the issues they have produced—is truly unprecedented.  This
year marks the first time **ever** that the federal government has carried out more executions than all
states combined.  (*Id*. at ¶ 8.)

  **B. In August 2020, DOJ Proposes a Revised "Manner of Federal Executions"
   Rule to Grant Itself New, Sweeping Authority and Discretion**

  In response to the rash of irregularly scheduled and implemented executions in 2020, as
discussed above, several lawsuits were filed.  Among other challenges, individuals contended that

DOJ's actions did not comply with limits on the federal government's authority to set execution dates without court involvement and approval.  *See United States v. Lee*, No. 4:97-cr-00243, 2020 WL 3921174, at *3 (E.D. Ark. July 10, 2020); *cf. LeCroy v. United States*, 975 F.3d 1192, 1195–96 (11th Cir. 2020).[1]  Other challenges concerned DOJ's effort to shift some tasks in implementing federal executions from the United States Marshals Service to BOP.  *See In re Fed. Bureau of Prisons' Execution Protocol Cases*, No. 19-mc-145, 2020 WL 5594118, at *10–12 & *12 n.12 (D.D.C. Sept. 20, 2020).

Faced with this litigation, DOJ decided to just change the rules.  On August 5, 2020, in the midst of the wave of executions, DOJ published a notice of proposed rulemaking ("NPRM") to revise the regulations governing the "manner of executions."  *See* 28 C.F.R. § 26; NPRM, 85 Fed. Reg. 43,324, 47,325 (Aug. 5, 2020).  (*See* Compl., Ex. 3.)  The NPRM asserted that amendments to the regulations were necessary "to provide the Federal Government with greater flexibility to conduct executions."  *Id.*

The NPRM explained that the FDPA "provides that Federal executions are to be carried out in the manner prescribed by the law of the relevant State," whereas the existing regulations had "provide[d] that Federal executions are to be carried out by lethal injection."  *Id.*  According to the NPRM, because "some States currently authorize execution by other means in certain circumstances, and more States may authorize execution by other means in the future," amendments to the regulations were warranted to provide that "Federal executions are to be carried out by lethal injection 'or by any other manner prescribed by the law of the State in which the

---

[1] In *Lee*, the issue was rendered moot because the court simultaneously issued an order setting the execution date pursuant to 28 C.F.R. § 26.2.  2020 WL 3921174, at *5.  In *LeCroy*, the Eleventh Circuit recognized that "courts historically played some concurrent role in—had some shared responsibility for—setting execution dates in the first instance," but the case did not involve that issue and instead concerned whether the court could postpone an execution date that had already been set without a showing that the traditional stay factors were satisfied.  975 F.3d at 1196.

sentence was imposed or which has been designated by a court in accordance with 18 U.S.C. 3596(a)[, the FDPA].'" *Id.* According to the NPRM, "[t]he proposed rule thus ensures that the Department is authorized to use the widest range of humane manners of execution permitted by law." *Id.*

But many of the NPRM's proposed regulatory amendments had nothing whatsoever to do with that rationale. Instead, several of the proposed changes, discussed further below, appeared to be designed to preempt legal challenges, like those that had been raised over the summer, by granting the Attorney General more expansive authority and cutting courts out of the process of setting execution dates. The NPRM did not explain the legal basis for DOJ's claimed authority to make those changes. Indeed, the NPRM did not explain the reasons for many of those amendments at all.

### C.   DOJ Finalizes the Rule in November 2020, Providing for a December 28, 2020 Effective Date

On November 27, 2020, DOJ published the Final Rule. DOJ had received 23 public comments on the proposed rule, including detailed comments from many of the Plaintiffs and other federal prisoners who have been sentenced to death. (*See* Compl., Ex. 2). These comments identified multiple constitutional and statutory problems with the proposed changes. (*See* Compl., Ex. 4). Notwithstanding those issues, the Final Rule retained the problematic provisions without material change. The Final Rule provides for a 30-day effective date, meaning that it will take effect on December 28, 2020, just weeks before the executions scheduled to occur right before Inauguration Day—including Plaintiff Dustin Higgs's execution scheduled for January 15, 2021.[2]

Among other changes, the Final Rules amends 28 C.F.R. § 26.1 to add the following new

---

[2] A corrective notice was issued on December 1, 2020, in the Federal Register, changing the effective date of the Final Rule from December 24, 2020, to December 28, 2020. 85 Fed. Reg. at 76, 979.

subsection (b) purporting to allow the Attorney General to "vary" from the regulations:

> (b) Where applicable law conflicts with any provision of this part, the Attorney General may vary from that provision to the extent necessary to comply with the applicable law.

DOJ claimed that this broad arrogation of authority was intended to ensure "compl[iance] with State statutes that contradict the regulations." Final Rule, 85 Fed. Reg. at 75,849. DOJ did not explain why it believed it had legal authority to authorize the Attorney General, in his sole discretion, to vary from "any provision of this part"—*i.e.*, binding regulations that have the force and effect of law—without further rulemaking or why such an expansive exception to ordinary rulemaking was warranted.

The Final Rule further amends 28 C.F.R. § 26.1 to add the following new subsection (c) concerning the Attorney General's delegation of duties:

> (c) Any task or duty assigned to any officer or employee of the Department of Justice by this part may be delegated by the Attorney General to any other officer or employee of the Department of Justice.

This new provision appears to have been designed to preempt litigation that had challenged the Attorney General's action in delegating tasks associated with the supervision of executions to the BOP notwithstanding Congress's specification in the FDPA that "the United States marshal . . . shall supervise implementation of the [death] sentence." 18 U.S.C. § 3596(a); Final Rule, 85 Fed. Reg. at 75,854. DOJ's only explanation for this change was that it "reiterate[d] the Attorney General's authority to manage the Department's execution process, by stating that any task or duty assigned to any officer or employee of the Department of Justice under part 26 may be delegated by the Attorney General to any other officer or employee of the Department of Justice." Final Rule, 85 Fed. Reg. at 75,849. DOJ dismissed concerns "that the Attorney General could change regulations without notice," claiming that "this provision itself is notice to the public that the Attorney General may re-designate responsibilities to other officials." Final Rule, 85 Fed. Reg. at

75,849–75,850.   DOJ further asserted that it had authority to override the FDPA's explicit

designation that federal executions must be supervised by the United States Marshals Service.   *Id.*

Additionally, the Final Rule repeals and removes 28 C.F.R. 26.2, which had provided for

court involvement in setting execution dates:

> (a) Whenever this part becomes applicable, the attorney for the government shall promptly file with the sentencing court a proposed Judgment and Order. The proposed Judgment and Order shall state, in addition to any other matters required by law or otherwise appropriate, that:
>> (1) The sentence shall be executed by a United States Marshal designated by the Director of the United States Marshals Service;
>> (2) The sentence shall be executed by intravenous injection of a lethal substance or substances in a quantity sufficient to cause death;
>> (3) The sentence shall be executed on a date and at a place designated by the Director of the Federal Bureau of Prisons; and
>> (4) The prisoner under sentence of death shall be committed to the custody of the Attorney General or his authorized representative for appropriate detention pending execution of the sentence.
> (b) The attorney for the government shall append to the proposed Judgment and Order a Return by which the designated United States Marshal may inform the court that the sentence of death has been executed.

