# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

FEDERAL CAPITAL HABEAS
PROJECT; KENNETH BARRETT;
DUSTIN HIGGS; NORRIS HOLDER; and
REJON TAYLOR

                           Plaintiffs,

v.

JEFFREY A. ROSEN, in his official
capacity as Acting Attorney General of the
United States[1]; and MICHAEL CARVAJAL,
in his official capacity as the Director of the
Federal Bureau of Prisons

                        Defendants.

</td><td>

Case No. 1:20-cv-3742 (RC)

</td></tr>
</table>

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Jeffrey A. Rosen is substituted for his predecessor, William P. Barr.

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ............................................................................................... 4

    I.     STATUTORY AND REGULATORY BACKGROUND ...................................... 4

    II.    PROCEDURAL HISTORY ................................................................. 9

STANDARD OF REVIEW ................................................................................ 10

ARGUMENT ................................................................................................... 11

    I.     PLAINTIFFS ARE UNLIKELY TO SUCCEED IN SHOWING THAT
          THE FINAL RULE VIOLATES THE APA, THE FDPA, OR THE
          CONSTITUTION. ............................................................................. 11

          A.    Plaintiffs Are Unlikely to Succeed in Showing That Section 26.1(b)
               Violates the APA. ................................................................. 11

          B.    Plaintiffs are Unlikely to Succeed in Showing That Section 26.1(c)
               Violates the APA or the FDPA. ............................................. 20

          C     Plaintiffs Are Unlikely to Succeed in Showing That The Removal of
               Section 26.2 Violates the Separation of Powers ....................... 25

    II.    PLAINTIFFS FAIL TO SHOW IRREPARABLE HARM. ................................ 31

    III.   THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST
          WEIGH AGAINST A PRELIMINARY INJUNCTION ..................................... 36

CONCLUSION ................................................................................................ 37

## TABLE OF AUTHORITIES

**Constitutional Provisions**

U.S. Const. art. II ................................................................................................................ 31

**Statutes**

5 U.S.C. § 553 .................................................................................................. 2, 16, 18, 21

18 U.S.C. § 1396 ................................................................................................................ 7

18 U.S.C. § 3596 ....................................................................................................... *passim*

18 U.S.C. § 3597 .............................................................................................................. 22

18 U.S.C. § 4041 .............................................................................................................. 22

18 U.S.C. § 4042 .............................................................................................................. 22

21 U.S.C. § 848 ............................................................................................................. 5, 6

28 U.S.C. § 509 ................................................................................................. 3, 7, 22, 23

28 U.S.C. § 510 ................................................................................................. 3, 7, 22, 23

28 U.S.C. § 561 .......................................................................................................... 22, 24

An Act To Establish the Department of Justice, ch. 150, § 14, 16 Stat. 162 (1870) ................... 22

Act of Apr. 30, 1790, 1 Stat. 112 ...................................................................................... 4

Act of June 19, 1937, 50 Stat. 304 .................................................................................... 5

Act of Sept. 6, 1966, Pub. L. No. 89-554, 80 Stat. 378 .................................................. 22

Ala. Code § 15-18-83 ....................................................................................................... 34

Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, 102 Stat. 4181 ..................... 5, 23

FDPA, Pub. L. No. 103-322, 108 Stat. 1796 (1994) ........................................................ 5

**Regulations**

28 C.F.R. Part 26 ..................................................................................................... 1, 6, 9, 13

28 C.F.R. Part 26 (effective through Dec. 27, 2020) ........................................................................ 5

28 C.F.R. § 26.1 ...................................................................................................................... *passim*

28 C.F.R. § 26.2 ...................................................................................................................... *passim*

28 C.F.R. § 26.2 (effective through Dec. 27, 2020) ........................................................................ 8

28 C.F.R. § 26.3 ...................................................................................................................... *passim*

28 C.F.R. § 26.3 (effective through Dec. 27, 2020) ................................................................... 5, 6

28 C.F.R. § 26.4 ................................................................................................................... 16, 33

57 Fed. Reg. 56,536-01 (Nov. 30, 1992) ....................................................................................... 5

58 Fed. Reg. 4898 (Jan. 19, 1993) .......................................................................... 5, 27, 28, 30

85 Fed. Reg. 47,324 (Aug. 5, 2020) .............................................................................................. 6

85 Fed. Reg. 75,846 (Nov. 27, 2020) ................................................................................. *passim*

**Other Authorities**

7 Op. Att'y Gen. 561 (1855) ....................................................................................................... 30

## **INTRODUCTION**

Plaintiffs—an advocacy organization and four federal inmates who were each sentenced to death for federal crimes—seek preliminary injunctive relief to postpone the effective date of three recent amendments to Department of Justice (the "Department" or "DOJ") regulations governing the implementation of federal executions. *See* Manner of Federal Executions, 85 Fed. Reg. 75,846 (Nov. 27, 2020) (codified at 28 C.F.R. Part 26) ("Final Rule"). Those amendments clarify the Department's duties pursuant to the Federal Death Penalty Act ("FDPA"), which provides that executions be implemented "in the manner prescribed by the law of the State in which the sentence is imposed," 18 U.S.C. § 3596(a), and also eliminate redundancies and inconsistencies.

Plaintiffs fail to justify the need for emergency relief. To begin, Plaintiffs are unlikely to succeed on merits of their claims, which are, at best, strained procedural objections.

First, they argue that the new provision, 28 C.F.R. § 26.1(b), violates the APA by allegedly evading the requirement for notice-and-comment. Section 26.1(b) provides that the Attorney General may vary from the Department's regulations governing implementation of federal executions when doing so would be necessary to comply with the FDPA. Plaintiffs contend that the Attorney General should be required to engage in notice-and-comment rulemaking each time the Department complies with controlling State law as required by the FDPA. This claim is unlikely to succeed for several reasons, beginning with its lack of ripeness. Plaintiffs do not allege that the Attorney General has, in fact, varied from the Department's regulations, or that any such variance is likely to occur. Nor could they, given the considerable speculation necessary to predict the narrow circumstances in which the federal regulations—which separately provide that the method of execution must be as provided by applicable State law—may actually conflict with such State law with respect to ancillary issues. Nor can Plaintiffs show that, if those narrow circumstances were to arise with respect to one of the Plaintiff-inmates' executions (which, except for Higgs, have not even been scheduled), they would not have sufficient opportunity to raise a challenge in the concrete circumstances of that variance.

Plaintiffs' Section 26.1(b) claim is also unlikely to succeed because it vastly misconstrues the nature and function of that provision.  Section 26.1(b) is not legislative as Plaintiffs suggest; it does not create any substantive law or norms but rather merely accounts for the fact that the Attorney General must be able to comply with Congress's directive in the FDPA.  Section 26.1(b) is, at most, procedural in nature, because it sets forth only how the Department will meet its own legal duties in carrying out executions—that is, by applying State law where the FDPA requires it. *Cf. Execution Protocol Cases*, 955 F.3d 106, 125 (D.C. Cir. 2020) (Katsas, J., concurring) ("The critical feature of a procedural rule is that it covers agency actions that do not themselves alter the rights and interests of parties.") (quoting *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. 2014)); *see also* 5 U.S.C. § 553(b)(3)(A) (excepting from notice and comment requirements "rules of agency organization, procedure, or practice").  Were it otherwise, the federal government would face the nearly impossible situation of having to either (1) promulgate a regulation that analyzes the restrictions imposed by the laws of all twenty-eight States that authorize the death penalty, create express exceptions from the regulation as needed, and then modify the regulation through further notice-and-comment whenever State law changes; or (2) remain unable to carry out federal executions whenever it did not anticipate a controlling State-law requirement.  That outcome is neither what the APA requires nor consistent with any reasonable interpretation of the FPDA.

Second, Plaintiffs similarly are unlikely to succeed on their APA and FDPA claims challenging Section 26.1(c), which allows the Attorney General to delegate any task or duty assigned related to the implementation of federal executions to any officer or employee of the Department.  Like the challenge to Section 26.1(b), this claim is unripe, as the Attorney General has not made any delegations pursuant to Section 26.1(c), and Plaintiffs offer nothing to suggest that a delegation of the U.S. Marshals' supervisory role over the implementation of death sentences will be made in the foreseeable future.  Furthermore, even if Plaintiffs' claim were currently justiciable, it would still be unlikely to succeed because Congress has expressly authorized the Attorney General to delegate functions within the Department, and such delegations are in fact

routinely made without notice-and-comment rulemaking.  *See* 28 U.S.C. §§ 509, 510.  The FDPA, which Plaintiffs say provides non-delegable authority to the United States Marshals Service to implement federal death sentences, was adopted against that background law and does not otherwise displace that law.  *See Execution Protocol Cases*, 955 F.3d at 125 (Katsas, J., concurring) (discussing 28 U.S.C. §§ 509 & 510 and concluding that "[t]ogether, these provisions permit the Attorney General to reassign duties from the Marshals Service to the Bureau of Prisons").

Third, Plaintiffs are unlikely to prevail on their claim that the removal of Section 26.2—which placed only a procedural requirement on government attorneys to submit a proposed Judgment and Order to the sentencing court—somehow violates constitutional separation of powers principles.  Plaintiffs lack standing to assert that claim in the first place.  The removal of Section 26.2 does not harm Plaintiffs in any way.  As relevant here, Section 26.2 merely required the government to propose to the sentencing court that the execution be scheduled by the Bureau of Prisons, as the regulations already require (unless a court orders otherwise), *see, e.g.*, 28 C.F.R. § 26.3 ("except to the extent a court orders otherwise . . . a sentence of death shall be executed . . . [o]n a date and at a time designated by the Director of the Federal Bureau of Prisons"), and thus eliminating that proposal would neither alter courts' authority nor affect Plaintiffs at all.  Nor would an injunction redress any conceivable injury, because, even if Section 26.2 were to be put back in place, the Bureau of Prisons would still have authority to schedule executions—as it has done for sixteen federal condemned inmates since 2001 under Section 26.2.  Plaintiffs' Section 26.2 claim is also unripe, since Higgs's execution was scheduled under the prior version of that regulation (which Plaintiffs conceded should remain in effect during an injunction), and it is unclear whether or when the Bureau of Prisons will schedule execution dates for any of the other Plaintiff-inmates. Even if Plaintiffs could get past those hurdles to justiciability, their claim also fails on the merits, because nothing in the Final Rule affects the power of the Judiciary whatsoever.

