IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FEDERAL CAPITAL HABEAS
PROJECT, et al.

        Plaintiffs,

    v.

JEFFREY A. ROSEN, in his official
capacity as Acting Attorney General of the
United States,[1] et al.

        Defendants.

Case No. 20-cv-03742-RC

**REPLY BRIEF IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR SECTION 705 RELIEF AND PRELIMINARY INJUNCTION**

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Jeffrey A. Rosen is substituted for his predecessor, William P. Barr.

# TABLE OF CONTENTS

**Page**

REPLY BRIEF FOR PLAINTIFFS ........................................................................ 1

ARGUMENT ....................................................................................................... 2

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ................................... 2

    A.    Section 26.1(b) Violates the Administrative Procedure Act ................................. 2

    B.    Section 26.1(c) Violates the Administrative Procedure Act and the Federal Death Penalty Act ......................................................................................... 5

        1.    *Administrative Procedure Act* ................................................................. 5

        2.    *Federal Death Penalty Act* ..................................................................... 6

    C.    The Department of Justice's Removal of Section 26.2 Violates Article III ......... 9

        1.    *The Historical Record Establishes that DOJ Cannot Set the Date of an Execution Without the Approval of an Article III Court* ................. 9

        2.    *The Final Rule's Removal of Section 26.2 Violates Article III* ............... 15

II.    PLAINTIFFS FACE IRREPARABLE HARM ...................................................... 16

III.    PLAINTIFFS' CLAIMS ARE JUSTICIABLE ...................................................... 18

    A.    Plaintiffs Have Article III Standing and Their Claims are Ripe ......................... 19

    B.    The Government's Justiciability Arguments Fail ............................................. 20

        1.    *Plaintiffs' Challenge to Section 26.1(b) is Justiciable* ............................. 20

        2.    *Plaintiffs' Challenge to Section 26.1(c) is Justiciable* ............................. 22

        3.    *Plaintiffs' Challenge to the Removal of Section 26.2 is Justiciable* ........ 24

IV.    CONCLUSION .......................................................................................... 25

## TABLE OF AUTHORITIES

Page

**Cases**

*United States ex rel. Accardi v. Shaughnessy*,
    347 U.S. 260 (1954)..................................................................................5, 6

*Babbitt v. United Farm Workers Nat'l Union*,
    442 U.S. 289 (1979)........................................................................................19

*Bond v. United States*,
    564 U.S. 211 (2011)........................................................................................24

*Bowsher v. Synar*,
    478 U.S. 714 (1986)........................................................................................17

*Dunn v. Ray*,
    139 S. Ct. 661 (2019)......................................................................................21

*Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*,
    653 F.3d 1 (D.C. Cir. 2011).............................................................................2

*In re Fed. Bureau of Prisons' Execution Protocol Cases*,
    955 F.3d 106 (D.C. Cir. 2020).....................................................................6, 7

*Hogg v. United States*,
    428 F.2d 274 (6th Cir. 1970) ...........................................................................6

*La. Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986)........................................................................................18

*League of Women Voters of United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016).............................................................................19

*\*N.L.R.B. v. Noel Canning*,
    573 U.S. 513 (2014)........................................................................................13

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
    417 F.3d 1272 (D.C. Cir. 2005)......................................................................20

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
    440 F.3d 459 (D.C. Cir. 2006)........................................................................22

*Nat'l Mining Ass'n v. Fowler*,
    324 F.3d 752 (D.C. Cir. 2003)........................................................................20

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
    538 U.S. 803 (2003)........................................................................................20

## TABLE OF AUTHORITIES

(continued)

Page

*Oil States Energy Servs., LLC v. Greene's Energy Group,*
  138 S. Ct. 1365 (2018) ................................................................................................12

*Perez v. Mortg. Bankers Ass'n,*
  575 U.S. 92 (2015) ........................................................................................................2

*POET Biorefining, LLC v. EPA,*
  970 F.3d 392 (D.C. Cir. 2020) ......................................................................................2

*\*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
  566 U.S. 639 (2012) ..................................................................................................7, 8

*Sabre, Inc. v. Dep't of Transp.,*
  429 F.3d 1113 (D.C. Cir. 2005) ..................................................................................19

*Seila Law LLC v. Consumer Fin. Prot. Bureau,*
  140 S. Ct. 2183 (2020) ..........................................................................................17, 18

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014) ....................................................................................................19

*Teva Pharms. USA, Inc. v. Sebelius,*
  595 F.3d 1303 (D.C. Cir. 2010) ..................................................................................23

*United States v. Chandler,*
  950 F. Supp. 1522 (N.D. Ala. 1996) ..........................................................................15

*United States v. Chandler,*
  No. 90-cr-00266 (N.D. Ala. Mar. 21, 1995) ..............................................................15

*\*United States v. Giordano,*
  416 U.S. 505 (1974) ..............................................................................................6, 7, 8

*United States v. Hall,*
  No. 94-cr-00121 (N.D. Tex. Sept. 30, 2020) .............................................................14

*United States v. Honken,*
  No. 1-cr-03047 (N.D. Ia. July 14, 2020) ...................................................................14

*United States v. Lee,*
  No. 97-cr-00243, 2020 WL 3921174 (E.D. Ark. July 10, 2020) ...............................14

*United States v. Montgomery,*
  No. 5-cr-06002 (W.D. Mo. Oct. 16, 2020) ................................................................13

**TABLE OF AUTHORITIES**
(continued)

Page

*United States v. Nelson*,
   No. 99-cr-00303 (W.D. Mo. June 16, 2020) ........................................................14

*United States v. Purkey*,
   No. 1-cr-00308 (W.D. Mo. July 16, 2020) ..........................................................14

*United States v. Sampson*,
   300 F. Supp. 2d 278 (D. Mass 2004) .............................................................15, 24

*United States v. Vialva*,
   No. 99-cr-00070 (W.D. Tex. Sept. 11, 2020) ......................................................14

*Woodhull Freedom Found. v. United States*,
   948 F.3d 363 (D.C. Cir. 2020) ...........................................................................19

**Statutes and Regulations**

5 U.S.C.
   § 551(5) ................................................................................................................2
   § 553 ....................................................................................................................3

18 U.S.C.
   § 2516(1) ..............................................................................................................8
   § 3596(a) ..............................................................................................................6

28 U.S.C. § 510 .............................................................................................7, 8, 23

28 C.F.R.
   § 26 ........................................................................................................... *passim*
   § 26.3(a)(3) ................................................................................................2, 5, 6
   § 26.1(b) ..................................................................................................... *passim*
   § 26.1(c) ..................................................................................................... *passim*
   § 26.2 .......................................................................................................... *passim*
   § 26.4(c)(3) ...........................................................................................................2

