# Exhibit A

**No.**

# In the Supreme Court of the United States

————

UNITED STATES OF AMERICA, PETITIONER

*v.*

DUSTIN JOHN HIGGS
(CAPITAL CASE)

————

*ON PETITION FOR A WRIT OF CERTIORARI
BEFORE JUDGMENT TO THE UNITED STATES
COURT OF APPEALS FOR THE FOURTH CIRCUIT*

————

**PETITION FOR A WRIT OF CERTIORARI
BEFORE JUDGMENT**

————

JEFFREY B. WALL
  *Acting Solicitor General*
    *Counsel of Record*
DAVID P. BURNS
  *Acting Assistant Attorney*
    *General*
HASHIM M. MOOPPAN
  *Counselor to the Solicitor*
    *General*
CHRISTOPHER G. MICHEL
BENJAMIN W. SNYDER
  *Assistants to the Solicitor*
    *General*
JEFFREY A. HALL
ELLEN E. NAZMY
  *Attorneys*

  *Department of Justice*
  *Washington, D.C. 20530-0001*
  *SupremeCtBriefs@usdoj.gov*
  *(202) 514-2217*

## QUESTION PRESENTED

In 2001, the United States District Court for the District of Maryland imposed on respondent Dustin John Higgs nine sentences of death based on respondent's convictions for the kidnapping and murder of three women on federal land beside the Baltimore-Washington Parkway. Under the Federal Death Penalty Act of 1994 (FDPA), 18 U.S.C. 3591 *et seq.*, "[w]hen the sentence is to be implemented," a United States marshal "shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed. If the law of the State does not provide for the implementation of a sentence of death, the court shall designate another State" as an alternate. 18 U.S.C. 3596(a). At the time of respondent's sentencing, the State of Maryland had death-penalty laws, and so his criminal judgment incorporated the FDPA but did not designate an alternate State. The State of Maryland, however, subsequently repealed its state-law capital punishment regime. The question presented is:

Whether the district court erred in holding that it lacked authority after the sentence became final to designate an alternate State under 18 U.S.C. 3596(a), which would mean that a federal death sentence validly imposed under the FDPA becomes permanently unenforceable if the State in which the sentence was imposed later repealed its own death penalty.

(I)

## PARTIES TO THE PROCEEDING

Petitioner (movant in the district court, and appellant in the court of appeals) is the United States of America.

Respondent (respondent in the district court, and appellee in the court of appeals) is Dustin John Higgs.

**RELATED PROCEEDINGS**

United States District Court (D. Md.):

> *United States* v. *Higgs*, 98-cr-520 (Jan. 9, 2001) (conviction and sentence)
>
> *United States* v. *Higgs*, 05-cv-3180 (Apr. 7, 2010) (order denying motion under 18 U.S.C. 2255)
>
> *United States* v. *Higgs*, 05-cv-3180 (June 29, 2016) (order denying motion under Fed. R. Civ. P. 60(d))
>
> *United States* v. *Higgs*, 98-cr-520 (Dec. 29, 2020) (order denying alternate-State designation under 18 U.S.C. 3596(a))

United States District Court (S.D. Ind.):

> *Higgs* v. *Daniels*, 16-cv-321 (Apr. 30, 2020)
>
> *Higgs* v. *Watson*, 20-cv-665 (filed Dec. 14, 2020)

United States Court of Appeals (4th Cir.):

> *United States* v. *Higgs*, No. 01-3 (Dec. 22, 2003)
>
> *United States* v. *Higgs*, No. 03-19 (Apr. 20, 2004)
>
> *United States* v. *Higgs*, No. 10-7 (Nov. 23, 2011)
>
> *In re: Dustin Higgs*, No. 16-8 (June 27, 2016)
>
> *United States* v. *Higgs*, No. 16-15 (Apr. 21, 2017)
>
> *In re: Dustin Higgs*, No. 20-2 (Feb. 6, 2020)
>
> *United States* v. *Higgs*, No. 20-18 (filed Dec. 30, 2020)

United States Court of Appeals (7th Cir.):

> *Higgs* v. *Watson*, No. 20-2129 (Jan. 11, 2021)

Supreme Court of the United States:

> *Higgs* v. *United States*, No. 03-10498 (Nov. 29, 2004)

(III)

IV

*Higgs* v. *United States*, No. 04-5526 (Nov. 29, 2004)

*Higgs* v. *United States*, No. 12-5075 (Dec. 10, 2012)

*Higgs* v. *United States*, No. 17-6085 (May 29, 2018)

**TABLE OF CONTENTS**

Page

Opinions below ...................................................................... 2
Jurisdiction .............................................................................. 2
Statutory provision involved ...................................................... 2
Statement ............................................................................... 3
Reasons for granting the petition ............................................... 9
    A.   The district court erred in refusing to designate
        an alternate state under the FDPA for
        implementation of respondent's federal
        death sentence .............................................................. 12
        1.  Section 3596(a) requires the district court to
            designate an alternate State for
            implementation of respondent's federal death
            sentence ................................................................ 14
        2.  Designating an alternate State would not
            improperly modify respondent's criminal
            judgment ............................................................... 23
    B.   The lower courts' refusal to provide the
        designation required by the FDPA should not be
        permitted to obstruct respondent's lawful death
        sentence ..................................................................... 26
    C.   The district court's error is not immune from
        review by a higher court ............................................... 29
Conclusion .............................................................................. 32
Appendix A — District court memorandum opinion
                (Dec. 29, 2020) ............................................ 1a
Appendix B — District court judgment and order
                (Jan. 9, 2001) ............................................ 18a
Appendix C — Court of appeals order (Jan. 7, 2021) ......... 27a
Appendix D — Court of appeals order (Jan. 8, 2021) ......... 29a
Appendix E — District court notice of appeal
                (Dec. 30, 2020) .......................................... 31a

(V)

VI

## TABLE OF AUTHORITIES

Cases:                                                    Page

*Andres* v. *United States*, 333 U.S. 740 (1948) ......... 10, 15, 17

*Arizona* v. *Manypenny*, 451 U.S. 232 (1981) ..................... 30

*Barr* v. *Lee*, 140 S. Ct. 2590 (2020) ..................... 6, 12, 22, 26

*Barr* v. *Roane*, 140 S. Ct. 353 (2019) ....................... 11, 12, 18

*Baze* v. *Rees*, 553 U.S. 35 (2008) ................................... 12, 27

*Bellard* v. *State*, 157 A.3d 272 (Md. 2017) ........................ 5, 6

*Bucklew* v. *Precythe*, 139 S. Ct. 1112 (2019) ..................... 27

*Calderon* v. *Thompson*, 523 U.S. 538 (1998) .......... 11, 26, 28

*Carr* v. *United States*, 560 U.S. 438 (2010) ........................ 20

*Carroll* v. *United States*, 354 U.S. 394 (1957) .............. 30, 31

*Cheney* v. *United States District Court*, 542 U.S. 367
    (2004) ........................................................................ 27, 32

*Cohen* v. *Beneficial Indus. Loan Corp.*, 337 U.S. 541
    (1949) .............................................................................. 30

*Di Bella* v. *United States*, 369 U.S. 121 (1962) .................. 30

*Dillon* v. *United States*, 560 U.S. 817 (2010) ..................... 23

*Fed. Bureau of Prisons' Execution Protocol Cases,*
    *In re*, 955 F.3d 106 (D.C. Cir.), cert. denied,
    141 S. Ct. 180 (2020) ....................................6, 14, 15, 19, 26

*Graham Cnty. Soil & Water Conservation Dist.* v.
    *United States ex rel. Wilson*, 559 U.S. 280 (2010) ........... 19

*Great-West Life & Annuity Ins. Co.* v. *Knudson*,
    534 U.S. 204 (2002) .......................................................... 21

*Griffin* v. *Oceanic Contractors, Inc.*, 458 U.S. 564
    (1982) .............................................................................. 21

*Hill* v. *McDonough*, 547 U.S. 573 (2006) ............................ 27

*McCleskey* v. *Zant*, 499 U.S. 467 (1991) ............................. 26

*Mont* v. *United States*, 139 S. Ct. 1826 (2019) ................... 19

*Morales* v. *Trans World Airlines, Inc.*, 504 U.S. 374
    (1992) .............................................................................. 25

VII

Cases—Continued:                                                    Page

*Nelson* v. *Campbell*, 541 U.S. 637 (2004)............................ 27

*Radzanower* v. *Touche Ross & Co.*, 426 U.S. 148
    (1976)................................................................................ 25

*United States, Ex parte*, 242 U.S. 27 (1916) ................ 31, 32

*United States* v. *Sampson*, 300 F. Supp. 2d 278
    (D. Mass. 2004), aff'd, 486 F.3d 13 (1st Cir. 2007)........... 16

*United States* v. *Tipton*, 90 F.3d 861 (4th Cir. 1996),
    cert. denied, 520 U.S. 1253 (1997) ..................................... 16

*United States* v. *Tuck Chong*, 123 F. Supp. 2d 563
    (D. Haw. 1999)............................................................. 16, 21

*United States* v. *Wilson*, 420 U.S. 332 (1975) .................... 30

*Will* v. *United States*, 389 U.S. 90 (1967) ..................... 11, 31

Statutes:

Act of Apr. 20, 1790, ch. 9, 1 Stat. 112:
        § 33, 1 Stat. 119................................................................ 14

Act of June 19, 1937, ch. 367, 50 Stat. 304 .......................... 15

Sentencing Reform Act of 1984, Pub. L. No. 98-473,
    Tit. II, § 212(a)(2), 98 Stat. 1998........................................ 25

18 U.S.C. 924(c).......................................................................... 4

18 U.S.C. 1111 ............................................................................. 4

18 U.S.C. 1201(a)(2).................................................................... 4

18 U.S.C. 3621(b) ...................................................................... 24

18 U.S.C. 3582 ..................................................................... 23, 25

18 U.S.C. 3582(c)....................................................................... 24

18 U.S.C. 3591 ......................................................................... 2, 3

18 U.S.C. 3591-3599............................................................. 5, 24

18 U.S.C. 3594 ..................................................................... 23, 24

18 U.S.C. 3596 ............................................................................ 23

18 U.S.C. 3596(a) .............................................................. *passim*

18 U.S.C. 3742(b) ...................................................................... 29

VIII

Statutes—Continued:                                        Page

26 U.S.C. 72(t)(2)(H)(iii)(I) (2019).....................................20
28 U.S.C. 1254(1) .............................................................2
28 U.S.C. 1291 ...........................................11, 29, 30, 31
28 U.S.C. 1651 .................................................................2
28 U.S.C. 2241 .................................................................6

Md. Code Art. 27 (2001):

§ 413 ...........................................................................5
§ 627 ...........................................................................5

Miscellaneous:

Death Penalty Information Center, *States With
and Without the Death Penalty—2020*,
https://deathpenaltyinfo.org/state-and-
federal-info/state-by-state ...................................15
Antonin Scalia & Bryan A. Garner, *Reading Law:
The Interpretation of Legal Texts* (2012).........................19

# In the Supreme Court of the United States

————

No.

UNITED STATES OF AMERICA, PETITIONER

*v.*

DUSTIN JOHN HIGGS
(CAPITAL CASE)

————

*ON PETITION FOR A WRIT OF CERTIORARI
BEFORE JUDGMENT TO THE UNITED STATES
COURT OF APPEALS FOR THE FOURTH CIRCUIT*

————

**PETITION FOR A WRIT OF CERTIORARI
BEFORE JUDGMENT**

————

The Acting Solicitor General, on behalf of the United States, respectfully petitions for a writ of certiorari before judgment to the United States Court of Appeals for the Fourth Circuit, and seeks summary reversal of the order of the United States District Court for the District of Maryland. In the alternative, the Acting Solicitor General respectfully suggests that the Court could treat this petition as a petition for a writ of mandamus to the district court. Either way, the government respectfully requests that this Court direct the district court to designate Indiana as the alternate State whose laws shall prescribe the manner of implementing respondent's execution under 18 U.S.C. 3596(a), and make clear that the execution may proceed as scheduled on January 15, 2021.