The NPRM had stated that this change was necessary to "provide the Federal Government with

greater flexibility to conduct executions in any manner allowed by federal law," given that Section

26.2(a)(2) limited the method of federal executions to lethal injection.   NPRM, 85 Fed. Reg. at

47,324–47,325.   But the NPRM did not explain why DOJ was seeking to delete every other

provision of Section 26.2, including the requirement that the federal government "promptly file

with the sentencing court a Proposed Order and Judgment" to set an execution date stating the

"date" and "place" of the execution and the requirement that "[t]he sentence shall be executed by

a United States Marshal."   28 C.F.R. §§ 26.2(a)(1), (3).   The NPRM addressed the deletion in a

single sentence, stating without elaboration that "the proposed rule would eliminate unnecessary

and redundant language in the regulations by striking the entirety of § 26.2 and reserving that

section for future use."   NPRM, 85 Fed. Reg. at 47,326.   Comments submitted during the

rulemaking explained that deleting Section 26.2 would violate Article III by cutting federal courts out of the process of setting execution dates.  (*See* Compl., Ex. 4).

The Final Rule nevertheless repealed Section 26.2 without adequately explaining how this change is consistent with the separation of powers.  Nor did the Final Rule acknowledge or explain DOJ's conflicting analysis from when it first promulgated the manner of execution regulations in 1993, when DOJ had recognized that its authority to set execution dates derives from "the authority of the federal courts" and thus required the process in Section 26.2 "directing the government's attorney in a capital case to file with the court a proposed Judgment and Order consistent with the regulations [setting an execution date]."  Implementation of the Death Sentence in Federal Cases, 58 Fed. Reg. at 4899.  The Final Rule simply asserted that it was "unnecessary" for the federal government to file a proposed Judgment and Order with the sentencing court and that BOP has authority to set execution dates unilaterally.  Final Rule, 85 Fed. Reg. at 75,850.

## III.    Legal Standard

A party's request for a preliminary injunction requires assessment of "four factors, taken together":  "likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in [the movant's] favor, and accord with the public interest." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016)).  The first two factors are paramount in the preliminary injunction analysis.  *See Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 10 (D.C. Cir. 2019) ("A foundational requirement for obtaining preliminary injunctive relief is that the plaintiffs demonstrate a likelihood of success on the merits.").  "The last two factors 'merge when the Government is the opposing party.'"  *Id.* (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  A request to "postpone the effective date of

an agency action or to preserve status or rights pending conclusion of the review proceedings"
under Section 705 the APA, 5 U.S.C. § 705, is evaluated based on the same factors. *See Sierra
Club v. Jackson*, 833 F. Supp. 2d 11, 30 (D.D.C. 2012).  Here, all four factors weigh in favor of
preserving the status quo and postponing the effective date and/or preliminarily enjoining the Final
Rule.[3]

## IV.    Plaintiffs Are Likely to Succeed on the Merits

### A.    The Final Rule Is Contrary to Law and Exceeds Statutory Authority

Under Section 706(2) of the APA, a reviewing court must set aside any agency action that
is "not in accordance with law," or is "in excess of statutory jurisdiction, authority, or limitations."
5 U.S.C. § 706(2).  An agency has acted contrary to (not in accordance with) law when its action
is "'inconsistent with the statutory mandate or . . . frustrate[s] the policy that Congress sought to
implement.'"  *Hudson v. Zinke*, 453 F. Supp. 3d 431, 436 (D.D.C. 2020) (quoting *Ill. Com.
Comm'n v. ICC*, 749 F.2d 875, 880 (D.C. Cir. 1984)).  Equally invalid under the APA are "ultra
vires" actions by an agency that "exceed its statutory authority."  *Mittleman v. Postal Regul.
Comm'n*, 757 F.3d 300, 307 (D.C. Cir. 2014) (internal citations omitted).  Here, the Final Rule
exceeds DOJ's statutory authority and is contrary to the FDPA and the APA in multiple respects,
demonstrating Plaintiffs' likely success on their APA claim.

---

[3] In addition to the grounds for preliminary relief included in this motion, Plaintiffs' Complaint
alleges that the Final Rule violates the APA in additional respects.  Plaintiffs reserve the right to
seek preliminary relief with respect to these additional grounds in the future as necessary.

### *a.   Section 26.1(b) Is Contrary to the APA's Rulemaking Requirement*

In new Section 26.1(b), the Final Rule claims sweeping authority for the Attorney General to alter any requirements of the "manner of execution" regulations, 28 C.F.R. Part 26, in his sole discretion and without following further rulemaking processes, providing:

> Where applicable law conflicts with any provision of this part, the Attorney General may vary from that provision to the extent necessary to comply with the applicable law.

28 C.F.R. § 26.1(b).   This provision is directly contrary to the APA's command that all modifications to rules that have the force of law must ***themselves*** comply with the APA's rulemaking requirements.  *See* 5 U.S.C. § 553.  By instead providing for an open-ended authority to "vary" from the regulations going forward, the Final Rule impermissibly short circuits the APA's rulemaking requirements and is therefore contrary to law.

In order to promulgate a "legislative rule" like the Final Rule—i.e., a rule that has the "force and effect of law"—an agency must comply with the "three-step procedure" specified by Section 553.  *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) (internal quotations omitted).[4] Section 553's procedural requirements also govern modifications to a legislative rule, as the APA defines "rule making" as the "agency process for formulating, *amending*, or repealing a rule."  5 U.S.C. § 551(5) (emphasis added).  Accordingly, once an agency has "established through public rulemaking . . . a legally-binding methodology," the agency "may modify that methodology only after notice and comment."  *City of Idaho Falls v. FERC*, 629 F.3d 222, 227 (D.C. Cir. 2011). "Rule making," the D.C. Circuit has explained, "includes not only the agency's process of

---

[4] By contrast, an agency can issue an "interpretive rule"—i.e., a rule that "'advise[s] the public of the agency's construction of the statutes and rules which it administers'"—without following Section 553.  *Perez*, 575 U.S. at 97 (citing *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995)).

formulating a rule, but also the agency's process of modifying a rule." *Alaska Pro. Hunters Ass'n, Inc. v. FAA*, 177 F.3d 1030, 1034 (D.C. Cir. 1980).

Thus, the APA prevents an agency from circumventing Section 553 by promulgating a broad, open-ended legislative rule and then modifying that rule through ad hoc interpretive rules without notice and comment. *See Perez¸* 575 U.S. at 111 (Scalia, J., concurring) ("The APA does not remotely contemplate" that an agency can expand its authority by writing "substantive rules more broadly and vaguely, leaving plenty of gaps to be filled in later, [and then] us[e] interpretive rules unchecked by notice and comment.").

In *United States v. Picciotto*, 875 F.2d 345 (D.C. Cir. 1989), the D.C. Circuit applied this principle to a Park Service regulation that listed specific restrictions for demonstrations in national capital parks and then purported to give the Park Service "open-ended" authority to impose "additional reasonable conditions" on demonstrators. *Id.* at 346. Pursuant to that grant of authority, the Park Service adopted a "number of 'additional conditions' that were made generally applicable to all demonstrators in Lafayette Park" without conducting notice and comment rulemaking. *Id.* Although the underlying regulation "was properly adopted pursuant to the APA's notice and comment requirements," the D.C. Circuit rejected the Park Service's argument that it could impose additional conditions on demonstrators without again going through notice and comment. *Id.* The court explained that, "[i]n essence, the Park Service is claiming that an agency can grant itself a valid exemption to the APA for all future regulations, and be free of [the] APA's troublesome rulemaking procedures forever after, simply by announcing its independence in a general rule"—but "[t]hat is not the law." *Id.* at 346–47. "Such agency-generated exemptions," the court stated, "would frustrate Congress's underlying policy in enacting the APA by rendering compliance optional." *Id.* at 347.