Merits aside, an injunction would be inappropriate because Plaintiffs fail to establish irreparable harm.  Plaintiffs speculate that they will be harmed if the Attorney General is permitted to vary from Department regulations under Section 26.1(b).  Yet, for the same reasons Plaintiffs'

challenge to that provision is not ripe and lacks merit, there is, *a fortiori*, no certain and great harm that could support the extraordinary remedy of a preliminary injunction.  There also could be no possible harm to Plaintiffs from the Attorney General's delegation of responsibilities within the Department pursuant to Section 26.1(c).  Nor could Plaintiffs be harmed by the elimination of Section 26.2's ministerial requirement that prosecutors submit proposed Judgments and Orders to the sentencing court that have no meaningful effect.

On the other side of the equitable balance, the Executive Branch has a strong interest in ensuring the efficient implementation of capital sentences. The injunction that Plaintiffs seek would only cause confusion regarding the Department's compliance with the FDPA and its ability to delegate duties internally, and would require government attorneys to continue to file a redundant (and practically meaningless) proposed Judgment and Order with sentencing courts in capital cases.

Finally, Plaintiffs' request for a preliminary injunction is particularly improper given that all currently scheduled executions, including Higgs's, were scheduled prior to the effective date of the Final Rule, and it is entirely speculative when any other executions will be scheduled.  Higgs, moreover, provides no basis to believe that any of the challenged provisions will be implicated in his upcoming execution, given that there is no conflict between the Department's regulations and the laws of any of the States under which Higgs's sentence could be carried out.  There is, in short, no emergency, and the Court should address Plaintiffs' claims in the ordinary course on motions for summary judgment.

Defendants respectfully ask that the Court deny Plaintiffs' motion.

## BACKGROUND

### I.    STATUTORY AND REGULATORY BACKGROUND

Federal law has authorized capital punishment since 1790.  *See* Act of Apr. 30, 1790, ch. 9, §§ 1, 3, 33, 1 Stat. 112, 112, 113, 119.  For the next 147 years, federal law prescribed "hanging . . . by the neck until dead" as the method of execution. Act of Apr. 30, 1790, § 33, 1 Stat. at 119. In 1937, Congress mandated that each federal execution be carried out "in the manner prescribed

by the laws" "of the State within which the sentence was imposed." Act of June 19, 1937, ch. 367, 50 Stat. 304, 304 ("1937 Act"). Following the Supreme Court's decisions in *Furman v. Georgia*, 408 U.S. 238 (1972), and *Gregg v. Georgia*, 428 U.S. 153 (1976), placing procedural limits on the imposition of capital sentences, Congress repealed the 1937 Act and in 1988 reinstated the federal death penalty for certain federal crimes, *see* Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, 102 Stat. 4181; *id.* § 7001(a) (codified at 21 U.S.C. § 848(e)).

In 1993, because no federal statute authorized the manner of execution for federal capital sentences, and because the need for procedures implementing federal death sentences had "become imperative with the growing number of cases under 21 U.S.C. 848," Proposed Rule, Implementation of Death Sentences in Federal Cases, 57 Fed. Reg. 56,536-01 (Nov. 30, 1992), the Department issued regulations providing for lethal injection as the method of execution for federal capital crimes "except to the extent a court orders otherwise," 28 C.F.R. § 26.3, and governing various tasks related to scheduling and carrying out the federal death sentences, 58 Fed. Reg. 4898 (Jan. 19, 1993); 28 C.F.R. Part 26 (effective through Dec. 27, 2020). Among other things, the regulations provided that, except as otherwise ordered by a court, a federal sentence of death shall be executed "[o]n a date and at a time designated by the Director of the Federal Bureau of Prisons," "[a]t a federal penal or correctional institution designated by the Director of the Federal Bureau of Prisons," and "[b]y a United States Marshal designated by the Director of the United States Marshals Service." 28 C.F.R. § 26.3(a)(1)-(3) (effective through Dec. 27, 2020).

A year later, Congress enacted the FDPA, Pub. L. No. 103-322, § 60002, 108 Stat. 1796, 1959 (1994), which provides that a federal death sentence shall be carried out "in the manner prescribed by the law of the State in which the sentence is imposed." 18 U.S.C. § 3596(a). If the law of the state in which the sentence is imposed "does not provide for implementation of a sentence of death," then the FDPA instructs that "the court shall designate another state, the law

of which does provide for the implementation of a sentence of death, and the sentence shall be implemented . . . in the manner prescribed by such law." *Id.*[2]

Because the 1993 regulations pre-dated the 1994 enactment of the FDPA, and given that the regulations authorized execution only through lethal injection absent a court order to the contrary, 28 C.F.R. § 26.3(a)(4) (effective through Dec. 27, 2020), the Department undertook to amend 28 C.F.R. Part 26 to account for the FDPA's requirement that federal death sentences be implemented in the manner prescribed by State law.  As the Department explained in its August 5, 2020 notice of proposed rulemaking proposing amendments to the 1993 regulations, although execution by lethal injection is now universally authorized in States that have capital punishment, "it is possible that a State in the future will provide that a manner other than lethal injection is the only authorized means of execution."  *See* Manner of Federal Executions, 85 Fed. Reg. 47,324, 47,325 (Aug. 5, 2020) ("NPRM").  That situation, as the Department further explained, could give rise to arguments by inmates in litigation that they cannot be executed under the Department's regulations.  *Id.*

The Department received twenty-three public comments on the proposed rule, including comments from the Federal Capital Habeas Project as well as counsel on behalf of three of the four Plaintiff-inmates in this case.  *See* ECF No. 1-4 at 25-26.  The Department evaluated each comment and determined that no major changes to the proposed rule were necessary.  85 Fed. Reg. at 75,847.  Accordingly, on November 27, 2020, the Department published its Final Rule, which went into effect on December 28, 2020.  *Id.*

As relevant here, the Final Rule adopts three changes to the existing regulations.

First, the Final Rule adds a new provision, 28 C.F.R. § 26.1(b), that states:  "Where applicable law conflicts with any provision of this part, the Attorney General may vary from that

---

[2] The FPDA does not apply to inmates who were sentenced pursuant to death penalty procedures of the Anti-Drug Abuse Act ("ADAA"), 21 U.S.C. § 848(g)-(r), which were repealed in 2006.  *See generally Execution Protocol Cases*, No 1:19-mc-145-TSC (Dec. 30, 2020), Mem. Op., ECF No. 378.  Of the four Plaintiff-inmates in this case, Kenneth Barrett was sentenced pursuant to the ADAA; the rest were sentenced pursuant to the FDPA.

provision to the extent necessary to comply with the applicable law."  28 C.F.R. § 26.1(b).  As the preamble explains, this rule "was added to account for the statutory requirement that the Attorney General implement an execution 'in the manner prescribed by the law of the State in which the sentence is imposed.'"  85 Fed. Reg. at 75,849 (quoting 18 U.S.C. § 1396(a)).  Its purpose is thus "only to ensure that the Attorney General can comply with state statutes that contradict the regulations."  *Id.*  In that case, and "in order to allow the execution to proceed without undue delay," Section 26.1(b) would enable the Attorney General to vary from the Department's lethal injection regulations and procedures to the extent necessary to carry out the execution in the manner prescribed by the relevant controlling State law.  *Id.*

Second, the Final Rule adds a subsection (c) following Section 26.1(b) that states:  "Any task or duty assigned to any officer or employee of the Department of Justice by this part may be delegated by the Attorney General to any other officer or employee of the Department of Justice."  28 C.F.R. § 26.1(c).  This provision, the preamble explains, "reiterate[s] the Attorney General's authority to manage the Department's execution process" by re-delegating responsibilities from certain officials to other officials or components within the Department.  85 Fed. Reg. at 75,849.  In response to comments criticizing Section 26.1(c) for many of the same reasons Plaintiffs raise here, DOJ explained that federal law vests all powers of components of the Department in the Attorney General and authorizes the Attorney General to reassign powers among those components.  *See id.* (citing 28 U.S.C. §§ 509 & 510).  Moreover, while the FDPA states that a United States Marshal shall "supervise implementation of" federal death sentences, *see* 18 U.S.C. § 3596(a), DOJ explained that the U.S. Marshals Service is "a bureau within the Department of Justice under the authority and direction of the Attorney General," and that "ultimate accountability for all actions of the Department and its officials lies with the Attorney General."  85 Fed. Reg. at 75,849.

Lastly, the Final Rule repeals Section 26.2 as unnecessary, duplicative, and creating potential conflicts with Section 3596(a) of the FDPA.  *Id.* at 75,850.  In relevant part, Section 26.2 directed government attorneys to "file with the sentencing court a proposed Judgment and Order"

stating, among other things, that "[t]he sentence shall be executed by intravenous injection of a lethal substance or substances in a quantity sufficient to cause death."  28 C.F.R. § 26.2(a)(2); *see also* 85 Fed. Reg. at 75,847.[3]  This provision's contemplation that courts would select a method of execution, DOJ explained, was removed as inconsistent with Section 3596(a) of the FDPA, which requires the Department to use the manner of execution prescribed by state law.  85 Fed. Reg. at 75,847.  Section 26.2 further required the government attorney's proposed Judgment and Order to state that "[t]he sentence shall be executed on a date and at a place designated by the Director of the Federal Bureau of Prisons."  28 C.F.R. § 26.2(a)(3).  The Final Rule removed this section because it was duplicative of 28 C.F.R. § 26.3(a)(1), which states:  "Except to the extent a court orders otherwise, a sentence of death shall be executed . . . [o]n a date and at a time designated by the Director of the Federal Bureau of Prisons."  *See* 85 Fed. Reg. at 75,850.

Prior to the effective date of the Final Rule, the Department had executed thirteen federal inmates pursuant to the 1993 regulations, the first being Timothy McVeigh in 2001, including ten

---

[3] The full text of the repealed section stated:

(a) Whenever this part becomes applicable, the attorney for the government shall promptly file with the sentencing court a proposed Judgment and Order. The proposed Judgment and Order shall state, in addition to any other matters required by law or otherwise appropriate, that:

(1) The sentence shall be executed by a United States Marshal designated by the Director of the United States Marshals Service;

(2) The sentence shall be executed by intravenous injection of a lethal substance or substances in a quantity sufficient to cause death;

(3) The sentence shall be executed on a date and at a place designated by the Director of the Federal Bureau of Prisons; and

(4) The prisoner under sentence of death shall be committed to the custody of the Attorney General or his authorized representative for appropriate detention pending execution of the sentence.

(b) The attorney for the government shall append to the proposed Judgment and Order a Return by which the designated United States Marshal may inform the court that the sentence of death has been executed.