58 Fed. Reg. 4898 (Jan. 19, 1993) ............................................................................9

85 Fed. Reg. 75,846 (Nov. 27, 2020) ........................................................................4

**Other Authorities**

1 U.S. Op. Atty. Gen. 228 (1818) ...........................................................................10

7 U.S. Op. Atty. Gen. 561 (1855) ..............................................................................9

Daily National Intelligencer, May 5, 1818 (Ex. 4) ................................................11

## TABLE OF AUTHORITIES
(continued)

Page

Letter from David Sewall, Judge of the U.S. District Court of Maine, to George
Washington, President of the United States (June 5, 1790).........................................11

Department of Justice, Federal Government to Resume Capital Punishment After
Nearly Two Decade Lapse (July 25, 2019) .............................................................23

Department of Justice, Justice Manual § 9-10.210 (last updated Dec. 2020)..............................25

Dunlap's American Daily Advertiser, June 15, 1793 (Ex. 1).........................................11

Elizabeth Magill & Adrian Vermeule, *Allocating Power Within Agencies*, 120
Yale L.J. 1032 (2011) ...................................................................................6

Federal Bureau of Prisons, Execution Protocol Manual (July 2019)............................................23

J. Belcher, A Report of the Trial of Samuel Tulley and John Dalton (1812) (Ex. 3)...................11

Jennifer Nou, *Subdelegating Powers*, 117 Colum. L. Rev. 473 (2017) ...........................................6

Letter to Spencer Roane (Sept. 2, 1819), in 8 Writings of James Madison 450 (G.
Hunt ed. 1908) ...........................................................................................13

M. Watt Espy & John Ortiz Smykla, *Executions in the United States, 1608–2002:*
*The Espy File* (2004)...................................................................................10

References on Capital Punishments and Pardons at Old Bailey, 1730–1837 (last
visited Jan. 6, 2021) ...................................................................................12

Captain William Wheland, Horrid Murder and Piracy On Board the Schooner
Eliza of Philadelphia (1800) (Ex. 2) ...........................................................11

### REPLY BRIEF FOR PLAINTIFFS

As Plaintiffs' opening brief explained, the Final Rule eliminates critical judicial safeguards restricting how the federal government executes individuals and grants wide-ranging powers to the Attorney General to depart from regulations concerning the implementation of the death penalty without notice, further rulemaking, or good cause. Through a variety of meritless justiciability arguments, the Government seeks to evade review of this unlawful regulation. But the need for immediate review and a preliminary injunction could not be more clear: the Government is rushing to execute three additional individuals—including Plaintiff Dustin Higgs— before January 20, and the Government published the Final Rule the day after Thanksgiving to ensure it would take effect before these executions and the end of the current Presidential Administration. The Government's own conduct reflects that the Attorney General stands ready to invoke the new, unlawful authority granted by the Final Rule as he deems necessary in his sole discretion to carry out the upcoming executions with as little oversight as possible, judicial or otherwise. All Plaintiffs have standing; this controversy is ripe; and an injunction is necessary to prevent irreparable harm—the final form of which cannot (and need not) presently be known, given that a key problem with the Final Rule is the illegal discretion it claims for the Attorney General to act without notice.

In short, this case is not an academic debate about the Administrative Procedure Act. This case is about a Final Rule that unlawfully provides the Government with nearly unlimited discretion to decide how individuals will be executed and who will execute them, seeking to avoid the judicial oversight that the Government has found inconvenient as it has conducted its unprecedented campaign of putting individuals to death. This Court should reject that attempt and enjoin the Final Rule.

**ARGUMENT**

I.    **PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS**

A.    **Section 26.1(b) Violates the Administrative Procedure Act**

Part 26 of the Code of Federal Regulations is a set of binding requirements issued by the Department of Justice (DOJ) pursuant to notice-and-comment rulemaking that dictate the manner of putting a federal inmate to death. 28 C.F.R. § 26 (Part 26). The Government largely fails to address Plaintiffs' actual challenge to new Section 26.1(b), which flouts the Administrative Procedure Act (APA) and seeks to insulate last-minute regulatory deviations from judicial review by empowering the Attorney General to ignore **any aspect of Part 26** whenever the Attorney General determines, in his sole discretion, that doing so is "necessary to comply with the applicable law."[2] It is undisputed that Part 26 comprises numerous provisions that qualify as "legislative rules" and thus can be amended only through notice-and-comment rulemaking. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015); 5 U.S.C. § 551(5). For example, Section 26.3(a)(3) provides that "a sentence of death *shall* be executed . . . [u]nder the supervision of a United States Marshal" and Section 26.4(c)(3) provides that a prisoner's spiritual adviser, defense attorneys, and friends or relatives "*shall* be present at the execution." 26 C.F.R. §§ 26.3(a)(3) and 26.4(c)(3) (emphasis added). Not only do these provisions use mandatory language that speak with the force of law, *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 407 (D.C. Cir. 2020), but they also "alter the rights or interests of parties" and thus cannot be characterized as merely "procedural," *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 5 (D.C. Cir. 2011) (citation omitted). Accordingly, in order to deviate from these requirements, the Attorney General must either go

---

[2] Section 26.1(b) provides: "Where applicable law conflicts with any provision of this part, the Attorney General may vary from that provision to the extent necessary to comply with the applicable law."

through notice-and-comment or show that one of the express exceptions listed in 5 U.S.C. § 553 applies.  Because Section 26.1(b) purports to authorize the Attorney General to "vary" from any aspect of Part 26 without satisfying either of these requirements, Section 26.1(b) violates the APA.

The Government's main response on the merits—that it "was not required to undertake notice-and-comment procedures in order to promulgate Section 26.1(b) in the first place" because Section 26.1(b) is an asserted "procedural rule," Opposition (Opp.) at 16—entirely misses the point.  Whether Section 26.1(b) is itself a procedural rule or legislative rule has no bearing on the fact that *other provisions* of Part 26, from which Section 26.1(b) purports to allow the Attorney General to vary at will, are legislative rules that may be deviated from only in compliance with the APA.  Plaintiffs' argument is not that the Government was required to go through notice and comment to enact Section 26.1(b) itself—although the Government's decision to do so is telling.  Rather, Plaintiffs' argument is that Section 26.1(b)'s supposed conferral on the Attorney General of authority to vary from any and all of Part 26 in his discretion going forward violates the APA.  In short: the APA requires notice-and-comment or an applicable exception (such as good cause) for deviations from Part 26.  Yet, rather than track the APA's requirements for deviating from Part 26, Section 26.1(b) purports to create a *different procedure*, authorizing the Attorney General to vary from Part 26 as he deems "necessary."  This conflicting procedure violates the APA.