(1)

2

## OPINIONS BELOW

The opinion of the district court (App., *infra*, 1a-17a) is not published in the Federal Supplement but is available at 2020 WL 7707165. The criminal judgment and order of the district court (App., *infra*, 18a-26a) and the orders of the court of appeals setting oral argument for a date after respondent's scheduled execution (App., *infra*, 27a-28a) and denying the government's motion to expedite decision (App., *infra*, 29a-30a) are unreported.

## JURISDICTION

The order of the district court was entered on December 29, 2020. The government filed a notice of appeal on December 30, 2020 (App., *infra*, 31a-32a). The jurisdiction of this Court is invoked under 28 U.S.C. 1254(1) or, in the alternative, 28 U.S.C. 1651.

## STATUTORY PROVISION INVOLVED

The Federal Death Penalty Act of 1994, 18 U.S.C. 3591 *et seq.*, provides in relevant part that:

> A person who has been sentenced to death pursuant to this chapter shall be committed to the custody of the Attorney General until exhaustion of the procedures for appeal of the judgment of conviction and for review of the sentence. When the sentence is to be implemented, the Attorney General shall release the person sentenced to death to the custody of a United States marshal, who shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed. If the law of the State does not provide for implementation of a sentence of death, the court shall designate another State, the law of which does provide for the implementation of a sentence of

3

death, and the sentence shall be implemented in the latter State in the manner prescribed by such law.

18 U.S.C. 3596(a).

### STATEMENT

Following a jury trial in the United States District Court for the District of Maryland, respondent was convicted in 2001 of nine capital offenses and sentenced to death on all nine counts. App., *infra*, 18a-21a. Respondent's convictions and sentences became final upon the completion of his unsuccessful direct appeal in 2004. *Id.* at 5a. Numerous post-conviction challenges have subsequently failed. *Id.* at 5a-6a.

Because the law of Maryland "does not provide for implementation of a sentence of death" following the State's repeal of its death penalty, 18 U.S.C. 3596(a), the United States asked the district court to enter an order under the Federal Death Penalty Act of 1994 (FDPA), 18 U.S.C. 3591 *et seq.*, designating Indiana—where the federal death chamber is located and respondent is incarcerated—as the alternate State whose laws shall govern the manner of implementation of respondent's death sentence, *ibid.* On December 29, 2020—roughly two weeks before respondent's scheduled execution date of January 15, 2021—the district court denied the government's motion, disclaiming the authority to designate an alternate State after the sentence became final. App., *infra*, 1a-17a.

The government immediately appealed and, in the alternative, petitioned for a writ of mandamus. Although the appeal was fully briefed by January 9, 2021, the court of appeals—over dissents by Judge Richardson—set the case for argument on January 27 and denied the government's motion to expedite a decision before January 15. App., *infra*, 27a-30a.

4

1. Early in the morning of January 27, 1996, respondent and his co-conspirator murdered Tanji Jackson, Tamika Black, and Mishann Chinn in cold blood on federal land just off the Baltimore-Washington Parkway. 353 F.3d 281, 289. Respondent had organized a triple date with the three women the previous evening at his apartment in Maryland, but after one of the women got into an argument with him, the women left on foot. *Id.* at 289-290. Respondent became angry, grabbed his .38 caliber firearm, and beckoned the other two men to join him in his van to drive after the women. *Id.* at 290. Respondent caught up to the women, who were persuaded to get into the van and believed they were being driven home. *Ibid.* Instead, respondent drove to the Patuxent National Wildlife Refuge and instructed the women to get out of the van. *Ibid.* Respondent then pulled out his pistol and handed it to his co-conspirator, who shot the three women dead. *Ibid.*

2. A federal grand jury in the District of Maryland indicted respondent on three counts each of first-degree premediated murder, in violation of 18 U.S.C. 1111; first-degree murder committed in perpetration of a kidnapping, also in violation of 18 U.S.C. 1111; kidnapping resulting in death, in violation of 18 U.S.C. 1201(a)(2); and using a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. 924(c). See 353 F.3d at 289, 294.

Under the supervision of then-Attorney General Janet Reno, the United States sought the death penalty against respondent on the nine murder and kidnapping counts. 353 F.3d at 294. A federal jury found respondent guilty on all counts and recommended nine sentences of death, which the district court imposed. *Id.* at 294-295. The Judgment and Order entered by the court

5

stated that the capital sentence was "imposed pursuant to Title 18, United States Code, Sections 3591 through 3597, including particularly Sections 3594 and 3596." App., *infra*, 21a.

Section 3596(a) provides in relevant part that, "[w]hen [a federal capital] sentence is to be implemented," it shall be implemented "in the manner prescribed by the law of the State in which the sentence is imposed," unless "the law of the State does not provide for implementation of a sentence of death," in which case "the court shall designate another State, the law of which does provide for the implementation of a sentence of death," and "the sentence shall be implemented in the latter State in the manner prescribed by such law." 18 U.S.C. 3596(a). At the time the district court entered the Judgment and Order, Maryland provided for the death penalty, see Md. Code Art. 27, §§ 413, 627 (2001), and the court thus had no basis to invoke the provision of Section 3596(a) that applies when "the law of the State does not provide for implementation of a sentence of death." 18 U.S.C. 3596(a).

3. The court of appeals affirmed respondent's convictions and sentences, and this Court denied review. 353 F.3d at 334; 543 U.S. 999. The district court also denied respondent's request for a new trial, the court of appeals affirmed that denial, and this Court denied review. 95 Fed. Appx. 37; 543 U.S. 1004.

Respondent subsequently sought post-judgment relief under 28 U.S.C. 2255. The district court denied his motion, the court of appeals affirmed the denial, and this Court denied review in 2012. 711 F. Supp. 2d 479; 663 F.3d 726; 568 U.S. 1069.

4. In 2013, the Maryland legislature prospectively repealed its death-penalty statute. See, *e.g.*, *Bellard* v.

6

*State*, 157 A.3d 272, 274, 276 (Md. 2017).  For years after the repeal, respondent continued to contest his federal convictions and death sentences in successive post-conviction proceedings without contending that Maryland's repeal had any effect on his case.  See, *e.g.*, 193 F. Supp. 3d 495; 16-cv-321 D. Ct. Doc. 42 (Apr. 30, 2020) (denying petition for a writ of habeas corpus under 28 U.S.C. 2241).

5. In July 2019, the Federal Bureau of Prisons (BOP) adopted a new lethal-injection protocol, and the United States announced that it would resume implementing federal capital sentences.  See *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106, 110-111 (D.C. Cir.), cert. denied, 141 S. Ct. 180 (2020).  The federal government carried out the first executions under the new protocol in July 2020.  See *Barr* v. *Lee*, 140 S. Ct. 2590 (2020) (per curiam).

The following month, the government filed a motion asking the district court to designate Indiana—where respondent has been incarcerated for nearly 20 years and where the government has carried out all federal executions by lethal injection since 2001—as the State whose law would govern the manner of implementation of respondent's sentence under the FDPA.  See 98-cr-520 D. Ct. Doc. 640 (Aug. 4, 2020).  The government explained that, because Maryland law no longer provides for implementation of a sentence of death, the FDPA requires that the court "shall designate another State, the law of which does provide for the implementation of a sentence of death," where "the sentence shall be implemented * * * in the manner prescribed by such law." 18 U.S.C.  3596(a).  Although the government captioned its motion as one to "Amend Judgment And Order," 98-cr-520 D. Ct. Doc. 640, at 1, it clarified in subsequent

7

briefing on the motion that it did not seek an alteration of the criminal sentence itself, but simply a supplemental or new order under the FDPA designating the State whose law would govern implementation of the sentence. See 98-cr-520 D. Ct. Doc. 644-3, at 7-11 (Sept. 1, 2020). Respondent opposed the motion, arguing that the court lacked the authority to designate an alternate State because respondent's sentence had become final, and that if the court did designate an alternate State, it should designate Virginia instead, because it is closer to Maryland and allows inmates to choose execution by electrocution if they do so by a prescribed date. See 98-cr-520 D. Ct. Doc. 649, at 2-9 (Sept. 18, 2020); 98-cr-520 D. Ct. Doc. 643, at 6-7 (Aug. 19, 2020).

Approximately three-and-a-half months after the government filed the motion—and more than two months after it had been fully briefed—the government scheduled respondent's execution for January 15, 2021. See 98-cr-520 D. Ct. Doc. 652 (Nov. 20, 2020). For more than an additional month, the district court still did not act on the motion.

6. On December 29, 2020, the district court denied the government's motion. App., *infra*, 1a-17a. The court stated that it "would see no impediment to concluding that Indiana is an appropriate place to carry out the execution," but held that it lacked "authority to amend or supplement its original judgment to designate a new state for [respondent's] execution." *Id.* at 8a, 16a-17a. Specifically, the court concluded that Section 3596(a) allows a court to designate an alternate State to govern implementation of a capital sentence only "at the time of sentencing," and that designating an alternate State subsequently would constitute an improper modification of the sentence. *Id.* at 14a; see *id.* at 8a-16a.

8

The district court acknowledged that "Congress may not have intended for section 3596 to 'provide a windfall to a [federal capital] defendant'" where a State repeals its capital-sentencing regime after the defendant is sentenced, but stated that such a "'windfall' * * * appears to be the outcome" under its interpretation. App., *infra*, 16a (citation omitted). The court added that "[i]t might be said that there is every reason to permit this execution to go forward:  [respondent's] crimes were an abomination, his central responsibility is indisputable, and he had a fair trial on both in terms of guilt and the applicability of the death penalty before a jury of his peers." *Ibid*. But the court concluded that it could not make the required designation "[u]ntil a higher court dispels [its] concern that it lacks authority to act." *Id*. at 17a.

7. The government immediately appealed. App., *infra*, 31a. On December 31, 2020—two days after the district court's order—the government filed in the court of appeals its opening brief and, in the alternative, petition for a writ of mandamus. 20-18 C.A. Doc. 6. The parties thereafter negotiated, and the court of appeals entered, a schedule under which the case would be fully briefed by January 9, in order to allow a decision before the scheduled execution on January 15. 20-18 C.A. Doc. 9 (Jan. 1, 2021).

On January 8, however, the court of appeals entered an order setting the case for telephonic argument on January 27, 2021, nearly two weeks after the scheduled execution. App., *infra*, 27a. Judge Richardson dissented. He observed that, "[r]especting the Executive's prerogative to carry out duly imposed capital sentences, the Supreme Court acts with dispatch when a district court bars a scheduled execution," and he found that

9

"[t]here is no good reason why we cannot do the same." *Id.* at 28a. The government thereafter filed a motion to dispense with or expedite oral argument so that the court of appeals could resolve the case before the scheduled execution. The court denied the motion over another dissent by Judge Richardson, who stated that the court's "decision frustrates the Executive's prerogative and ignores the Supreme Court's guidance, both of which provide good reason to decide with dispatch." *Id.* at 30a; see *id.* at 29a.