Here, DOJ's Final Rule impermissibly claims an "agency-generated exemption[]," *id.* at 347, providing the Attorney General in Section 26.1(b) with the authority to "vary" from the binding Final Rule in his sole discretion whenever he perceives a "conflict" with "applicable law." There is no requirement that the Attorney General notify individuals on federal death row (or their counsel) when he decides to "vary" from the regulations in his sole discretion; indeed, the commentary accompanying the Final Rule expressly notes that notice may *not* be provided in an effort to proceed with executions "without undue delay." Final Rule, 85 Fed. Reg. at 75,846. But the desire to proceed with federal executions without delay cannot justify such unbounded authority under the APA. Because DOJ used the notice and comment process to give the requirements of the Final Rule the force and effect of law, the APA requires that any modification of those requirements be made by further notice and comment. Put simply, DOJ cannot "grant itself a valid exemption to the APA for all future regulations," *Picciotto*, 875 F.2d at 347, and the Final Rule's attempt to do so is contrary to law.

DOJ appears to justify Section 26.1(b) as a specific implementation of the APA's "good cause" exception, which provides that Section 553 "does not apply . . . when the agency for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). According to the commentary to the Final Rule, Section 26.1(b) "account[s] for the statutory requirement that the Attorney General implement an execution 'in the manner prescribed by the law of the State in which the sentence is imposed.' 18 U.S.C. 3596(a)." Final Rule, 85 Fed. Reg. at 75,849. The commentary further asserts that "[i]t is possible that at some point in the future a State statute that applies to the execution of a Federal inmate may differ, even in a minor respect, from the regulations[]" with "the specifics of such a difference . . . not currently foreseeable." *Id.* Thus, the commentary

concludes, Section 26.1(b) "authorizes the Attorney General to account for that difference" "in order to allow the execution to proceed without undue delay." *Id.* In short, the commentary appears to anticipate that there would be "good cause" to depart from Section 553 where a variance from Part 26 is necessary to comply with the FDPA and it would be unrealistic for the Attorney General to go through notice and comment.

But that argument cannot justify the Final Rule. To begin with, the broad language of Section 26.1(b) does not correspond with the narrow circumstances where "good cause" may exist, instead expanding the Attorney General's authority to allow for a general "variance" power well beyond the circumstances where good cause might justify noncompliance with the APA. Section 26.1(b) does not define what constitutes "applicable law" or limit the sources of law that could qualify; nor does the Final Rule provide guidance on what constitutes a "conflict" triggering the Attorney General's new authority. While the commentary refers to potential differences with State statutes, Section 26.1(b) more broadly refers to "applicable law," which could theoretically apply to *any source* of law—state, federal, or otherwise—and *any kind* of law—statutory, judicial, or even unwritten protocols. The commentary further indicates the expansive nature of the claimed power to deviate from federal regulations by stating that the power could be triggered based on *any* "difference" between state and federal law—presumably allowing the Attorney General to prioritize a less protective state law over a more protective federal one. In all these respects, Section 26.1(b) functions as an impermissible "open-ended provision" designed to exempt the Attorney General from the APA's "troublesome rulemaking procedures forever" by authorizing him to vary from the Final Rule's requirements at his discretion. *Picciotto*, 875 F.2d at 346–47.

More fundamentally, however, even if good cause might exist to vary from the regulations in individual cases without following Section 553, DOJ lacks authority to promulgate an open-

ended exemption like Section 26.1(b) that does not actually require the Attorney General to show

that good cause exists in a particular case in order to exercise the "variance" power.  By not limiting

variance to scenarios where "good cause" exists, Section 26.1(b) constitutes the kind of "agency-

generated exemption[] [that] would frustrate Congress' underlying policy in enacting the APA by

rendering compliance optional."  *Picciotto*, 875 F.2d at 347.  Regardless of whatever perceived

inconvenience the duly-enacted regulations present, the Attorney General has no authority—under

the APA or otherwise—to simply excuse himself from rulemaking requirements whenever he in

his sole discretion thinks it is "necessary."  Were that the law, the Attorney General would have

sweeping authority to literally rewrite the rules governing federal executions at the last moment,

with no clear limits on the exercise of his discretion—precisely the type of unbounded agency

action that the APA was designed to prohibit.  The Final Rule's attempt to claim impermissible

authority for the Attorney General to "vary" from the regulations in the future is contrary to law

and renders the regulations invalid.

### b.  Section 26.1(c) Is Contrary to the APA's Rulemaking Requirement and the Specific Delegation of Authority in the FDPA

In new Section 26.1(c), the Final Rule further asserts broad authority for the Attorney

General to reassign tasks associated with implementing the death penalty, providing:

> (c) Any task or duty assigned to any officer or employee of the Department of Justice by this part may be delegated by the Attorney General to any other officer or employee of the Department of Justice.

The commentary accompanying the Final Rule acknowledged that this provision would allow the

Attorney General to reassign duties without providing notice and override "Congress's specific

designation of certain officials—particularly a United States Marshal—to carry out certain duties"

under the FDPA.  Final Rule, 85 Fed. Reg. at 75,849.  But DOJ dismissed those concerns, asserting

that the open-ended authority in Section 26.1(c) "itself is notice to the public that the Attorney

General may re-designate responsibilities to other officials" and claiming that the Attorney General may "[a]s a matter of law" alter the FDPA's requirement that the United States Marshal be responsible for supervising implementation of federal death sentences. *Id.* at 75,849–75,850.

Section 26.1(c) is contrary to both the APA and the FDPA. Like new Section 26.1(b), it claims impermissible authority for the Attorney General to rewrite duly enacted federal regulations governing implementation of death sentences without going through notice and comment to make those changes. As discussed, the D.C. Circuit has rejected the argument that if an open-ended provision has itself gone through notice and comment rulemaking, specific implementations of that provision do not need to go through notice and comment. *Picciotto*, 875 F.2d at 346–47. As with Section 26.1(b), the generic "notice" provided in Section 26.1(c) that the Attorney General may choose to depart from binding regulations in the future to reassign critical functions in carrying out death sentences cannot substitute for statutorily required process. 5 U.S.C. § 553.

More fundamentally, Section 26.1(c)'s claimed delegation authority is contrary to the FDPA, in which Congress explicitly assigned responsibility for implementing federal death sentences to the United States Marshals Service, stating that "a United States marshal . . . shall supervise implementation of the sentence." 18 U.S.C. § 3596(a). Indeed, new Section 26.1(c) appears designed to preempt litigation that had contended that the federal government's Execution Protocol "reflect[ed] an unlawful transfer of authority from the United States Marshals Service to the Federal Bureau of Prisons." *In re Federal Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106, 112 (D.C. Cir. 2020).[5] Section 26.1(c) thus attempts to give the Attorney General a firmer basis for making that same delegation. But the Final Rule violates the FDPA because DOJ

---

[5]  The D.C. Circuit did not resolve this issue. In separate opinions, Judge Katsas wrote that he "would reject the claim on the merits" and Judge Rao wrote that she "would hold that it was forfeited." *In re Federal Bureau of Prisons' Execution Protocol Cases*, 955 F.3d at 112.

cannot override Congress's directive that the United States Marshal shall supervise the implementation of federal death sentences.

In an attempt to overcome that specific delegation in the FDPA, the Final Rule invokes the Attorney General's general authority in 28 U.S.C. §§ 509 and 510 to reassign duties among DOJ components. Final Rule, 85 Fed. Reg. at 75,849; *see* 28 U.S.C. § 509 ("All functions of other officers of the Department of Justice and all functions of agencies and employees of the Department of Justice are vested in the Attorney General . . . ."); *id.* § 510 ("The Attorney General may from time to time make such provisions as he considers appropriate authorizing the performance by any other officer, employee, or agency of the Department of Justice of any function of the Attorney General."). According to DOJ, Congress has granted the Attorney General the general authority to override any specific statutory provisions that specifically delegate certain functions to certain officials.