28 C.F.R. § 26.2 (effective through Dec. 27, 2020).

inmates this year without *any* court ever holding that the Department's procedures violated any of the regulatory provisions in 28 C.F.R. Part 26 that have been modified by the Final Rule.

## II.   PROCEDURAL HISTORY

Plaintiff the Federal Capital Habeas Project is an organization that provides and facilitates post-conviction representation to federal inmates sentenced to death.  The other Plaintiffs are federal death-row inmates incarcerated at the United States Penitentiary ("USP") Terre Haute, Indiana.  Compl. ¶¶ 10-14, ECF No. 1.  The Plaintiff-inmates were each lawfully convicted of exceptionally heinous murders and other crimes and sentenced to death more than twelve years ago.  *See United States v. Barrett*, 797 F.3d 1207, 1211-12 (10th Cir. 2015); *United States v. Higgs*, 353 F.3d 281, 289 (4th Cir. 2003); *Holder v. United States*, 721 F.3d 979, 983 (8th Cir. 2013); *United States v. Taylor*, 814 F.3d 340, 345 (6th Cir. 2016).  Of the individual Plaintiffs, the only one whose execution is currently scheduled is Plaintiff Dustin Higgs:  his execution was scheduled before the Final Rule's effective date, and will be carried out on January 15, 2021, assuming there are no legal impediments to his execution at that time.[4]

Plaintiffs commenced this action on December 18, 2020, three weeks after the Final Rule was published.  *See* Compl.  The Complaint raises three claims.  Count I alleges that the repeal of 28 C.F.R. § 26.2 violates constitutional separation-of-powers principles because it purportedly removes the Judicial Branch's role in setting execution dates.  Compl. ¶¶ 66-67.  Count II alleges that 28 C.F.R. § 26.1(b) and (c) improperly exempt the Attorney General from notice-and-comment rulemaking in contravention of the APA, and further that 28 C.F.R. § 26.1(c) violates the FDPA's directive that federal death sentences be implemented by a United States Marshal.  Compl. ¶¶ 73-75.  Third, Count III alleges that the Department's responses to the public comments, as well as its decision to adopt 28 C.F.R. § 26.1(b) and (c), and to repeal 28 C.F.R. § 26.2, were arbitrary

---

[4] As discussed below, as of the date of this filing, the implementation of Higgs's upcoming execution is the subject of an emergency appeal before the Fourth Circuit, in which the Government seeks to have the sentencing court designate Indiana law as the law governing the implementation of Higgs's death sentence.  *See infra* at 14.

and capricious, an abuse of discretion, or otherwise not in accordance with law in violation of the APA.  Compl. ¶¶ 83-85.  The Complaint seeks an Order setting aside the Final Rule and declaring that the Rule is invalid under Article III of the United States Constitution, the FDPA, and the APA. *Id.*, Prayer For Relief ¶¶ 3-7.

Plaintiffs simultaneously moved for a preliminary injunction, seeking to stay implementation or enforcement of the Final Rule based solely on Counts I and II of the Complaint. In that motion, Plaintiffs acknowledge that if portions of the Final Rule were enjoined, the prior version of the challenged regulations would remain in effect.  Mot. at 4.  The motion does not seek a stay of Plaintiff Higgs's upcoming execution, or any other relief which would prevent the Government from carrying out Higgs's execution as scheduled.

## <u>STANDARD OF REVIEW</u>

"A preliminary injunction is an extraordinary and drastic remedy."  *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (citation omitted).  It is "never awarded as of right," *id.* at 690, and "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted); *accord Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009).  The movant must satisfy a four-prong test, establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011).

As the D.C. Circuit has explained, "[t]he basis for injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies."  *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (citation omitted).  "Although the concept of irreparable harm does not readily lend itself to definition," the D.C. Circuit has explained that "the injury must be both certain and great; it must be actual and not theoretical."  *Id.*  Injunctive relief "will not be granted against something merely feared as liable to occur at some indefinite time."  *Id.* (citation omitted).  That is, the party seeking injunctive relief must show that "[t]he injury complained of [is] of such

imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Id.* (citation omitted). "Bare allegations of what is likely to occur are of no value since the court must decide whether the harm will *in fact* occur." *Id.* (emphasis in original).

## ARGUMENT

## I.     PLAINTIFFS ARE UNLIKELY TO SUCCEED IN SHOWING THAT THE FINAL RULE VIOLATES THE APA, THE FDPA, OR THE CONSTITUTION.

### A.     Plaintiffs Are Unlikely to Succeed in Showing That Section 26.1(b) Violates the APA.

Plaintiffs are unlikely to succeed on their claim that 28 C.F.R. § 26.1(b) is unlawful because it evades the APA's notice-and-comment requirement. That provision states: "Where applicable law conflicts with any provision of this part, the Attorney General may vary from that provision to the extent necessary to comply with the applicable law." 28 C.F.R. § 26.1(b). Plaintiffs contend that the rule is an invalid "agency-generated exemption" giving the Attorney General unfettered discretion to modify any existing rules governing the implementation of federal death sentences. Mot. at 15, ECF No. 3-1. While Plaintiffs appropriately concede that no agency action has been taken pursuant to Section 26.1(b)—which went into effect just last week, on December 28, 2020— they argue that the APA requires the Government to undergo notice and comment rulemaking any time the Attorney General determines that a variance pursuant to Section 26.1(b) is appropriate. *Id.* at 16. This argument is unlikely to succeed for several reasons.

First, Plaintiffs' asserted claim is not ripe. "Absent [a statutory provision providing for immediate judicial review], a regulation is not ordinarily considered the type of agency action 'ripe' for judicial review under the [Administrative Procedure Act (APA)] until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him." *Nat'l Park Hosp. Ass'n v. U.S. Dep't of Interior*, 538 U.S. 803, 808 (2003) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) (alterations in original)); *see also id.* at 807-08 ("Ripeness is a justiciability doctrine designed 'to prevent the

courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'") (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967)). To determine ripeness, the court must "evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Id.* at 808 (quoting *Abbott Labs.*, 387 U.S. at 149).

Applying the first factor, the issue presented here hinges on conjecture about agency actions that have not occurred, based on Plaintiffs' reading into the regulation wide-ranging applications and unfettered discretion that do not exist. Plaintiffs grossly overstate the scope of Section 26.1(b). In the preamble to the Final Rule, DOJ made clear that Section 26.1(b) was crafted merely to account for the "possibil[ity] that at some point in the future" an applicable State law will conflict with a federal regulation with respect to the execution of a federal inmate, in which case the FDPA would require the Department to follow the state law. *See* 85 Fed. Reg. at 75,849. The most significant source of potential conflict is laws governing the manner of execution, such as if a State were to pass a law providing that a manner other than lethal injection— electrocution or the firing squad, for instance—is the means of execution. *See id.* at 75,847. But Section 26.1(b) would not be implicated in that scenario because a separate provision in the regulations already eliminates any possible conflict: the regulations specifically authorize the Department to use lethal injection or to implement a death sentence "by any other manner prescribed by the law of the State in which the sentence was imposed or which has been designated by a court." 28 C.F.R. § 26.3(a)(4). And Plaintiffs have not even challenged Section 26.3(a)(4) even though it authorizes departure on the most important aspect of the regulations. This underscores why it is obviously appropriate to have a catchall provision, namely Section 26.1(b); given that the regulations have to comply with any state law incorporated by the FDPA, it is simply prudent for the regulations to acknowledge that possibility rather than create a situation where the regulations are contrary to law.

And while Plaintiffs speculate that there is no limiting factor to what could constitute a "conflict" with "applicable law," Mot. at 16, the possibility of such a conflict is exceedingly narrow, given the D.C. Circuit's holding that the FDPA incorporates "only those execution procedures prescribed by a state's statutes and formal regulations," *see Execution Protocol Cases*, 955 F.3d at 129 (Rao, J., concurring); *id.* at 124 n.10 (Katsas, J., concurring) (same), and even then arguably only those that concern effectuation of death, *see Execution Protocol Cases*, No. 20-5361 (D.C. Cir. Dec. 10, 2020) (en banc) (Katsas, J., concurring in the denial of reconsideration) ("[U]nder the FDPA, 'implementation' of a death sentence involves only conduct that immediately precedes the execution."). *See also Execution Protocol Cases*, 955 F.3d at 143 (Rao, J., concurring) ("Given that most details found in state execution protocols are not prescribed by law, DOJ will be able to make most procedural choices regarding federal executions."). Given the narrow scope of Section 26.1(b), it is precisely the type of regulation unfit for pre-enforcement review over abstract disagreements untethered to any concrete application.[5]

Plaintiffs similarly overstate the scope of Section 26.1(b) with respect to the discretion it confers on the Attorney General. *See* Mot. at 15-16. Contrary to Plaintiffs' view that Section 26.1(b) imposes "no clear limits on the exercise of [the Attorney General's] discretion," Mot. at 17, Section 26.1(b) by its own terms expressly limits the Attorney General's ability to vary from 28 C.F.R. Part 26 only "[w]here applicable law conflicts" with the federal regulation and only "to the extent necessary to comply with the applicable law." 28 C.F.R. § 26.1(b). Put differently, the provision authorizes the Department to do no more than what the FDPA specifically requires—

---

[5] Indeed, Defendants note that, insofar as any capital defendant was sentenced pursuant to the ADAA rather than the FDPA, Section 26.1(b) is effectively irrelevant, as it was crafted solely to address the potential need for executions to comply with the FDPA, *see* 85 Fed. Reg. at 75,849, and the FDPA does not apply to inmates sentenced pursuant to the ADAA, *see* Mem. Op., ECF No. 378 at 6-8, No. 1:19-mc-145-TSC (Dec. 30, 2020). As relevant here, Plaintiff Kenneth Barrett was sentenced pursuant to the ADAA and Section 26.1(b) therefore has no relevance to him because there is no potential conflict between the regulations and the ADAA that would necessitate an exception.

*i.e.*, carry out executions "in the manner prescribed by the law of the State in which the sentence is imposed." *See* 18 U.S.C. § 3596(a).

Unsurprisingly then, Plaintiffs fail to identify a single concrete impact Section 26.1(b) has on them. Aside from Higgs, none of the Plaintiff-inmates in this case have scheduled execution dates, and thus any question as to whether and how Section 26.1(b) might someday impact those Plaintiffs is entirely speculative, abstract, and unfit for judicial resolution. *See* Compl. ¶¶ 12-14; *see also Texas v. United States*, 523 U.S. 296, 301 (1998) (claim unripe when "operation of [the rule] is better grasped when viewed in light of a particular application").