The Government hyperbolically and incorrectly argues that Plaintiffs' position would require "the Government to undergo notice and comment rulemaking any time the Attorney General determines that a variance pursuant to Section 26.1(b) is appropriate," thus allegedly "call[ing] into question the Department's ability to carry out federal death sentences" because "the Department would be placed in the impracticable situation of having to analyze every applicable statute and formal regulation of every state that authorizes the death penalty . . . in order to account

for all potential conflicts through notice-and-comment rulemaking." Opp. at 19. Plaintiffs' position is nothing of the sort. The Government is under no obligation to survey in advance every potential variance from Part 26 that might be needed and provide for such variance via notice-and-comment rulemaking. Indeed, Plaintiffs have expressly recognized that circumstances might arise where there is "good cause" to deviate from the requirements of Part 26 without going through notice-and-comment. Opening Brief (Br.) at 15–16. But what the Government cannot do under the APA—and what it seeks to do through Section 26.1(b)—is to provide itself the advance, unreviewable discretion to vary from any aspect of Part 26 regardless of whether good cause exists or further notice-and-comment rulemaking is feasible. Section 26.1(b) is invalid because it invents a different exemption from notice-and-comment not authorized by the APA.

The Government's response also does nothing to address the troubling breadth of Section 26.1(b), which by its terms may be invoked anytime the Attorney General claims that "any provision" of Part 26 conflicts with "applicable law," and provides no definition or limitation on what "applicable law" means. Although the Government claims that "applicable law" will likely be narrow and asserts that the Federal Death Penalty Act (FDPA) "incorporates only those execution procedures prescribed by a state's statues and formal regulations," Opp. at 13 (internal citations omitted), the regulatory text contains no such limitation. Instead, the actual language of Section 26.1(b)—"applicable law"— could encompass *any* source of law, not just state law, and even then, not just state statutes and formal regulations. Likewise, by requiring only a "conflict" between Part 26 and "applicable law," Section 26.1(b) is not limited to situations where Part 26 and the "applicable law" are mutually exclusive, as the Government contends, Opp. at 16; instead, the commentary to the Final Rule suggests that Section 26.1(b) would apply whenever there is a "difference" between Part 26 and the applicable law—including a "minor" difference. 85 Fed.

4

Reg. 75,846, 75,849 (Nov. 27, 2020).  In response to comments received on the Notice of Proposed Rulemaking, the Government easily could have revised the text of Section 26.1(b) to provide limits or clarity on the scope of the claimed authority, but it chose not to limit itself, instead opting for intentionally broad and vague language.

Through Section 26.1(b), the Government seeks to transform the FDPA's relatively narrow command to follow state law into a broad grant of authority, unguided by any procedural requirements or judicial oversight, to deviate at will from the federal regulations governing how prisoners will be put to death.  The APA prohibits this approach.

**B.    Section 26.1(c) Violates the Administrative Procedure Act and the Federal Death Penalty Act**

**1.    *Administrative Procedure Act***

Like Section 26.1(b), new Section 26.1(c) violates the APA by purporting to give the Attorney General the authority to ignore a legislative rule promulgated through notice-and-comment rulemaking.  Specifically, Section 26.3(a)(3) uses mandatory "shall" language to provide that a "sentence of death *shall* be executed . . . [u]nder the supervision of a United States Marshal (Marshal) designated by the Director of the United States Marshals Service."  28 C.F.R. 26.3(a)(3) (emphasis added).  Accordingly, "as long as the regulations remain operative, the Attorney General denies himself the right to sidestep" this delegation to the U.S. Marshals.  *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267 (1954).  Contrary to this specific, binding delegation in Section 26.3(a)(3), Section 26.1(c) purports to authorize the Attorney General to delegate "[a]ny task or duty assigned to any officer or employee of the Department of Justice . . . to any other officer or employee of the Department of Justice," without revising Section 26.3(a)(3) through notice-and-comment or otherwise establishing good cause to depart from it.  Accordingly, Section 26.1(c)—as applied to Section 26.3(a)(3)—violates the APA and is *ultra vires*.

5

In arguing otherwise, the Government simply fails to confront the implications of DOJ's decision to "adopt[] a rule that constrains its own discretion."  Elizabeth Magill & Adrian Vermeule, *Allocating Power Within Agencies*, 120 Yale L.J. 1032, 1064 (2011).  Citing the Sixth Circuit's decision in *Hogg v. United States*, 428 F.2d 274, 280 (6th Cir. 1970), the Government notes that "courts have held that the APA 'does not require that all internal delegations . . . be published in order to be effective.'"  Opp. at 21.  This observation is beside the point, however, as it does not address what rules agencies must follow when they ***do*** decide to publish their internal delegations as public, binding rules—as DOJ has done here, in Section 26.3(a)(3).  In *Accardi*, the Supreme Court held that the Attorney General, having delegated his authority to the Board of Immigration Appeals through a binding regulation, could not simply decide to take his authority back.  347 U.S. at 267.  Because the "*Accardi* doctrine generally requires agencies to follow their own rules, including procedural rules regarding internal delegation," DOJ cannot avoid the binding delegation to the United States Marshals in Section 26.3(a)(3) based on an argument that it did not *have* to bind itself in the first place.  Jennifer Nou, *Subdelegating Powers*, 117 Colum. L. Rev. 473, 518–19 (2017).

### 2.    *Federal Death Penalty Act*

Section 26.1(c)'s purported delegation authority also violates the FDPA, which specifically provides that "a United States marshal . . . shall supervise implementation of the sentence"—and thus constitutes Congress's own delegation of this weighty responsibility to a particular official within DOJ.  18 U.S.C. § 3596(a).

The Government's response to this argument relies entirely on Judge Katsas's non-binding concurrence in the *Execution Protocol Cases*, 955 F.3d 106 (D.C. Cir. 2020).  Opp. at 23.  In that concurrence, Judge Katsas expressed his view that the specific statutory delegation at issue in the FDPA, unlike the specific statutory delegation at issue in *United States v. Giordano*, 416 U.S. 505

(1974), fails to override the Attorney General's general power under 28 U.S.C. § 510 to assign duties within DOJ, and thus allows the Attorney General to delegate the implementation of death sentences to employees of the Bureau of Prisons (BOP) as opposed to the United States Marshals. According to Judge Katsas, the FDPA fails to control because it does not contain "language expressly prohibiting the Attorney General from deciding or delegating matters relating to executions." *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106, 125 (D.C. Cir. 2020) (Katsas, J., concurring).

But that interpretation runs counter to settled principles of statutory construction and *Giordano* itself. In *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012), the Supreme Court explained that the rule that a specific statutory provision controls over a general one applies ***both*** to "statutes in which a general permission or prohibition is ***contradicted*** by a specific prohibition or permission" ***and*** to statutes "in which a general authorization and a more limited, specific authorization ***exist side-by-side***." *Id.* at 645 (emphasis added). Judge Katsas focused only on the first "contradiction" scenario and deemed it significant that the FDPA does not specifically state that the Attorney General cannot delegate supervision of the implementation of federal death sentences. *In re Federal Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106, 112 (D.C. Cir. 2020). But this case implicates the second "side-by-side" scenario discussed in *RadLAX*, as the FDPA's specific delegation to the United States Marshal in the FDPA "exist[s] side-by-side" with and must take precedence over 28 U.S.C. § 510's general authorization to the Attorney General to delegate "function[s] of the Attorney General" "from time to time," 28 U.S.C. § 510. In other words, because the FDPA directly assigns death sentence implementation to the United States Marshals, and not to the Attorney General, that specific delegation by Congress controls the more general authority conferred by 28 U.S.C. § 510.