## REASONS FOR GRANTING THE PETITION

The actions of the courts below are unprecedented and untenable. Although the FDPA generally provides that, "[w]hen the sentence is to be implemented," it shall be done "in the manner prescribed by the law of the State in which the sentence is imposed," the statute specifically provides an exception that, "[i]f the law of the State does not provide for implementation of a sentence of death"—as Maryland's law no longer does— "the court shall designate another State, the law of which does provide for the implementation of a sentence of death," to govern the manner of implementation of the sentence. 18 U.S.C. 3596(a). The district court here, however, declined to rule on the government's motion to designate Indiana, the site of federal death row, for more than three months after it was fully briefed. When the court finally ruled on December 29—roughly two weeks before respondent's January 15 execution date—it adopted the novel and implausible position that the FDPA permits designation of an alternate State only "at the time of sentencing." App., *infra*, 14a. Thus, in the court's view, a State that repeals *its own* death penalty simultaneously nullifies all *federal* death sentences previously imposed within the State. The court

10

recognized that its holding delivered an unjustified "'windfall'" to respondent and other similarly situated federal capital defendants, but claimed it was compelled to accept that "'absurd'" outcome "[u]ntil a higher court dispels" its error. *Id.* at 15a-17a (citations omitted).

The United States appealed and sought mandamus in the court of appeals two days later. But two of the panel judges, over dissents by Judge Richardson, issued an order scheduling oral argument for January 27—nearly two weeks *after* the scheduled execution date. App., *infra*, 27a-30a. Breaking with the many other courts of appeals that have expeditiously resolved claims before scheduled federal executions, the Fourth Circuit thus abdicated its responsibility to "decide with dispatch" the exceptionally important and straightforward question in this case, effectively granting respondent an indefinite stay of execution. *Id.* at 30a (Richardson, J., dissenting).

This Court should intervene to correct the district court's manifest error and direct it to designate Indiana under Section 3596(a) so that respondent's execution can proceed as planned on January 15. Nothing in the text, structure, history, or purpose of Section 3596(a) remotely suggests the loophole the court perceived, whereby Maryland's repeal of its own death penalty effectively commuted all pending federal death sentences imposed within the State. Indeed, this Court interpreted language in Section 3596(a)'s statutory predecessor to *avoid* a "hiatus" of the kind the district court created. *Andres* v. *United States*, 333 U.S. 740, 745 n.6 (1948). And three Justices have explained that the implementation provisions of Section 3596(a) should not be interpreted to "make it impossible to carry out executions of prisoners sentenced in some States." *Barr* v.

11

*Roane*, 140 S. Ct. 353, 353 (2019) (statement of Alito, J.). The district court's atextual reading would do just that, creating the very problem that Congress wrote Section 3596(a) to solve.

Contrary to the district court's suggestion, designating an alternate State would not improperly modify respondent's criminal judgment. The FDPA itself requires the designation, which concerns only the manner of implementation of the death sentence imposed by the judgment itself. Respondent's judgment makes that particularly clear by expressly incorporating Section 3596(a). App., *infra*, 21a. The district court and respondent thus have it exactly backward; designating Indiana would not be improperly modifying the judgment, but following both it and the FDPA.

As a procedural matter, this Court could provide timely relief in either of two ways. It could grant this petition for a writ of certiorari before judgment, summarily reverse the district court's decision, and direct the court to designate Indiana to govern implementation of respondent's sentence—as the district court indicated it would if authorized to do so. App., *infra*, 16a; see, *e.g.*, *Carroll* v. *United States*, 354 U.S. 394, 403 (1957) (providing that jurisdiction exists under 28 U.S.C. 1291 to review orders in criminal cases that have "sufficient independence from the main course of the prosecution"). Or the Court could construe this petition as one for a writ of mandamus and order the district court to designate Indiana for the same reasons. App., *infra*, 16a; see, *e.g.*, *Will* v. *United States*, 389 U.S. 90, 97-98 (1967) (explaining that mandamus is warranted where a district "court overreached its judicial power to deny the Government the rightful fruits of a valid conviction").

12

Either way, the Court should not allow the delays and errors by the courts below to obstruct implementation of respondent's lawful sentence for a horrific triple murder committed nearly 25 years ago. The district court acknowledged that there is "every reason to permit this execution to go forward," given that respondent's "crimes were an abomination, his central responsibility is indisputable, and he had a fair trial." App., *infra*, 16a. Family members of respondent's victims have waited more than two decades for his sentence to be carried out. They are planning to attend the execution in Indiana on Friday. And the government is fully prepared to implement the sentence in a humane manner. Allowing the flawed decisions below to delay this lawful execution "would serve no meaningful purpose and would frustrate the [federal government's] legitimate interest in carrying out a sentence of death in a timely manner." *Baze* v. *Rees*, 553 U.S. 35, 61 (2008) (plurality opinion). The government accordingly respectfully requests that this Court act in a manner that makes clear that respondent's execution can "proceed as planned" on January 15. *Barr* v. *Lee*, 140 S. Ct. 2590, 2592 (2020) (per curiam).

**A. The District Court Erred In Refusing To Designate An Alternate State Under The FDPA For Implementation Of Respondent's Federal Death Sentence**

In 2001, the federal district court in Maryland sentenced respondent to death pursuant to the FDPA. App., *infra*, 22a. On November 20, 2020, the government informed respondent that it would implement his sentence on January 15, 2021. See *id.* at 7a-8a. Section 3596(a) directs how that process should unfold:

When the sentence is to be implemented, the Attorney General shall release the person sentenced to

13

death to the custody of a United States marshal, who
shall supervise implementation of the sentence in the
manner prescribed by the law of the State in which
the sentence is imposed.  If the law of the State does
not provide for implementation of a sentence of
death, the court shall designate another State, the
law of which does provide for the implementation of
a sentence of death, and the sentence shall be imple-
mented in the latter State in the manner prescribed
by such law.

18 U.S.C. 3596(a).

 Section 3596(a)'s application here is straightforward.
It is now time for respondent's sentence "to be imple-
mented," but Maryland "does not provide for implemen-
tation of a sentence of death." 18 U.S.C. 3596(a). Thus,
the district "court shall designate another State" as an
alternate.  *Ibid.*  And the district court appeared to rec-
ognize that, under this statutory directive, it would be
"appropriate" to designate Indiana—where the federal
death chamber is located and respondent has been in-
carcerated for the past two decades. App., *infra*, 16a-
17a.

 The district court, however, declined to do so be-
cause it read into the statute a novel temporal limita-
tion, holding that an alternate State could be designated
*only* "at the time of sentencing." App., *infra*, 14a.  That
limitation appears nowhere in Section 3596(a), which re-
fers to "[w]hen the sentence is to be *implemented*," not
the time of sentencing.  18 U.S.C. 3596(a) (emphasis
added).  And the temporal limitation makes no sense,
because it would mean that *federal* death sentences are
rendered inoperative based on *state* decisions about
*their own* death-penalty laws—the very problem Con-
gress sought to solve by mandating designation of an

14

alternate State when "the law of the State does not provide for implementation of a sentence of death." *Ibid.*

The district court concluded that, even if Section 3596(a) required designation of an alternate State, such a designation would improperly modify respondent's judgment. App., *infra*, 15a-16a. That holding fails for the same reason and more. Because the FDPA requires it, the designation is not an impermissible modification of the death sentence. Indeed, it does not modify the sentence at all, but merely complies with the FDPA's requirements for how the sentence shall be implemented. That is especially clear here, because respondent's judgment itself expressly incorporates Section 3596(a). *Id.* at 21a.

In sum, the district court's interpretation of the FDPA provides respondent with an "absurd" "windfall" that is at odds with the statutory text, structure, history, and purpose—as well as principles of federal supremacy and common sense. App., *infra*, 15a-16a (citations omitted). The court's error is both exceptionally important and easily corrected; summary reversal or mandamus is accordingly warranted.

> *1. Section 3596(a) requires the district court to designate an alternate State for implementation of respondent's federal death sentence*

a. Section 3596(a) has its roots in two prior federal death penalty statutes. See *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106, 108-109 (D.C. Cir.) (*Execution Protocol Cases*), cert. denied, 141 S. Ct. 180 (2020). In the Crimes Act of 1790, ch. 9, 1 Stat. 112, the First Congress provided that "the manner of inflicting the punishment of death" for federal crimes "shall be by hanging." § 33, 1 Stat. 119. In 1937, Con-

15

gress moved from that single prescribed manner of fed-
eral execution to the "manner * * * prescribed by the
laws of the State within which the sentence is imposed."
Act of June 19, 1937 (1937 Act), ch. 367, 50 Stat. 304.

As this Court has explained, the 1937 Act's "adoption
of the local mode of execution" allowed the federal gov-
ernment to employ the "'more humane methods of exe-
cution, such as electrocution, or gas'" that were being
adopted by States. *Andres*, 333 U.S. at 745 n.6 (citation
omitted). But it also left a potential gap, because some
States did not provide for the death penalty and there-
fore did not prescribe a method of execution. See, *e.g.*,
Death Penalty Information Center, *States With and
Without the Death Penalty—2020*, https://deathpenal-
tyinfo.org/state-and-federal-info/state-by-state (DPIC)
(listing States that repealed their death penalties be-
fore 1937). The 1937 Act addressed that potential gap
in the default provision by adding a fallback provision:
"If the laws of the State within which sentence is im-
posed make no provision for the infliction of the penalty
of death, then the court shall designate some other
State in which such sentence shall be executed in the
manner prescribed by the laws thereof." 50 Stat. 304.
In enacting Section 3596(a) in 1994, Congress carried
forward the 1937 Act's implementation provisions with-
out substantial amendment. See *Execution Protocol
Cases*, 955 F.3d at 110.

There has never been any doubt, under either the
1937 Act or the FDPA, about the fallback provision's
role in the statutory scheme. It is "specifically designed
to prevent the choices of an individual state from effec-
tively nullifying the federal death penalty." *Execution
Protocol Cases*, 955 F.3d at 120 (Katsas, J., concurring);
see *id.* at 142 (Rao, J., concurring) (explaining that the

16

provision applies "whenever the sentencing state does not provide for the death penalty"); *id.* at 145 (Tatel, J., dissenting) (explaining that the provision applies when the state where sentencing occurred "has no death penalty"); see also *United States* v. *Tipton*, 90 F.3d 861, 902 (4th Cir. 1996) (similarly describing the operation of the fallback provision in the 1937 Act), cert. denied, 520 U.S. 1253 (1997).  In short, Section 3596(a) "clearly contemplates that the federal death penalty might be applied anywhere in the nation, although [some] of the states do not authorize capital punishment." *United States* v. *Tuck Chong*, 123 F. Supp. 2d 563, 568 (D. Haw. 1999).

Moreover, designating an alternate State is not optional.  Section 3596(a) directs that a district court "shall designate another State" "[i]f the law of the [default] State does not provide for implementation of a sentence of death." 18 U.S.C. 3596(a).  Courts have long understood that directive to "unambiguously provide that where * * * the law of the state in which a federal death sentence has been imposed does not authorize death as a penalty for any crime, the court has the authority and responsibility to designate another state, whose law does include the death penalty, as the place for the defendant's execution." *United States* v. *Sampson*, 300 F. Supp. 2d 278, 280 (D. Mass. 2004), aff'd, 486 F.3d 13 (1st Cir. 2007).

In interpreting Section 3596(a) and its predecessor statute, no court (until the district court below) has ever suggested that a sentencing court's duty to designate an alternate State exists *only* at the time it imposes the death sentence.  Indeed, nothing in the text or structure of Section 3596(a) states or even implies such a limitation.  Section 3596 is entitled "[i]mplementation of a

17

sentence of death," and the instructions in Section 3596(a) unambiguously apply post-sentencing. 18 U.S.C. 3596(a) (emphasis omitted). The first sentence of Section 3596(a) provides direction about the custody of a death-row inmate "who *has been* sentenced to death * * * until exhaustion of the procedures for appeal of the judgment of conviction and for review of the sentence"—a period that typically lasts many years after sentencing. 18 U.S.C. 3596(a) (emphasis added). The second sentence provides the default direction for "*[w]hen the sentence is to be implemented.*" *Ibid.* (emphasis added). And the third sentence provides the fallback direction for how "the sentence *shall be implemented*" if "the law of the State does not provide for implementation of a sentence of death." *Ibid.* (emphasis added). The unmistakable temporal flow and structure of Section 3596(a) leave no room to conclude that the fallback provision cannot be invoked after the sentence becomes final, let alone when the default State does not repeal its death-penalty law until that time.