But that analysis—and the Final Rule—contravene the well-established canon of "statutory construction that the specific governs the general." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992). That canon is "most frequently applied to statutes in which a general permission or prohibition is contradicted by a specific prohibition or permission." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). The "canon has full application as well to statutes . . . in which a general authorization and a more limited, specific authorization exist side-by-side." 566 U.S. at 645. In the latter scenario, the Court has explained, "the canon avoids not contradiction but the superfluity of a specific provision that is swallowed by the general one, 'violat[ing] the cardinal rule that, if possible, effect shall be given to every clause and part of a statute.'" *Id.* (citing *D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932)).

Thus, the "general/specific canon" applies where "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." *Id.*

The general/specific canon applies in this context; indeed, the Supreme Court has previously held that 28 U.S.C. §§ 509 and 510 do not provide the Attorney General with the general authority to override statutory provisions that more specifically direct the Attorney General to delegate certain tasks to certain officials. *United States v. Giordano*, 416 U.S. 505 (1974). In *Giordano*, the Court considered whether the Attorney General could use his general authority under 28 U.S.C. §§ 509 and 510 to override a provision of the 1968 Crime Bill that "conferr[ed] power on the 'Attorney General, or any Assistant Attorney General specifically designated by the Attorney General'" to authorize wiretap applications. *Id.* at 507–08 (citing 18 U.S.C. § 2516(1)). The Attorney General contended that 28 U.S.C. §§ 509 and 510 authorized him to delegate the duty to authorize wiretap applications to other DOJ employees not listed in the Crime Bill (specifically, his Executive Assistant), but the Court rejected that argument. *Id.* at 514. The Court explained that "[d]espite [Section] 510, Congress does not always contemplate that the duties assigned to the Attorney General may be freely delegated." *Id.* Although the Crime Bill did not contain "language forbidding delegation," the Court determined that the statute was properly read to "specifically limit[]" the Attorney General's ability to reassign that function because "the matter of delegation [wa]s expressly addressed" by Congress's specification that particular subordinate officers—Assistant Attorneys General—could authorize wiretap applications. *Id.* Accordingly, the Court applied the "general/specific" canon to hold that the specific limitation imposed by the Crime Bill could not be displaced by the general authorization, provided by 28 U.S.C. §§ 509 and 510, for the Attorney General to delegate duties within DOJ.

So too here, the general authorization provided by 28 U.S.C. §§ 509 and 510 cannot be

read to displace Congress's specification in the FDPA that the United States Marshal must supervise implementation of federal death sentences.  The authority claimed in the Final Rule would render that specific delegation superfluous, as 28 U.S.C. §§ 509 and 510 would "swallow[]" Congress's directive that a *particular* official subordinate to the Attorney General be charged with the weighty responsibility of putting federal prisoners to death.  *RadLAX*, 566 U.S. at 645.  The FDPA addresses a "specific problem"—which federal officials must supervise the implementation of the death penalty—with a "specific solution":  the United States Marshal shall bear that responsibility.  *Id.*  The general delegation authority granted to the Attorney General in 28 U.S.C. §§ 509 and 510 provides no basis to override Congress's specific command in the FDPA.

The authorization granted by the Final Rule would undermine Congress's carefully designed statutory scheme in similar ways to those the Supreme Court found problematic in *Giordano*.  There, the Court noted that the Crime Bill's limitation of delegation to Assistant Attorneys General was meant to "centralize[]" responsibility "in a publicly responsible official subject to the political process."  *Giordano*, 416 U.S. at 520 n.9 (observing that the Attorney General and the nine Assistant Attorneys General are "appointed by the President, by and with the consent of the Senate").  Further, the fact that "[t]he mature judgment of a particular responsible Department of Justice official is interposed as a critical precondition to any judicial order" approving a wiretap application supported the conclusion that Congress had expressly determined which DOJ officers should bear responsibility for that task.  *Id.* at 515–16.  The Court thus concluded that it would be "wholly at odds" with the statutory scheme "to permit the Attorney General to delegate his authority at will" to another DOJ officer or employee not specifically mentioned in the statute.  *Id.* at 523.

Similarly here, Congress chose to centralize the weighty responsibility of supervising executions in a politically accountable component of DOJ, as the United States Marshals—and their Director—are appointed by the President, by and with the consent of the Senate.  28 U.S.C. §§ 561(a) and (c).  The Final Rule would undermine this scheme by authorizing the Attorney General to reassign the supervision of federal executions from the United States Marshals to *any other* DOJ employee—including those with far less accountability, such as the BOP Director and even BOP employees.  *See* 18 U.S.C. § 4041 (BOP Director appointed by the Attorney General and not confirmed by the Senate).  Additionally, carrying out executions falls squarely within the "primary role and mission" of the Marshals Service: to "execute" and "enforce" orders of the federal courts.  *See* 28 U.S.C. § 566(a).  And the Marshals Service is uniquely suited to implement executions because it functions in each district where sentences are imposed.  *See* Frederick S. Calhoun, *The Lawmen: United States Marshals and Their Deputies*, 2–3, 5–6 (1990).  By contrast, BOP's role is to provide for the "safekeeping," "care," "subsistence," and "protection" of prisoners.  *See* 18 U.S.C. § 4042(a).  Congress vested the Marshals Service with the authority to oversee federal executions as part of a carefully crafted scheme, and the authority claimed in the Final Rule would impermissibly—and unlawfully—undermine that scheme.

For all these reasons, Plaintiffs are likely to succeed on their claim that the Final Rule is contrary to law.

### B.    The Final Rule Violates the Separation of Powers

Plaintiffs are additionally likely to succeed on their claim that the Final Rule violates the separation of powers by attempting to remove Article III courts from the process of setting execution dates in implementation of a death sentence.  Under Section 706(a) of the APA, a

reviewing court must set aside any agency action that is "contrary to constitutional right, power, privilege or immunity." 5 U.S.C. § 706(2).

Article III of the Constitution ensures that the Executive Branch cannot remove from the Judiciary certain essential functions that are inherent to the judicial power.  By "vest[ing] the 'judicial Power of the United States in the Federal Judiciary[,]" Article III "establishes the Judiciary's independence by giving the Judiciary distinct and inviolable authority." *Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1330 (2016).  Accordingly, the separation of powers doctrine guards against any attempt to "withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty."  *Stern v. Marshall*, 564 U.S. 462, 484 (2011) (citing *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 284 (1855)).

To properly understand what the "judicial power" entails—and thus what powers cannot be claimed by the other branches under the separation of powers—the Supreme Court has instructed that it is necessary to examine the practices of courts from the Founding Era.  *See Oil States Energy Servs., LLC v. Greene's Energy Group*, 138 S. Ct. 1365, 1376–77 (2018) (examining 18th-century practices to determine whether "history" established that particular issues "must be decided by a court"); *id.* at 1381 (Gorsuch, J., dissenting) (consulting the "historical record," including practices "in England at the time of the founding").  If the "courts at Westminster in 1789" were responsible for adjudicating a certain type of action, Article III courts today likewise must be responsible for adjudicating such an action—and that responsibility includes "resolution of 'the mundane as well as the glamorous, matters of common law and statute as well as constitutional law, issues of fact as well as issues of law.'"  *Stern*, 564 U.S. at 484 (citation omitted).