As to Higgs, whose execution is currently set for January 15, 2021, his challenge to Section 26.1(b) is premature because it hinges on the outcome of pending litigation in which the Government seeks to have the court that sentenced Higgs designate Indiana law as the law governing the implementation of his death sentence. *See United States v. Higgs*, 8:98-cr-520 (D. Md.). Higgs's judgment of conviction was issued by the U.S. District Court for the District of Maryland at a time when Maryland still had the death penalty. In August 2020, the Government moved the sentencing court to designate Indiana law as an alternative pursuant to Section 3596(a) of the FDPA, which provides that, if the law of the State in which the sentence is imposed "does not provide for implementation of a sentence of death" then "the court shall designate another state, the law of which does provide for the implementation of a sentence of death, and the sentence shall be implemented in the latter State in the manner prescribed by such law." 18 U.S.C. § 3596(a); *see also* Motion, ECF No. 640, No. 8:98-cr-520 (D. Md. Aug. 4, 2020). Just last week, the sentencing court denied the Government's motion, concluding that such relief would be an impermissible modification of Higgs's criminal judgment. *See* Order, ECF No. 657, *United States v. Higgs*, 8:98-cr-520 (D. Md. Dec. 29, 2020). The Government filed an emergency appeal on December 31, 2020.

Thus, as things stand, it is not even currently known which State's law will govern the implementation of Higgs's execution, much less whether the Attorney General would have any basis to invoke Section 26.1(b) based on a conflict between the Department's regulation and

relevant State law (whichever State that is).  Further, it is highly unlikely that Section 26.1(b) will be utilized regardless of which State's law applies.  Maryland does not provide for the death penalty; Indiana law is entirely consistent with federal regulations, as confirmed by the July 17, 2020 execution of Dustin Honken that was carried out pursuant to Indiana law; and Virginia law, which allows inmates to choose between lethal injection and electrocution, is consistent with 28 C.F.R. § 26.3(a)(4), which Plaintiffs do not challenge and which allows the Department to follow the manner of execution prescribed by State law.[6]  Clearly, Higgs's attenuated theory of justiciability, which "require[s] guesswork as to how independent decisionmakers will exercise their judgment," renders his APA challenge to Section 26.1(b) unfit for judicial decision.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013).

For similar reasons, Plaintiffs cannot meet the second factor:  hardship to the parties of withholding court consideration.  *See Nat'l Park Hosp. Ass'n*, 538 U.S. at 808.  Section 26.1(b) does not require Plaintiffs "to engage in, or to refrain from, any conduct" whatsoever, *Texas*, 523 U.S. at 301, much less impact them in a way "that is immediate, direct, and significant," *Friends of Animals v. Haugrud*, 236 F. Supp. 3d 131, 135 (D.D.C. 2017).  In fact, as discussed in more detail below, Section 26.1(b) does not alter federal death penalty law at all; it merely reflects the Attorney General's existing duties under the FDPA.  Section 26.1(b) therefore "does not create 'adverse effects of a strictly legal kind,'" which are required to show that postponement of adjudication would result in hardship.  *See Nat'l Park Hosp. Ass'n*, 538 U.S. at 809 (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998)).

Plaintiffs argue that "the Final Rule provides no constraints on the timing of the Attorney General's decision to vary from the federal regulations . . . , leaving Plaintiffs no time to file a challenge at that time."  Mot. at 36.  But while Section 26.1(b) does not itself impose a notice requirement, Section 26.4(a) states that a prisoner will receive notice "of the manner of execution

---

[6] As discussed below, *infra* at 37, although Plaintiffs suggest that the Court could enjoin the entirety of the Final Rule, such relief is unavailable as it would not be tailored to remedy any alleged harms connected with Plaintiffs' challenges to only three discrete provisions within that Rule.

and the date designated for execution at least 20 days in advance," or, where applicable, the prisoner will be notified of his option to "choose among multiple manners of execution."  28 C.F.R. § 26.4(a).  Plus, to the extent Plaintiffs argue that they will not have notice of States' laws governing their executions, those States' laws *themselves* provide notice to them.  Moreover, Plaintiffs offer nothing but conjecture and anecdotes supporting their conclusion that, assuming Section 26.1(b) is ever even applied to Plaintiffs, the result would be adverse to Plaintiffs.  They do not, for instance, describe any basis for their presuppositions that the Attorney General might invoke Section 26.1(b) "to prioritize a less protective state law over a more protective federal one."  Mot. at 16.  Indeed, Section 26.1(b) would not even allow the Department to apply a less protective State law unless that law and the federal regulations presented mutually exclusive requirements.  Plaintiffs' conjecture thus underscores the lack of ripeness here, because it hinges on the specifics of the asserted conflict between the regulations and applicable State law.  By assuming outcomes of an agency action that has not occurred, Plaintiffs' arguments lack any foundation from which to weigh their claim.  The claim is therefore unripe and the Court should not consider it.

Second, even if the Court finds this issue ripe for review, Plaintiffs' APA claim would still be unlikely to succeed because the Department was not required to undertake notice-and-comment procedures in order to promulgate Section 26.1(b) in the first place, so it cannot be that future applications of Section 26.1(b) require further rulemaking.  *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92 (2015) (holding that, where notice and comment is not required to publish an interpretation in the first instance, revisions to that interpretation also need not go through notice and comment).  That is because the APA's notice-and-comment requirement applies only to legislative rules.  *See Nat'l Mining Ass'n*, 758 F.3d at 251.  By contrast, "rules of agency organization, procedure, or practice," among other things, are expressly exempted.  5 U.S.C. § 553(b)(3)(A).  Section 26.1(b) falls within this exception.

While courts acknowledge that classifying rules as legislative or procedural is at times "quite difficult and confused," "[t]he critical feature of a procedural rule is that it covers agency actions that do not themselves alter the rights or interests of parties."  *Nat'l Mining Ass'n*, 758 F.3d

at 250, 251 (emphasis added) (quotation marks omitted).  The D.C. Circuit has often reminded litigants that "an otherwise-procedural rule"—even one with a "substantial impact on the rights of individuals"—"does not become a substantive one, for notice-and-comment purposes, simply because it imposes a burden on regulated parties."  *James v. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 281 (D.C. Cir. 2000) (quotation marks omitted).  The hallmark of a procedural rule is that it "expresses an agency's . . . internal practice or procedure" without "foreclos[ing] alternate courses of action or conclusively affect[ing] rights of private parties."  *Batterton v. Marshall*, 648 F.2d 694, 702 (1980).

Section 26.1(b) *itself* neither alters Plaintiffs' rights nor impairs their interests.  The Plaintiff-inmates' capital sentences were imposed long ago after extensive criminal proceedings.  And with respect to the implementation of those sentences, the relevant substantive burdens are imposed by the FDPA, not Section 26.1(b).  Moreover, the Department has adopted a regulation through notice-and-comment procedures providing that federal death sentences be carried out by lethal injection, "or by any other manner prescribed by the law of the State in which the sentence was imposed," as required by the FDPA.  *See* 28 C.F.R. § 26.3(a)(4).  Thus, Section 26.1(b) by itself in no way affects Plaintiffs' rights and responsibilities in any way.  Tellingly, Plaintiffs do not challenge Section 26.3(a)(4) even though it expressly authorizes the Department to use the States' manner of execution, which presumably is the most significant departure from the *prior regulation* of authorizing only lethal injection as the manner of execution.  Again, departure from the *new regulations* pursuant to the general catchall provided in Section 26.1(b) would occur only in exceedingly narrow circumstances, as discussed above.  *Supra* at 13.

Judge Katsas's discussion of BOP's lethal injection protocol in the *Execution Protocol Cases* is instructive.  *See* 955 F.3d at 125-26 (Katsas, J., concurring).  The plaintiffs there argued that BOP should have undergone notice-and-comment rulemaking to devise its execution protocol because the protocol purportedly impacted the plaintiff-inmates' rights and imposed new substantive burdens.  *See* Dkt. No. 1822762 at 47-48, No. 19-5322 (filed Jan. 6, 2020).  Judges Katsas and Rao disagreed and directed that judgment be entered for the government.  *Execution*

*Protocol Cases*, 955 F.3d at 113 (Katsas, J., concurring); *id.* at 144-45 (Rao, J., concurring). Judge Katsas noted that "pre-existing law establishes lethal injection as the method of execution, 28 C.F.R. § 26.3(a)(4), and the protocol simply sets forth procedures for carrying out the injections." *Id.* at 125 (Katsas, J., concurring). The D.C. Circuit thus held that the protocol is a procedural rule exempt from notice-and-comment requirements. *Id.*; *see also id.* at 144-45 (Rao, J., concurring).[7] Like the protocol at issue in that case, Section 26.1(b) merely spells out how the Department will carry out executions under existing law—*i.e.*, by following applicable State law when the FDPA requires it. Put differently, all relevant rights and responsibilities are already determined by the FDPA, so federal death sentences will be carried out pursuant to the FDPA with or without Section 26.1(b). Accordingly, Section 26.1(b) does "not impose [any] new substantive burdens" that required notice-and-comment rulemaking in the first place, *see Aulenback, Inc. v. Fed. Highway Admin.*, 103 F.3d 156, 169 (D.C. Cir. 1997), and, for that same reason, any action under Section 26.1(b) will not itself be a new substantive law that requires notice-and-comment before they can be taken. And even assuming Section 26.1(b) *did* have to go through notice-and-comment procedures, that would not mean that the variances it contemplates were similarly required to do so. As discussed, the deviations from the regulation it contemplates are both required and limited by the FDPA, and are identifiable by reference to the relevant state law at the relevant time. There is accordingly no basis for Plaintiffs' speculation that Section 26.1(b)'s clarification that DOJ may *comply* with the law in carrying out executions somehow opens the door to lawlessness.[8]

---

[7] Judge Katsas went on to explain that "the execution protocol is also a general statement of agency policy" because it expressly disclaimed creating legally enforceable rights or obligations, expressly permits deviations and adjustments at the discretion of the BOP Director or the Warden, and was not published in the Code of Federal Regulations or the Federal Register. *Execution Protocol Cases*, 955 F.3d at 125-26 (Katsas, J., concurring).

[8] Plaintiffs spill a significant amount of ink attempting to preempt an argument by Defendants that the "good cause" exception to notice-and-comment rulemaking applies. *See* Mot. at 15-17 (citing 5 U.S.C. § 553(b)(B)). That argument, however, is premature, as the Department has not invoked the "good cause" exception given that the APA's notice-and-comment procedures do not apply for the reasons discussed herein.