*Giordano* confirms that analysis.  The Supreme Court in *Giordano* specifically noted that the specific delegation at issue from the 1968 Crime Bill—which "conferr[ed] power on the 'Attorney General, or any Assistant Attorney General specifically designated by the Attorney General'" to authorize wiretap applications—did *not* contain "language forbidding delegation." 416 U.S. at 507–08, 513–514 (citing 18 U.S.C. § 2516(1)).  Nonetheless, and consistent with the principle summarized in *RadLAX*, the Court in *Giordano* read the Crime Bill's specific grant of authority to Assistant Attorneys General as limiting the Attorney General's general power to assign the duties to other DOJ officials.  If anything, the FDPA's direct assignment to the United States Marshals—as opposed to an assignment to Assistant Attorneys Generals via Attorney General designation as in *Giordano*—is an even stronger basis for the specific (the FDPA) controlling over the general (28 U.S.C. § 510).

The Government also fails to adequately answer the political accountability concern recognized in *Giordano*.  The Final Rule claims authority for the Government to override a specific delegation by Congress to a politically accountable actor—the United States Marshal.  According to the Government, every officer within DOJ is equally politically accountable because the Attorney General "is ultimately responsible for all actions of the Department, regardless of which official carries them out."  Opp. at 24.  The Supreme Court, however, explicitly rejected this argument in *Giordano*.  There, the Attorney General attempted to delegate the power to authorize wiretap applications to his Executive Assistant.  Under the Government's theory, the Executive Assistant would have been just as politically accountable as the Assistant Attorneys General to whom the statute permitted delegation.  But the Court held that the authorization of wiretap applications had "to be limited to those responsive to the political process, a category to which the Executive Assistant to the Attorney General *obviously does not belong*."  416 U.S. at 520

(emphasis added).  The Government cites no authority for the plainly incorrect proposition that the Attorney General can simply confer his own political accountability on every DOJ official.

### C.    The Department of Justice's Removal of Section 26.2 Violates Article III

#### 1.    *The Historical Record Establishes that DOJ Cannot Set the Date of an Execution Without the Approval of an Article III Court*

Plaintiffs' opening brief demonstrated that the Final Rule's removal of Section 26.2, which required DOJ to involve federal courts in setting execution dates, violates Article III given the longstanding and nearly unbroken practice of judicial involvement in setting federal execution dates.  *See* Br. at 22–26.  The Government acknowledges the uniform practice since 1830 of requiring judicial involvement in setting execution dates.  Opp. at 30.  The Government asserts, however, that the Final Rule does not violate Article III because, on the Government's account, "sometimes the President fixed the date of execution and sometimes the courts did so" prior to 1830.  Opp. at 30.  This argument fails for three reasons.  First, the historical record reveals that, even prior to 1830, federal courts set execution dates in most cases.  Second, this practice mirrors the practice used by courts in London in the Eighteenth Century, which informed the Framers' institutional design.  Third, even if the practice was not settled in the Founding Era, two centuries of unbroken practice since have "liquidated" the content of Article III and established that courts must be involved in setting federal execution dates.

The Government's only evidence for its claim of mixed pre-1830 practice regarding judicial involvement is the 1993 Final Rule and an 1855 Opinion by Attorney General Caleb Cushing (the 1855 Opinion), Opp. at 30, both of which rely substantially on a cryptic 1818 Opinion by Attorney General William Wirt (the 1818 Opinion).  *See* 58 Fed. Reg. 4898, 4899–4900 (Jan. 19, 1993); Caleb Cushing, 7 U.S. Op. Atty. Gen. 561, 562 (1855).  The 1818 Opinion was addressed directly to President James Monroe and was prompted by an inquiry from a federal

judge in Baltimore who had recently sentenced two robbers to death and had "heard that the President neither intends to pardon them, nor to issue a warrant for their execution; and that this last determination is founded on the opinion that it was the duty of the court which passed the sentence to fix the day for the execution." William Wirt, 1 U.S. Op. Att'y. Gen. 228, 228 (1818). The federal judge was confused because Maryland law required the Governor to choose the date of execution and there was no federal statute that expressly empowered federal judges to choose dates. Attorney General Wirt reported that he had found, "on inquiry, that courts of the United States have adopted, in this particular, the practice of the State courts in which they hold their sessions, and these are various: death-warrants from the governors being required in several of the States; and in others the courts fixing the day." *Id.* Accordingly, Attorney General Wirt advised that the President should set dates for federal death sentences entered in states where the governors were responsible for setting execution dates.

Viewed in isolation, the 1818 Opinion is ambiguous. The federal judge's inquiry and the Attorney General's opinion both indicate that the President had not previously set dates for federal executions. And despite Attorney General Wirt's statement that he had made an inquiry of the "courts of the United States," the 1818 Opinion did not provide any cases or examples of what those courts had actually done.

But an examination of the historical record reveals that the 1818 Opinion—the ultimate source of the Government's argument about pre-1830 practice here—got it wrong. Prior to the case that spurred the Baltimore federal judge's inquiry, there were eleven federal executions arising from six cases.[3] There are primary sources available for five of these cases, and in all of

---

[3] In 2004, the Inter-university Consortium for Political and Social Research at the University of Michigan released a list of all "executions performed under civil authority in the United States between 1608 and 2002." M. Watt Espy & John Ortiz Smykla, *Executions in the United States,*

them the execution dates were set by federal judges—including three U.S. Supreme Court justices who were "riding circuit":[4]

- In 1790, Judge David Sewall of the District Court of Maine entered the first federal death sentence. Judge Sewall specified a date of execution in the final judgment and informed President Washington by letter.[5]

- In June 1793, Justice William Paterson, riding circuit in North Carolina, entered death sentences for four men convicted of piracy and murder and set July 6 as the execution date.[6]

- In April 1800, Justice Samuel Chase, riding circuit in Pennsylvania, entered death sentences for three men convicted of piracy and set May 9 as the execution date.[7]

- In October 1812, Justice Joseph Story, riding circuit in Massachusetts, entered death sentences for two men convicted of piracy and murder (one was later pardoned) and set December 10 as the execution date.[8]

- In March 1818, five months before the 1818 Opinion was issued, a judge of the District Court of Louisiana entered a death sentence for a man convicted of piracy and murder and set June 26 as the execution date.[9]

---

*1608–2002: The Espy File* (2004) (The Espy File). The analysis in this brief relies on a subset of the Espy File which lists all executions carried out under Federal, Territorial, or Indian authority from 1790 to 1963: https://bit.ly/351FvLT.