The statutory history and purpose further foreclose any such reading. Construing Section 3596(a) to limit alternate-State designations to the time of sentencing would make it impossible to implement a federal death sentence entered in a State that subsequently repeals its death penalty, thereby creating the very problem Congress adopted the fallback provision to solve. This Court, however, refused to read Section 3596(a)'s predecessor to create such a gap or "hiatus," even when doing so required a more textually strained interpretation. *Andres*, 333 U.S. at 745 n.6 (reading the 1937 Act's reference to "'State[]'" laws as including laws of a federal territory, in order to avoid creating a gap in the Act's coverage) (citation omitted). And in recent FDPA

18

litigation, three Justices cautioned against reading Section 3596(a) in a way that "could well make it impossible to carry out executions of prisoners sentenced in some States"—exactly what would happen if post-sentencing repeals of state death-penalty laws are construed as effectively commuting federal death sentences in those States. *Roane*, 140 S. Ct. at 353 (statement of Alito, J.); cf. *Baze*, 553 U.S. at 47 (plurality opinion) (explaining that, because capital punishment is lawful, it "necessarily follows that there must be a means of carrying it out").

b. Notwithstanding those overwhelming indicia of statutory meaning, the district court determined—and respondent agrees—that Section 3596(a) allows designation of an alternate State only at the time of sentencing. App., *infra*, 12a-16a; see Resp. C.A. Br. 24-29. That interpretation rests almost entirely on a single *ipse dixit* assertion. In the court's view, shared by respondent, "the third sentence" of Section 3596(a)— which requires designating the alternate State—"could just as easily be read in relation to the last phrase of the second sentence, which refers to the original imposition of the sentence (i.e., 'in the manner prescribed by the law of the State in which the sentence is imposed')." App., *infra*, 13a (emphasis omitted); see Resp. C.A. Br. 25-26.

That position is plainly wrong. The second sentence of Section 3596(a) reads in full: "When the sentence is to be implemented, the Attorney General shall release the person sentenced to death to the custody of a United States marshal, who shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed." 18 U.S.C. 3596(a). The use of the present tense in the phrase

19

"sentence is imposed" does not mean that the specified law is determined at the time of sentencing. Rather, as noted above, the second sentence expressly addresses what to do "*[w]hen the sentence is to be implemented*"— namely, the marshal shall "supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed." *Ibid.* (emphasis added). By definition, that supervision of implementation occurs long after the sentence was imposed. Courts applying Section 3596(a) have thus uniformly (and undisputedly) looked to the law of the State at the time the sentence is being implemented, not when it was imposed. See, *e.g.*, *Execution Protocol Cases*, 955 F.3d at 123-124 (Katsas, J., concurring); *id.* at 142-143 (Rao, J., concurring); *id.* at 146-147 (Tatel, J., dissenting).

To be sure, it might have been more grammatically precise for the second sentence of Section 3596(a) to refer to implementation "in the manner prescribed by the law of the State in which the sentence *was* imposed," rather than "*is* imposed." But this Court has not hesitated to give a "present tense" construction "backward looking" effect when context requires that result, particularly where a contrary interpretation would deliver an unjustified "windfall" to a criminal defendant. *Mont* v. *United States*, 139 S. Ct. 1826, 1834 (2019) (interpreting the statutory term "is imprisoned") (emphasis omitted). That approach follows from the overarching principle that federal courts "construe statutes, not isolated provisions," *Graham Cnty. Soil & Water Conservation Dist.* v. *United States ex rel. Wilson*, 559 U.S. 280, 290 (2010) (citation omitted), and that proper interpretation requires consideration of "the entire text, in view of its structure" and the "logical relation of its many parts," *Mont*, 139 S. Ct. at 1833-1834 (quoting Antonin Scalia &

20

Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012)). Indeed, use of the present tense may reflect nothing more than congressional drafting manuals' ungrammatical direction "that, except in unusual circumstances, all laws, including penal statutes, should be written in the present tense." *Carr* v. *United States*, 560 U.S. 438, 463 (2010) (Alito, J., dissenting) (describing drafting manuals); cf., *e.g.*, 26 U.S.C. 72(t)(2)(H)(iii)(I) (2019) (referring to a "1-year period beginning on the date on which a child of the individual *is* born") (emphasis added).

In any event, the phrase "sentence is imposed" appears in Section 3596(a)'s second sentence rather than its third sentence, 18 U.S.C. 3596(a), and should not be read into the third in the manner that the district court and respondent urge. The third sentence begins with "[i]f the law of the State does not provide for implementation of a sentence of death." *Ibid.* That phrase refers to the default State mentioned in the prior sentence— the State in which the federal court imposed the death sentence—but it does not refer to that State's law *at the time of sentencing*. Rather, in describing that State's law, Section 3596(a)'s third sentence uses the present-tense phrase "does not provide for implementation of a sentence of death," which naturally looks to the law at the time "*[w]hen the sentence is to be implemented*," as the second sentence expressly begins. *Ibid.* (emphasis added).

Moreover, as explained above, every other tool of statutory interpretation overwhelmingly refutes the contrary interpretation. Both the district court and respondent acknowledge that their position means that federal capital sentences like respondent's are effectively commuted to life imprisonment when the State in

21

which the federal sentencing court is located repeals its death-penalty laws after the sentence becomes final. App., *infra*, 14a-16a; see Resp. C.A. Br. 28-29. Critically, however, neither respondent nor the district court has provided any explanation for why Congress—which sought to ensure "that the federal death penalty might be applied anywhere in the nation," *Tuck Chong*, 123 F. Supp. 2d at 568—would have mandated such a self-defeating result.

To the contrary, the district court acknowledged that its position would result in an unintended "windfall" for respondent and similarly situated death-row inmates, and seemed to agree that the result would be "absurd." App., *infra*, 16a-17a (citation omitted). Such an obvious departure from Congress's design can be justified only if the statute unambiguously requires that result. See, *e.g.*, *Griffin* v. *Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."). But neither the district court nor respondent suggests that their reading satisfies that standard. Indeed, the most the district court could say is that Section 3596(a) "could just as easily" be read as the court ultimately did. App., *infra*, 13a. That is nowhere near enough to justify the court's implausible reading. See, *e.g.*, *Great-West Life & Annuity Ins. Co.* v. *Knudson*, 534 U.S. 204, 217-218 (2002) (explaining that it is a court's "job to avoid rendering what Congress has plainly done * * * devoid of reason and effect").

Finally, both the district court and respondent rely on the fact that the government in some other capital prosecutions has sought designation of an alternate

22

State at the time of sentencing.  See App., *infra*, 13a-14a; Resp. C.A. Br. 27-28.  But in those cases (*e.g.*, the prosecution of the Boston Marathon bomber), the relevant State had *already* abolished the death penalty at the time of sentencing.  See, *e.g.*, DPIC, *supra* (noting that Massachusetts repealed its death penalty in 1984).  In such a circumstance, it is inevitable that an alternate State will have to be designated, and it makes sense to do so at the time of sentencing to provide maximum clarity for all involved.  But that practice says nothing about the scenario presented here, where a State repeals its death penalty long *after* the federal sentence becomes final.[*]

If anything, the parties' respective conduct in this case further undermines respondent's position.  The government asked the district court to designate an alternate State within weeks of successfully resuming the implementation of capital sentences last July.  See App., *infra*, 7a; *Lee*, 140 S. Ct. at 2592.  But for *years* after Maryland repealed its death penalty, Higgs filed claims seeking to vacate his convictions or sentences, without ever suggesting that his current death sentences could

---

[*] The district court also relied on the fact that the government has not sought to designate an alternate State for another death-row inmate sentenced by a federal court in Maryland before it repealed its death penalty or a death-row inmate sentenced by a federal court in Illinois before it repealed its death penalty.  App., *infra*, 14a.  Those inmates, however, have not exhausted their direct appeals and collateral review, and so are not yet eligible for execution.  While the government could move to designate an alternate State in those cases, its decision not to do so yet does not in any way suggest that it believes that those inmates can never be executed.  After all, those inmates—like respondent—continue to be housed on death row precisely because they can still be executed once they have exhausted their claims and an alternate State is designated.

23

no longer be implemented. See p. 6, *supra*. That ap-
proach would be counterproductive if he actually em-
braced the district court's rationale in this case: if his
current death sentences were vacated but then reim-
posed following a retrial and resentencing, then an al-
ternate State could be designated at that time even on
his own view, thus leaving him *worse off* than he claims
he is now.

### 2. *Designating an alternate State would not improperly modify respondent's criminal judgment*

The district court and respondent further contended
that designating an alternate State as required by Sec-
tion 3596(a) would be an improper modification of re-
spondent's criminal judgment. App., *infra*, 15a-16a;
Resp. C.A. Br. 14-23. That position too is fundamentally
flawed. Although criminal judgments generally cannot
be modified by a sentencing court once they have been
imposed, see, *e.g.*, *Dillon* v. *United States*, 560 U.S. 817,
824 (2010) (citing 18 U.S.C. 3582), that principle poses
no obstacle to the alternate-State designation required
by Section 3596(a). Designating a State for implemen-
tation of a death sentence is not a modification of the
death sentence itself. And even if it were, it would be
permissible as a specifically authorized departure from
the general sentencing rule.

a. To begin, the FDPA expressly distinguishes be-
tween the "[i]mposition of a sentence of death" and the
"[i]mplementation of a sentence of death." 18 U.S.C.
3594, 3596 (emphasis omitted). The former is governed
by Section 3594; the latter, at issue here, is governed by
Section 3596. Thus, when a district court makes an al-
ternate-State designation under Section 3596(a), it does
not "impos[e]" a new or modified sentence, but simply

24

facilitates the "implementation" of the original sentence, as the FDPA expressly requires.

Facilitating such implementation is fully consistent with the general rule against modifying sentences. In the context of imprisonment, for example, the "*term* of imprisonment" is part of the sentence and generally cannot be modified outside of certain defined circumstances, 18 U.S.C. 3582(c) (emphasis added), but the *place* and *conditions* of imprisonment are not part of the sentence. Instead, Congress has provided that BOP—not the sentencing court—"shall designate the place of the prisoner's imprisonment" after considering numerous factors. 18 U.S.C. 3621(b). BOP does not impermissibly "modify" a criminal sentence when it exercises its authority to, for example, move a prisoner from one correctional facility to another.

The same is true with capital sentences under the FDPA. The FDPA provides that the applicable sentence is a "sentence of death," the phrase used repeatedly throughout the statute. See 18 U.S.C. 3591-3599. A modification of a "sentence of death" would entail changing that sentence so that it is no longer a "sentence of death" but rather a sentence of something else, such as "life imprisonment without possibility of release." 18 U.S.C. 3594. By contrast, designating an alternate State to govern implementation of a death sentence is simply a modification of the "manner" in which "implementation of the sentence" shall occur. 18 U.S.C. 3596(a). The sentence remains a "sentence of death," just carried out in a newly identified way.