Additionally, an analysis of the Article III judicial power must consider any longstanding practices that have developed since the Founding Era and whether the Executive and Legislative Branches have acquiesced to those practices.  In the Article II context, for example, the Supreme Court has observed that "a systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned . . . may be treated as gloss on 'executive Power' vested in the President by s 1 of Art. II."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–11 (1952); *see also, e.g.*, Mem. Op. from Caroline D. Krass, Principal Deputy Assistant Att'y Gen., Office of Legal Counsel, to the Att'y General., Authority to Use Military Force in Libya at 7 (Apr. 1, 2011) ("Krass Mem.")[6] (describing Congress's acquiescence to the President's assertion of war powers and writing "[t]his historical practice [relating to war powers] is an important indication of constitutional meaning, because it reflects the two political branches' practical understanding, developed since the founding of the Republic, of their respective roles and responsibilities with respect to national defense").[7]

The relevant historical record here shows that Founding Era courts were responsible for setting execution dates—and today's courts thus must also have that responsibility.  Through the Judiciary Act of 1789, Pub. L. No. 1-20, 1 Stat. 73, and the Crimes Act of 1790, Pub. L. No. 2-9, 1 Stat. 112, the First Congress created federal district courts, directed them to adjudicate federal

---

[6] https://www.justice.gov/sites/default/files/olc/opinions/2011/04/31/authority-military-use-in libya_0.pdf.

[7] The Supreme Court has most frequently considered acquiescence by Congress when determining the scope of executive power under Article II of the Constitution—an inquiry that is necessary because the "text of the Constitution provides relatively little guidance about the scope of presidential authority." *See* Curtis A. Bradley and Trevor W. Morrison, *Historical Gloss and the Separation of Powers*, 126 Harv. L. Rev. 412, 417–18 (2012).  Article III of the Constitution likewise provides relatively little guidance about the scope of judicial authority, and longstanding acquiescence by the Political Branches in power exercised by Article III courts accordingly should equally inform the meaning of judicial power.

crimes, and authorized them to impose the death penalty for certain crimes.  On June 5, 1790, the district court of Maine imposed the first federal death sentence.  *See* Letter from David Sewall, Judge of the U.S. District Court of Maine, to George Washington, President of the United States (June 5, 1790) ("Sewall Letter") (on file at the U.S. National Archives and Record Administration), https://founders.archives.gov/documents/Washington/05-05-02-0299.   David Sewall, the judge who imposed the death sentence, wrote to President Washington to explain that "[a] Writ or Warrant of Execution will Issue from the district court to the Marshall, in Consequence of Which the Sentence will be put in force at the *Time mentioned in the Judgement*, unless the Supreme executive shall deem it expedient to interpose."  *Id.* (emphasis added).  Washington ultimately declined to intervene, and the execution went forward at the time set by the court.

Since that first federal execution carried out on a date set by the Article III court, federal courts have exercised authority to approve proposed execution dates and the Political Branches have repeatedly acquiesced in that understanding and exercise of judicial power.  Indeed, since at least 1830, federal courts have had the sole authority to set execution dates in federal death penalty cases.[8]   In that year, Andrew Jackson, through an opinion issued by his Attorney General, "determined in all cases to leave the execution of the sentence of the law to the discretion of the court."  J.N. Macpherson Berrien, 2 U.S. Op. Atty. Gen. 344, 345 (1830).  More than twenty years

---

[8] In some cases prior to 1830, the President set an execution date for federally death-sentenced prisoners if the Governor in the state of execution possessed the power to set execution dates.  In other cases, consistent with the practice at the time of the Founding, federal courts set the date of execution.  As early as 1818, President Monroe, who was present at the Continental Congress and involved in the ratification of the Constitution, recognized that any authority of the President to set an execution date was derived from the inherent power of the courts under Article III.  1 U.S. Op. Atty. Gen. 228, 228 (1818) (explaining President Monroe's view "that it was the duty of the court which passed the sentence to fix the day for the execution").  And from 1830 on, the "systematic, unbroken" practice was to recognize that federal courts must be involved in setting execution dates for federally death-sentenced prisoners.  *Youngstown*, 343 U.S. at 610.

later, Caleb Cushing, the Attorney General under President Franklin Pierce, issued an opinion that described the necessity of having Article III courts set dates for executions:

> Such is now the established practice.  The court sentences and fixes the day of execution; and unless the President interpose, the Marshal of the United States proceeds to execution in due time.

Caleb Cushing, 7 U.S. Op. Atty. Gen. 561, 563 (1855).  More recently, the Official Historian of the United States Marshals Service wrote a memorandum to the Director stating that "there is no historical example, save perhaps in time of war or national emergency, where the president, acting through the Attorney General or the Bureaus of the Department of Justice, determined the date of an execution and its method independent of any orders of the court or laws of Congress."  Memorandum Opinion from Ted Calhoun, Official Historian, United States Marshals Service, to Henry Hudson, Director of the United States Marshals Service, Historic Procedures for Federal Executions 3 (July 21, 1992).[9]  That memorandum further observed that "since 1830, the trial judge alone has set the date of the execution."  *Id.*

Consistent with this centuries' old practice, when DOJ initially promulgated the manner of execution regulation in 1993, it expressly recognized the role of courts in setting execution dates for federal prisoners.  Section 26.2 of that regulation required "the attorney for the government" to "promptly file with the sentencing court a proposed Judgment and Order" stating the "date" and "place" where the "sentence shall be executed."  28 C.F.R. §§ 26.2(a) and 26.2(a)(3).  DOJ observed that its authority to issue the regulations was derived from "the authority of the federal courts, acting pursuant to the All Writs Act, 28 U.S.C. § 1651(a), to order that their sentences be implemented."  Implementation of Death Sentences in Federal Cases, 58 Fed. Reg. at 4899.  "Thus, § 26.2 direct[ed] the government's attorney in a capital case to file with the court a proposed

---

[9] This United States Marshals Service memorandum was produced in response to a request under the Freedom of Information Act.  It is on file with counsel for Plaintiffs.

Judgment and Order consistent with the regulations[,]" thereby triggering "the duty and authority to comply with such orders pursuant to the statutory instruction to the United States Marshals Service to 'obey, execute, and enforce all orders of United States District Courts,' 28 U.S.C. 566(a)." *Id.* DOJ further observed that "[t]he authority and duty of the Marshals Service to execute court orders includes the authority to specify procedures for execution *consistent with the court order*." *Id.* (emphasis added). DOJ reiterated that "far from contemplating the unilateral exercise of executive authority" in fixing execution dates, "the proposed rule directs government attorneys to seek a *court order*" that approves the proposed date of the execution. *Id.* at 4900 (emphasis added).

The Final Rule—which purports to eliminate judicial power over setting execution dates— marks an abrupt and illegal reversal from the Nation's practice since its first federal execution, from nearly 200 years of judicial authority, and from DOJ's own prior regulation. Now, the Final Rule purports to vest exclusive authority to set execution dates in the BOP. That attempt to cut Article III courts out of the process of reviewing and approving the date when a federal prisoner will be put to death violates the separation of powers. Until publication of the Final Rule, the setting of dates for executions had been recognized as a "systematic, unbroken" judicial practice, "long pursued to the knowledge of" the Executive Branch "and never before questioned." *Youngstown*, 343 U.S. at 610. That the Executive had not just acquiesced to but had also repeatedly and expressly acknowledged the Judiciary's authority to set execution dates "reflects the two . . . branches' practical understanding, developed since the founding of the Republic, of their respective roles and responsibilities." Krass Mem. at 7. The Executive cannot now simply decide to exclude Article III courts and claim that authority for itself.