Furthermore, Plaintiffs' construction of Section 26.1(b) would call into question the Department's ability to carry out federal death sentences.  The Department cannot feasibly ensure *ex ante* that its regulations are consistent with any and all State laws that are or will be incorporated by the FDPA in order to implement any given inmate's capital sentence at a future time.  Were Plaintiffs' view correct, the Department would be placed in the impracticable situation of having to analyze every applicable statute and formal regulation of every state that authorizes the death penalty, *see Execution Protocol Cases*, 955 F.3d at 129 (Rao, J., concurring), in order to account for all potential conflicts through notice-and-comment rulemaking, and would have to engage in further notice-and-comment procedures to modify those exceptions or create new ones any time a State law is amended, repealed, or a new one is adopted.  And, in Plaintiffs' view, even if the Department undertook such a burdensome endeavor, it would still be prevented from carrying out an execution whenever it did not anticipate a potential conflict with applicable State law unless a court were to order otherwise.  That would cause significant practical problems, imposing a burden far beyond what the APA requires, and would impermissibly hamper the Department's obligation to implement federal death sentences under the FDPA.

Plaintiffs do not acknowledge these unworkable consequences of their proposed interpretation of Section 26.1(b), nor do they explain why they view that provision to be a legislative rule.  Plaintiffs note that the provision does not expressly define the terms "conflict" and "applicable law."  *See* Mot. at 16.  But that point merely goes to the question of how often a conflict triggering Section 26.1(b) might arise, not whether Section 26.1(b) is a legislative or procedural rule.  And, as discussed above, Plaintiffs' concern that Section 26.1(b) will lead to a wide range of agency actions is misplaced, given the narrow scope of State law incorporated by the FDPA.  *See supra* at 13.  In the event Section 26.1(b) is ever actually applied in a concrete situation, and an inmate challenges that action, the proper course would be to challenge the departure as contrary to Section 26.1(b) itself, not to challenge the existence of Section 26.1(b) altogether.

Plaintiffs are also wrong to suggest that Section 26.1(b) is analogous to the administrative scheme at issue in *United States v. Picciotto*, 875 F.2d 345 (D.C. Cir. 1989).  *See* Mot. at 14-15.  That case involved the criminal conviction of a woman who had demonstrated in a national park in violation of a Park Service rule that had been promulgated without notice and comment.  *Picciotto*, 875 F.2d at 346.  The D.C. Circuit reversed the conviction after concluding that the rule at issue was "an independent substantive rule" subject to notice-and-comment requirements because first, the rule imposed numerous additional restrictions on permit holders that did not appear in the agency's regulations or any other source of law; and second, the Park Service rule established a criminal offense with possible imprisonment for violations.  *Id.* at 348.  Unlike that rule, Section 26.1(b) does not modify or add to any existing law, nor does it determine any rights or responsibilities.  Rather, it is a procedural rule ensuring that the Department complies with its statutory obligations under the FDPA.  Plaintiffs' reliance on *Picciotto* is thus misplaced.

At bottom, Plaintiffs' concerns with Section 26.1(b) rest on a misconception of the purpose and functions of that rule, as well an over-statement of the APA's procedural requirements.  Plaintiffs thus fail to establish likelihood of success on their APA claim.

### B.      Plaintiffs are Unlikely to Succeed in Showing That Section 26.1(c) Violates the APA or the FDPA.

Plaintiffs next argue that 28 C.F.R. § 26.1(c) violates the APA's notice-and-comment requirements as well as the FDPA.  Mot. at 17-21.  Section 26.1(c) states:  "Any task or duty assigned to any officer or employee of the Department of Justice by this part may be delegated by the Attorney General to any other officer or employee of the Department of Justice."  28 C.F.R. § 26.1(c).  Both claims are unlikely to succeed, again for lack of ripeness and lack of merit.

To begin, the APA and FDPA claims regarding Section 26.1(c) are unripe.  Plaintiffs do not allege that the Attorney General has made any delegations pursuant to Section 26.1(c), that he is likely to do so, or that any such delegations would harm Plaintiffs.  Thus, Plaintiffs' invitation to litigate the validity of Section 26.1(c) in the abstract and without reference to any concrete application of that provision is precisely "the kind of 'abstract disagreement over administrative

policies,' . . . that the ripeness doctrine seeks to avoid." *See Ohio Forrestry Ass'n*, 523 U.S. at 736 (quoting *Abbott Labs.*, 387 U.S. at 148); *see also Time Warner Ent. Co., L.P. v. FCC*, 93 F.3d 957, 974 (D.C. Cir. 1996) (pre-enforcement review unripe where claim is not "sufficiently fleshed out to allow the court to see the concrete effects and implications of its decision") (quoting *Chamber of Commerce v. Reich*, 57 F.3d 1099, 1100 (D.C. Cir. 1995)).

In any event, assuming Plaintiffs could overcome the ripeness issue, their APA challenge to Section 26.1(c) would be unlikely to succeed on the merits, because the Attorney General's internal delegation of authority—whether to the Marshals Service or any other officer or employee of the Department of Justice—is not subject to notice-and-comment requirements.  The APA explicitly excludes from those requirements "matter[s] relating to agency management or personnel."  5 U.S.C. § 553(a)(2).  Following that provision, courts have held that the APA "does not require that all internal delegations . . . be published in order to be effective."  *Hogg v. United States*, 428 F.2d 274, 280 (6th Cir. 1970); *see also L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 33 n.12 (D.D.C. 2020) ("A delegation of authority to perform defined agency duties may be exempt from the notice-and-comment process as a rule of 'agency organization.'" (citing *Hogg*, 428 F.2d at 280)); *Saratoga Sav. & Loan Ass'n v. Fed. Home Loan Bank of San Francisco*, 724 F. Supp. 683, 686 (N.D. Cal. 1989) (concluding that, under § 553(a)(2), Federal Home Loan Bank Board was not required to follow notice-and-comment procedures before delegating authority to examine thrift institutions to employees of individual Federal Home Loan Banks).

Plaintiffs do not cite a single case in which a delegation of authority was held to require notice and comment; indeed, they cannot because any such delegation is not a legislative rule that "create[s] new law, rights or duties."  *See Gen. Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1565 (D.C. Cir. 1984).  They instead repeat their invocation of *Picciotto*, which had nothing to do with delegation and which, as discussed above, is materially distinct from the regulations at issue in this case.  *See supra* at 20.  Whereas the challenged rule in *Picciotto* imposed additional substantive duties and obligations distinct from the Park Service's existing regulations, 875 F.2d at 348, Section 26.1(c) merely reiterates the Attorney General's existing statutory authority to manage

officers and employees of the Department.  Moreover, Section 26.1(c) does not impose criminal penalties, which the court in *Picciotto* found sufficient to hold the Park Service's rule "to the strict letter of the APA."  *Id.* at 346.

Plaintiffs fare no better with their FDPA claim.  They argue that Section 26.1(c) violates the FPDA because it purportedly "override[s] Congress's directive that the United States Marshal shall supervise the implementation of federal death sentences."  Mot. at 19.  Plaintiffs rest this argument on the FDPA provision stating that, when a person sentenced to death has exhausted his appellate and post-conviction remedies, he shall be "release[d] . . . to the custody of a United States marshal, who shall supervise implementation of the sentence[.]"  18 U.S.C. § 3596(a); *see also* 18 U.S.C. § 3597(a) ("A United States marshal charged with supervising the implementation of a sentence of death may use appropriate state or local facilities for the purpose.").  This claim fails for reasons already well explained by Judge Katsas in his *Execution Protocol Cases* decision.  955 F.3d at 124-25 (concurring op.).

First, federal statutes expressly authorize the Attorney General to reassign and delegate functions within the Department.  *See* 28 U.S.C. §§ 509, 510.  Specifically, subject to exceptions not relevant here, 28 U.S.C. § 509 vests in the Attorney General "[a]ll functions of other officers of the Department of Justice and all functions of agencies and employees of the Department of Justice."  And 28 U.S.C. § 510 authorizes the Attorney General to, "from time to time," delegate functions within the Department.  This statutory authority dates back to the establishment of the Department in 1870.  *See, e.g.*, An Act To Establish the Department of Justice, ch. 150, § 14, 16 Stat. 162, 164 (1870) (providing that "the Attorney-General may require any solicitor or officers of the [DOJ] to perform any duty required of said Department or any officer thereof"); Act of Sept. 6, 1966, Pub. L. No. 89-554, § 4(c), 80 Stat. 378, 612 (codifying this authority at 28 U.S.C. §§ 509, 510).  Both BOP and USMS are components of DOJ and are supervised and controlled by the Attorney General.  *See* 28 U.S.C. § 561(a), (c) (each U.S. Marshal is part of USMS, "a bureau within the [DOJ] under the authority and direction of the Attorney General"); 18 U.S.C. §§ 4041-4042 (BOP Director is "appointed by and serv[es] directly under the Attorney General," and BOP

duties are performed "under the direction of the Attorney General"). Thus, any duties Congress assigned to a U.S. Marshal—like those of any DOJ officer—are subject to reassignment by the Attorney General. *See* Anti-Drug Abuse Act of 1988, Pub. L No. 100-690 § 7608(a)(1), 102 Stat. 4181, 4512; *see also* 16 Stat. at 164, § 15 (transferring certain "supervisory powers" over Marshals to the Attorney General); *cf. United States v. Bourgeois*, 423 F.3d 501, 509 (5th Cir. 2005) ("In §§ 3596(a) and 3597(a) of the FDPA, Congress expressly delegated [supervisory] power to the Executive Branch, specifically the [DOJ] in the person of the Attorney General."). Indeed, the FDPA was enacted against the background of the Attorney General's longstanding statutory authority in 28 U.S.C. §§ 509 and 510.