[4] The sixth case took place in Tennessee in 1800 and involved a Native American man only referred to as "George." We have been unable to find a primary source describing this case.

[5] *See* Letter from David Sewall, Judge of the U.S. District Court of Maine, to George Washington, President of the United States (June 5, 1790), https://bit.ly/3olleZl.

[6] *See* Dunlap's American Daily Advertiser, June 15, 1793, p.3. (Ex. 1.)

[7] *See* Captain William Wheland, Horrid Murder and Piracy On Board the Schooner Eliza of Philadelphia 15–16 (1800). (Ex. 2)

[8] *See* J. Belcher, A Report of the Trial of Samuel Tulley and John Dalton 39 (1812). (Ex. 3)

[9] *See* Daily National Intelligencer, May 5, 1818, p.2. (Ex. 4)

Thus, the reported mixed results of Attorney General Wirt's "inquiry" simply do not hold up to scrutiny: federal judges (including three Supreme Court Justices) *uniformly* set execution dates prior to 1818.

Not only does the 1818 Opinion underlying the Government's sources fail to support the Government's claim of mixed historical practice, but the federal judges who presided over these early American executions undoubtedly were familiar with the practice of London's Central Criminal Court—a practice further supporting the conclusion that Article III courts must be responsible for setting execution dates. *See Oil States Energy Servs., LLC v. Greene's Energy Group*, 138 S. Ct. 1365, 1376–77 (2018) (examining 18th-century practices in England to determine whether "history" established that particular issues "must be decided by a court"). At the time of the Founding, the Recorder of London—*i.e.*, the Senior Judge at the Central Criminal Court—was responsible for setting the dates and times of executions. *See* 4 W. Blackstone, Commentaries 529 (1753); University of Victoria, Full Notes and References on Capital Punishments and Pardons at Old Bailey, 1730–1837 at 48–49, https://bit.ly/35cIYXS (last visited Jan. 6, 2021). The Recorder would periodically compile all the cases in which individuals had been convicted of capital crimes and would present the cases to the King at a meeting called "the Recorder's Report." University of Victoria, *supra* at 49. The Recorder's Report gave the King the opportunity to issue a pardon, but did not involve him in the process any further; after receiving the "royal pleasure" to carry out an execution, the Recorder (the Senior Judge) would issue a warrant setting the date and time of execution. *See* 4 W. Blackstone, Commentaries *529. Judge Sewall's 1790 letter to President Washington indicates that the English practice, albeit modified to account for America's geographic sprawl, was meant to continue: Sewall informed Washington that a "Writ or Warrant of Execution will Issue from the district court to the Marshall, in

Consequence of Which the Sentence will be put in force at the *Time mentioned in the Judgement*, *unless the Supreme executive shall deem it expedient to interpose*."[10]   The Founders thus understood that courts were to be responsible for entering sentences of death and involved in setting the date of executions, whereas the executive was to be responsible for issuing a pardon.

Even without this historical evidence reflecting the longstanding judicial role in setting execution dates prior to 1830, the nearly two centuries of subsequent practice have established this judicial function as an Article III requirement—or, as the Supreme Court has put it, "liquidated" the content of Article III.  In *N.L.R.B. v. Noel Canning*, 573 U.S. 513 (2014), the Court explained that historical practice is "an important interpretive factor," "even when that practice began after the founding era."  *Id.* at 525.  The Founders, the Court explained, had expressly anticipated "that difficulties and differences of opinion might occasionally arise in expounding terms & phrases necessarily used in such a charter . . . and that it might require a regular course of practice to liquidate & settle the meaning of some of them."  *Id.* (citing Letter to Spencer Roane (Sept. 2, 1819), in 8 Writings of James Madison 450 (G. Hunt ed. 1908)).  Here, the practice from 1830 on further confirms that federal courts must play a role in setting execution dates.

The Government resists that conclusion by incorrectly asserting that since 1993, "thirteen federal defendants have been executed and three more have been scheduled for execution, and *every single one* was executed pursuant to an execution date set by the Executive Branch rather than the Judiciary."  Opp. at 28.  That representation ignores that for each of the federal executions that has occurred since 1993, DOJ set the date of execution pursuant to an ***express delegation*** from the sentencing court.  *See, e.g.*, *United States v. Montgomery*, No. 5-cr-06002 ("Montgomery") (W.D. Mo. Oct. 16, 2020), ECF No. 444 (setting date of execution "pursuant to the Judgment and

---

[10] Sewall Letter, *supra* note 5 (emphasis added).

Order issued on Apr. 4, 2008, by Judge Gary A. Fenner"); *United States v. Hall*, No. 94-cr-00121 ("Hall") (N.D. Tex. Sept. 30, 2020), ECF No. 1205 (setting date of execution "pursuant to the Judgment and Order issued on Feb. 12, 1996, by Judge Terry R. Means"); *United States v. Nelson*, No. 99-cr-00303 ("Nelson") (W.D. Mo. June 16, 2020), ECF No. 493 (setting date of execution "pursuant to the Judgment and Order issued on March 11, 2002, by Judge Fernando J. Gaitan"); *United States v. Purkey*, No. 1-cr-00308 ("Purkey") (W.D. Mo. July 16, 2020), ECF No. 620 (setting date of execution "pursuant to the Judgment and Order issued on January 23, 2004, by Judge Fernando J. Gaitan, Jr."). In a handful of cases, individuals sentenced to death argued that DOJ had impermissibly set the execution date without the court's approval—and the courts resolved that issue by affirmatively approving the execution dates and issuing the necessary Judgment and Order delegating the court's authority to set the date. *See United States v. Lee*, No. 97-cr-00243, 2020 WL 3921174, at *5 (E.D. Ark. July 10, 2020); *United States v. Honken*, No. 1-cr-03047 ("Honken") (N.D. Ia. July 14, 2020), ECF No. 822 ("I will enter an order consistent with the language of § 26.2 to confirm the DOJ's and BOP's authority to implement Honken's sentence, including setting the date for his execution."); *United States v. Vialva*, No. 99-cr-00070 ("Vialva") (W.D. Tex. Sept. 11, 2020), ECF No. 691 ("[T]he Court issues this Order to . . . confirm DOJ's authority to select Vialva's execution date and implement his sentence of death."). Thus, contrary to DOJ's representation, every execution-scheduling decision DOJ has made since 1993 has been pursuant to an express delegation of authority from an Article III Court.

Whether looking at the historical evidence at the Founding, more than 200 years of unbroken judicial practice since, or recent history, the meaning of Article III's broad grant of judicial power is clear: Under Article III, federal courts must be involved in the process of setting federal execution dates.

### 2.    *The Final Rule's Removal of Section 26.2 Violates Article III*

Attempting to downplay the significance of Section 26.2, the Government summarily asserts that the submission by the Government to the federal courts of a Judgment and Order pursuant to Section 26.2 was merely "ministerial."  Opp. at 25, 29.  Thus, according to the Government, the removal of Section 26.2 cannot be a violation of Article III because Section 26.2 did not provide the federal courts with a meaningful role in setting execution dates.