The absence of any improper sentence modification is especially evident here, because respondent's criminal judgment expressly states that his sentence is "im-

25

posed pursuant to Title 18, United States Code, Sections 3591 through 3597, including particularly Sections 3594 and 3596." App., *infra*, 21a. Making a designation required by Section 3596(a) is thus not modifying the judgment, but *following* the judgment. Unsurprisingly, neither the district court nor respondent has identified any case suggesting that a step required by the judgment is an impermissible sentence modification.

b. In any event, even if it would constitute a modification of a federal capital defendant's sentence to designate an alternate State post-sentencing, Section 3596(a)'s specific provisions would supersede any general rule against sentence modifications. See, *e.g.*, *Morales* v. *Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992) ("[I]t is a commonplace of statutory construction that the specific governs the general."); *Radzanower* v. *Touche Ross & Co.*, 426 U.S. 148, 155 (1976) (similar).

The general prohibition against sentence modification on which respondent relies was adopted in 1984 and is addressed to the "[i]mposition of a sentence of imprisonment." 18 U.S.C. 3582 (emphasis omitted); see Sentencing Reform Act of 1984, Pub. L. No. 98-473, Tit. II, § 212(a)(2), 98 Stat. 1998 (1984). It does not speak directly to capital sentences at all, let alone express a "clear intention" to foreclose adjustments to such capital sentences that might become necessary in light of intervening changes of law. *Radzanower*, 426 U.S. at 153-54. Instead, Congress directly addressed that distinct topic a decade later in the FDPA. 18 U.S.C. 3596(a). It is that later-enacted, directly on-point provision that provides the governing rule here. See *Radzanower*, 426 U.S. at 153 (indicating that a "statute covering a more generalized spectrum" will not take

26

precedence over "a statute dealing with a narrow, precise, and specific subject" unless the general statute is "later enacted" and expresses a "clear intention" to displace the more specific provision).  Respondent's attempts to declare the FDPA "irrelevant" and "beside the point" thus fail.  Resp. C.A. Br. 15.

**B.  The Lower Courts' Refusal To Provide The Designation Required By The FDPA Should Not Be Permitted To Obstruct Respondent's Lawful Death Sentence**

This Court should not permit lower courts to block implementation of a lawful death sentence by refusing to take action on a timely request for an alternate-State designation under Section 3596(a).  Instead, the government "must be allowed to exercise its 'sovereign power to punish offenders.'"  *Calderon* v. *Thompson*, 523 U.S. 538, 558 (1998) (quoting *McCleskey* v. *Zant*, 499 U.S. 467, 491 (1991)).  Respondent's sentence, having been affirmed on appeal and upheld (repeatedly) against collateral challenges, has "acquire[d] an added moral dimension." *Id.* at 556.  The Executive Branch has a right and duty to "execute [that] moral judgment," and the "victims of crime" have a right to "move forward knowing the moral judgment will be carried out."  *Ibid.*

As explained above, the FDPA provides that the district court "shall" designate an alternate State "[w]hen the sentence is to be implemented."  18 U.S.C. 3596(a).  The government here sought to designate Indiana for respondent's execution promptly upon the resumption of federal executions in July 2020, which followed a lengthy process of studying and adopting a new lethal-injection protocol.  See *Lee*, 140 S. Ct. at 2591-2592; *Execution Protocol Cases*, 955 F.3d at 109-110.  Notably, the district court appeared to recognize that Indiana

27

was the "appropriate place" to be designated. App., *infra*, 17a. Although respondent had suggested Virginia instead—ostensibly on the ground that it is closer to Maryland, but perhaps also because Virginia law allows inmates to elect electrocution, which federal regulations until recently did not expressly authorize, see p. 7, *supra*—the district court did not dispute that Indiana would be the proper choice given that it is where respondent has been incarcerated for the past two decades and where the federal death chamber is located. Yet the court nevertheless declined for months even to act on the government's motion, including for more than a month after respondent's execution was scheduled; and when the court finally denied the motion 17 days before the scheduled execution, the court of appeals indicated it would not even consider the government's appeal and mandamus petition until after the scheduled execution date had passed. See pp. 8-9, *supra*.

Such passive obstruction of the capital-punishment system that Congress adopted in the FDPA, and that the Executive Branch has a constitutional charge to carry out, should not be countenanced. See *Cheney* v. *United States District Court*, 542 U.S. 367, 382 (2004) (recognizing that correction by a higher court is appropriate "to prevent a lower court from interfering with a coequal branch's ability to discharge its constitutional responsibilities"). As this Court has repeatedly emphasized, both the government and the victims of crime "have an important interest in the timely enforcement of a [death] sentence." *Bucklew* v. *Precythe*, 139 S. Ct. 1112, 1133 (2019) (quoting *Hill* v. *McDonough*, 547 U.S. 573, 584 (2006)); see *Baze*, 553 U.S. at 61 (plurality opinion) (noting the "State's legitimate interest in carrying out a sentence of death in a timely manner"); *Nelson* v.

28

*Campbell*, 541 U.S. 637, 644 (2004) (noting the government "retains a significant interest in meting out a sentence of death in a timely fashion"). Preventing respondent's sentence from being carried out would "inflict a profound injury to the 'powerful and legitimate interest in punishing the guilty,'" an interest "shared by the [government] and the victims of crime alike." *Calderon*, 523 U.S. at 556 (citation omitted).

Respondent argued below that the government—not the district court—bears responsibility for any cancellation of his execution date, because the government should have sought designation as soon as Maryland repealed its capital-sentencing laws in 2013. See Resp. C.A. Br. 31-32. But given that the government at the time had no working execution protocol and no clear plan to obtain one, it was neither legally required nor practically sensible to seek a designation long before "[w]hen the sentence is to be implemented." 18 U.S.C. 3596(a). The government's request in August 2020, shortly after federal executions resumed, gave the district court ample time to take the ministerial step of designating an alternate State well before respondent's execution date. Indeed, even the court recognized that "[i]t might be said there is every reason to permit this execution to go forward" in light of respondent's "indisputable" guilt of "crimes [that] were an abomination." App., *infra*, 16a. Yet the lower courts abdicated responsibility for the role that Section 3596(a) assigns the judiciary in bringing that sentence to completion, handing respondent an "'absurd'" "'windfall'" that—to put it mildly—"Congress may not have intended." *Ibid.* (citations omitted). This Court should neither allow that error to go uncorrected nor accept the lower courts' dilatory handling of this matter.

29

## C.  The District Court's Error Is Not Immune From Review By A Higher Court

Perhaps recognizing the indefensibility of the district court's order, respondent argued below that appellate courts are powerless to review that order, no matter how erroneous it may be.  Resp. C.A. Br. 29-34; Resp. C.A. Mot. to Dismiss 1-12.  He contends that Congress authorized government appeals of criminal sentences only in 18 U.S.C. 3742(b), and because that provision does not reach the district court's order refusing to make the designation required by the FDPA in Section 3596(a), the government cannot appeal that order.  In respondent's view, therefore, not only can the State of Maryland effectively commute an existing federal death sentence by repealing its own death penalty, but a federal district court can do so simply by refusing to make an alternate-State designation under the FDPA, even if the refusal is clear and indisputable legal error.

No basis exists for that remarkable contention.  Jurisdiction lies in the court of appeals under a straightforward application of 28 U.S.C. 1291, which provides "jurisdiction o[ver] appeals from all final decisions of the district courts of the United States  * * *  except where a direct review may be had in the Supreme Court."  The district court's order on the government's post-judgment motion plainly satisfies that requirement, in that it finally resolves the government's motion for a sentence-implementation order pursuant to Section 3596(a).

Respondent does not appear to dispute that the district court's order is a "final decision[] of the district court[]." 28 U.S.C. 1291.  Instead, he asserts that an appeal is barred under a "'historic policy  * * *  that denies the Government the right of appeal in criminal

30

cases save as expressly authorized by statute.'" Resp. C.A. Mot. to Dismiss 6 (quoting *Di Bella* v. *United States*, 369 U.S. 121, 130 (1962)). He argues that under that policy, "'the Federal Government enjoys no inherent right to appeal a criminal judgment [under] the grant of general appellate jurisdiction, now contained in 28 U.S.C § 1291.'" *Ibid.* (quoting *Arizona* v. *Manypenny*, 451 U.S. 232, 246 (1981)).

But such a "presumption" about the appealability of a "criminal judgment" under Section 1291, *Manypenny*, 451 U.S. at 246, is plainly inapposite for the post-judgment order here, which is not the judgment of conviction and sentence in a criminal case but instead a post-judgment order on a sentence-implementation issue under the FDPA. The "presumption" on which respondent relies is premised on "prudential concern[s]" about delays from "unbounded litigation by the sovereign" before trial, and double-jeopardy concerns about "appeal by the prosecutor following a jury verdict of acquittal," neither of which applies to a post-judgment order seeking to effectuate a lawful capital sentence. *Ibid.*; cf. *United States* v. *Wilson*, 420 U.S. 332, 338-339 (1975) (noting more recent enactments reflecting Congress's desire to "authorize appeals whenever constitutionally permissible"). No presumption of non-appealability exists where the challenged order "possess[es] sufficient independence from the main course of the prosecution to warrant treatment as [a] plenary order[], and thus be appealable on the authority of 28 U.S.C. § 1291." *Carroll*, 354 U.S. at 403; cf. *Cohen* v. *Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949).

The district court's order refusing to make a Section 3596(a) designation here plainly possesses such "independence from the main course of the prosecution."

31

*Carroll*, 354 U.S. at 403. It comes two decades after the jury and district court finally adjudicated respondent's guilt and sentence, and would not result in any delay, retrial, or modification of respondent's criminal judgment. It concerns only a narrow, but important, question about the manner in which the Executive Branch may implement respondent's sentence in light of Maryland's subsequent repeal of its own death-penalty law. Not only are the prudential or constitutional concerns that have led courts to create exceptions to Section 1291's plain text in the context of appeals relating to the adjudication of guilt or imposition of sentence inapplicable, but it is in fact respondent's reading that would raise constitutional and prudential concerns, by allowing district courts effectively to usurp the President's prerogative to commute federal death sentences.

In any event, wholly apart from Section 1291, this Court also has jurisdiction to provide relief through a writ of mandamus. Indeed, this Court has done so in the past when facing a district "court [that] overreached its judicial power to deny the Government the rightful fruits of a valid conviction." *Will*, 389 U.S. at 97-98 (citing *Ex parte United States*, 242 U.S. 27, 37 (1916)). There, as here, the district court had entered a post-judgment order that "permanent[ly] suspen[ded]" a defendant's sentence "based upon considerations extraneous to the legality of the conviction." *Ex parte United States*, 242 U.S. at 37. There, as here, the effect of the district court's order "was equivalent to a refusal to carry out the statute" that established the designated punishment. *Ibid.* And there, as here, "to refuse to execute such a sentence when imposed" would be inconsistent with "the distribution of powers made by the Constitution." *Id.* at 41-42. Accordingly, if appeal were

32

unavailable, mandamus would be the only "adequate" and "appropriate" remedy to correct the district court's "clear and indisputable" legal error. *Cheney*, 542 U.S. at 380-381 (citation omitted).

## CONCLUSION

The Court should grant the petition for a writ of certiorari before judgment, summarily reverse the district court's decision, and direct the district court to designate Indiana under 18 U.S.C. 3596(a) as the State whose laws shall prescribe the manner of implementation of respondent's sentence. In the alternative, the Court could treat this petition as a petition for a writ of mandamus and direct the district court likewise. Either way, the Court should promptly enter judgment making clear that respondent's execution may proceed as scheduled on January 15, 2021.

Respectfully submitted.