Like the other structural principles that the Supreme Court has enforced under the

separation of powers, the setting of execution dates by courts is necessary to protect individual liberty. That principle is well illustrated by the case of David Chandler, a former death row inmate whose death sentence was ultimately commuted after BOP impermissibly sought to execute him before he had the chance to pursue post-conviction review. After Mr. Chandler's direct appeal concluded, but before he had any opportunity to initiate federal habeas proceedings, BOP attempted to unilaterally set an execution date for Mr. Chandler and informed him of the date without notifying the court. *United States v. Chandler*, 950 F. Supp. 1522, 1527 (N.D. Ala. 1996). Chandler objected to this procedure and sought a stay, Motion, *United States v. Chandler*, No. 90-cr-00266 ("Chandler"), (N.D. Ala. Feb. 17, 1995), ECF No. 319, which prompted BOP to submit the proposed execution date for the court's approval consistent with Section 26.2, Order, *Chandler*, (Feb. 21, 1995), ECF No. 320. The District Court rejected the government's proposed order—thus exercising critical oversight—and stayed the execution to allow Mr. Chandler to pursue federal habeas relief. Order, Chandler, (Mar. 21, 1995), ECF No. 322. Although Mr. Chandler ultimately did not prevail in post-conviction review proceedings, the en banc Eleventh Circuit acknowledged that the "evidence of guilt was not overwhelming," *Chandler v. United States*, 218 F.3d 1305, 1320 (11th Cir. 2000), five judges wrote individual dissenting opinions, and President Clinton ultimately commuted Mr. Chandler's sentence.[10] Mr. Chandler's case is a perfect example of the idea that the "structural principles secured by the separation of powers protect the individual as well." *Bond v. United States*, 564 U.S. 211, 222 (2011). Protecting the judicial power of courts to set execution dates ensures that the Executive Branch cannot unilaterally determine the date when a court's sentence will be carried out and execute individuals before they have the

---

[10] Garry Mitchell, *Clinton Commutes Execution Sentence*, Washington Post (Jan. 20, 2001), https://www.washingtonpost.com/wpsrv/aponline/20010120/aponline184839_000.htm.

opportunity to exhaust judicial remedies.[11]

The Supreme Court's decision in *Holden v. Minnesota*, 137 U.S. 483 (1890), does not compel a different result.  DOJ did not cite *Holden* as a basis for the Final Rule, but has of late cited this inapposite case in resisting court oversight in the setting of execution dates (even prior to the Final Rule).  *Holden* involved a Minnesota law that gave the governor responsibility for issuing a warrant for a state prisoner stating the time and manner of death, which the Court permitted, noting that the "sentence of death" at common law generally did not include the date of execution.  *Id.* at 495-96.  But *Holden* did not address the practice of common law courts to subsequently issue a writ setting a date to enforce their judgments—as occurred with the first federal execution.  Indeed, *Holden* considered only the practice of state courts and had no opportunity to consider the nature of the Article III judicial power, which the Supreme Court has recognized differed from the practices of common law state courts, which were manipulated by state legislatures for political ends.  *See Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 219 (1995) ("The Framers of our Constitution lived among the ruins of a system of intermingled legislative and judicial powers.").  *Holden*'s analysis of state court practice and authority accordingly carries no weight in assessing whether federal courts must be involved in setting execution dates.

---

[11] The case of Gary Sampson provides another example where a District Court exercising authority over the implementation of a death sentence rejected parts of a proposed Judgment and Order the federal government had submitted.  *United States v. Sampson*, 300 F. Supp. 2d 278, 282 (D. Mass 2004).  The government requested that the execution be carried out in Indiana at USP-Terre Haute, but the District Court instead specified in the Judgment and Order that the execution must occur in New Hampshire.  The Court observed that it was "clear" it had "the authority to designate the state in which Sampson w[ould] be executed" and emphasized that the court's review ensured that "more than convenience to the government" would be taken into account in implementing a sentence of death.  *Id.* at 280, 282.  As the Court explained, "the execution of a human being by the state is perhaps the most solemn and significant act a government can perform," *id.* at 280, and "the law[] recogni[zes] . . . the importance of giving priority to fairness, rather than convenience or efficiency, in federal capital cases."  *Id.* at 283.  The court's exercise of its Article III authority to dictate essential terms concerning the implementation of the death sentence thus represented an important check on the federal government's authority.

Engaging with none of the constitutional and historical context establishing the federal judiciary's role in setting federal execution dates, the Final Rule simply asserts that it is "incorrect as a matter of law" to observe that "BOP's authority to set an execution date derives solely from the courts."  85 Fed. Reg. at 75,850.  But in the two cases the Final Rule cites, the courts had approved proposed execution dates and thus had not been cut out of that process as the Final Rule now contemplates in repealing Section 26.2.  Indeed, in *LeCroy v. United States*, 975 F.3d 1192 (11th Cir. 2020), the court recognized that "courts historically played some concurrent role in— had some shared responsibility for—setting execution dates in the first instance." *Id.* at 1196.  And in setting Mr. LeCroy's date, BOP had recognized that it was doing so pursuant to authority that had been delegated by the Article III sentencing court.  *LeCroy*, 2:02-cr-00038-RWS-JCF, Dkt. 591 (notifying the court that BOP had scheduled the execution "in accordance with 28 C.F.R. Part 26").  The Eleventh Circuit did not consider any issue about the initial setting of the execution date, but rather considered only whether that date, once set, could be *postponed* without satisfying the traditional stay factors.  *LeCroy*, 975 F.3d at 1196 (holding that Mr. LeCroy had not shown that a stay was justified).  *LeCroy* thus does not support the notion that DOJ has unilateral authority to set an execution date in the first instance.

In *United States v. Lee*, 2020 WL 3921174 (E.D. Ark. July 10, 2020), the district court considered the argument that BOP had lacked authority to set an execution date and resolved the issue by entering an order that "track[ed] the language in 28 C.F.R. § 26.2" and approved the proposed execution date, thus "confirm[ing]" DOJ's authority "to implement Mr. Lee's death sentence on [that date]."  *Id.* at *5.  Although the court expressed some skepticism about whether the authority to set execution dates is exclusively judicial, *id.* at *3–4, the court's entry of the order setting Mr. Lee's execution date ensured that the execution did not proceed without the

involvement of an Article III court in setting that date—in sharp contrast to the procedure the Final Rule now contemplates in repealing Section 26.2.  In short, neither *LeCroy* nor *Lee* can justify DOJ's claimed authority in the Final Rule to cut courts out of the execution date-setting process altogether.

Nor can DOJ avoid the separation-of-powers violation arising from the repeal of Section 26.2 by relying on its assertion that courts retain the "power to set aside or postpone execution dates pursuant to their authority to issue stays and injunctions." Final Rule, 85 Fed. Reg. at 75,850. There is of course no dispute that DOJ "must [recognize] a court's authority to stay or enjoin a scheduled execution." *LeCroy*, 975 F.3d at 1196.  But the existence of separate judicial authority to issue stays and injunctions *after* an execution date is set does not substitute for the role courts must play in the process of setting that date in the first place.  By stripping courts of their automatic oversight in setting execution dates, the Final Rule encroaches on their Article III authority in that particular respect—and that separation-of-powers violation cannot be eliminated by pointing to the ability of courts to exercise judicial power in *other* respects.