Plaintiffs argue that 28 U.S.C. §§ 509 and 510 are displaced by Congress's requirement in the FDPA that a U.S. Marshal supervise implementation of federal death sentences. Mot. at 19-20. But there is no such implied repeal of Sections 509 and 510. *Randall v. Loftsgaarden*, 478 U.S. 647, 661 (1986) (repeal by implication is "not favored"). Instead, as Judge Katsas found when addressing the FDPA's references to the Marshal's role, "[t]ogether, [Sections 509 and 510] permit the Attorney General to reassign duties from the Marshals Service to the Bureau of Prisons." *See Execution Protocol Cases*, 955 F.3d 106 at 124–25. Similarly, Judge Katsas squarely rejected Plaintiffs' view that *United States v. Giordano*, 416 U.S. 505 (1974), prohibits the Attorney General from reassigning supervisory authority over death sentences. *See Execution Protocol Cases*, 955 F.3d at 125 (Katsas, J., concurring); Mot. at 21-22. Judge Katsas explained that *Giordano* involved "a statute 'expressly' limiting the Attorney General's power to delegate," whereas "the FDPA contains no such language expressly prohibiting the Attorney General from deciding or delegating matters relating to executions." *Execution Protocol Cases*, 955 F.3d at 125 (Katsas, J., concurring). Unlike statutes that include affirmative limitations on delegations, *see Giordano*, 416 U.S. at 514; *United States v. Libby*, 498 F. Supp. 2d 1, 12 (D.D.C. 2007); *Halverson v. Slater*, 129 F.3d 180, 185-89 (D.C. Cir. 1997), the FDPA does not so limit the Attorney General's authority under Sections 509 and 510.

Plaintiffs' remaining FDPA arguments similarly are unlikely to succeed.  *See* Mot. at 22. They note that U.S. Marshals are a "politically accountable component of DOJ, . . . appointed by the President, by and with the consent of the Senate."  *Id.* (citing 28 U.S.C. § 561(a) & (c)).  This point is addressed in the Final Rule's preamble, which notes that the Marshals Service is "a bureau within the Department of Justice under the authority and direction of the Attorney General," *see* 28 U.S.C. § 561(a), and that the Attorney General—who is also appointed by the President and confirmed by the Senate—is ultimately responsible for all actions of the Department, regardless of which official carries them out.  *See* 85 Fed. Reg. at 75,849.  Plaintiffs ignore that the Attorney General is just as politically accountable as the U.S. Marshals.

Plaintiffs further assert that the Marshals Service is "uniquely suited" to implement executions because enforcing court orders is part of its primary mission and further that the Service is present in districts across the country.  Mot. at 22.  The Final Rule's preamble similarly addressed these points.  It explains that enforcing court orders is not something done exclusively by the Marshals Service and further that "the details of implementing a death sentence by the Department of Justice do not depend on a court order alone."  85 Fed. Reg. at 75,849-50.  And it makes no difference that the Marshals Service performs its functions in different localities: federal executions are primarily implemented at the U.S. Penitentiary in Terre Haute, Indiana.  And, as a matter of law, the Attorney General enforces federal law in all districts of the United States through the Department of Justice components, including the Marshals Service.  *Id.*

Doubtless recognizing the Attorney General's broad statutory authority to delegate functions within the Department, Plaintiffs try to manufacture separation-of-powers concerns about the Executive Branch stripping Congress of its primacy in determining how federal death sentences are implemented.  *See* Mot. at 20-22.  That, of course, ignores that it is Congress that authorized the Attorney General to delegate functions within the Department in the first place. Moreover, history shows that Congress and the Executive Branch have long shared authority in this area, and thus, even "absent directly preempting congressional action, the Attorney General had constitutional and statutory authority to provide by regulation the means for executing death

sentences." *United States v. Tipton*, 90 F.3d 861, 902-03 (4th Cir. 1996); *see also id.* at 903 (Attorney General had inherent authority to provide the manner of execution for offenses under the Anti-Drug Abuse Act of 1988, which preceded the FDPA).

For these reasons, Plaintiffs are not likely to succeed on their APA or FDPA challenges to Section 26.1(c) and thus are not entitled to preliminary injunctive relief on those claims.

### C.   Plaintiffs Are Unlikely to Succeed in Showing That The Removal of Section 26.2 Violates the Separation of Powers.

Finally, Plaintiffs contend that the Final Rule's removal of Section 26.2—which required DOJ attorneys to submit a proposed Judgment and Order to the sentencing court that, among other things, acknowledged the Department's authority to schedule the execution—is unconstitutional because it allegedly violates separation-of-powers principles. Once more, this claim is both non-justiciable and meritless.

Plaintiffs' separation-of-powers claim fails at the outset because Plaintiffs lack standing to raise it. Plaintiffs will not suffer any legally cognizable harm from the removal of Section 26.2 because that provision does not confer any benefit on them, and its removal does not affect them in any way. *See Lujan*, 497 U.S. at 891. Section 26.2 was a ministerial requirement imposed only on government attorneys, and it did not confer any authority on courts or the Executive Branch with respect to scheduling or otherwise. *See United States v. Lee*, No. 4:97-cr-00243-LPR-2, 2020 WL 3921174, *4 (July 10, 2020) (Section 26.2 "controls DOJ attorneys, not the Court"). In the absence of that provision, Plaintiffs may still, of course, challenge the Department's scheduling and implementation of federal executions, and courts, of course, retain the authority to consider any such challenges, whether or not government attorneys are required to file a proposed Judgment and Order with the sentencing court.

Put differently, an order from this Court enjoining the removal of Section 26.2 would not redress any injury. As detailed below, although Plaintiffs argue at length that Article III courts must set execution dates, Plaintiffs ignore that the *Bureau of Prisons* has set the dates for each of the sixteen executions scheduled since 2001, including Plaintiff Higgs's, pursuant to the 1993

regulations.  *See United States v. Higgs*, Crim. No. 98-520, ECF No. 652 (D. Md. Nov. 20, 2020) (notifying the sentencing court that the Bureau of Prisons scheduled Higgs's execution for January 15, 2021).  Thus, even if the Court were to enjoin implementation of the Final Rule as Plaintiffs request, the 1993 regulations, which Plaintiffs do not challenge, would remain in effect, *see United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019), and the Bureau of Prisons would still be authorized to schedule executions.

Plaintiffs' claim regarding Section 26.2 is also not ripe.  None of the Plaintiff-inmates—except Higgs, whose execution was scheduled pursuant to the 1993 regulations—have execution dates.  And it is entirely speculative whether or when the other three Plaintiff-inmates will be scheduled for execution.  If the Bureau of Prisons does, at some point, schedule an execution for any of the other three Plaintiff-inmates, Plaintiffs could bring their separation-of-powers challenge at that time, when the Court would be presented with a concrete set of facts to consider.  Currently, however, the parties' dispute is merely theoretical and therefore not justiciable.

Standing and ripeness aside, Plaintiffs' Section 26.2 claim has no likelihood of success on the merits because, as noted, the amendment does not affect the Judiciary's functions or powers at all.  Plaintiffs' argument rests on a fundamental misunderstanding of the regulations that have been in place since 1993 and the effect of the Final Rule.  The repealed Section 26.2—which Plaintiffs seek to maintain through this lawsuit—explicitly contemplated that the Bureau of Prisons would set the dates for the execution of capital defendants.  Although Section 26.2 provided that DOJ attorneys "shall promptly file with the sentencing court a proposed Judgment and Order," the text of that proposed Judgment and Order is explicit that "[t]he sentence shall be executed on a date and at a place designated *by the Director of the Federal Bureau of Prisons*."  28 C.F.R. § 26.2(a)(3) (emphasis added).  Moreover, the very next regulation, 28 C.F.R. § 26.3, makes clear that the Bureau of Prisons may set an execution date *even absent* the court's acknowledgment of the Bureau's scheduling authority; Section 26.3 provides that "[e]xcept to the extent a court orders otherwise"—*i.e.*, including in the absence of any court order at all—"a sentence of death shall be executed . . . [o]n a date and a time designated by the Director of the Federal Bureau of Prisons."

26

28 C.F.R. § 26.3(a)(1).  Obviously then, the removal of Section 26.2 makes no difference to the Judiciary's role in setting execution dates.[9]

That is confirmed by the regulatory history and implementation of Section 26.2.  Contrary to Plaintiffs' suggestion that the Final Rule is a "reversal" from past practice as to the Executive Branch's ability to set execution dates, *see* Mot. at 27, the Department has long and consistently taken the position that, absent a court order to the contrary, BOP may set the date of execution.  The NPRM for the 1993 regulations states explicitly that "establishment by the Executive Branch of procedures for execution is entirely adequate for execution of a duly-ordered sentence of death."  57 Fed. Reg. at 56,536.  The government explained in that NPRM that vesting the Bureau of Prisons with the power to designate an execution date "will obviate the practice, which is a pointless source of delay in state cases, of seeking a new execution date from the sentencing court each time a higher court lifts a stay of execution that caused an earlier execution date to pass."  *Id.*  The Department went on to explain in the NPRM that the proposed "procedure will not, of course, limit any right of the prisoner under sentence of death to seek collateral relief from his sentence."  *Id.*

The preamble to the 1993 regulations further confirms that the Department has taken the position, *for decades*, that the Bureau of Prisons may set execution dates without the involvement of federal courts.  In response to comments on the proposal to allow the Bureau of Prisons to schedule execution dates, the government explained that, "[i]t was [ ] suggested that a court might be better suited by its familiarity with the case to set the execution date, and that the Director's institutional knowledge might impair her decision."  58 Fed. Reg. at 4900.  However, the government concluded that "the knowledge the Director will bring to the decision—knowledge of

---

[9] Plaintiffs point to the example of David Chandler in an attempt to illustrate the importance of Section 26.2.  *See* Mot. at 28.  But Plaintiffs' anecdote shows exactly why Section 26.2 is unnecessary.  Once the Bureau of Prisons set Chandler's execution date, he moved for a stay, which the court granted.  Clearly, whether or not government attorneys filed the proposed Judgment and Order previously required by Section 26.2, courts are fully empowered to intervene as appropriate.  Plaintiffs do not explain how the outcome would have been different had the government attorney not filed a proposed Judgment and Order.

institutional resources and circumstances that might interfere—makes the Director better suited than a judge to determine the execution date." *Id.* The government also reiterated its rationale from the NPRM that "[h]aving the Director set the date is also a more efficient procedure than repeated resort to the courts." *Id.*

Perhaps most importantly, past practice uniformly supports that regulatory history. To read Plaintiffs' brief, one could come away with the impression that—despite the 1993 regulations and the Department's clear intent for the Bureau of Prisons to set execution dates—only the Judiciary may set execution dates. But between the promulgation of the 1993 regulations and the adoption of the new regulations in December 2020, thirteen federal defendants have been executed and three more have been scheduled for execution, and *every single one* was executed pursuant to an execution date set by the Executive Branch rather than the Judiciary.