The Government's position incorrectly and unduly minimizes the importance of the judicial role previously recognized by Section 26.2.  The submission of a Judgment and Order enabled courts to exercise a key oversight function in supervising the setting of execution dates— and removing that oversight function aggrandizes the authority of the Executive Branch at the expense of the courts.  Moreover, the submission process was not pointless or toothless in practice.  Indeed, on at least two occasions, district courts have *rejected* the Government's proposed Judgment and Orders setting execution dates.  In *United States v. Chandler*, 950 F. Supp. 1522 (N.D. Ala. 1996), the Northern District of Alabama rejected the government's proposal to execute Mr. Chandler before he had the opportunity to pursue federal habeas relief.  Order, *United States v. Chandler*, No. 90-cr-00266 ("Chandler"), (N.D. Ala. Mar. 21, 1995), ECF No. 322.  Similarly, in *United States v. Sampson*, 300 F. Supp. 2d 278 (D. Mass 2004), the District of Massachusetts rejected the government's proposal to execute Mr. Sampson in Indiana, stating that "more than the convenience of the government" had to be taken into account in implementing a sentence of death.  *Id.* at 282.  The court emphasized that the "execution of a human being by the state is perhaps the most solemn and significant act a government can perform" and that the court's review of the proposed Judgment and Order was necessary to ensure that principles of "fairness, rather than convenience or efficiency," would animate the implementation of the execution.  *Id.* at 280, 283.

The Government dismisses the significance of the Judiciary's longstanding oversight role, arguing that the removal of Section 26.2 does not prevent ***individuals*** from bringing any violations of law by the Government to the court's attention.  Opp. at 27 n.9.  But this argument only highlights why the removal of Section 26.2 unconstitutionally diminishes the Judiciary.  Whereas the 1993 Rule required DOJ to obtain judicial approval of its proposals for implementing executions in *every* case, the Final Rule relegates the Judiciary to reviewing only those execution dates that individual death row inmates manage to challenge—and then only in the context of issuing a stay pursuant to the traditional stay factors.  Putting the onus on the condemned to identify and seek redress for defects in the process for setting their dates of execution and requiring them to satisfy the stay factors is no substitute for automatic judicial review of proposed Judgments and Orders at the outset—particularly where the Judiciary has played that role since the Founding.

In short, the removal of Section 26.2 is far from benign regulatory "housekeeping"—as the Government would have the Court believe.  That alteration and the authority claimed in the Final Rule for BOP to unilaterally set execution dates seeks to end centuries of unbroken practice under which DOJ could set execution dates only if the Judiciary so allowed—notably, when the Judiciary's scrutiny is needed most as DOJ rushes to execute as many individuals as possible before Inauguration Day.  Courts are not rubber stamps and the Executive Branch is not above the law.  The removal of Section 26.2 violates Article III.

## II.    PLAINTIFFS FACE IRREPARABLE HARM

The Government misconceives Plaintiffs' case for irreparable harm, claiming that individuals would not suffer an "actual" injury if they are executed pursuant to unlawful regulations or by unauthorized officials.  Opp. at 32.  But the indignity of being subject to unlawful acts by unauthorized persons is not Plaintiffs' central claim of harm.  Irreparable harm arises from the fact that the Final Rule permits the Attorney General to change the rules governing executions

at the last minute or issue execution dates at will in violation of the separation of powers. For example, the Attorney General may claim authority under Section 26.1(b) to "vary" from the regulations in his sole discretion—and there are numerous realistic scenarios in which last-minute variations would cause immense harm, such as depriving an individual being put to death of his spiritual advisor. *See* Br. at 33-35. Because the Final Rule claims wide-ranging powers for DOJ to act without notice—the power to vary from execution regulations without notice, appoint new officials to supervise executions without notice, and set execution dates without judicial involvement—it cannot be known with certainty how the Final Rule will be applied to harm those being executed. That is the entire point: under the Final Rule, a wide range of arbitrary acts without notice may well cause irreparable harm to individuals being put to death, but unless the Final Rule is enjoined now, it will be too late to stop those unlawful acts.

Moreover, the Government is wrong that being subject to unlawful regulations is not itself an immediate or redressable harm. To the contrary, the Supreme Court has "found it sufficient that the challenger 'sustain[s] injury' from an executive act that allegedly exceeds the official's authority." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2196 (2020) (citing *Bowsher v. Synar*, 478 U.S. 714, 721 (1986)). In *Seila*, the Supreme Court considered whether Seila, the subject of an enforcement action by the Consumer Financial Protection Bureau (CFPB), had standing to argue that Congress violated Article II by protecting the CFPB director from being removed by the President. *Id.* at 2195. Critically, Seila did not argue that the absence of a removal protection would have caused CFPB not to take the enforcement action or even to treat Seila in a materially different way. But the Court held that no such showing was necessary because "a litigant challenging governmental action as void on the basis of the separation of powers is not required to prove that the Government's course of conduct would have been different in a

'counterfactual world' in which the Government had acted with constitutional authority." *Id.* at 2196 (citations omitted). Seila had undoubtedly sustained a "concrete injury" from an executive act—it had been "compelled to comply with the civil investigative demand and to provide documents it would prefer to withhold." *Id.* Accordingly, Seila had standing to argue that there were structural defects in the agency responsible for the act. "Our precedents," the Court explained, "have long permitted private parties aggrieved by an official's exercise of executive power to challenge the official's authority to wield that power." *Id.*

In this case, it cannot be disputed that the individual Plaintiffs face a concrete injury from an executive act: DOJ officials intend to put them to death. Accordingly, the Final Rule inflicts an "actual injury" for purposes of establishing irreparable harm (and standing) because it directs DOJ to carry out that act using unlawful procedures. If DOJ uses Section 26.1(b) to deviate from Part 26 in the process of executing Plaintiffs, it will have executed them using unlawful procedures. If DOJ uses Section 26.1(c) to assign supervision of Plaintiffs' executions to BOP, Plaintiffs will have been executed by officials who are unauthorized by statute to do so. And if DOJ sets the dates of Plaintiffs' executions without consulting the courts, Plaintiffs will have been scheduled to die through a process that violates the Constitution. Although the principle articulated in *Seila* applies most directly to Plaintiffs' Article III challenge, it applies with equal force to Plaintiffs' statutory challenges. An agency "literally has no power to act . . . unless and until Congress confers power upon it" and its acts that exceed statutory authority are no less illegal than those that exceed constitutional authority. *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

## III.  PLAINTIFFS' CLAIMS ARE JUSTICIABLE

The Government repeatedly raises justiciability arguments, but none has merit. Plaintiffs have Article III standing and their claims are ripe.