JEFFREY B. WALL
  *Acting Solicitor General*
DAVID P. BURNS
  *Acting Assistant Attorney*
  *General*
HASHIM M. MOOPPAN
  *Counselor to the Solicitor*
  *General*
CHRISTOPHER G. MICHEL
BENJAMIN W. SNYDER
  *Assistants to the Solicitor*
  *General*
JEFFREY A. HALL
ELLEN E. NAZMY
  *Attorneys*

JANUARY 2021

# APPENDIX A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

————

Criminal No. PJM 98-520

UNITED STATES OF AMERICA

*v.*

DUSTIN JOHN HIGGS, DEFENDANT

————

Filed:   Dec. 29, 2020

————

## MEMORANDUM OPINION

————

More than two decades ago, a jury sitting in the District of Maryland found Defendant Dustin Higgs guilty on 15 counts for the first-degree murder and kidnapping of Tamika Black, Mishann Chinn, and Tanji Jackson. The jury subsequently determined that Higgs should receive the death penalty on each of the murder and kidnapping charges.   On January 9, 2001, the Court entered its final Judgment and Order on the jury's verdict and sentence, indicating the procedures for imposing that sentence.   On appeal, the Fourth Circuit affirmed Higgs's conviction and sentence and the Supreme Court denied certiorari.   *See United States v. Higgs*, 353 F.3d 281 (4th Cir. 2003), *cert. denied*, 543 U.S. 999 (2004). Higgs has been on death row ever since and is currently incarcerated at Federal Correctional Complex Terre Haute in the state of Indiana.

(1a)

2a

Now, some 20 years later, the Government seeks to carry out Higgs's death sentence.

Federal law provides that a federal execution shall be carried out in accordance with the laws of the state in which the defendant was sentenced. *See* 18 U.S.C. § 3596(a). However, Maryland abolished the death penalty in 2013, more than 12 years after Higgs was sentenced in this Court. Today, in the absence of state law by which to carry out Higgs's sentence in Maryland, the Government asks the Court to amend its 2001 Judgment and Order and direct that his execution be carried out in Indiana, pursuant to Indiana law.

Higgs merits little compassion. He received a fair trial and was convicted and sentenced to death by a unanimous jury for a despicable crime. That said, the Court believes it lacks the authority to do as the Government asks and will deny the Government's motion.

## I. Background

### A. Factual Background

On the evening of January 26, 1996, Higgs, Willis Haynes, and Victor Gloria picked up Tanji Jackson, Tamika Black, and Mischann Chinn in Washington, D.C., and drove them to Higgs's apartment in Laurel, Maryland, to drink alcohol, listen to music, and smoke marijuana. In the early pre-dawn hours of the following morning, Higgs and Jackson got into an argument, prompting Jackson to grab a knife from the kitchen. Haynes persuaded Jackson to drop the knife, whereupon Jackson, along with Black and Chinn, angrily walked out of the apartment. According to Gloria, as Jackson left, she made some sort of general threat

3a

against the men and, once outside the apartment, appeared to write down the license plate number of Higgs's van.

Higgs observed this and, in response, angrily grabbed his coat and his silver .38 caliber handgun and urged Haynes and Gloria to accompany him to catch up with the departing women. The three men got into Higgs's car and pursued the women, with Higgs driving, Haynes in the front passenger seat, and Gloria in the back seat behind Higgs. When they caught up with the three women, Haynes, at Higgs's direction, persuaded the women to get in the vehicle, presumably to be driven home. Higgs commenced driving towards Washington, D.C. Meanwhile, according to Gloria, Higgs and Haynes engaged in a quiet conversation in the front of the van, which Gloria could not hear. But instead of taking the women home, Higgs drove into the Patuxent National Wildlife Refuge, a federal refuge in Laurel, Maryland, and pulled over in a secluded spot. One of the young women asked the men if they were trying to "make [them] walk from there," to which Higgs responded, "Something like that." The women then got out of the car.

In the front seat, Higgs whispered something to Haynes and handed his gun to Haynes, who put it behind his back and got out of the car. Moments later, Gloria, who remained in the back seat of the car, heard a gunshot and wiped the mist off the back window in time to see Haynes shoot one of the women in the chest. Gloria turned to ask Higgs what he was doing and saw Higgs holding the steering wheel, watching the shootings in the rearview mirror. Gloria put his head down and heard more shots and a woman screaming.

4a

Haynes then returned to the van and the men drove away, leaving the women, all of whom had apparently been shot, on the road or roadside. Higgs drove the van to the Anacostia River, where he or Haynes threw the gun into the water, then drove back to Higgs's apartment to clean up and to throw away any items that the women might have touched. Higgs and Haynes then dropped Gloria off at a fast food restaurant and warned him to "keep [his] mouth shut."

Around 4:30 the same morning, a driver found the bodies of the three women strewn along Maryland Route 197, which runs through Patuxent National Wildlife Refuge, and contacted the U.S. Park Police. The Court distinctly recalls from the trial testimony that at least one of the women's bodies appeared to have been run over by a vehicle. At the scene, the police found Jackson's day planner, which contained Higgs's nickname and telephone number, as well as part of Higgs's address and the license plate number on his van. A medical examiner later determined that Jackson and Black had each been shot once in the chest and once in the back and that Chinn had been shot once in the back of the head.

Almost three years later, on December 21, 1998, Higgs and Haynes were indicted on three counts each of first-degree premeditated murder, *see* 18 U.S.C. § 1111(a), first-degree murder committed in the perpetration or attempted perpetration of a kidnapping, *see id.*, kidnapping resulting in death, *see* 18 U.S.C. § 1201(a)(2), and using a firearm in the commission of a crime of violence, *see* 18 U.S.C. § 924(c).

The cases were severed for trial and Haynes was tried first. The jury found him guilty on all counts but

5a

thereafter failed to reach a unanimous verdict on whether to impose a death sentence.   On August 24, 2000, the Court therefore sentenced Haynes to concurrent life terms on the first-degree murder and kidnapping counts and to a 45-year consecutive sentence on the firearm offenses.   The Fourth Circuit affirmed Haynes's conviction and sentence on appeal, and the Supreme Court denied certiorari.   *See United States v. Haynes*, 26 F. App'x 123 (4th Cir. 2001), *cert. denied*, 535 U.S. 979 (2002).

At Higgs's trial, which began five weeks after Haynes was sentenced, a different jury returned guilty verdicts against Higgs on all counts.   On October 26, 2000, after hearing evidence on aggravating and mitigating factors relevant to a possible death sentence, the jury returned a sentence of death against Higgs on each of the murder and kidnapping counts.   On January 9, 2001, the Court entered judgment on the jury's verdict.   ECF No. 414.

The Fourth Circuit affirmed both Higgs's conviction and sentence, and the Supreme Court denied certiorari. *See United States v. Higgs*, 353 F.3d 281 (4th Cir. 2003), *cert. denied*, 543 U.S. 999 (2004).   Shortly thereafter, the Fourth Circuit affirmed this Court's denial of Higgs's motion for a new trial, as to which the Supreme Court again denied certiorari.   *See United States v. Higgs*, 95 F. App'x 37 (4th Cir. 2004), *cert. denied*, 543 U.S. 1004 (2004).   In the intervening years, Higgs has sought, and has been consistently denied, various other forms of post-conviction relief, all denials being affirmed on appeal.   *See, e.g.*, *Higgs v. United States*, 711 F. Supp. 2d 479, 487 (D. Md. 2010), *aff'd*, 663 F.3d 726 (4th Cir. 2011), *cert. denied*, 568 U.S. 1069 (2012); *United States v. Higgs*, 193 F. Supp. 3d 495 (D. Md. 2016); *see*

6a

*also* Order Denying Petition for a Writ of Habeas Corpus, *Higgs v. Daniels*, No. 16-cv-321 (S.D. Ind. Apr. 30, 2020), *appeal pending*, *Higgs v. Watson*, No. 20-2129 (7th Cir. filed June 29, 2020).

### B.   Relevant Legal Background

The Court's 2001 Judgment and Order states that Higgs was "adjudged guilty" on all 12 counts, including 9 counts punishable by death.   It provides that he "is sentenced as provided on pages 3-6 of this judgment," pages which set forth several procedural details regarding implementation of the sentence of death.   Although the Judgment and Order does not explicitly designate Maryland as the state in which and according to the laws of which Higgs's sentence is to be implemented, it does direct that the sentence is "imposed pursuant to Title 18, United States Code, Sections 3591 through 3597, including particularly Sections 3594 and 3596."   In relevant part, section 3596 requires that "implementation of the sentence" of death must occur "in the manner prescribed by the law of the State in which the sentence is imposed."   18 U.S.C. § 3596(a).   Here, that state is Maryland.

Under the same provision, the Court was authorized —indeed, required—to designate another state only "[i]f the law of the State d[id] not provide for implementation of a sentence of death."   *Id.*   In 2001, when Higgs was sentenced, Maryland law did provide for the death penalty and its implementation.   *See* Md. Code, art. 27, § 413 (2001) (providing for death penalty for individuals convicted of first-degree murder); Md. Code, art. 27, § 627 (2001) (providing for execution by lethal injection).   It was not until 2013 that Maryland re-

7a

pealed its statutes relating to the imposition and imple-
mentation of death sentences, *see Bellard v. State*, 452
Md. 467, 472 (2017), thereby abolishing the death pen-
alty and calling into question the procedure for imple-
menting Higgs's death sentence in 2021.

### C.  Recent Procedural History

On August 4, 2020, the Government filed the present
motion, less than two pages in length, requesting that
the Court clear the way for Higgs's execution in the ab-
sence of Maryland state law governing its implementa-
tion.   The Government at first asked the Court to
amend its 2001 Judgment and Order to provide for the
sentence of death to be carried out in the state of Indi-
ana rather than Maryland.   On August 19, Higgs filed
a response in opposition to the Government's motion, ar-
guing in part that the Court lacked the authority to mod-
ify his judgment of conviction.

On September 1, the Government put forth a 19-page
reply, conceding for the first time that the Court indeed
lacked the authority to amend the judgment, asking in-
stead that the Court "supplement" its judgment.   The
following day, Higgs filed a motion to strike or summar-
ily deny the Government's motion and reply or, in the
alternative, allow Higgs to file a surreply.   The Court
declined to strike the Government's motion but granted
Higgs leave to file a surreply, which he did on Septem-
ber 18, 2020.

Without waiting for the Court's response, the Gov-
ernment proceeded to schedule Higgs's execution for

8a

January 15, 2021.[1]   The Court held a telephone conference with the parties on December 8, 2020, and now considers the Government's motion and Higgs's opposition thereto.

## II.   Discussion

The Court considers first whether it has the authority to amend or supplement its original judgment to designate a new state for Higgs's execution.   It holds that it does not.   The Court next considers whether it is authorized to designate a new state without such designation constituting an amendment or supplement to the original judgment.   The Court concludes that, under relevant case law, it cannot provide the Government the relief it seeks.

### A.   The Court's Authority to Amend Its Judgment

The Government's initial, extraordinary request that the Court amend its original judgment and sentence is something that the Court plainly cannot do.   A "'judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances."

---

[1]   *See* Notice of Execution Date (Nov. 20, 2020), ECF No. 649.   It is not lost on the Court that this execution is scheduled to occur just five days before the inauguration of a new president who has stated his opposition to capital punishment.   Higgs is set to be the fifth and final federal inmate to be executed in the waning days of the current administration.   *See* Mark Berman & Matt Zapotosky, *Trump Administration Sets Wave of Executions for Days Leading Up to Biden Inauguration*, Wash. Post (Dec. 2, 2020, at 4:31 p.m.), https://www.washingtonpost.com/national-security/federal-executions-accelerate-before-biden-inauguration/2020/12/02/34db45e0-340d-11eb-b59c-ad b7153d10c2_story.html.

9a

*Dillon v. United States*, 560 U.S. 817, 824 (2010) (quoting 18 U.S.C. § 3582(b)).    Only a few limited exceptions to this rule exist, none of which applies here.    *See* 18 U.S.C. § 3582(c) (permitting sentence reductions for "extraordinary and compelling reasons," for certain elderly prisoners, as "otherwise expressly permitted by statute," or pursuant to sentencing range reductions); Fed. R. Crim. P. 35 (permitting sentence corrections for clear error or sentence reductions for substantial assistance to the Government); *see also United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020) ("Generally, sentences may not be modified once imposed.").