Finally, DOJ cannot defend the Final Rule on grounds that "nothing would compel the court to use the precise 'magic words' contained in § 26.2" to validate a proposed execution date. 85 Fed. Reg. at 75,850.  In repealing Section 26.2 and conferring unilateral authority on BOP to set execution dates, the Final Rule does not just dispense with a "magic words" requirement but rather dispenses with *any* requirement to involve courts in the process of setting execution dates. That effort to strip courts of an essential judicial power violates the separation of powers, further demonstrating that Plaintiffs are likely to succeed on their claim that the Final Rule is invalid.

## V.   The Other Preliminary Injunction and Section 705 Factors Weigh in Favor of Relief

### A.   The Final Rule Inflicts Irreparable Harm on Plaintiffs

A preliminary injunction and stay under Section 705 of the APA is warranted because the

Final Rule threatens Plaintiffs with harm that is "great," "imminent," and "beyond remediation." *League of Women Voters*, 838 F.3d at 7–8 (citation omitted).   The Final Rule addresses the implementation of death sentences—an area where the potential for irreparable harm is obvious. *See, e.g.*, *Wainwright v. Booker*, 473 U.S. 935, 935 n.1. (1985) (Powell, J., concurring) (observing that risk of irreparable harm was "necessarily present" in capital case); *Duvall v. Keating*, 162 F.3d 1058, 1062 (10th Cir. 1998) (granting immediate review of denial of temporary restraining order to death row inmate because his impending execution guaranteed he would "suffer irreparable harm absent immediate review").   Notably, DOJ has scheduled multiple additional executions in the next month, including the execution of Plaintiff Dustin Higgs.   These executions—and any additional executions scheduled in the near future—will be carried out under the invalid Final Rule unless the Final Rule is enjoined by this Court, creating the imminent risk of irreparable harm.

Of particular concern, the Attorney General has claimed authority under the Final Rule to "vary" from the regulations and to reallocate responsibility for supervising implementation of death sentences in his sole discretion and with no requirement to provide advance notice of any changes.   The repeal of Section 26.2 also threatens the imminent risk that execution dates could be set unilaterally by BOP in violation of Article III.   The uncertainty surrounding when and how the Attorney General may impermissibly depart from binding law presents the risk that Plaintiffs will be prevented from raising challenges or having any opportunity to vindicate their rights.   In this critical respect, the Final Rule interferes with Plaintiff Federal Capital Habeas Project's ability to represent its clients and threatens to strip the individual Plaintiffs of any chance to mount legal defenses without knowing what rules the Attorney General will choose to apply to their executions. "[T]he very uncertainty" itself "exposes [Plaintiffs] to the likelihood of irreparable harm." *Thrivent Fin. for Lutherans v. Acosta*, No.16-cv-03289, 2017 WL 5135552, at *8 (D. Minn. Nov.

3, 2017).

With respect to the sweeping authority to "vary" from the binding regulations, it is difficult to know in advance which "applicable law" the Attorney General might use as a basis for a variance, but it is not difficult to identify scenarios in which last-minute variations would cause immense harm. Even where the federal regulations and state law appear to be similar, textual ambiguities and unpublished state protocols raise the substantial risk that the Attorney General could vary from the federal regulations just before an execution is carried out. And the Final Rule commits that variance to the Attorney General's unreviewable discretion.

A state execution carried out in 2019 in Alabama illustrates this harm. In executing Domineque Ray, a Muslim man, the Alabama Department of Corrections ("ADOC") relied on an unpublished state protocol to prevent Mr. Ray from having an imam with him in the execution chamber. *Ray v. Commissioner, Alabama Department of Corrections*, 915 F.3d 689, 693 (11th Cir. 2019). Two weeks before the date of his execution, Mr. Ray was informed that a Protestant chaplain employed by ADOC rather than his imam would kneel at his side while he was put to death, and he was denied access to the "prison's policy that dictated these arrangements." *Id.* Five days later, Mr. Ray filed a complaint in federal court challenging the unpublished ADOC policy as a violation of the First Amendment's Establishment Clause. *Id.* Although the Eleventh Circuit stayed the execution, concluding that Ray was likely to succeed on his First Amendment claim, *id.* at 695, the Supreme Court vacated the stay in a two-sentence opinion:

> On November 6, 2018, the State scheduled Domineque Ray's execution date for February 7, 2019. Because Ray waited until January 28, 2019 to seek relief, we grant the State's application to vacate the stay entered by the United States Court of Appeals for the Eleventh Circuit.

*Dunn v. Ray*, 139 S. Ct. 661 (Mem) (2019). Ray was executed the same night, with his imam

watching "from the next room, behind glass."[12]

Under the Final Rule, a federal death row inmate whose sentence is governed by Alabama law—or any similar law—would face an irreparable First Amendment injury if the Attorney General invoked the authority to "vary" from the regulations to deny him access to his spiritual advisor in the execution chamber, as occurred in Mr. Ray's case.  *See Karem v. Trump*, 960 F.3d 656, 667 (D.C. Cir. 2020) ("'[A] prospective violation of a constitutional right constitutes irreparable injury for . . . purposes' of 'seeking equitable relief.'") (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)).  The federal regulations guarantee an individual the right to have his spiritual adviser present at the execution, providing a list of persons, including "[o]ne spiritual adviser," who "*shall* be present at the execution."  28 C.F.R. § 26.4(c)(3)(i) (emphasis added).  Alabama, by contrast, specifies only that a spiritual advisor "*may* be present at an execution," 15 Ala. Code § 15-18-83 (emphasis added), and the unpublished ADOC policy prevented an imam from being present in Mr. Ray's case.  Under the Final Rule, the Attorney General could follow "applicable law" such as the unpublished ADOC policy in contravention of the federal regulations—and such a variance could occur without notice right before an execution.

Such last-minute variations from the federal regulations threaten substantial harm.  Because the Final Rule places no time limits on the Attorney General's decision to vary from the federal regulations, and does not specify any procedures that the Attorney General must follow, the Attorney General could decide to make any number of changes in how an individual is executed minutes before the execution occurs and with no explanation for why the changes are warranted.  And because the Final Rule does not define or limit the "applicable law" that could justify such a

---

[12] Matthew S. Schwartz, *Justices Let Alabama Execute Death Row Inmate Who Wanted Imam By His Side*, NPR (Feb. 8, 2019), https://www.npr.org/2019/02/08/692605056/supreme-court-lets-alabama-execute-muslim-murderer-without-imam-by-his-side.

variance, the Attorney General could rely on unpublished protocols or ambiguous laws to depart from the binding regulations, no matter whether the protocols would be considered the "law of the state" under the FDPA or whether the Attorney General's interpretation of an ambiguity is reasonable.  In short, the Final Rule allows the Attorney General to upend an individual's reliance on the federal regulations with no notice and on the basis of potentially unlawful state practices.

This harm is irreparable.  Indeed, Mr. Ray's case again illustrates the point.  Mr. Ray did not find out about the ADOC protocol that prevented him from having his imam present in the execution chamber until two weeks before his scheduled execution, and later reporting confirmed that ADOC's protocols are not published anywhere.[13]  Accordingly, there was no way for Mr. Ray to know ahead of time that this protocol would apply for purposes of trying to protect his rights. *See Dunn v. Ray*, 139 S. Ct. at 662 (Kagan, J., dissenting) ("The State contends that Ray should have known to bring his claim earlier, when his execution date was set on November 6.  But the relevant statute would not have placed Ray on notice that the prison would deny his request."). Nevertheless, the Supreme Court held that Mr. Ray brought his challenge to the protocol *too late*. *Id.* at 661.  Accordingly, individuals like Plaintiff Dustin Higgs cannot wait for the Attorney General to decide, potentially hours or minutes before their execution, that a certain state protocol is applicable law.  Assuming it were even possible to raise a challenge at that time, the challenge could be deemed to come too late.  The inability to seek *ex post* legal relief for a harm is the definition of irreparable.