To begin, prior to last year, three federal defendants were executed under the 1993 regulations: Timothy McVeigh, Juan Raul Garza, and Louis Jones, Jr. The Bureau of Prisons set an execution date for McVeigh, and he was executed on June 11, 2001. *See* Memorandum from Kathleen Hawk Sawyer, Federal Bureau of Prisons (May 11, 2001) (attached as Ex. 1). Although the district court in the Southern District of Texas initially set Garza's date of execution, President Clinton granted a reprieve and then himself set a new execution date, pursuant to which Garza was executed on June 19, 2001. *See* Executive Grant of Clemency (Dec. 11, 2000) (attached as Ex. 2); Executive Grant of Clemency (Aug. 2, 2000) (attached as Ex. 3). The Bureau of Prisons also set the execution date for Jones, and he was executed on March 18, 2003. *See* Memorandum from Kathleen Hawk Sawyer, Federal Bureau of Prisons (Nov. 14, 2002) (attached as Ex. 4).

During last year, the Bureau of Prisons executed ten federal defendants and scheduled three more before the regulations went into effect.[10] The implementation of those executions were (and

---

[10] *See* Department of Justice, Press Release, https://www.justice.gov/opa/pr/federal-government-resume-capital-punishment-after-nearly-two-decade-lapse; Department of Justice, Press Release, https://www.justice.gov/opa/pr/executions-scheduled-four-federal-inmates-convicted-murdering-children; Department of Justice, Press Release, https://www.justice.

continue to be) heavily litigated by each of the inmates sentenced to death; yet, with few exceptions, those inmates have not contested the Bureau of Prisons' authority to schedule the execution dates.  *See, e.g.*, Redacted Am. Compl., *Execution Protocol Cases*, No. 19-mc-145, ECF No. 92 (D.D.C. June 1, 2020).  Indeed, even though Higgs has sought leave in separate litigation to amend his complaint to allege that he was arbitrarily and capriciously selected for execution, he has not argued that the Bureau of Prisons lacks the *authority* to set his execution date.  *See* Proposed Am. & Suppl. Compl. of Pl. Dustin Higgs, *Execution Protocol Cases*, No. 19-mc-145, ECF No. 343-1 (D.D.C. Dec. 4, 2020).  Moreover, and tellingly, those inmates who have challenged the Bureau of Prisons' authority have not prevailed on that argument.  *See LeCroy v. United States*, 975 F.3d 1192, 1196 (11th Cir. 2020) ("[W]e are confident that [the Department's regulations and execution protocol] do *not* vest courts with a free-floating, standardless reservoir of authority to postpone an already-scheduled execution, free and clear of the traditional stay standard."), *cert. denied*, 141 S. Ct. 220 (2020) (mem.); *Lee*, 2020 WL 3921174, *5 (concluding that the Bureau of Prisons' setting of and notice of the inmate's execution date was not *ultra vires*).

Accordingly, far from impacting the constitutional powers of Article III courts, the Final Rule merely removed a ministerial requirement that government attorneys file a proposed Judgment and Order with the sentencing court.  Plaintiffs resort to hyperbole by calling the change an attempt to "remove from the Judiciary certain essential functions that are inherent to the judicial power."  Mot. at 23.  Plaintiffs never explain how the Final Rule actually limits the power of the Judiciary, or how it allegedly removes courts from any role whatsoever.  Capital defendants remain free to seek relief in federal courts related to the implementation of their sentences, and Article III

---

gov/opa/pr/executions-scheduled-two-federal-inmates-convicted-heinous-murders;   Department of   Justice,   Press   Release,   https://www.justice.gov/opa/pr/executions-scheduled-inmates-convicted-brutal-murders-many-years-ago; Department of Justice, Press Release, https://www.justice.gov/opa/pr/executions-scheduled-two-federal-inmates;   Department   of   Justice,   Press Release,   https://www.justice.gov/opa/pr/execution-rescheduled-federal-inmate-convicted-brutally-murdering-grandmother-and-her-nine; Department of Justice, Press Release, https:// www.justice.gov/opa/pr/execution-scheduled-federal-death-row-inmate-convicted-murdering-child.

courts, naturally, retain the power to set aside or postpone execution dates pursuant to their authority to issues stays and injunctions when legally warranted.  The Executive Branch could not limit that power through regulation, of course, nor does the Final Rule attempt to do so.  *See* 85 Fed. Reg. at 75,850.

Even if the Court were to construe Plaintiffs' claim as a challenge to the Executive Branch's general authority to set execution dates—though it should not because this request for a *preliminary injunction* does not and could not challenge the *1993* regulation specifying that BOP would set the execution dates unless otherwise ordered by a court—Plaintiffs' separation-of-powers claim is still unlikely to succeed.  Plaintiffs assert that the "historical record here shows that Founding Era courts were responsible for setting execution dates" and that "today's courts thus must also have that responsibility."  Mot. at 24.  However, the Judiciary has historically shared the responsibility with the Executive Branch in setting executions since the Founding.

Since the First Congress "made a number of" federal offenses "punishable by death" in the Crimes Act of 1790, *Bucklew v. Precythe*, 139 S. Ct. 1112, 1122 (2019), to the present, Congress has not, to the government's knowledge, prescribed rules for fixing the date of execution.  That omission is consistent with the fact that "at common law the sentence of death was generally silent as to the precise day of execution."  *Holden v. Minnesota*, 137 U.S. 483, 496 (1890) (collecting cases).  And, as Plaintiffs acknowledge, the Supreme Court has determined that, in the context of executions carried out by the States, the Constitution permits either the executive or the judiciary to set a date for execution.  *Id.* at 495-96; *see also* Mot. at 29.

As a matter of historical practice in the federal system, both the Executive Branch and the Judiciary have set execution dates.  Accordingly, in an 1855 opinion, the Attorney General explained that sometimes the President fixed the date of execution and sometimes the courts did so.  7 Op. Att'y Gen. 561, 562 (1855); *see* 58 Fed. Reg. at 4899-4900 (describing nineteenth-century practices).  In 1830, President Andrew Jackson decided to "leave" it to the "discretion of the court" to fix the date of execution, and it appears that this became the "established practice" for at least a period.  7 Op. Att'y Gen. at 562-63.  But the varied practice in which either the

Judiciary or the Executive Branch may set the date of execution has persisted and strongly suggests there is not a constitutional requirement one way or the other. *See Lee*, 2020 WL 3921174, at *4 ("While it is not beyond reasonable dispute, the better view is that the original understanding during the founding era was that the Executive Branch had the inherent authority to implement a sentence, at least where the Court and Congress were silent on matters of implementation.").

At present, however, there can be no doubt that the Executive Branch may set execution dates, because Congress has entrusted the Attorney General to carry out lawful sentences of death, after the capital defendant has "exhaust[ed] the procedures for appeal of the judgment of conviction and for review of the sentence." 18 U.S.C. § 3596(a). Specifically, "[w]hen the sentence is to be implemented, the Attorney General shall release the person sentenced to death to the custody of a United States marshal, who shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed." *Id.* The Executive Branch's authority to set an execution date—and the Attorney General's 1993 regulations incorporating the same—is also consistent with the Executive Branch's constitutional duties in general to "take care that the Laws be faithfully executed," U.S. Const. art. II, § 3, and with Congress's statutory authorization to, among other things, prescribe regulations for the Department, as discussed above. *See supra* at 24-25; *see also cf. Tipton*, 90 F.3d at 902-03.

For all the reasons above, Plaintiffs are incorrect (Mot. at 31) that the courts have been "strip[ped]" of "an essential judicial power" by the removal of the requirement in Section 26.2 to send a proposed judgment to the sentencing court—the entry of which is entirely unnecessary for the Executive Branch to schedule executions and the elimination of which thus does not limit the Judiciary's authority in any way. Plaintiffs are therefore unlikely to succeed on their constitutional separation-of-powers claim.

## II.    PLAINTIFFS FAIL TO SHOW IRREPARABLE HARM.

Wholly independent of the merits, the Court should deny Plaintiffs' request for preliminary injunctive relief for the simple but fundamental reason that they have failed to show the

indispensable requirement of irreparable harm.  *See, e.g.*, *Sampson v. Murray*, 415 U.S. 61, 88 (1974) ("[T]he basis of injunctive relief in the federal courts has always been irreparable harm."). While being executed is certainly "irreparable," Plaintiffs are incorrect that the risk of harm is "obvious," simply because this case involves regulations related to the federal government's implementation of capital sentences. Mot. at 32.  Indeed, three of the four Plaintiff-inmates in this case do not even have execution dates, and none of the Plaintiffs have shown that any of the regulations challenged in this case have been, or imminently will be, applied to them.  In any event, the consequence of being executed is not the relevant "injury" for the purposes of Plaintiffs' motion, which does not and cannot challenge the lawfulness of the convictions or sentences of any of the Plaintiff-inmates.

Rather, the Plaintiff-inmates' asserted injury is that their executions may be carried out under regulations that they believe are unlawful.  Even assuming for present purposes that they are correct on the merits (*but see* Part I, *supra* ), Plaintiffs must do more than allege that the Final Rule is unlawful, even in the context of capital punishment.  In particular, the must show that the allegedly unlawful conduct is likely to inflict actual, non-speculative harm.  *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7-8 (D.C. Cir. 2016) (explaining that "the harm must be certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief") (citation omitted); *see also Execution Protocol Cases*, 980 F.3d 123, 137 (D.C. Cir. 2020) (affirming denial of injunction because inmates scheduled for execution failed to show irreparable harm, despite finding a violation of the Food, Drug, and Cosmetic Act); *Nelson v. Barr*, No. 20-5260 (D.C. Cir. Aug. 27, 2020) (reversing order enjoining execution of Keith Nelson for "insufficient findings and conclusions that irreparable injury will result from the statutory violation found by the district court"); *Execution Protocol Cases*, No. 19-mc-145 (TSC), 2020 WL 7186766, *7 (D.D.C. Dec. 6, 2020) (no irreparable harm despite finding FDPA violations; explaining that, "[g]iven the Supreme Court's repeated vacatur of this court's prior injunctions and the D.C. Circuit's finding that Plaintiffs were not entitled to injunctive relief despite Defendants' violation of the [FDPA] . . . the court cannot find that Plaintiffs have

demonstrated irreparable harm to warrant injunctive relief"); *id.* ("The Supreme Court has made clear that the prospect of an inmate being executed prior to their claims being fully litigated will not serve as a basis for injunctive relief.") (citing *Barr v. Lee*, 140 S. Ct. 2490 (2020); *Barr v. Purkey*, 141 S. Ct. 196 (2020) (mem.); *Barr v. Hall*, No. 20A99, 2020 WL 6798770 (Nov. 19, 2020)).