A.     **Plaintiffs Have Article III Standing and Their Claims are Ripe**

With respect to Article III standing, Plaintiffs' showing of irreparable harm also establishes "actual injury." *See League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (holding that the same injury sufficed "for purposes both of standing and irreparable harm"). Moreover, in the current "pre-enforcement" posture, Plaintiffs have standing to bring each challenge because there is a "credible threat" that the government will apply the Final Rule to Plaintiffs. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (*SBA*). Plaintiffs include four federal death row inmates, one with an imminent execution date, and the ***entire point*** of the Final Rule is to govern their "manner of execution."

It does not matter for purposes of standing that the Final Rule has "not yet been applied and may never be applied," so long as the fear of enforcement is "not imaginary or wholly speculative." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979). Indeed, even where the government argues that a challenged law cannot be interpreted to apply to a plaintiff, the D.C. Circuit has recognized that a plaintiff can establish standing if the government has not taken steps that would prevent the government from changing its mind. *Woodhull Freedom Found. v. United States*, 948 F.3d 363, 373 (D.C. Cir. 2020). The D.C. Circuit has further explained that plaintiffs can use an agency's previous statements and actions to establish what actions the agency is likely to take in the future. *See Sabre, Inc. v. Dep't of Transp.*, 429 F.3d 1113, 1117–18 (D.C. Cir. 2005) ("[T]he Department's statements, taken as a whole, indicate a very high probability that it will act against [plaintiffs]."). Here, there is every reason to believe that the Government will invoke the new authority granted by the Final Rule—which was specifically designed to govern the manner of Plaintiffs' executions, and which was urgently finalized so that the new rules would be in place for the remaining executions scheduled next week in the final days of this Presidential Administration.

Finally, with respect to ripeness, because Plaintiffs present only "purely legal claim[s] in the context of . . . facial challenges," each of Plaintiffs' claims "is 'presumptively reviewable.'" *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1282 (D.C. Cir. 2005) (citing *Nat'l Mining Ass'n v. Fowler*, 324 F.3d 752, 757 (D.C. Cir. 2003)). Instead of confronting that presumption, which it fails to rebut, the Government mischaracterizes Plaintiffs' challenges as depending on the application of the Final Rule to certain facts. That is incorrect. Moreover, even if some claims would benefit from further factual development, the "hardship to the parties of withholding court consideration" would be immense. *See Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003).

## B.     The Government's Justiciability Arguments Fail

### 1.     *Plaintiffs' Challenge to Section 26.1(b) is Justiciable*

The Government contends that Plaintiffs' challenge to Section 26.1(b)'s "vary" authority is unripe because the "issue presented here hinges on conjecture about agency actions that have not occurred." Opp. at 12. But the Government fails to explain why Plaintiffs' facial challenge would require an assessment of specific circumstances and the Government offers no good answer to Plaintiffs' argument that withholding review would cause significant hardship.

Plaintiffs' purely legal challenge to Section 26.1(b) is presumptively ripe for review. As discussed, Section 26.1(b) allows the Attorney General to "vary" from ***any*** provision in Part 26 if he deems it to conflict with "applicable law" without going through notice and comment or otherwise satisfying an APA exception to notice and comment. Plaintiffs raise a facial challenge to this provision that turns on a pure question of law: whether Section 26.1(b) provides a lawful procedure for determining whether a provision of Part 26 may be ignored.

Instead of addressing Plaintiffs' challenge head on, the Government argues that, because it is impossible to know ahead of time what circumstances will cause the Government to invoke

Section 26.1(b), the Court should wait to review Plaintiffs' challenge until such a situation arises. But Plaintiffs' challenge does not depend on the nature of a specific variance; instead, the Attorney General's reliance on Section 26.1(b) to "vary" from duly enacted legislative rules without following APA procedures will *always* be illegal.

Indeed, the Government's argument that it is impossible to know in advance when and how Section 26.1(b)'s "vary" authority will be invoked only shows that withholding review would impose significant hardship on Plaintiffs. As discussed, Section 26.1(b) places no limitations on what counts as "applicable law" and does not provide for any procedure or notice when the Attorney General determines that a variance from the provisions of Part 26 is "necessary." Accordingly, the Attorney General could decide days, or even hours, before an execution that a variance is necessary to comply with unwritten state protocols. *See* Br. at 34–35. Given the Supreme Court's disinclination to grant "last-minute" challenges to executions, *Dunn v. Ray*, 139 S. Ct. 661 (Mem) (2019), Plaintiffs likely would be unable to challenge the Attorney General's application of Section 26.1(b)—assuming they even learned about such an application in time to challenge it. In other words, absent judicial review of Section 26.1(b) at this juncture, it is unlikely that Plaintiffs will be able to seek review of Section 26.1(b) at all.

The Government dismisses this concern, arguing that "given the scope of the FDPA, Plaintiffs would certainly be aware of any controlling State law the Attorney General could be *required* to conform to, and there would be no impediment to filing suit to challenge the Attorney General's conformance with State law if and when it arises in the context of a specific inmate's execution." Opp. at 34 (emphasis in original). But as discussed above, the Government misses the fundamental point. The plain text of Section 26.1(b) is, deliberately, not limited to state statutes and formal regulations, or even to state law. *See* pp. 4–5, *supra*. Thus, far from allowing Plaintiffs

21

to be "aware" of its potential applications, Section 26.1(b) was deliberately designed to permit the Attorney General to exercise maximal, undetermined discretion.

Finally, although the Government does not contest Plaintiffs' standing to challenge Section 26.1(b), it bears emphasis that there is a "credible threat" that the Government will apply its Section 26.1(b) "vary" authority—including for Plaintiff Dustin Higgs, whose execution is set to take place in a matter of days.   Indeed, there is significant uncertainty about which State's law will control Mr. Higgs' execution if the execution is permitted to proceed.  No justiciability bar prevents this Court's review of Section 26.1(b) given the harm that Mr. Higgs and the other Plaintiffs face from the Attorney General's new authority under that provision.

## 2.    *Plaintiffs' Challenge to Section 26.1(c) is Justiciable*

The Government effectively concedes that Plaintiffs' challenge to Section 26.1(c)'s delegation authority is justiciable, offering only a one sentence ripeness argument that "Plaintiffs do not allege that the Attorney General has made any delegations pursuant to Section 26.1(c), that he is likely to do so, or that any such delegations would harm Plaintiffs." Opp. at 20.  As discussed, the Attorney General's decision to delegate supervision of Plaintiffs' death sentence to BOP—as contemplated by Section 26.1(c)—would harm Plaintiffs.  *See* pp. 17–18, *supra*.  And the fact that the Attorney Generally has not yet exercised his authority to make that delegation does not prevent Plaintiffs from establishing ripeness.