The Fourth Circuit has taken a very a narrow view of the authority of district courts to amend *any* aspect of a criminal sentence in the absence of an explicitly recognized exception authorizing such amendment.    For example, in *United States v. Jones*, the Fourth Circuit held that a district court lacked authority to amend the defendant's judgment to require immediate payment of a fine imposed four years earlier, even though the amendment sought to bring the sentence in compliance with subsequent case law.    238 F.3d 271, 272-73 (4th Cir. 2001).    The court in *Jones* was clear that, "[a]lthough there are circumstances under which a district court may modify or correct a criminal judgment order, none of them authorize[s] the district court to [amend a judgment] based solely on a subsequent change in case law." *Id.* at 272.    The court rejected the Government's argument that it should nevertheless affirm the district court's amending order because the defendant could not "show that he was harmed by the amendment."    *Id.*

Since the *Jones* court found that a district court lacked authority to amend a judgment to revise the terms for payment of a fine where the original judgment

10a

was no longer in compliance with the law, the Court be-
lieves *a fortiori* that it lacks authority to amend the
judgment as to the place of execution, where Maryland
law no longer provides procedures for an execution.

### B.    The Court's Authority to Supplement Its Judgment

The Court finds it notable that the Government first
wrote in support of a "Motion to Amend Judgment and
Order" but then in reply "agree[d] that this case does
not present circumstances that would permit the Court
to alter Higgs's criminal judgment."    That explains
why the Government abruptly changed its stance and
asks that the Court instead "supplement" its judgment
to the same effect.[2]    Gov't Reply at 6, ECF No. 644.
This avails the Government not at all.

The Court is unaware of any applicable case address-
ing whether the Court might have clear-cut authority to
"supplement" a final judgment when it may not "amend"
one.    But the Court is able to look to analogous Fourth
Circuit case law for guidance.    *United States v. Light-
ner*, sheds some light on the question.    There, the
Fourth Circuit vacated a district court's letter opinion
purporting to "clarify" the defendant's criminal judg-
ment with respect to the payment of an imposed fine.

---

[2]  The Government frames this issue by suggesting that the rele-
vant portion of the written Judgment and Order, including the stat-
utory references and procedural directives, is not in fact part of the
sentence but amounts to severable language that may be ignored or
amended by the Court at will.    The Court finds this suggestion wholly
unpersuasive, both as a practical matter and in light of Supreme Court
and Fourth Circuit precedent described herein.    *See, e.g.*, *Berman
v. United States*, 302 U.S. 211, 212 (1937) ("Final judgment in a crim-
inal case means sentence.    The sentence is the judgment.").

11a

266 F. App'x 240, 241 (4th Cir. 2008).    The court ex-
plained its decision as follows:

> The original judgment provides that the fine be paid
> according to the schedule of payments prepared by
> the Probation Office.    In its [later] opinion, the dis-
> trict court imposed the requirement that Lightner
> participate in the [Inmate Financial Responsibility
> Program].    However informal and well-intended the
> court's letter, the practical effect of the clarification
> was accomplishing "through the back door" what the
> district court was admonished from doing in *Jones*.
> Based on *Jones*, we find that the court was unauthor-
> ized to "clarify" the judgment, which essentially
> served to amend the judgment.

*Id.* at 242.    *Lightner* thus clearly shows that the Fourth
Circuit views even a supplemental order issued merely
to clarify a monetary sentence as an amendment to the
original judgment "through the back door" and there-
fore beyond the authority of the district court.

True, while the Court's original designation of Mary-
land occurred only by implication—by ordering imple-
mentation according to 18 U.S.C. § 3596, which at the
time of judgment required execution of the sentence in
Maryland—the practical effect of the original judgment
was necessarily designation of the state of Maryland.
The Court thus concludes that a supplemental order
designating a different state for Higgs's execution would
constitute an amendment of the original judgment in all
but name.    To the extent that the Government requests
that the Court supplement or "clarify" its 2001 Judg-
ment and Order by designating Indiana in lieu of Mary-

12a

land as the place of Higgs's execution, such a supplement is precluded by the Fourth Circuit's decision in *Lightner*.

### C. The Court's Authority to Designate a New State without Amending or Supplementing Its Judgment

As an alternative of questionable distinction, the Government unpersuasively argues that the Court may, and indeed must, "enter a new order" designating Indiana to implement Higgs's sentence. The Government's theory is that because such an order purportedly "would not contradict the court's [2001] Judgment and Order," it could not be considered an impermissible modification or supplement of that judgment. Gov't Reply at 9.

The Government rests its argument for a separate order on the language of 18 U.S.C. § 3596, which it contends "indicates that the relevant inquiry should focus on the time of implementation, not initial sentencing." *Id.* at 11. In considering the Government's textual argument, it is helpful to view the relevant statutory provision in context:

[1] A person who has been sentenced to death pursuant to this chapter shall be committed to the custody of the Attorney General until exhaustion of the procedures for appeal of the judgment of conviction and for review of the sentence. [2] **When the sentence is to be implemented,** the Attorney General shall release the person sentenced to death to the custody of a United States marshal, **who shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed. [3] If the law of the State does not provide for implementation of a sentence of death, the court shall designate another State,** the law of which does provide

13a

for the implementation of a sentence of death, and the sentence shall be implemented in the latter State in the manner prescribed by such law.

18 U.S.C. § 3596(a) (emphases and sentence numbering added). The Government suggests that the temporal phrase at the beginning of the second sentence extends to the third sentence, which should be read to mean that "[i]f the law of the State does not provide for implementation of a sentence of death" "[w]hen the sentence is to be implemented," *then* "the court shall designate another State." But the third sentence could just as easily be read in relation to the last phrase of the second sentence, which refers to the original imposition of the sentence (i.e., "in the manner prescribed by the law of the State *in which the sentence is imposed*").[3]

Indeed, in reality, a district court sitting in a state that does not have the death penalty would ordinarily "designate another State" at the time it imposes the sentence, not at some later time. In fact, in the case of every current federal death row inmate who was sentenced in a state that did not have laws for implementing a death sentence, the court designated a different state under section 3596 *at the time of and as part of* the final judgment and sentencing order. *See* Judgment at 6, *United States v. Tsarnaev*, No. 13-cr-10200 (D. Mass. June 24, 2015), ECF No. 1480 (designating Indiana); Judgment at 2, *United States v. Rodriguez*, No. 04-cr-55 (D.N.D. Feb. 8, 2007), ECF No. 652 (designating South Dakota); *see also* Amended Judgment and Order at 2,

---

[3] This is not an inappropriate time to invoke the rule of lenity, by which ambiguous words of a criminal statute are construed more favorably to the defendant. *See Rule of Lenity, Black's Law Dictionary* (11th ed. 2019).

14a

*United States v. Sampson*, No. 01-cr-10384 (D. Mass. Feb. 6, 2017), ECF No. 2917 (designating Indiana after new trial and conviction).

The designation of a different state under 18 U.S.C. § 3596, then, invariably occurs at the time of sentencing, whether it is explicit or implicit.  It is part of the criminal judgment.  In no sense does section 3596 grant the Court authority and jurisdiction it does not otherwise possess, i.e., to amend or supplement its judgment well after the fact.

As far as the Court can tell, there are only two other federal inmates in the same situation as Higgs, both having been sentenced to death in states that later abolished the death penalty:  Kenneth Lighty and Ronald Mikos.  Lighty was convicted and sentenced to death in this very Court in 2006, seven years before Maryland repealed its death penalty.  *See* Judgment and Order, *United States v. Lighty*, No. 03-cr-457-PJM (D. Md. Mar. 10, 2006), ECF No. 248.[4]  Mikos was convicted and sentenced to death in the Northern District of Illinois in 2006, and Illinois subsequently abolished the death penalty in 2011.  *See* Judgment (Sentencing Order), *United States v. Mikos*, 02-cr-137 (N.D. Ill. 2006), ECF No. 426.  Unlike in the present case, however, the Government has not moved for designation of a new state to implement either Lighty's or Mikos's death sentence.

Also unlike here, the criminal judgments in both cases explicitly designated the state in which the sentence was to be implemented under section 3596.  In

---

[4]  Lighty is currently back before this Court on a number of post-conviction filings.

15a

*Mikos*, the judgment specifically provides (using the language of section 3596) that the defendant's sentence shall be implemented "in the manner prescribed by the death penalty law of the State of Illinois." *Id.* at 2. Likewise, in *Lighty*, as it happens, this Court's judgment uses the same language to require that the defendant's sentence shall be implemented "in the manner prescribed by the law of the State of Maryland." Judgment at 1-2, *Lighty*, No. 03-cr-457-PJM. In those cases, it would be difficult, if not impossible, to argue that the designation of a state other than Illinois or Maryland, respectively, would not amend the judgments, since it would necessarily contradict explicit directives of the original judgments.

Again, while the 2001 Judgment and Order does not explicitly direct execution of the sentence in the state of Maryland, it does so impliedly by reference to section 3596. So, although an order designating a state other than Maryland to implement Higgs's sentence might not literally contradict the explicit language of the Judgment and Order, it would definitely change its effect. To conclude that the Court is authorized, at this late stage, to designate a state other than Maryland here, when the court could not do so in *Mikos* or *Lighty*, would ignore the identical practical effect in all these cases. *See Lightner*, 266 F. App'x at 242. The judgment in *Mikos* designated Illinois as the state of execution, while the implicit effect of the judgment here was to designate Maryland as the state of execution. Either way, a change to the state designation would alter the original judgment. That is something the Court lacks the authority to do.

In the Government's view, not allowing the designation of a state other than Maryland "would be an absurd

16a

result and itself contrary to the sentence of death." Gov't Reply at 9. But *reductio ad absurdum* never fares well against *dura lex, sed lex*. This is especially true when it is a matter of life and death. A mere desire to avoid an unintended result cannot overcome a district court's lack of authority to amend a criminal judgment. Congress may not have intended for section 3596 to "provide a windfall to a defendant" in this rarest of circumstances, *id.* at 11, but that appears to be the outcome. Unless and until the Fourth Circuit or indeed the Supreme Court creates a relevant exception to the prohibition, such that *Jones* and *Lightner* would not be relevant or controlling here, the Court concludes that it lacks authority to amend or supplement its judgment to avoid a purportedly "absurd result."

### III.  Conclusion

The Court finds that any order it might issue designating a state other than Maryland for the implementation of Higgs's death sentence—whether labeled an amendment, a supplement, or a new order—would necessarily modify its 2001 Judgment and Order and therefore would be beyond the authority of the Court recognized in *Jones* and *Lightner*.

It might be said that there is every reason to permit this execution to go forward: Higgs's crimes were an abomination, his central responsibility is indisputable, and he had a fair trial on both in terms of guilt and the applicability of the death penalty before a jury of his peers. The jury's verdict was affirmed on appeal, and this Court and appeals courts have considered and rejected Higgs's numerous post-conviction motions throughout the intervening years. If it had clear authority to act, the Court would see no impediment to concluding

17a

that Indiana is an appropriate place to carry out the execution, as the Government requests.    But the 2001 Judgment and Order provides, by reference to section 3596, that the execution is to be carried out according to Maryland law.    The Court is not in a position to declare that it is authorized to circumvent the strong prohibition against amending a criminal sentence simply by calling such an amendment a "supplement" or "new order."

Until a higher court dispels the Court's concern that it lacks authority to act, the Government's Motion to Amend Judgment and Order, or to do the same by supplemental directive, is **DENIED**.    A separate Order will issue.