Plaintiff Federal Capital Habeas Project faces additional imminent and irreparable harm. The Final Rule will "impair" Federal Capital Habeas Project's functions and "directly conflict with

---

[13] Nina Totenberg, *Supreme Courts Sees 2 Similar Death Penalty Questions Very Differently*, NPR (Mar. 30, 2019), https://www.npr.org/2019/03/30/708238203/supreme-court-sees-2-similar-death-penalty-questions-very-differently

[its] mission" by making it harder for the Project to provide services that are vital to its organizational purposes. *Open Communities All. v. Carson*, 286 F. Supp. 3d 148, 178 (D.D.C. 2017) (quoting *League of Women Voters*, 838 F.3d at 8). (*See* Friedman Decl.) If the Final Rule takes effect, it will impede the ability of the Project to monitor pending death penalty litigation and will force it to divert resources away from other efforts.

Finally, it bears emphasis that Plaintiffs' pre-enforcement challenge is ripe for review for many of the same reasons that irreparable harm exists. "Determining whether administrative action is ripe for judicial review" requires the evaluation of two factors: "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). "The 'fitness' prong of the analysis generally addresses 'whether the issue is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." *Teva Pharms. USA, Inc. v. Sebelius*, 595 F.3d 1303, 1308 (D.C. Cir. 2010) (citing *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 440 F.3d 459, 463 (D.C. Cir. 2006)). There is no question that the Final Rule is sufficiently final. And the "substantive issues [Plaintiffs] raise[] are undoubtedly 'purely legal'" and thus fit for judicial review now. *Id.* at 1308–09. In addition, the hardship of withholding review would be immense. Because the Final Rule provides no constraints on the timing of the Attorney General's decision to vary from the federal regulations or reassign the responsibility for supervising implementation of a death sentence to an employee other than the United States Marshal, such a decision could come within hours or minutes of an execution, leaving Plaintiffs no time to file a challenge at that time. Withholding review would allow the Attorney General to carry out the execution before his unlawful actions could be challenged—with the execution itself mooting further review of the issue. There is no greater

possible hardship, and review of the unlawful Final Rule at this time thus is appropriate.

**B.    The Balance of Equities and Public Interest Weighs in Favor of Relief**

In weighing the equities to determine whether a preliminary injunction is warranted, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted).  Here, Plaintiffs' harms are significant and weigh heavily in favor of injunctive relief to ensure that Plaintiffs' executions do not proceed under unlawful regulations before Plaintiffs have the opportunity to litigate their challenge to those regulations.  On the other side of the balance, a preliminary injunction would not harm Defendants.  Instead, an injunction would merely maintain the status quo by leaving in place the prior regulations governing the manner of federal executions while Plaintiffs pursue their claims.

Moreover, the public interest would be served by granting preliminary relief to enforce DOJ's compliance with the APA, the FDPA, and the Constitution, and to prevent the unlawful regulations from taking effect.  "Forcing federal agencies to comply with the law is undoubtedly in the public interest." *Cent. United Life, Inc. v. Burwell*, 128 F. Supp. 3d 321, 330 (D.D.C. 2015), *aff'd*, 827 F.3d 70 (D.C. Cir. 2016); *see also, e.g.*, *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (similar).  And "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters*, 838 F.3d at 12.  Particularly where, as here, the regulations violate the separation of powers, "it is in the public interest to uphold a constitutionally guaranteed right." *Playboy Enters., Inc. v. Meese*, 639 F. Supp. 581, 587 (D.D.C. 1986).

The public interest factor carries particular weight in this unique context, given that this is the first time in over a century that individuals have been executed during a presidential transition period and that DOJ rushed to publish the unlawful Final Rule during the transition period and

-37-

notwithstanding the incoming administration's support for abolition of the death penalty.  Since 1889, every outgoing presidential administration has halted federal executions during the transition period.  Here, in contrast, DOJ is rushing to execute as many individuals as possible—and has now claimed impermissible authority in the Final Rule to literally rewrite the rules governing those executions.  The public interest weighs against permitting the Final Rule to take effect in the midst of this unprecedented and alarming wave of federal executions.

## VI.   The Court Should Enjoin Implementation of or Stay the Final Rule to Postpone It from Taking Effect

Because all factors weigh in favor of preliminary relief, this Court should postpone the effective date of the Rule and stay or enjoin implementation or enforcement of the Rule.  The APA authorizes courts to "postpone the effective date of an agency action" to prevent a new rule from taking effect while judicial review is pending.  5 U.S.C. § 705; *see, e.g.*, *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 48 (D.D.C. 2020).  Section 705 also authorizes this Court to grant other relief, including the requested stay, "to preserve status or rights pending conclusion of the review proceedings."  5 U.S.C. § 705.  Here, a preliminary injunction, postponement of the effective date, or stay of the Final Rule is warranted and necessary to provide complete relief to Plaintiffs.

## VII.    Conclusion

For the foregoing reasons, Plaintiffs respectfully request that the requested relief be granted.

Dated:  December 18 2020

By: */s/ Elizabeth Prelogar*
Elizabeth Prelogar (DC Bar No. 1011890)
Elias S. Kim (*pro hac vice* motion forthcoming)
COOLEY LLP
1299 Pennsylvania Ave., NW, Suite 700
Washington, DC  20004-2400
Telephone: (202) 842-7800
Facsimile: (202) 842-7899
eprelogar@cooley.com
ekim@cooley.com

Elizabeth Wright (*pro hac vice* motion forthcoming)
Jennifer Elkin (*pro hac vice* motion forthcoming)
COOLEY LLP
550 Boylston street
Boston, MA  02116-3736
Telephone: (617) 937-2300
Facsimile: (617) 937-2400
ewright@cooley.com
jelkin@cooley.com

Colin Scott (*pro hac vice* motion forthcoming)
COOLEY LLP
101 California Street, 5th Floor
San Francisco, CA  94111-5800
Telephone: (415) 693-2000
Facsimile: (415) 693-2222
cscott@cooley.com

*Counsel for Plaintiff Federal Capital Habeas Project*

David Autry (*pro hac vice* motion
forthcoming)
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone: (405) 521-9600
Facsimile: (405) 521-9669
dbautry77@gmail.com

*Counsel for Plaintiff Kenneth Eugene Barrett*

Matthew Lawry (*pro hac vice* motion
forthcoming)
FEDERAL COMMUNITY DEFENDER
OFFICE, E.D. PENNSYLVANIA
601 Walnut St Ste 545 W
Philadelphia, PA 19106
Telephone: (215) 928-0520
Matthew_Lawry@fd.org

*Counsel for Plaintiff Dustin John Higgs*

Scott W. Braden (DC Bar No. 2007123)
FEDERAL PUBLIC DEFENDER,
E.D. ARKANSAS
1401 West Capitol Street
Little Rock, AR 72201
Tel: (501) 324-6114
scott_braden@fd.com

*Counsel for Plaintiff Norris Holder*

Alexis Hoag (*pro hac vice* motion
forthcoming)
ERIC HOLDER INITIATIVE FOR CIVIL &
POLITICAL RIGHTS
Columbia University
1130 Amsterdam Ave
202 Hamilton Hall
New York, NY 10027
Tel: (203) 645-4918
ajh2233@columbia.edu

*Counsel for Plaintiff Rejon Taylor*