Here, Plaintiffs cannot show that the harm they allege is either great or certain, so they are not entitled to a preliminary injunction. Plaintiffs contend that the Final Rule's addition of Section 26.1(b) is of "particular concern," because it creates "uncertainty surrounding when and how the Attorney General may impermissibly depart from binding law." Mot. at 32. Yet, as discussed above, Plaintiffs' challenge in this regard hinges on pure conjecture about whether the Attorney General would be required to conform to State law in any particular circumstances in order to comply with the FDPA. *See supra* at 12-14. That is particularly speculative given that, as discussed above, the regulations separately account for the most likely source of conflict—the actual manner of execution—requiring that it be in accordance with State law. *See* 28 C.F.R. § 26.3(a)(4). The even greater level of speculation required to assume that there may be some other conflict that would require the Attorney General to invoke Section 26.1(b) only underscores that Plaintiffs' claim is not ripe for judicial review, much less that irreparable harm is sufficiently certain to support the extraordinary remedy of injunction relief.

Plaintiffs attempt to manufacture the threat of harm by arguing that the Final Rule may interfere with Plaintiff Federal Capital Habeas Project's ability to represent its clients, and may hinder the individual Plaintiffs' ability to mount legal defenses. Mot. at 32. And Plaintiffs contend that "it is difficult to know in advance which 'applicable law' the Attorney General might use as a basis for variance." *Id.* at 33. Yet again, as Defendants explained above, Plaintiffs are incorrect. The Department's existing regulations state that a prisoner will receive notice of "the manner of execution and the date designated for execution at least 20 days in advance," or, where applicable, the prisoner will be notified of his option to "choose among multiple manners of execution." 28 C.F.R. § 26.4(a). Moreover, the FDPA incorporates only those binding State laws and regulations

that concern the "manner" of implementing the death sentence, 18 U.S.C. § 3596(a), *Execution Protocol Cases*, 955 F.3d at 133, 135 (Rao, J., concurring), and Section 26.1(b) provides that the Attorney General may vary from a regulation "only in circumstances where controlling law requires him to do so and only to the extent necessary," 85 Fed. Reg. at 75,849.  Thus, Plaintiffs' suggestion that the Attorney General may, at some point in the future, hypothetically employ a variance based on "textual ambiguities and unpublished state protocols," Mot. at 33, finds no basis in the Final Rule, and is pure speculation.  If a situation does ultimately arise in which an inmate scheduled for execution believes the manner of execution to be unlawful, then the inmate may challenge the Department's implementation of the sentence at that time—just as the inmates scheduled for execution over the last year have been able to do in other cases.

Plaintiffs' discussion of the Alabama execution of Domineque Ray is instructive—though not for the reasons Plaintiffs believe.  In that situation, Alabama law provided that a spiritual advisor "may be present at an execution," Ala. Code § 15-18-83, and, as Plaintiffs recount it, an unpublished policy of the state's correctional department prevented Mr. Ray's selected spiritual advisor from being present.  Mot. at 34.  But the Attorney General could not ignore the federal regulation based on "unpublished [Alabama Department of Corrections] policy," because complying with such a policy would not be "necessary to comply with the applicable law," 28 C.F.R. § 26.1(b), given that such non-binding policies are not incorporated by the FDPA.  *See Execution Protocol Cases*, 955 F.3d at 133, 135 (Rao., J., concurring) (holding that the FDPA requires the government to comply only with "execution procedures enacted or promulgated by states as part of their binding law," not "aspects of a state execution procedure that were not formally enacted or promulgated"); *id.* at 124 n.10 (Katsas, J., concurring) ("agree[ing] with Judge Rao that the FDPA's reference to 'law of the State' covers only state statutes and binding regulations").  Here, particularly given the scope of the FDPA, Plaintiffs would certainly be aware of any controlling State law the Attorney General could be *required* to conform to, and there would be no impediment to filing suit to challenge the Attorney General's conformance with State law if and when it arises in the context of a specific inmate's execution, as many death-row inmates have

done pursuant to the FDPA.  Accordingly, there is no basis for the wide-ranging, prophylactic injunction that Plaintiffs seek in this case.

Plaintiffs' only other claim of harm is that the Final Rule will make it harder for the Federal Capital Habeas Project to do its work, by requiring it to monitor pending death penalty litigation, which will "divert resources away from other efforts."  Mot. at 35-36.  To start, it is not clear why that would be true, given that inmates sentenced to death are very likely to be represented by their own counsel who would naturally be monitoring developments in any event.  But, even so, the type of diversion of resources that the Federal Capital Habeas Project says will be necessary is not sufficient to justify a preliminary injunction.  This case stands in stark contrast to *Open Communities Alliance v. Carson*, 286 F. Supp. 3d 148 (D.D.C. 2017), upon which Plaintiffs rely. In that case, the court concluded that the challenged agency inaction directly affected the value of housing vouchers, which, in turn, hampered the organization's work with developers to build affordable housing and forced the organization to abandon plans to launch a "web portal" built around the anticipated rule's effects.  *Id.* at 178.  The Federal Capital Habeas Project alleges no such concrete effects from the Final Rule.  *See* Mot. at 36.  Indeed, the Declaration of Ruth Friedman, which Plaintiffs submitted in support of their motion, provides only generalized assertions that the Final Rule "will have significant impact" on and will "substantially impair[]" the efforts of the organization, ECF No. 3-2 ¶ 9, without any specific facts demonstrating that the mere existence of the Final Rule will cause a certain and great injury to the Federal Capital Habeas Project imminently.

Plaintiffs do not even attempt to argue that they will be irreparably harmed by other two amendments in the Final Rule that they challenge—the addition of Section 26.1(c) or the removal of Section 26.2.  *See* Mot. at 31-37.  That is understandable.  As discussed above, it is entirely speculative that the Attorney General will, in fact, delegate any authority pursuant to Section 26.1(c).  It is also hard to understand how Plaintiffs could be harmed by any such internal Department personnel decisions.  Nor can Plaintiffs demonstrate that the removal of Section 26.2's ministerial filing obligation on government attorneys causes Plaintiffs any injury.  Courts regularly

review challenges to the scheduling and implementation of death sentences, and nothing in the Final Rule affects their authority to do so.  Nor can Plaintiffs show that the submission of the proposed Judgment and Order under Section 26.2 would have any effect on the Department's ability to schedule their executions, given that it had no effect on the Department's ability to do so for the sixteen executions scheduled while that regulation was in place.

Because Plaintiffs cannot demonstrate the requisite irreparable harm, their motion for a preliminary injunction should be denied.

III.    **THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH AGAINST A PRELIMINARY INJUNCTION.**

Because Plaintiffs are not likely to succeed on the merits, and because they have failed to show irreparable harm, this Court need not proceed to the remaining preliminary injunction factors. *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987) ("[T]he bases for injunctive relief are irreparable injury and inadequacy of legal remedies.").  Should the Court proceed further, however, the equities weigh heavily against issuing an injunction.  *See Winter*, 555 U.S. at 32 ("[T]he balance of equities and consideration of the public interest are pertinent in assessing the propriety of any injunctive relief.") (punctuation omitted).

The Executive Branch and the public have undeniably strong interests in ensuring the efficient implementation of capital sentences consistent with the FDPA.  *Cf. Hill v. McDonough*, 547 U.S. 573, 584 (2006) (recognizing the government's "strong interest in enforcing its criminal judgments"); *Bucklew*, 139 S. Ct. at 1133 (emphasizing that "[b]oth the [government] and the victims of crime have an important interest in the timely enforcement of a [death] sentence").  Enjoining the challenged portions of the Final Rule could impair those interests.  As to Section 26.1(b), an injunction would cause confusion if there were, hypothetically, some controlling State law with which the Department must comply under the FDPA but conflicts with the Department's 1993 regulations.  An injunction regarding Section 26.1(c) could similarly, and needlessly, muddy the waters regarding the Attorney General's preexisting statutory authority to delegate internal Department responsibilities.  And requiring the resurrection of Section 26.2 would add the

administrative burden on government attorneys to file redundant and practically meaningless proposed Judgment and Orders.

On the other side of the scale, Plaintiffs have failed to demonstrate any irreparable harm that would result from challenged portions of the Final Rule.  The balance of interests and equities therefore favors Defendants, and it supports denial of Plaintiffs' motion.  And to the extent that Plaintiffs seek an injunction barring implementation of even the portions of the Final Rule they do *not* challenge in their motion, *see, e.g.*, Mot. at 38, such relief would be far broader than could conceivably be designed to remedy even the speculative harms Plaintiffs assert could occur under the three challenged regulations.  *See, e.g.*, *State of Neb. Dep't of Health & Human Servs. v. Dep't of Health & Human Servs.*, 435 F.3d 326, 330, 369 (D.C. Cir. 2006) ("We have long held that '[a]n injunction must be narrowly tailored to remedy the specific harm shown.'") (quoting *Aviation Consumer Action Project v. Washburn*, 535 F.2d 101, 108 (D.C. Cir. 1976), and collecting cases).  Thus, under no circumstances could preliminary relief in this case enjoin use of all provisions within the Final Rule, rather than only the revised versions of 28 C.F.R. §§ 26.1(b), 26.1(c), and 26.2.

## CONCLUSION

For these reasons, Defendants respectfully ask that the Court deny Plaintiffs' motion for a preliminary injunction.

 Respectfully submitted,

MICHAEL R. SHERWIN
Acting United States Attorney

BRIAN P. HUDAK
Acting Chief, Civil Division

JOHNNY H. WALKER, D.C. Bar #988057
Assistant United States Attorney
555 4th Street, N.W.
Washington, District of Columbia 20530
Telephone: 202 252 2575
Email: johnny.walker@usdoj.gov

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

JEAN LIN
Special Litigation Counsel

By:  */s/ Bradley P. Humphreys*
BRADLEY P. HUMPHREYS, D.C. Bar
  #988057
CRISTEN C. HANDLEY, MO Bar #69114
JONATHAN KOSSAK, D.C. Bar #991478
Trial Attorneys
Federal Programs Branch
Civil Division, Department of Justice
1100 L Street, N.W.
Washington, District of Columbia 20005
Telephone: (202) 305-0878
jean.lin@usdoj.gov
bradley.humphreys@usdoj.gov
cristen.handley@usdoj.gov
jonathan.kossak@usdoj.gov

*Counsel for Defendants*

Dated: January 4, 2021

**CERTIFICATE OF SERVICE**

I hereby certify that on January 4, 2021, I caused a true and correct copy of foregoing to be served on all counsel of record via the Court's CM/ECF system.


 _/s/ Bradley P. Humphreys_
*Counsel for Defendants*