That the Attorney General has not yet applied Section 26.1(c) to Plaintiffs is irrelevant to the principle that pre-enforcement review is appropriate where—as here—"the issue is purely legal" and consideration of the issue would not "benefit from a more concrete setting." *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 440 F.3d 459, 463–64 (D.C. Cir. 2006).  Plaintiffs' APA challenge to Section 26.1(c) is ripe because the Final Rule specifies an impermissible procedure for reassigning duties that have been delegated through binding regulations.  Because

Section 26.1(c) cannot be applied lawfully, there is no need to wait for a specific application. And Plaintiffs' FDPA challenge to Section 26.1(c) also is "undoubtedly 'purely legal' in the relevant sense. [It] turns on questions of statutory construction." *Teva Pharms. USA, Inc. v. Sebelius*, 595 F.3d 1303, 1308–09 (D.C. Cir. 2010). Specifically, resolving Plaintiffs' FDPA claim requires deciding whether the specific delegation in the FDPA provides an exception to the general delegation authority in 28 U.S.C. § 510. The answer to this question is "impervious" to "factual variation" and is thus presumably reviewable. *Id.* at 1309. The Government does not even attempt to rebut this presumption.

Moreover, there is a credible threat that the Attorney General will use Section 26.1(c) to reassign the implementation of Plaintiffs' death sentences to BOP. Indeed, the entire point of this new section of the Final Rule was to permit the Attorney General to do so. As Plaintiffs alleged in the Complaint, Section 26.1(c) was designed to preempt litigation challenging DOJ's Federal Execution Protocol issued in 2019—which, as drafted, was to be administered by BOP—as violating the FDPA's assignment of death-sentence duties to the U.S. Marshals. Complaint ¶¶ 46–47.[11]

As with Section 26.1(b), moreover, withholding review of Section 26.1(c) would cause undue hardship because Section 26.1(c) places no time limits on DOJ's authority to reassign duties. DOJ could theoretically reassign the implementation of a death sentence on the day of execution, leaving the prisoner no time to bring a challenge. For all these reasons, Plaintiffs' challenge to Section 26.1(c) is ripe for review.

---

[11] Department of Justice, Federal Government to Resume Capital Punishment After Nearly Two Decade Lapse (July 25, 2019), https://bit.ly/3nm9DYD; Federal Bureau of Prisons, Execution Protocol Manual (July 2019).

### 3.     *Plaintiffs' Challenge to the Removal of Section 26.2 is Justiciable*

Finally, the Government errs in contending that the repeal of Section 26.2—which removes federal courts from the process of setting federal execution dates—is non-justiciable.

First, the Government contends that "enjoining the removal of Section 26.2 would not redress any injury" because Section 26.2 "does not confer any benefit" on Plaintiffs.  But as discussed, Section 26.2 preserves the fundamental duty of courts to ensure that the implementation of an execution is governed by "fairness, rather than convenience or efficiency." *Sampson*, 300 F. Supp. 2d at 283.  Plaintiffs benefited from that oversight function, which ensured that the Executive could not set an execution date that undermined Plaintiffs' efforts to obtain post-conviction relief. Article III's requirement that courts must be involved in setting execution dates is thus a perfect example of the idea that the "structural principles secured by the separation of powers protect the individual as well." *Bond v. United States*, 564 U.S. 211, 222 (2011).

Second, the government is wrong to assert that the Court must await "a concrete set of facts" to adjudicate Plaintiffs' separation-of-powers argument.  Opp. at 26.  As with its other ripeness arguments, the government fails to explain why concrete facts would aid the Court's consideration of Plaintiffs' challenge.  Plaintiffs' challenge to the Final Rule's removal of Section 26.2 presents a pure question of law:  whether Article III requires a federal court order to set an execution date.  The Court can resolve that question by evaluating the historical record and weighing the parties' arguments about the kinds of evidence necessary to establish an "essential function" of Article III.  Additionally, withholding review would cause Plaintiffs significant hardship.  Once an execution date is set, ongoing judicial review of a death sentence does not prevent the Government from carrying out the execution.  The only way to stop the clock is to obtain a formal stay.  Accordingly, if the Court withholds review of this regulation and requires

24

Plaintiffs to wait until BOP sets an execution date, it is possible that Plaintiffs will be executed before their claim can be fully adjudicated.

With respect to standing, DOJ has now claimed authority in the Final Rule to set execution dates without court involvement for the individual Plaintiffs who do not have them yet. That unlawful action could come at any time. As discussed, the government executed ten people between July and December, with dates set for three additional individuals over the next week. Complaint ¶ 1. This pace is unprecedented and shows no sign of abating—in December 2020, DOJ amended the "Justice Manual" to direct BOP to "promptly schedule the defendant's execution after he has exhausted his direct appeal and post-conviction remedies."[12]

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the requested relief be granted.

Dated:  January 6, 2020

By: */s/ Elizabeth Prelogar*
Elizabeth Prelogar (DC Bar No. 1011890)
Elias S. Kim (*pro hac vice*)
COOLEY LLP
1299 Pennsylvania Ave., NW, Suite 700
Washington, DC  20004-2400
Telephone: (202) 842-7800
Facsimile: (202) 842-7899
eprelogar@cooley.com
ekim@cooley.com

Elizabeth Wright (*pro hac vice*)
Jennifer Elkin (*pro hac vice*)
COOLEY LLP
550 Boylston street
Boston, MA  02116-3736
Telephone: (617) 937-2300
Facsimile: (617) 937-2400
ewright@cooley.com
jelkin@cooley.com

---

[12] Department of Justice, Justice Manual § 9-10.210 (last updated Dec. 2020), https://bit.ly/38mHQDb.

Colin Scott (*pro hac vice*)
COOLEY LLP
101 California Street, 5th Floor
San Francisco, CA  94111-5800
Telephone: (415) 693-2000
Facsimile: (415) 693-2222
cscott@cooley.com

*Counsel for Plaintiff Federal Capital Habeas
Project*

David Autry (*pro hac vice*)
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone: (405) 521-9600
Facsimile: (405) 521-9669
dbautry77@gmail.com

*Counsel for Plaintiff Kenneth Eugene Barrett*

Matthew Lawry (*pro hac vice*)
FEDERAL COMMUNITY DEFENDER
OFFICE, E.D. PENNSYLVANIA
601 Walnut St Ste 545 W
Philadelphia, PA 19106
Telephone: (215) 928-0520
Matthew_Lawry@fd.org

*Counsel for Plaintiff Dustin John Higgs*

Scott W. Braden (DC Bar No. 2007123)
FEDERAL PUBLIC DEFENDER,
E.D. ARKANSAS
1401 West Capitol Street
Little Rock, AR 72201
Tel: (501) 324-6114
scott_braden@fd.com

*Counsel for Plaintiff Norris Holder*

Alexis Hoag (*pro hac vice*)
ERIC HOLDER INITIATIVE FOR CIVIL &
POLITICAL RIGHTS
Columbia University
1130 Amsterdam Ave

26

202 Hamilton Hall
New York, NY 10027
Tel: (203) 645-4918
ajh2233@columbia.edu

*Counsel for Plaintiff Rejon Taylor*