Dec. 29, 2020          /s/   <u>PETER J. MESSITTE</u>
                              PETER J. MESSITTE
                              United States District Judge

18a

## APPENDIX B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

———————

Case No. PJM-98-0520

UNITED STATES OF AMERICA, PLAINTIFF

*v.*

DUSTIN JOHN HIGGS, DEFENDANT

———————

Filed:   Jan. 9, 2001

———————

## **JUDGMENT AND ORDER**

———————

The Defendant, Dustin John Higgs, was represented by Harry Trainor, Knight, Manzi, Nussbaum & La-Placa, 14440 Old Mill Road, Upper Marlboro , Maryland 20772, and Timothy J. Sullivan, Esq., Sullivan & Sullivan, 7305 Baltimore Avenue, Suite 301, College Park, MD 20740-3234.

The Defendant was found guilty on Counts 1-15 by a jury after a plea of not guilty.    Counts 1, 2, 4, 6, 7, 9, 11, 12 and 14 are offenses punishable by death.    Accordingly, the Defendant is adjudged guilty of such counts, involving the following offenses:

19a

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number |
|---|---|---|---|
| 18 U.S.C. § 1111 | First Degree Premeditated Murder of Tamika Black | January 27, 1996 | 1 |
| 18 U.S.C. § 1111 | First Degree Murder of Tamika Black Which Occurred During Perpetration or Attempted Perpetration of a Felony (Kidnapping) | January 27, 1996 | 2 |
| 18 U.S.C. § 1201(a)(2) | Kidnapping of Tamika Black Which Resulted in Her Death | January 27, 1996 | 4 |
| 18 U.S.C. § 1111 | First Degree Premeditated Murder of Mishann Chinn | January 27, 1996 | 6 |
| 18 U.S.C. § 1111 | First Degree Murder of Mishann Chinn Which Occurred During Perpe- | January 27, 1996 | 7 |

20a

| | | | |
|---|---|---|---|
| | tration or Attempted Perpetration of a Felony (Kidnapping) | | |
| 18 U.S.C. § 1201(a)(2) | Kidnapping of Mishann Chinn Which Resulted in Her Death | January 27, 1996 | 9 |
| 18 U.S.C. § 1111 | First Degree Premeditated Murder of Tanji Jackson | January 27, 1996 | 11 |
| 18 U.S.C. § 1111 | First Degree Murder of Tanji Jackson Which Occurred During Perpetration or Attempted Perpetration of a Felony (Kidnapping) | January 27, 1996 | 12 |
| 18 U.S.C. § 1201(a)(2) | Kidnapping of Tanji Jackson Which Resulted in Her Death | January 27, 1996 | 14 |

As pronounced on October 26, 2000, the Defendant is sentenced as provided on pages 3-6 of this judgment as to Counts 1, 2, 4, 6, 7, 9, 11, 12 and 14.  The judgment as to Counts 5, 10 and 15 will be entered in a separate

21a

order.    The sentence as to Counts 1, 2, 4, 6, 7, 9, 11, 12 and 14 is also imposed pursuant to Title 18, United States Code, Sections 3591 through 3597, including particularly Sections 3594 and 3596.

It is ordered that the Defendant shall pay to the United States a special assessment of $100 [$50.00] [PJM 1/3/00] for Counts 1, 2, 4, 6, 7, 9, 11, 12 and 14, which shall be due immediately.    The special assessment as to Counts 5, 10 and 15 will be assessed in a separate order.

22a

## **SENTENCE**

Based upon the Special Findings and Decision of the jury on October 26, 2000, pursuant to the conviction of the defendant, DUSTIN JOHN HIGGS, under Counts 1, 2, 4, 6, 7, 9, 11, 12 and 14, the Court hereby imposes upon the defendant a sentence of death as to Counts 1, 2, 4, 6, 7, 9, 11, 12 and 14.   The Court declines to impose a fine due to the defendant's inability to pay.

The sentence shall be executed by a United States Marshal designated by the Director of the United States Marshals Service.

The sentence shall be executed by intravenous injection of a lethal substance or substances in a quantity sufficient to cause death.

The sentence shall be executed on a date and at a place designated by the Director of the Federal Bureau of Prisons, which date shall be no sooner than 60 days from the entry of the judgment of death.   If the date designated for execution passes by reason of a stay of execution, then a new date shall be designated promptly by the Director of the Federal Bureau of Prisons when the stay is lifted, at a federal penal or correctional institution designated by the Director of the Federal Bureau of Prisons, by a United States Marshal designated by the Director of the United States Marshals Service, assisted by additional personnel selected by the Marshal and the Warden of the designated institution and acting at the direction of the Marshal, and by intravenous injection of a lethal substance or substances in a quantity sufficient to cause death, such substance or substances to be determined by the Director of the Federal Bureau of Prisons and to be administered by qualified personnel

23a

selected by the Warden and acting at the direction of the Marshal. Unless the President interposes, the United States Marshal shall not stay execution of the sentence on the basis that the prisoner has filed a petition for executive clemency.

Except to the extent a court orders otherwise:

(a) The Warden of the designated institution shall notify the prisoner under sentence of death of the date designated for execution at least 20 days in advance, except when the date follows a postponement of fewer than 20 days of a previously scheduled and noticed date of execution, in which case the Warden shall notify the prisoner as soon as possible.

(b) Beginning seven days before the designated date of execution, the prisoner shall have access only to his spiritual advisors (not to exceed two), his defense attorneys, members of his family, and the officers and employees of the institution. Upon approval of the Director of the Federal Bureau of Prisons, the Warden may grant access to such other proper persons as the prisoner may request.

(c) In addition to the Marshal and the Warden, the following persons shall be present at the execution:

(1) Necessary personnel selected by the Marshal and Warden;

(2) Those attorneys of the Department of Justice whom the Deputy Attorney General determines are necessary;

(3) Not more than the following numbers of persons selected by the prisoner:

24a

(i)   one spiritual advisor;

(ii)  two defense attorneys;

(iii) three adult friends or relatives; and

(4)  Not more than the following numbers of persons selected by the Warden:

(i)   eight citizens; and

(ii)  ten representatives of the press.

(d)  No other person shall be present at the execution, unless leave for such person's present is granted by the Director of the Federal Bureau of Prisons.   No person younger than 18 years of age shall witness the execution.

(e)  The Warden should notify those individuals described in paragraph (c) of this section as soon as practicable before the designated time of the execution.

(f)  No photographic or other visual or audio recording of the execution shall be permitted.

(g)  After the execution has been carried out, qualified personnel selected by the Warden shall conduct an examination of the body of the prisoner to determine that death has occurred and shall inform the Marshal and Warden of his determination.   Upon notification of prisoner's death, the Marshal shall complete and sign the Return hereunder or any similar document and shall file such document with the sentencing court.

(h)  The remains of the prisoner shall be disposed of according to procedures established by the Director of the Federal Bureau of Prisons.

25a

No officer or employee of the Department of Justice shall be required to be in attendance at or to participate in any execution if such attendance or participation is contrary to the moral or religious convictions of the officer or employee, or if the employee is a medical professional who considers such participation or attendance contrary to medical ethics.    For purposes of this section, the term "participation" includes personal preparation of the condemned individual and the apparatus used for execution and supervision of the activities of other personnel in carrying out such activities.

The defendant, DUSTIN JOHN HIGGS, is hereby committed to the custody of the Attorney General or her authorized representative for appropriate detention pending exhaustion of the procedures for appeal of the judgement of conviction and for review of the sentence, and pending execution of this sentence.

Signed this [3] day of [Jan.], 2001.

/s/  PETER J. MESSITTE
     PETER J. MESSITTE
     United States District Judge

26a

## RETURN

I have executed this Judgment as follows:

_____
_____
_____

Defendant delivered on _____ to _____ at _____, with a cer-
tified copy of this judgment.

_____
United States Marshal

By: _____
Deputy Marshal

I hereby inform this Honorable Court that the sen-
tence of death imposed herein has been executed.

Date: _____

_____
DESIGNATED UNITED STATES MARSHAL

27a

## APPENDIX C

### UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 20-18
(8:98-cr-00520-PJM-2)

UNITED STATES OF AMERICA, PLAINTIFF-APPELLANT

*v.*

DUSTIN JOHN HIGGS, DEFENDANT-APPELLEE

Filed:    Jan. 7, 2021

### ORDER

Upon consideration of the government's opening brief and the defendant's response brief, the court directs the clerk to schedule this case for remote oral argument on January 27, 2021, at 11:00 a.m.    The parties may file any motions pertaining to the scheduling of argument by January 8, 2021.

Entered at the direction of Judge Keenan with the concurrence of Judge Floyd.    Judge Richardson dissented from the order and filed a dissenting opinion.

For the Court

/s/    PATRICIA S. CONNOR, Clerk
PATRICIA S. CONNOR

28a

RICHARDSON, Circuit Judge, dissenting:

I respectfully dissent from the order delaying this case to schedule oral argument on January 27. Argument and more time for deliberation can be helpful, particularly in weighty matters like this one. But the Executive Branch scheduled Higgs's execution for January 15. And the parties agreed to an expedited briefing schedule to permit consideration of a single question of statutory interpretation before that date. *See* Fourth Circuit I.O.P. 22.1.

Respecting the Executive's prerogative to carry out duly imposed capital sentences, the Supreme Court acts with dispatch when a district court bars a scheduled execution. *See Barr v. Hall*, No. 20A102, 2020 WL 6797719 (U.S. Nov. 19, 2020) (mem.); *Barr v. Lee*, 140 S. Ct. 2590 (2020); *Barr v. Purkey*, 140 S. Ct. 2594 (2020) (mem.); *Barr v. Purkey*, 141 S. Ct. 196 (2020) (mem.). There is no good reason why we cannot do the same. So I respectfully dissent from the decision to delay this process to hear oral argument during our previously scheduled term of court, which falls two weeks after the scheduled execution.

29a

## APPENDIX D

### UNITED STATES COURT OF APPEALS
### FOR THE FOURTH CIRCUIT

No. 20-18
(8:98-cr-00520-PJM-2)

UNITED STATES OF AMERICA, PLAINTIFF-APPELLANT

*v.*

DUSTIN JOHN HIGGS, DEFENDANT-APPELLEE

Filed:   Jan. 8, 2021

### ORDER

Upon consideration of submissions relative to the government's motion to dispense with, or alternatively expedite, oral argument, the court denies the motion in light of the novel legal issues presented.

Entered at the direction of Judge Keenan with the concurrence of Judge Floyd.   Judge Richardson dissented from the order and filed a dissenting opinion.

For the Court

/s/   PATRICIA S. CONNOR, Clerk
PATRICIA S. CONNOR

30a

RICHARDSON, Circuit Judge, dissenting:

I continue to respectfully dissent from our decision to delay this case by scheduling oral argument two weeks *after* the scheduled execution.   *See* Order, ECF 15, No. 20-18 (Jan. 7, 2020) (Richardson, J., dissenting).   That decision frustrates the Executive's prerogative and ignores the Supreme Court's guidance, both of which provide good reason to decide with dispatch.

31a

## APPENDIX E

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

Crim. No. PJM-98-520

UNITED STATES OF AMERICA

*v.*

DUSTIN JOHN HIGGS

Filed:   Dec. 30, 2020

### NOTICE OF APPEAL

Notice is hereby given that the United States of America appeals to the United States Court of Appeals for the Fourth Circuit from the district court's (Hon. Peter J. Messitte, J.) Memorandum and Order (entered on the docket on December 29, 2020), ECF Nos. 657, 658.

Respectfully submitted,

Robert K. Hur
United States Attorney

By:    _____/s/_____

Ellen E. Nazmy
Special Assistant United States Attorney

_____/s/_____

Jason Medinger
Assistant United States Attorney