1           UNITED STATES DISTRICT AND BANKRUPTCY COURTS
                 FOR THE DISTRICT OF COLUMBIA

2

3  FEDERAL CAPITAL HABEAS       Case No. 20-cv-03742
    PROJECT, et al.,

4

5          Plaintiffs,

6       v.             Washington, D.C.

7  JEFFREY A. ROSEN, et al.,   January 7, 2021

8         Defendants.    11:30 a.m.

9  -------------------------/

10           TRANSCRIPT OF MOTIONS HEARING
        BEFORE THE HONORABLE RUDOLPH CONTRERAS

11           UNITED STATES DISTRICT JUDGE

12  APPEARANCES:

13  For the Plaintiffs:    Cooley LLP
                     By: ELIZABETH PRELOGAR, ESQUIRE

14                   1299 Pennsylvania Avenue, NW
                   Suite 700

15                   Washington, D.C. 20004

16

    For the Defendants:    U.S. Department of Justice

17                   By: BRADLEY HUMPHREYS, ESQUIRE
                   1100 L Street, NW

18                   Washington, D.C. 20009

19

    Court Reporter        Lisa K. Bankins RMR FCRR RDR

20                   United States District Court
                   333 Constitution Avenue, NW

21                   Washington, D.C. 20001

22

23  Proceedings recorded by mechanical stenography,
    transcript produced by notereading.

24

25

```
 1                      P R O C E E D I N G S
 2            THE CLERK:  This is Civil Action 20-3742,
 3    Federal Capital Habeas Project, et al. versus Jeffrey
 4    Rosen, et al.  For plaintiffs, I have Ms. Elizabeth
 5    Prelogar.  For defendants, I have Mr. Bradley Humphreys.
 6    Our court reporter today again is Ms. Lisa Bankins.  All
 7    parties are present.
 8            THE COURT:  Good morning, everyone.
 9            MS. PRELOGAR:  Good morning, Your Honor.
10            THE COURT:  So, you know, because it's
11    plaintiffs' motion, I typically let the movant go first.
12    But I want to talk to the government a little bit first
13    before we get into the presentations.
14            You know, Mr. Humphreys, when I sat in your
15    shoes as a representative for the Department of Justice,
16    if something like this came across my desk, I would always
17    bend over backwards to see if I can diffuse the emergency
18    situation so that a judge like myself doesn't have to go
19    through this rigmarole and it seems like this is a case
20    that could have easily been dealt with in that fashion
21    because what you're saying is that none of these bad
22    things have happened and it would seem like with a
23    relatively straightforward representation from the
24    government, that we could avoid the emergency and I'm
25    curious as to why that hasn't happened.
```

1          MR. HUMPHREYS:  Well, I'm not sure exactly --

2     thank you, Your Honor, good morning -- what sort of

3     representation you had in mind, Your Honor.

4          THE COURT:  You know, for example, the part with

5     the substitution of the supervision of the marshal who is

6     someone at B.O.P., you say that hasn't happened and the

7     plaintiffs haven't shown that it's likely to happen.  You

8     know, if you represented that there is no intent to do

9     that and I'm referring to the date that's scheduled for

10    January 15th, if you can represent that that's not going

11    to happen, the same with the other part about -- well, the

12    part about the setting the date, I understand your

13    argument that that was done under the old regulation so

14    nothing would change.  So I think that one is taken care

15    of.

16          And I understand with the third part, the part

17    about exemptions from the regulations, it's a little bit

18    tricky because there are issues still before the Fourth

19    Circuit that may change that, that that may be hard to say

20    one way or the other just yet.  But assuming the Fourth

21    Circuit agrees with you and says Indiana applies and that

22    you have represented that there are no differences between

23    the Indiana rules and DOJ's rules so that there would be

24    nothing to exempt from, a representation to that effect

25    would take care of that -- seems to take care of that as

1    well.  Is the government amenable to diffusing the

2    emergency in that sort of situation?

3          MR. HUMPHREYS:  Of course, I always have to

4    confer with my clients, Your Honor.  My understanding is

5    with respect to 26.1(c) that there will be no such

6    delegation as for any of the upcoming scheduled

7    executions.

8          THE COURT:  You're more familiar with the

9    regulatory provisions than I.  So, you know, C is the part

10   about the marshal?

11         MR. HUMPHREYS:  Yes, Your Honor.  C is the

12   authority for the Attorney General.  That would be the

13   marshal issue --

14         THE COURT:  Okay.  What you're representing

15   today is that for the January 15th scheduled execution

16   that there's no intent to substitute anyone else for the

17   marshal.  Is that what you are saying?

18         MR. HUMPHREYS:  That's correct, Your Honor.  My

19   understanding is it would be consistent with the -- that

20   the executions that will take place next week assuming

21   there are no impediments to those executions will be

22   carried out in the same way that the other -- the previous

23   ten executions that have happened over the last year will

24   be.

25         THE COURT:  Okay.  Now let's focus -- the only

1    plaintiff to my understanding of the factual setup here is

2    that there's only one plaintiff who has a scheduled

3    execution and that's Mr. Higgs and that's for

4    January 15th.  So that's my immediate concern and it

5    probably is for most of the folks on the call today.

6            With respect to what's going on in the Fourth

7    Circuit about what state's rules should apply, my view of

8    the docket was that there's a reply brief due January 9th.

9    Is that your understanding of the lay of the land there?

10           MR. HUMPHREYS:  I don't know the exact date,

11   Your Honor.  Perhaps I should.  I apologize.  Yes, there

12   is a reply date coming in.  January 9th I believe is

13   correct.  Yes.

14           THE COURT:  Okay.  Which is Saturday.  So I'm

15   assuming that they plan to move quickly for obvious

16   reasons.  So let's -- you know, assuming that they agree

17   with you and say Indiana applies, your representation was

18   that Indiana's rules do not require any changes.  Is that

19   right?

20           MR. HUMPHREYS:  That is correct, Your Honor.

21           THE COURT:  So assuming that that happens, would

22   the government be willing to make a more explicit

23   representation that it would not invoke the exempt --

24   that portion of the regulations that's at issue here?

25           MR. HUMPHREYS:  Yes.  We are.  And I think the

1    fact that there would be no variation required is

2    evidenced by the execution of Mr. Honken earlier this year

3    which complied with the regulations.

4           THE COURT:  Okay.  So before we get into the

5    presentations on the motions, I would like to schedule a

6    telephone conference for Monday afternoon.  So if everyone

7    can look at their calendars?  I'm wide open Monday

8    afternoon.  So if anyone wants to propose a time?

9           MS. PRELOGAR:  Your Honor, this is Elizabeth --

10          THE COURT:  You froze.  I'm sorry.  It looks

11   like we lost her.

12          MS. PRELOGAR:  I'm so sorry, Your Honor.  Can

13   you hear me now?

14          THE COURT:  We can.

15          MS. PRELOGAR:  I'm going to turn off my video if

16   that's okay.  I don't understand exactly what's happening

17   with my bandwidth.  But it seems like it's not working

18   with my computer.

19          THE COURT:  Okay.  We've unfortunately all

20   experienced this issue.

21          MS. PRELOGAR:  You would think I'd have this

22   down after seven or eight months of working from home, but

23   not quite yet.  I'm so sorry about this.

24          THE COURT:  It's to be expected.  No worries.

25          MS. PRELOGAR:  I was trying to say I have no

1    conflicts on Monday afternoon either.

2              THE COURT:  Mr. Humphreys?

3              (Mr. Humphreys lost connection.  After which,

4    the following ensued:)

5              MR. HUMPHREYS:  I lost connection.  But I'm back

6    on.

7              THE COURT:  So how about Monday at 2?  Does that

8    work?

9              MS. PRELOGAR:  Yes.  Monday at 2 p.m. works for

10   me.

11             THE COURT:  All right.  And, Mr. Humphreys, if

12   you get or either side, frankly, if either side gets

13   notice of what the Fourth Circuit did before that phone

14   call, please alert the Court with just a notice to the

15   Court filed on the docket.

16             MR. HUMPHREYS:  Yes, Your Honor.

17             THE COURT:  Okay.  Let me hear from the

18   plaintiffs first.  I will admit that I have read what was

19   filed at midnight or was it the government that filed at

20   midnight last night or who filed the pleading at last

21   night at midnight?  It was the plaintiffs.  Right?

22             MR. HUMPHREYS:  Yes, Your Honor.

23             THE COURT:  Okay.  I did read it.  I can't say

24   that I've absorbed it all in the short time I've had to

25   absorb it.  So if you want to hit some of those points

1    today, that might help.

2             MS. PRELOGAR:  Absolutely, Your Honor.  And

3    apologies again for my technical difficulties.  You went

4    out a little bit there on my end.  I hope you can continue

5    to hear me.  So I'll stick with my video off in hopes of

6    maximizing that.

7             THE COURT:  Okay.  You are coming across very

8    clearly now.

9             MS. PRELOGAR:  Excellent.  I'm happy to hear

10   that.  Your Honor, as you know, next week, the federal

11   government plans to execute three individuals days before

12   a new President takes office and in a break from

13   historical tradition when executions have generally been

14   halted during a transition period like this one.  And as

15   Your Honor noted, one of the individuals scheduled to be

16   executed is a plaintiff here, Dustin Higgs.

17            These executions follow the wave of executions

18   last year that made 2020 one of the deadliest years ever

19   in the modern history of the federal death penalty and it

20   was in the midst of that wave when there were legal

21   challenges filed by individuals who were being put to

22   death that the federal government decided to just change

23   the rules governing the manner implementing the

24   executions.  They changed the rules to eliminate judicial

25   oversight and to centralize power in the Attorney General

1    and grant the Attorney General wide-ranging authority in

2    ways that we believe violates the Constitution, the

3    Federal Death Penalty Act and the Administrative Procedure

4    Act.  The federal government --

5                THE COURT:  Ms. Prelogar, you went out for part

6    of your presentation.

7                MS. PRELOGAR:  I am so sorry about that, Your

8    Honor.  I'm wondering if I should exit the meeting and try

9    to come back in.

10                THE COURT:  When you're on, it's very, very

11    clear.  Perhaps continue and I will try to alert you and

12    let's see if it continues to happen.

13                MS. PRELOGAR:  Okay, Your Honor.  I appreciate

14    that.  We're asking the Court to issue a preliminary

15    injunction because we believe that we're likely to succeed

16    in showing that the final rule is invalid in multiple

17    respects and because our plaintiffs will face grave

18    irreparable harm if these rules remain in effect and

19    govern the implementation of their executions before we

20    have a chance to adjudicate these claims.

21                And I would like to just respond briefly to the

22    questions that you were asking the government earlier.

23    You know, we had sought a potential stay of the final rule

24    from the federal --

25                (Ms. Prelogar lost connection and joined the

1    session via phone connection.)

2         MS. PRELOGAR:  All right.  I think we've got it

3    now.  So to try to set the stage here, Your Honor, for why

4    we believe the preliminary injunction is warranted, these

5    executions now are scheduled for next week including our

6    plaintiff, Dustin Higgs, and we're concerned because the

7    executions are following the wave of executions that

8    occurred in 2020 that prompted the federal government to

9    try to seek to change the rules that govern the manner of

10   implementing the federal death penalty.

11         And just to try to crystallize our core concerns

12   with the final rule, we're concerned that it eliminates

13   judicial oversight in setting execution dates, that it

14   centralizes power in the Attorney General to vary from the

15   regulations as he sees fit and to reassign duties as Your

16   Honor noted from the U.S. Marshal Service to the Bureau of

17   Prisons and that these changes violate the Constitution,

18   the Federal Death Penalty Act and the Administrative

19   Procedure Act.  And I think it bears emphasis that the

20   federal government rushed to finalize these rules the day

21   after Thanksgiving specifically so that they would be in

22   place for these new executions that are scheduled to

23   happen next week.

24         I thought I'd begin by talking through our

25   merits arguments and why we believe that we're likely to

1    succeed in our challenge to the final rule and then turn

2    to the justiciability and irreparable harm arguments which

3    I think raise an overlap set of issues.

4            So I'll begin with Section 26.1(b).  This is the

5    vary provision.  The provision that authorizes the

6    Attorney General to vary from any provision of the

7    regulation when he believes that applicable law conflicts

8    with the regulations.  And the key problem with this rule

9    is that it effectively grants the Attorney General

10   wide-ranging authority to vary from other regulations that

11   have the force and effect of law without going through

12   further rule making under the Administrative Procedure Act

13   or seeking to invoke one of the APA's exceptions.

14           It's really -- you know, it's APA 101.  You

15   can't modify or amend the provision of the legislative

16   rule without following the procedure in Section 553.  We

17   cited as Your Honor knows the United States versus

18   Picciotto case.  This is the case from the D.C. Circuit

19   that I think is squarely on point here because in that

20   case, the U.S. Park Service had promulgated a rule

21   governing demonstrations in national parks and it had a

22   provision somewhat similar to this one saying that it

23   could impose additional conditions on a going forward

24   basis without following notice and comment.  And what the

25   D.C. Circuit said is that that was not an appropriate

1    grant of power because in essence the park service was

2    trying to claim a fed exemption for itself from all APA

3    further rule making and this is a quote, "and be free of

4    the APA's troublesome rule making procedures forever after

5    simply by announcing its independence in a general rule."

6    That is not the law.  So our basic premise here is that an

7    agency just isn't allowed to exempt itself from the APA on

8    a going forward basis even if it passes the exemption

9    through notice and comment.

10                Now the government has argued and I understand

11    as Your Honor was saying there hasn't fully been time to

12    digest the reply brief.  So I'll go over a few of our

13    arguments in that reply brief if that would be helpful.

14    But the government's principal response is to say that

15    Section 26.1(b) is not itself a legislative rule.  And the

16    problem is is that focuses on the wrong question.  Of

17    course, 26.1 was passed through notice and comment.  So

18    it's somewhat academic.  But we're not concerned about the

19    procedures for 26.1(b) itself.  We're concerned about the

20    authority the Attorney General is claiming to deviate from

21    all of the other regulations going forward.  It's really

22    an expansive authority that says that the Attorney General

23    can depart from any part of Part 26 if he determines there

24    is a conflict with applicable law in his apparently sole

25    discretion and it's those other regulations that have

binding legislative force as having mandatory language
that alters the rights and interest of parties and that
requires further rule making process in order to have an
authority to deviate from those regulations.

So the government says then, well, actually this
authority isn't that broad.  It's only going to apply a
variance when it's necessary to comply with the Federal
Death Penalty Act.  But our concern with that argument is
that it's not what the regulation says.  The regulation
doesn't refer to the Federal Death Penalty Act at all and
it doesn't define applicable law in that kind of narrow
way.  It seems like applicable law could include other
sources of federal law, certainly state law, state
statutes I assume, maybe state judicial decisions and
maybe unwritten state protocols.  There is just no
definition in the regulation itself that would limit the
Attorney General's authority in that regard.

And it also doesn't define what constitutes a
conflict that would trigger the Attorney General's ability
to deviate from the rule.  The commentary suggests that
perhaps any difference would qualify and that would mean
that the A.G. could prioritize a less protected state law
over the more protected federal regulations.

The government says in its brief that the
difference would have to be mutually exclusive.  But again

1    that doesn't appear in the regulations at all.  The

2    regulation in fact suggests it could be a potential minor

3    difference.  And it also doesn't require that the variance

4    be announced with any advance notice, that notice be given

5    to the individuals who are sentenced to death or to their

6    counsel in a timely basis.

7           The final argument the government makes is that

8    it has a practical need for this rule.  It has to be able

9    to vary because sometimes it wants to carry out executions

10   without undue delay.  That's the language used in the

11   commentary.  But the problem with that argument is that

12   the APA itself provides the mechanism to vary when there

13   is good cause to do so.  And the regulation doesn't track

14   the APA.  It instead grants far more wide-ranging

15   authority to the Attorney General to essentially decide

16   when he wants to deviate from other regulations with the

17   force and effect of law without complying with the APA.

18          So for those reasons, we think we're likely to

19   succeed on the challenge to 26.1(b), the vary provision.

20   I'm happy to answer questions about that or I could turn

21   to 26.1(c) if Your Honor would like.

22          THE COURT:  No.  Why don't you go on?  I mean

23   both parties briefs were very clear and I think I

24   understand it all.  I just have to absorb some of it.  But

25   I don't have a lot of questions.  But I'm interested in

1    hearing -- you know, sometimes you hear things a little

2    differently than when you read them.  So I'm interested to

3    hear it and if I have questions, I will interject.

4            MS. PRELOGAR:  Okay.  That sounds good.  Thank

5    you, Your Honor.

6            So turning to 26.1(c), this is the provision

7    that authorizes the Attorney General to reassign tasks

8    from one DOJ component to another.  And the problem with

9    this provision and it's one that the government

10   acknowledged in the final rule and in the commentary and

11   kind of doubled down on is that it would apparently permit

12   the Attorney General to reassign the supervision of

13   execution from the U.S. Marshals to the B.O.P. and to

14   B.O.P. employees.  And it in fact seems expressly designed

15   to preempt litigation about that very type of delegation

16   where individuals who were put to death last year had

17   challenged that under the execution protocol and said that

18   that was an invalid delegation.

19           We think that this provision, too, is contrary

20   to the APA.  The regulations specify as they must that the

21   U.S. Marshal should supervise the implementation of the

22   death sentence.  But now this other provision, 26.1(c),

23   would apparently allow the government to just depart from

24   that binding regulation on a going forward basis again

25   without notice.  And the government has argued that these

1      kinds of delegations just don't require any APA

2      procedures.  But we think that that overlooks that the

3      regulations themselves say as they must that the U.S.

4      Marshal should supervise and so the government has bound

5      itself in that fashion and can't then exempt itself from

6      making changes to that regulation.

7              But more fundamentally, we think as well that

8      this violates the Federal Death Penalty Act.  So this is

9      our argument based on 18 USC, Section 3596(a).  That's the

10     part of the FDPA that specifically says a United States

11     Marshal shall supervise implementation of the sentence.

12     And we think that that's crystal clear that Congress

13     decided that the U.S. Marshal should bear in that weighty

14     responsibility of supervising when individuals are put to

15     death under federal law.  The government says --

16             THE COURT:  Let me interject for a second here.

17     Just as a factual matter to the extent you know, what role

18     does the marshal actually play on the day of?

19             MS. PRELOGAR:  So, Your Honor, I'm going to

20     apologize here because I don't know the specifics of how

21     the coordination between the U.S. Marshal and the Bureau

22     of Prisons and the Warden occurs.  I do know that these

23     new regulations specify a role for the U.S. Marshal and

24     suggests that it should be done in conjunction with the

25     Warden or with the Director of the Bureau of Prisons, but

1    I don't know actually the specifics of, you know, kind of

2    down to the implementing the death sentence when is the

3    marshal making the call and when otherwise.

4              THE COURT:  Okay.

5              MS. PRELOGAR:  I can try and get that

6    information if you'd like and circle back on it.

7              THE COURT:  No.  I just want to get, you know,

8    as I assess the harm, I just want to get the sense of -- I

9    understand the legal harm and the conceptual harm.  I just

10   wanted to know if we could crystallize any more practical

11   harm.

12             MS. PRELOGAR:  Well, our concern ultimately is

13   in potentially excluding the marshal from this role.  We

14   think that Congress purposefully assigned the

15   responsibility to the U.S. Marshal and as we've noted, the

16   U.S. Marshal is a politically accountable component of the

17   Department of Justice because the Director of the Marshal

18   Service is appointed by the President, confirmed by the

19   Senate, stands in a different footing than, for example,

20   the Director of the B.O.P. who is just appointed by the

21   Attorney General without Senate confirmation.

22             So we do think that this was a deliberate choice

23   by Congress also in recognition, of course, that the

24   Marshal Service, its primary mission is to enforce court

25   orders and so in that respect, too, the marshals are well

1    situated to supervise the implementation of a death

2    sentence.

3          THE COURT:  And aside from the Director of the

4    Marshal Service, the individual marshals are Senate

5    confirmed just like U.S. Attorneys are.  Isn't that right?

6          MS. PRELOGAR:  That is correct.  That's my

7    understanding as well.  Yes.

8          And here actually, this delegation authority, it

9    wouldn't even necessarily be directing it to, for example,

10   the Director of B.O.P.  Essentially, it could be even low

11   level employees at B.O.P.  There's no limitation on the

12   ways in which the Attorney General could invoke this power

13   to delegate away from the U.S. Marshal and to lower level

14   employees or other officers of the Department of Justice.

15         The government says it can do this under the

16   general authority in 28 USC, Section 509 and 510.  These

17   are kind of the general sources of authority for the

18   Attorney General to from time to time delegate functions

19   of DOJ as he sees fit.  But our concern here is that the

20   government's argument runs straight into the canon of

21   statutory construction that the specific governs the

22   general.

23         So here we have a statute, the Federal Death

24   Penalty Act, that specifically says that the U.S. Marshal

25   shall supervise the implementation of death sentences and

1    that has to control over the more general authority in

2    Section 510 to the Attorney General to delegate tasks as

3    he sees fit because Congress here has directly spoken on

4    the particular issue and it itself has made the

5    delegation.

6              We've cited as well the Giordano case.  So this

7    is the Supreme Court case that involves the authorization

8    of wiretap application.  We think its reasoning is equally

9    applicable here.  In that case, there was a provision in

10   the crime bill that said that the Attorney General could

11   authorize wiretap applications or associate Attorney

12   Generals who had been designated by the Attorney General.

13   And the court said that that statutory provision trumped

14   any effort by the Attorney General to name someone else at

15   DOJ, his executive assistant in that case.

16             So there was no provision in that statute that

17   specifically said, you know, no further delegations are

18   permitted.  But the court interpreted the fact that

19   Congress itself had spoken about the lower level DOJ

20   officials who could do this and took that as an indication

21   of what Congress intended that it shouldn't go to anyone

22   else.  And we think that that rationale applies here where

23   Congress has specifically said it should be the U.S.

24   Marshals and for that reason, we don't think that the

25   Attorney General has authority now to basically override

1    that statute and instead designate B.O.P. or someone else

2    to carry out implementation of the death sentence.

3            And I'll just make one final note on this.  The

4    government in its brief relies principally on the

5    concurrence of Judge Katsas in the execution protocol

6    cases on this issue.  We do think that that concurrence

7    doesn't control here.  It obviously wasn't a D.C. Circuit

8    decision.  But also we think that it overlooks the canon

9    of the specific governing the general with respect to the

10   Supreme Court's recognition that when you have

11   side-by-side provisions like this, the one that

12   specifically says U.S. Marshal shall supervise and then

13   one that says Attorney General can from time to time

14   delegate, those kinds of side-by-side provisions, the

15   specific one does govern the more general one.  And it's

16   also worth noting that in that case, Judge Catsis also

17   concluded that actually the U.S. Marshals were still

18   supervising and so there wasn't an actual direct conflict.

19           I'll turn now to our arguments about 26.2.  This

20   is the provision that previously required DOJ to file a

21   proposed judgment and order approving essentially the date

22   of the execution and to give that court authorization to

23   set the date of the execution.  In the new rule, the

24   Department of Justice now has eliminated that provision

25   altogether and has asserted new authority in the rule for

1      B.O.P. to set execution dates unilaterally without

2      involving the courts at all.  We think that this violates

3      the separation of powers and we've explained in our

4      briefing and further went through this history in our

5      reply that really from the time of the founding to the

6      present day, there has been an unbroken practice of

7      recognition that the executive branch has lacked authority

8      to set execution dates without a court order.  DOJ cannot

9      cut courts out of the process now.

10                 And maybe I could just tick through the history

11     briefly.  At the time of the founding looking at the

12     practice in London, it was the recorder of London, this

13     was a senior circuit judge in London who set the execution

14     dates.  So that would have been the practice that the

15     framers were aware of when they created our Constitution.

16     And then that matches as well the practice that continued

17     in the United States shortly after the framing.  We were

18     able to track down every federal execution from 1790

19     through 1818.  Nearly every one.  There were eleven and

20     there were records we could find for ten.  And in all ten

21     of those, the court set the dates.

22                 In 1830, President Andrew Jackson affirmatively

23     declared that courts should set execution dates going

24     forward and that was the practice for the next 200 years

25     practically.  And then when DOJ first promulgated these

1    regulations, it specifically recognized that courts have

2    to be involved in setting dates, which is why it had 26.2.

3    This was the procedure to get a judgment and order

4    permitting the setting of the execution date.

5              The government has said that all executions

6    since 1993 involved the B.O.P. setting the date.  But as

7    we've demonstrated in our reply brief, in those cases,

8    there was a court order, a 26.2 judgment and order that

9    expressly authorized B.O.P. to do that.  So it's just

10   wrong to say that any executions have occurred without

11   that kind of court order in place.

12             And in fact there were a few cases where B.O.P.

13   hadn't obtained that court order and the litigants

14   challenged it and then the court entered an order in

15   recognition that B.O.P. didn't have the authority to set

16   the dates without the involvement of the court.

17             The Department of Justice now says, well, this

18   is ministerial.  I think the language in their brief is

19   that this was a practically meaningless requirement.  But

20   we think that that is just plain wrong and we think that

21   this obviously separation of powers is an important

22   constitutional principle in its own right.  But it also

23   provides an important task to protect individual rights.

24   And we pointed to David Chandler as an example.  That's

25   one where the government sought to unilaterally set the

1    date and he had not yet finished his post-conviction

2    review proceedings and ultimately, the court got involved

3    and recognized that there was no authority to set that

4    date for Mr. Chandler.  The government -- I'm sorry.  Were

5    you talking, Your Honor?

6              THE COURT:  Yeah.  Let me ask you this question.

7    Again I'm trying to get my arms around the practical

8    differences and the government's argument that this is

9    just a ministerial issue.  Is the real practical

10   difference here that if government is required to file the

11   notice and essentially a proposed order, the judge can

12   deny it under a normal standard whereas if the defendant,

13   the criminal defendant or the convict at that point has to

14   file something, in that situation he would for the judge

15   to do something he has to meet the TRO/PI standard?

16             MS. PRELOGAR:  Yes.  That's exactly right.  And

17   I think actually, it's a decision in LeCroy that the

18   government has relied on illustrates the difference.  So

19   our submission is the court has to be involved in the

20   initial date setting and that doesn't require satisfying

21   the traditional stay factors or TRO or PI.  That's because

22   it's an inherent attribute of the Article III judicial

23   power.  And so the court could, you know, deny the

24   execution date or deny the authority to set the execution

25   date without having to run through those factors.

1          And here the practical difference really is that

2     by trying to cut courts out of the process and get the

3     dates set by B.O.P. unilaterally, it would essentially

4     then box an individual into the framework of having to

5     come to court and affirmatively seek a stay of that

6     execution date.

7          Now there certainly will be situations we

8     imagine where if the date has been set for unlawful

9     reasons or an unlawful manner, those stay factors probably

10    could be satisfied.  But it's an additional burden, an

11    affirmative burden on the individual that's not required

12    given this Article III attribute of judicial power to be

13    involved from the outset.

14         And again, I just point the Court to the David

15    Chandler example.  That's one where the government rushed

16    to set the date unilaterally before he had a chance to

17    pursue post-conviction review.  So we think that that

18    really does illustrate that the government, you know, is,

19    of course, the prosecutor.  It decides whether to seek the

20    death penalty in the first place.  It marshals the

21    evidence against the accused.  It obtains the conviction

22    and the death sentence and now it wants to be able to say

23    for itself, well, you know, your remedies are exhausted or

24    we're going to push forward and set this date.  And it's

25    just flatly inconsistent with the history of how from this

1    nation's founding on, courts have had that responsibility

2    and it has been a court order that has been an

3    indispensable attribute of giving the executive branch the

4    clearance to go ahead and set an execution date to carry

5    it out.

6           THE COURT:  Go ahead.

7           MS. PRELOGAR:  I will turn now if I could to the

8    issues of irreparable harm and justiciability.  This

9    raises an overlapping set of issues and so I'll largely

10   discuss them together.  And, you know, I want to say at

11   the outset, of course, these rules have now taken effect.

12   They are meant to provide the governing framework for

13   executing individuals under federal law.  Our plaintiffs

14   are directly affected by the regulations.  They are the

15   most directly affected.  They are federally death

16   sentenced individuals.  And so there's really no doubt

17   that the regulations will be applied in carrying out their

18   execution.  It's a question of exactly how.

19          And what the government says is, well, it's just

20   not clear they'll be harmed.  But they're harmed in part

21   by the uncertainty of not knowing how the government might

22   choose to depart at the last minute and decide to change

23   the governing framework of how their sentences are

24   implemented.  And there's very much a concrete application

25   of this.  It's not hard to imagine the scenarios.

1              THE COURT:  Okay.  Let me ask you first before

2      you -- so I can understand the lay of the land before you

3      go into that part of the presentation.  With respect to --

4      I believe there is three plaintiffs that have not had a

5      date scheduled?

6              MS. PRELOGAR:  That is correct.

7              THE COURT:  The government says that the

8      regulations require at least 20 days notice.  Am I correct

9      to understand that between now and the end of the

10     administration, those three plaintiffs cannot have a date

11     scheduled.  Is that right?  Or cannot have an execution

12     date that happens before the end of the administration?

13             MS. PRELOGAR:  So it's correct I think that

14     pursuant to the regulations themselves, the execution

15     couldn't be carried out without 20 days notice.  Although

16     I'll just say, Your Honor, this is one of the things that

17     causes us concern because some states provide a lesser

18     notice period.  Seven days in some states that we're aware

19     of.  And so this vary regulation maybe the Attorney

20     General would say, well, that's the applicable law so we

21     can give less notice even though that's a less protective

22     right.  So it's not entirely clear given the way that

23     these provisions are interlocking and how they can

24     interact with each other whether the government could

25     conceivably seek to shorten the notice period.  And I

1    think it is significant that the government has truly been

2    rushing to execute as many people as possible in the final

3    days of this presidential administration in an

4    unprecedented break from history.  So I think our concern

5    represents a credible threat.

6           THE COURT:  Well, while we're on this point, let

7    me just ask Mr. Humphreys then based on that 20-day

8    regulation, is it your understanding that the government

9    cannot set an execution date before the end of the

10   administration for those three other plaintiffs?  Is that

11   your understanding?

12          MR. HUMPHREYS:  Yes.  That's correct, Your

13   Honor.  And I don't want to cut into Ms. Prelogar's time.

14   That is correct.

15          THE COURT:  This is an important issue.  So each

16   of you have as much time as you want today.  So go ahead.

17          MR. HUMPHREYS:  I would point out that shows

18   speculation that there could be a lesser time imposed

19   under state law.  It reflects a misunderstanding of the

20   rule.  As we explained, the department can depart from its

21   regulations only as necessary to apply the state law.  The

22   only time, you know, then a shorter time can come into

23   play would be if a state law were to say something like

24   there must be no more than X days notice and that, of

25   course -- well, I have no reason to believe that that's in

1   the state law.

2           THE COURT:  I started this hearing in those

3   interests of diffusing the emergency and getting

4   representations from the government.  My understanding now

5   is that you're saying that those three plaintiffs that

6   have not had a date set will not be scheduled to be

7   executed before January 21st.

8           MR. HUMPHREYS:  That is correct, Your Honor.

9           THE COURT:  Okay.  Go ahead, Ms. Prelogar.

10          MS. PRELOGAR:  Well, Your Honor, I just want to

11  clarify that and I'm not quite sure I understand the

12  government's representation.  So I want to make sure I

13  understand.  There would be nothing to prevent the

14  government from setting the date.  I think the question

15  was whether they could occur after the Inauguration Day.

16  And so if the government is representing that it's not

17  planning to set the dates either, I would just like to

18  know if that's the representation that's being made.

19          THE COURT:  Do you know the answer to that, Mr.

20  Humphreys?

21          MR. HUMPHREYS:  I'm sorry.  I do not know the

22  answer to that right now.  I have no reason to believe

23  that any others will be scheduled.

24          THE COURT:  Okay.  Maybe you can answer that

25  Monday on our call.

1          MS. PRELOGAR:  I appreciate that.  And it's

2     obviously of critical importance to our plaintiffs.

3          THE COURT:  I understand the importance of that.

4     I mean there's -- you know, irreparable harm here is, you

5     know, to the extent that it can be made as a legal matter

6     as a practical matter is unusual from the typical case --

7          MS. PRELOGAR:  I understand that, Your Honor.

8     And just to touch on that idea that the harm is unduly

9     speculative.  You know, our view is they created these

10    regulations for a reason and you can look at past actions.

11    Past is prologue here in our view.  The context matters.

12    Each of these things that we're objecting to were the

13    subject of litigation that happened in the weight of

14    executions last summer and it appears that what DOJ wanted

15    to do was change the rules to kind of preempt further

16    litigation on these issues or to give the Attorney General

17    a firmer basis for doing what he had been doing that was

18    alleged to be unlawful.  For example, as I mentioned with

19    the switching authority from the marshals to B.O.P., that

20    had been an issue that was raised in the execution

21    protocol case.

22          And with respect to setting the dates, that had

23    come up in the execution of Danny Lee that occurred last

24    summer where there was litigation because the government

25    had ultimately attempted to set the date without a court

1    order and the court had to issue the order to approve the

2    date.  That's how the issue finally got resolved.

3              And then with respect to the variance, we just

4    have substantial concerns that they put this regulation in

5    the statute specifically to be able to make these kinds of

6    changes, you know, at the last minute, days, hours, maybe

7    moments before an execution occurs in order to make sure

8    as the commentary says that the execution can occur

9    without undue delay.  So that's specifically a

10   contemplated authority that could happen at the last

11   minute without notice to the individual, without notice to

12   counsel in a manner that we think could substantially harm

13   our plaintiffs, whether that seems like denying them

14   spiritual advisers in the execution chamber because of

15   some conflict with state law or other changes that are

16   hard to anticipate at this juncture, but that could cause

17   grave harm at the last minute.

18             And I recognize that in that respect, it's a

19   little bit of a different situation than you maybe

20   normally counter.  But I think part of that comes from the

21   fact that this is a framework governing the implementation

22   of execution and part of the substantial harm here is that

23   if we can't challenge these changes now, it's very

24   possible we'll lose the ability to challenge them later

25   because our clients will have been executed and that will

1      moot the challenge.  So if there is some kind of --

2              THE COURT:  I am going to issue a minute order

3      later teeing up a legal issue that I will want you to

4      address on Monday.  But something -- I had a different --

5      a case in a different context, but also a last-minute move

6      by the administration involving a very different context,

7      but involving the same issue as to the government was

8      arguing a lack of ripeness and the problem was that the

9      case would become ripe and moot almost simultaneously,

10     which is the problem you have here.  And I will direct you

11     to certain case law that says I may have the authority

12     under the All Writs Act to issue an order notwithstanding

13     the four TRO/PI standards that will prevent that from

14     occurring.

15              So I'll send that minute order after we get off

16     the call and then you can look at that legal issue and

17     tell me what you think about it on Monday.  But go ahead.

18              MS. PRELOGAR:  I appreciate that, Your Honor.

19     We were doing that legal research to find precisely pieces

20     in that posture in recognition that this is a unique kind

21     of circumstance and we were thinking it's almost like the

22     exception to mootness, you know, capable of repetition,

23     yet evading review, but occurring in a ripeness framework.

24     So I appreciate that and will be eager to take a look at

25     that case law and give you our view.

```
1              THE COURT:  Well, there is another case and I'll
2    provide you the cite during the minute order.  It involved
3    the Trump tax returns.  And that was an issue on whether
4    Congress could then immediately turn over the returns to
5    the New York Attorney General and it was that issue that
6    it would -- government argued it wasn't ripe and but it
7    would become ripe and moot almost instantaneously.  And in
8    that case, Judge Nichols crafted an order that would
9    prevent that from occurring.
10             And there's another AstraZenica case which I
11   will also provide you the case which involved -- that case
12   involved a drug issue in which the government had argued
13   that the FDA hadn't acted yet and that the issue was not
14   ripe, but there were distributors poised to mail out drugs
15   immediately upon an order by the FDA so that the drugs
16   would be out in the market almost simultaneous to the FDA
17   order and the harm would be done nearly instantaneously
18   and in that case, Judge Mehta crafted -- I believe it was
19   Judge Mehta crafted an order to deal with that issue.
20             So I'll provide you the cites and you can tell
21   me what you think.
22             MS. PRELOGAR:  Okay.  I appreciate that.  And
23   just trying to put it in the framework of ripeness, you
24   know, we think here both of the elements are clearly
25   satisfied.  So of course, it's the fitness of the issues
```

1    for judicial review and then the hardship from the holding

2    court consideration.  And here I think it's important to

3    emphasize we are making a facial challenge to these

4    regulations as written.  So these are purely legal issues

5    and the government throughout its brief has suggested

6    that, you know, we should wait for a concrete application

7    of these and look at the facts.  But we think that here

8    these regulations are unlawful.  They are contrary to law.

9    They violate the Constitution, the FDPA, the APA on their

10   face and so there is no set of facts that will alter kind

11   of the legal questions that are at issue for this Court's

12   review.

13           For example, we don't think there's any

14   application of that vary authority that suggests that that

15   authority granted in 26.1(b) is lawful.  We think that

16   provision on its face contemplates a different procedure

17   for varying from binding regulations than the APA

18   mandates.  And so there is just no further factual

19   development that would be necessary to adjudicate that

20   claim.

21           And, of course, the D.C. Circuit has recognized

22   that when you have a facial challenge like this purely

23   legal issue even in this pre-enforcement context, there is

24   a presumption that it's reviewable and the government

25   hasn't rebutted that presumption here.

1           And then the hardship issue is really I think

2    what Your Honor was touching on that the situation of

3    immediately becoming ripe and moot at the same time.  You

4    know, the hardship here is immense for the reasons we've

5    been discussing that we could lose our opportunity to

6    challenge these at all.

7           And I would just note, for example, and I

8    realize we are going to be discussing this again on Monday

9    with respect to Mr. Higgs, right now we don't have a state

10   approved law that we know would govern this execution,

11   whether the execution can even occur.  Of course, the

12   District of Maryland has said that no, the government

13   can't seek to amend the judgment here.  And the government

14   is relying on this as the basis to say that, well, we need

15   further factual development.  But I think this actually

16   shows the harm.  This execution is supposed to happen

17   eight days from today and we don't even know what law the

18   government is going to say is the applicable law or the

19   ways in which it might try to vary from that law.  So we

20   think that this actually further illustrates the hardship

21   from this holding court consideration and is a reason to

22   find that the case is ripe now.

23           And I'll just make one final point.  I

24   appreciate you're letting me go through all of these

25   points.  Just to emphasize again the fact that there is no

1      requirement of notice for any of these regulations that

2      purport to authorize the Attorney General to vary or to

3      reassign duties and this is happening in the moments

4      potentially before an individual is getting executed.

5      That potentially raises the prospect that the individual

6      won't know.  It doesn't necessarily give counsel notice or

7      an ability to go in and try to protect these rights at a

8      later date.  So for all of these reasons, we think there

9      is a sound basis for finding that the case is ripe and

10     justiciable.  We'd encourage the Court to grant a

11     preliminary injunction.

12                 THE COURT:  All right.  Thank you.  Mr.

13     Humphreys, do you want to reply?

14                 MR. HUMPHREYS:  Thank you for the opportunity.

15     The defendants, of course, ask that the Court deny

16     plaintiff's request for a preliminary injunction.  And

17     particularly in this case there is no need for emergency

18     relief.  For some of the reasons we were discussing

19     earlier which I'll get into, but we think this case could

20     easily be decided on cross motions for summary judgment.

21                 As I've explained and as the Court obviously

22     seems aware that the only plaintiff who is scheduled for

23     execution is Mr. Higgs.  And there is no state law

24     regardless of whether which state -- which sentencing

25     court designates state law is appropriate that could

require a variance under 26.1(b) --

THE COURT:  Let me ask you a very practical question and I understand it's not your case that's before the Fourth Circuit.  So to the extent you know, what happens if the Fourth Circuit doesn't act before January 15th?  I suppose the fact that they scheduled the reply on a Saturday means that they intend to act.  But what happens if they don't act?

MR. HUMPHREYS:  I apologize, Your Honor.  I would have to go a bit of a whim there to answer.  It is not my case.

THE COURT:  Yes.

MR. HUMPHREYS:  But the FDPA requires that the execution be carried out in a manner of the state which applies it.  The government has obviously asked for emergency relief.

THE COURT:  Okay.  Go ahead.

MR. HUMPHREYS:  So that was 26.1(b) as any, you know, so-called emergency.  Also as I represented, the government does not plan to carry out in terms of delegation anything differently than it has for the last ten executions.  So that means the marshal will continue to supervise the execution for Mr. Higgs.

And then as to 26.2, that's not an issue here at all because clearly, Mr. Higgs was sentenced under the old

rules when 26.2 was in place.  So it's just I think off the table in terms of the preliminary injunction.

Plaintiff claims that there may be various scenarios where the department could vary from regulations.  But even if you put aside that -- that won't be the case for Mr. Higgs.  They ignore that there must be some controlling state law that the department would be required to follow.  They don't identify one for Mr. Higgs because there is not one and nor have they done so for either of the other two inmates scheduled for execution.

THE COURT:  Sure.  One of your primary arguments is that, look, it's really fairly narrow areas in which this problem arises.  But the plaintiffs with justification argue, well, that's not really what the regulation says.  What limits the government to interpret the regulations in the narrow way you have in your papers?

MR. HUMPHREYS:  Sure.  Well, I would start with obviously the text of the regulation that says itself which starts with conflicts.  You know, where applicable law conflicts with the regulations.  So I think that gets to the mutual exclusivity point.  That there can't be a variation unless there's actually a state law that conflicts.

Also the government has taken the position which has been adopted by several courts including the D.C.

1    Circuit that the FDPA itself is quite narrow and it

2    applies only to state laws in terms of statute and

3    controlling formal regulations and also that it must be

4    death effectuating.  I think that provides a very serious

5    limit to circumscribe the situations in which 26.1(b)

6    would apply.

7         I would also point out that 26.3(a)(4) which is

8    also in the regulations and plaintiffs don't challenge

9    already allows the department to vary from or wouldn't be

10   a variance, but to adopt the manner of execution as

11   required by state law.  And it's understandable not

12   challenged because that's just exactly what the FDPA

13   requires.  The same is true here.  26.1(b), that merely

14   gives the department the necessary flexibility to do what

15   Congress had instructed which is to comply with state law

16   where required by the FDPA.

17        In terms of harm, the government -- obviously,

18   there are, you know, three people scheduled for execution.

19   But I would point the Court to the D.C. Circuit's recent

20   decision in the execution protocol cases where in the

21   context of capital punishment, the Court said that there

22   is no irreparable harm that can support an injunction

23   despite the district court's finding of a statutory

24   violation of the Federal Death Penalty Act.  I think that

25   case is dispositive here as to harm.

1          I'd also note that the plaintiffs' reliance in

2     their reply brief on Seila Law is misplaced.  That case

3     addresses requirements for Article III standing, not

4     whether the plaintiffs could justify emergency injunctive

5     relief which the plaintiffs are seeking here.  In that

6     case, the issue was -- the alleged injury was whether the

7     CFPB could issue a civil investigative command at all

8     because of structural concerns.  But here the plaintiffs

9     don't challenge the department's authority to promulgate

10    regulations at all.  They argue that they are just

11    unlawful based on the various merits claims.

12          But in order to obtain an injunction here, they

13    must show harm flowing specifically from the regulations

14    and they can't do so because it's speculative whether or

15    not they will actually be invoked in any way, much less

16    whether that invocation would harm plaintiffs.

17          Again just to circle back, I think in their

18    reply brief, plaintiffs seem to now be relying to some

19    degree on the separation of powers claim to support

20    irreparable harm.  But they didn't do that in their

21    opening brief and I think that's because as I mentioned,

22    there is clearly no need for emergency relief as to 26.2,

23    which is the proposed order and judgment requirement since

24    Mr. Higgs was scheduled -- was sentenced when that

25    regulation applied when 26.2 was in effect.  Given the

1    lack of imminent irreparable harm, we ask that the Court

2    deny the motion.

3              THE COURT:  Let me ask you another very

4    practical question and you may or may not know the answer

5    to this one either.  But let's say the Fourth Circuit

6    moves slowly and, you know, rules that Indiana law applies

7    on the 16th of January and Mr. Higgs was not executed on

8    the 15th.  But the Fourth Circuit gives the green light at

9    least for what the issues that it has jurisdiction over on

10   the 16th.  Can the government schedule the execution on

11   the 17th or does it have to give 20 days notice?

12             MR. HUMPHREYS:  That is an excellent question

13   because I mean in the case when a court -- when the

14   execution is stayed, then the department has authority

15   under 26.4(a) to go ahead and reschedule as soon as

16   possible after the stay is lifted.  My understanding

17   though is -- I'm a little stumped on that one, Your Honor.

18   I could get back to you on that.

19             THE COURT:  Okay.  That would be helpful because

20   obviously, the fact that he was -- the date was scheduled

21   under the old regulations.  If there is a change, then it

22   would be under the new regulations.  Correct?

23             MR. HUMPHREYS:  I don't believe that's right,

24   Your Honor, because the old regulations themselves only

25   state that B.O.P. shall set the execution date.

1              THE COURT:  Okay.

2              MR. HUMPHREYS:  So I don't think that would be

3    true.

4              THE COURT:  Okay.  I understand.  All right.  Go

5    ahead.

6              MR. HUMPHREYS:  I will briefly touch on the

7    merits, Your Honor.  Most of these points are covered in

8    our brief.  But on ripeness in plaintiffs' reply, they

9    seem to at least concede that with respect to some aspects

10   of the regulations that the Attorney General may be able

11   to depart without notice and comment.  I think that just

12   underscores the lack of ripeness in this case because it's

13   again entirely speculative whether there would be a state

14   law that actually conflicts with the regulations in the

15   instance of any particular execution and whether or not --

16   the department would need to comply with that in order to

17   comply with the FDPA.  So without knowing what state law

18   applies in any particular case, the Court cannot

19   meaningfully evaluate whether the department's departure

20   from regulations would be purportedly substantive even if

21   plaintiffs' theory that some of the department's existing

22   regulations are interpreted is correct which we disagree

23   with.

24             THE COURT:  Let me ask you yet another practical

25   question.

1          MR. HUMPHREYS:  Yes, sir.

2          THE COURT:  If DOJ's position is that it only

3     need to deal with state statutes and regulations, I

4     presume that if the conflict exists, that would -- that

5     decision would be made in advance of the time that

6     Mr. Higgs is strapped to a gurney.

7          MR. HUMPHREYS:  I think it would be very clear

8     to plaintiffs and -- the department would know about that

9     ahead of time and so would plaintiffs and would be able to

10    bring suit to if they thought that an implementation of

11    the death sentence under that state law violated some

12    other right.

13         THE COURT:  Okay.  Go ahead.

14         MR. HUMPHREYS:  And as for Higgs specifically

15    just to reiterate, Your Honor, the department has already

16    determined that there is no conflict with state law and

17    that the execution can proceed under the Department of

18    Justice's regulations.

19         THE COURT:  Is -- and I did not read all the

20    briefs before the Fourth Circuit and perhaps you did not

21    either.  But is there any argument that a state other than

22    Indiana should apply?

23         MR. HUMPHREYS:  I believe Mr. Higgs has opted

24    for Virginia as his preferred state law to apply.

25         THE COURT:  Okay.  And I think you may have

1    addressed this, but I don't recall specifically.  Is there

2    any difference between Virginia and federal --

3                MR. HUMPHREYS:  There is, Your Honor, in that

4    Virginia state law allows for the option of the death

5    penalty -- I'm sorry -- the option of the electric chair

6    as the means to carry out the death penalty.  I believe,

7    Your Honor, however that it requires 15 days notice under

8    Virginia law and that the time to make that election --

9    Mr. Higgs' time to make that election would have passed.

10               THE COURT:  And is that -- I mean you probably

11   don't know his strategy either.  But is it the fact that

12   B.O.P. does not have a working electric chair?  Is that

13   the strategy or --

14               MR. HUMPHREYS:  I'm sorry.  I couldn't speculate

15   as to Mr. Higgs' strategy.

16               THE COURT:  Do you know whether B.O.P. has a

17   working electric chair?

18               MR. HUMPHREYS:  I do not know the answer to

19   that.  I will say, Your Honor, in part because of this

20   concern, because my understanding is that there is not one

21   at the Terre Haute facility in Indiana that the regulation

22   specifically provides for the option of using state

23   facilities to carry out executions which is part of the

24   rule that plaintiffs don't challenge.

25               THE COURT:  Okay.

1          MR. HUMPHREYS:  So as to ripeness, the mere

2     possibility that there may ever be such a state law that

3     would require the department to utilize Section 21(b) is

4     especially limited in this case.

5          And I will say I also have had limited time with

6     plaintiffs' reply brief.  But I believe that the cases

7     they cite with regard to a facial challenge that deal with

8     regulations that govern the primary conduct of the

9     plaintiffs themselves.  Here, the regulations apply to

10    DOJ's own procedures.  We don't think that those cases

11    apply here.  And that the normal rule, the agency rules

12    are not -- excuse me -- agency regulations aren't subject

13    to review until there's been a concrete action that would

14    apply.

15         On the actual -- getting beyond ripeness to the

16    merits of the 26.1(b) claim, as we explained in our brief,

17    it's a procedural rule for which notice and comment is not

18    required.  The D.C. Circuit decision in the execution

19    protocol cases that we cite in our brief we think is

20    decisive.  In that case, the plaintiffs challenge the

21    execution protocol itself for carrying out federal

22    executions.  And both Judge Catsis and Judge Rao agree

23    that the protocol was not required to go through notice

24    and comment and directed judgment in the government's

25    favor.  They both concluded -- well, again and that's

1    because the substantive law was not changed by the

2    protocol.  Here, the substantive law is the FDPA which

3    actually directs the department to vary as necessary or at

4    least it directs the department that it must comply with

5    state law.  That is within the FDPA's scope.

6            We think if anything if the protocol at issue in

7    that case is procedural, then the regulation here is also.

8    The FDPA is the touchstone.

9            Also just quickly to wrap up on this point, to

10   address the case, Picciotto, which I'm not sure if I'm

11   pronouncing that right, but that's the case plaintiffs

12   principally rely on.  That was a criminal case and the

13   D.C. Circuit concluded that the Federal Park Service had

14   created a new substantive law by interpreting the existing

15   statute to criminally prohibit additional conduct.  In

16   light of this case where the department is merely making

17   procedural changes, the change in Pickyito imposed actual

18   new law.  Here, again the law is the FDPA.

19           Unless Your Honor has any other questions on

20   26.1(b), I'll move on to the delegation section, which is

21   26.1(c).

22           THE COURT:  Sure.

23           MR. HUMPHREYS:  That claim is also unlikely to

24   succeed.  To start, the delegation's authority within the

25   Department of Justice are not subject to the APA's notice

1    and comment requirements.  Certainly, internal delegation

2    is not a legislative rule.  Not to confer any rights or

3    duties on anyone.  26.1(c) merely reiterates the Attorney

4    General's existing statutory authority to manage officers

5    and employees of the department under Sections 509 and

6    510.

7            Plaintiffs on the notice and comment point do

8    argue for the first time in their reply that the Attorney

9    General has effectively prevented himself from exercising

10   his delegation authority through 26.3(a)(3).  It's not a

11   convincing argument for a couple of reasons, Your Honor.

12   First is that the regulation must be read in the

13   background of the Attorney General's overall statutory

14   delegation authority.  However, even if the prior

15   regulation did bind the Attorney General somehow, it no

16   longer does because in this final rule, it has gone

17   through notice and comment to now make explicit in the

18   regulations that it may -- that the Attorney General may

19   delegate authorities within the department's regulations

20   that govern this method of execution.  And it's for that

21   reason the Accardi rule or the Accardi principle that

22   plaintiffs cite in their brief doesn't apply.

23           On to the merits of the FDPA claim with respect

24   to the 26.1(c), this argument again is inconsistent with

25   509 and 510, which is a general statutory principle in

1   which Congress has vested responsibility over all

2   functions of the department with the Attorney General.

3   Congress has also explicitly authorized the Attorney

4   General to make such provisions as he considers

5   appropriate authorizing performance by any other officer,

6   employee or agent of the department for any of these

7   functions.

8          Congress passed the FDPA in 1994 against this

9   background and nothing in this statute suggests that the

10  Congress intended to prevent the AG from reassigning the

11  marshal's responsibilities under the FDPA.

12         The plaintiffs cite Giordano.  But that case

13  merely reaffirms the "unexceptional" general proposition

14  that merely vesting a duty in a specific officer -- and in

15  that case the Attorney General -- evinces no intention

16  whatsoever to preclude delegation to other officers at the

17  Department of Justice.  And we think the the same is true

18  here.  The fact that Congress specifically mentioned the

19  U.S. Marshals in Section 3596 does not evince any

20  intention to preclude delegation to another official

21  within DOJ.

22         The statute in Giordano addressed a very

23  separate issue where Congress provided an explicit

24  limitation on the delegation which is absent from the

25  FDPA.

1          I think this case for that reason is also just

2     not like RadLAX which was not a delegation case and where

3     the court was forced to choose between two interpretations

4     of a bankruptcy statute.  Here the best reading of the

5     FDPA is that Congress merely set a default that the

6     marshals would supervise executions, but that the Attorney

7     General retains its authority to delegate that power under

8     509.

9          On the removal, unless the Court has questions

10    about that, I would move on to 26.2 briefly.  As we

11    discussed, it's just not applicable for purposes of this

12    P.I.  And I don't think it's really necessary to get into

13    the long century history of authority between the

14    branches.  But I will point out as we did in our brief

15    that all 26.2 did was impose a filing requirement on

16    government attorneys.  Clearly, whether or not government

17    attorneys filed a piece of paper with the court does not

18    raise the level of the constitutional separation of

19    powers.  The department did not do regulations to step on

20    the court's power --

21         THE COURT:  I'll ask you the same question I

22    asked the plaintiffs.  I mean does -- you say it's

23    ministerial because the criminal defendant or the convict

24    or however you would refer to him or her can always file

25    something.  But does that change the standard by which the

1    court can change or stay the date?

2          MR. HUMPHREYS:  I don't think that issue is --

3    I'm sorry I'm not answering your question directly.  But

4    let me point out first that again the 1993 regulations did

5    not ask or did not contemplate that the court itself, a

6    sentencing court we're talking about here, would set the

7    execution date specifically.  It just said that B.O.P.

8    shall set the date.  So even under the '93 regulations

9    which the plaintiffs have challenged, nothing would be

10   different here.  B.O.P. would still be the one setting the

11   date.

12         To sort of circle back to your question, it's

13   also not the case that challenges to the implementation of

14   death penalties are really -- take place in sentencing

15   courts.  I don't have a cite, but I believe the Supreme --

16   at hand.  I could follow up with that.  But I believe that

17   the Supreme Court has said that challenges to the method

18   of implementation are not to be raised in collateral or

19   2255 relief, which is why in the District of Columbia and

20   several of your colleagues on the bench have cases, civil

21   cases challenging the method of implementation and why

22   there are many more of those cases across the country.

23   That is the proper avenue to bring those sorts of claims

24   including claims to the time of the execution, not in the

25   sentencing court.  So I think in practice, the proper way

1    is to file suit and then to get a stay, one would need the

2    four factors, to meet the four preliminary injunction

3    factors.  That was a circular way to answer your question.

4    I apologize if I didn't get to what you were asking.

5            THE COURT:  Sure.  But if the prosecutor submits

6    the proposed order which was required under the old regs

7    and which just generally says B.O.P. will set the date and

8    the judge says no, there's all this litigation going on so

9    I'm going to set it for 2030, what happens next after

10   that?  Does the sentencing judge have that authority?

11           MR. HUMPHREYS:  There's a shared cooperation

12   between the branches.  I don't think that -- well, sorry.

13   That is not the situation here.  I don't know the answer

14   to that question, whether or not a court could

15   indefinitely stay, you know, schedule an execution out.  I

16   would think that the government would seek appellate

17   relief.

18           THE COURT:  Okay.

19           MR. HUMPHREYS:  Just to reiterate, Section 26.2

20   is another issue.  Plaintiffs cannot show irreparable

21   harm.  Leave it to Your Honor, please.  So the government

22   would ask that the Court deny plaintiffs' motion for

23   preliminary injunction.

24           THE COURT:  All right.  Thank you.

25           MR. HUMPHREYS:  One more thing, Your Honor.  I

1    apologize.  I wanted to answer your question about the

2    role of the U.S. Marshal just to shed some light on that

3    since you asked plaintiffs' counsel at the beginning.  The

4    supervision -- the U.S. Marshal is at the execution and

5    generally opens the execution and stays there during the

6    pendency of it.  Has the authority to stop the execution.

7    Calls it closed and then reports the fact that it's

8    happened to the sentencing court.  That is the general

9    responsibility.

10                THE COURT:  Okay.  That's helpful.  Thank you.

11   All right.  Ms. Prelogar, you want to reply?

12                MS. PRELOGAR:  I do, Your Honor.

13                THE COURT:  I'm not sure I've been pronouncing

14   your name correctly.  So if you could clarify that for me

15   since this is not the last time I'll hear from you?

16                MS. PRELOGAR:  Absolutely.  You were very close.

17   It's Prelogar like before the loggers.

18                THE COURT:  Okay.  The phonetic pronunciation is

19   helpful.  Thank you.

20                MS. PRELOGAR:  Excellent.  So if I could just

21   respond to a few of the points the government has made and

22   tried to do a little bit of rush clearance here.

23                I want to say at the outset, it sounds like the

24   government in its presentation has suggested a number of

25   ways that it is committing to not apply these rules to our

plaintiffs or at least not to Mr. Higgs.  I want to say at
the outset, we approached the government after we filed
the preliminary injunction motion to see if they would
voluntarily agree to a stay of the final rule so that this
could be adjudicated in the normal course and they were
not willing to do that.  So we have kind of continuing
concerns that the government may continue to want to seek
to invoke this authority in ways that are not entirely
able to be anticipated, but they could cause us great
harm.  If the government wants to revisit that and
consider a stay, we would certainly be open to resolving
in that manner.

        And I'll just say as well that we're concerned
also about some of the representations that are made in
the government's brief that they don't necessarily bind
the government and I would just point the Court here to a
decision that I believe we cited in our reply brief.  It's
a D.C. Circuit decision, a recent one, called Woodhull
Freedom Foundation versus United States and I'll give the
citation just so you have it handy.  It's 948 F.3rd. 363.
This is a standing case.  So I don't know that it's
directly relevant to the particular issues that the
government has brought up today.

        But there, the plaintiffs had brought a
challenge to a particular statute and the government in

1      its brief said, well, that statute the way we interpret it

2      is not going to apply to the plaintiff because she lacks

3      standing and the D.C. Circuit held that because the

4      representations in the brief didn't actually bind the

5      Department of Justice and that it had not actually

6      disavowed any intent of invoking what was there a criminal

7      penalty provision, there was ambiguity about whether the

8      law would be applied in a way that would harm the

9      plaintiff and so she had standing.  And so to the extent

10     here that the government suggests that the ways that it's

11     described these regulations in its brief would somehow

12     eliminate the possibility of harm, I think that does run

13     counter to the Woodhull case.

14             And the final preliminary matter I wanted to

15     address was to remind the Court that, of course, we also

16     represent an organizational plaintiff here at the Federal

17     Capital Habeas Project and so kind of the attention

18     focused on Mr. Higgs I think is correct and appropriate

19     given his impending execution date, but we wanted to make

20     clear that we do believe that our organizational

21     plaintiff, of course, has an interest in all of the

22     executions that are happening given the role and mission

23     it has in advising counsel in these cases and trying to

24     help with that process.

25             THE COURT:  Sure.  I understand that.  But in

1    the context of a P.I. in which their harm is alleged to be

2    resources and attention that are not quantified in any

3    such way, I'm not sure that gets very far in a short term.

4            MS. PRELOGAR:  Understood, Your Honor.  If I

5    could turn for a minute to the merits arguments and I'll

6    be brief and I appreciate the Court's willingness to hear

7    us out on these arguments.  Just to cut to the chase, with

8    respect to Section 26.1, again this is the vary provision,

9    the government just said that it would be clear to

10   plaintiff and they could bring, you know, they could bring

11   suit in time and challenge any variance and I just don't

12   think that that's necessarily accurate or correct.  And

13   given the example of Domineque Ray, that was a state

14   execution, not a federal one, but the exact same problem

15   could arise where he was denied access to his spiritual

16   advisor and Imam in the execution chamber because under

17   the state protocol, no Imam's were cleared to go into the

18   execution chamber and they offered him only a Christian

19   spiritual counsel.  And he tried to challenge that.

20           In the Supreme Court -- he was found that it was

21   likely to be a violation of the religion clauses.  But the

22   Supreme Court ultimately ruled that he happened dropped

23   the suit in time.  It was coming too late, close in time

24   to his execution.

25           So I think this idea that we would necessarily

have an ability to challenge any variance in time is out
of sync with how some of these issues have actually arisen
in the context of executing individuals.

And again, it's not clear and I realize we'll
discuss this on Monday what state's law will apply.
There's a dispute about whether any state's law can apply,
whether it would be Indiana or Virginia.  As the
government mentioned, Virginia authorizes electrocution.
And so there is just any number of issues that could
potentially come up that we fear could cause the Attorney
General to seek to invoke the authority to vary.

And I'll just say one more point on this
provision.  The government again has emphasized that it
used this as a very narrow provision.  But we submit it
comments on this proposed rule raising these issues and no
changes were made to the rule can narrow it in the way
that the government is describing.  It was repeated
verbatim from the proposed rule to the final rule without
the clarifications the government is now seeking to offer
about the mutually exclusive requirements rather than the
more general conflict or, you know, only laws that
conflict with the Federal Death Penalty Act instead of the
broader applicable law.  There was a time and a place for
the government to fix this and solidify its interpretation
and it didn't do it which creates the risk that the

1    Attorney General now has this broad authority to vary in
2    ways that are much broader than the government is
3    suggesting here.
4           I'll briefly respond on the 26.1(c) provision.
5    This is the delegation provision that would allow the
6    Attorney General to strip the U.S. Marshals of their
7    supervisory authority.  I just want to make one quick
8    point here.  The government suggests that Giordano
9    actually supports their case because it talks about a
10   general provision that responsibilities in the Attorney
11   General wouldn't just place the more general authority in
12   Section 510 for the Attorney General to delegate his
13   responsibilities.  But that is a completely different type
14   of statutory setup because, of course, when Congress
15   generally vests responsibilities in the Attorney General,
16   it expects him to delegate that.  He can't do all of the
17   functions of the Department of Justice himself and so that
18   corresponds, you know, very closely to the Section 510
19   authority to then parcel that out and delegate.
20          That is totally different than the situation
21   here where Congress did not vest this responsibility in
22   the Attorney General.  Congress vested it in the United
23   States Marshal and made the choice about which component
24   of the Department of Justice should have this weighty
25   responsibility.  So we do think that the Giordano specific

1    holding which considered a somewhat similar statute

2    directly applies in this context as well where Congress

3    hasn't made a general delegation to the Attorney General,

4    but rather to the United States Marshal specifically.

5             And then just a final point on Section 26.2.

6    This is the provision, of course, that removes the courts

7    from the process of setting execution dates.  I think it's

8    incorrect to say that the elimination of this provision

9    doesn't effectuate any change.  The government has said,

10   you know, that under the prior rules, B.O.P. would set the

11   execution date, but critically, it could only do so

12   pursuant to a court order that specifically authorized it

13   to do so.  And as we've already discussed, the court could

14   have declined to issue that order if it thought that it

15   was inappropriate to set the date at that particular time

16   or if the Court wanted to retain its discretion to set the

17   date as sentencing courts from the time of the founding

18   and early history frequently did.

19            We don't think that it's accurate to suggest

20   that this is just a change with no difference because now

21   under these regulations, the process that the government

22   anticipates here is one where B.O.P. unilaterally sets the

23   dates and this would be under Section now 26.3 I believe

24   A -- sorry.  I don't quite have it handy.  But there is

25   another provision here now that specifically provides that

1    B.O.P. shall set the date of the execution and it will do

2    so in the anticipation of the government without any

3    involvement of the court in authorizing that procedure.

4              And it's -- you know, I didn't hear the

5    government respond on this.  There's an unbroken history

6    of here from the time of the founding.  B.O.P. cannot set

7    execution dates without a court order in place authorizing

8    that.  So we think this is a fundamental change and one

9    that will very much affect our plaintiffs.

10             The government says that Mr. Higgs had a date

11   set under the old rules.  We have two plaintiffs here who

12   haven't had dates set and don't have a Section 26.2 order

13   in place.  That's Norris Holder and Kenneth Barrett.  And

14   the fear is that the government now could rely on this new

15   authority to at any time seek to set their dates without

16   the involvement of a court.

17             And in fact the government just as part of the

18   other rush to change the rules around at execution, it

19   just changed the U.S. Attorney's manual to provide now

20   that the date should be set as soon as post conviction

21   proceedings conclude or that, you know, as promptly

22   thereafter.  This is now Section 9-10.210 of the U.S.

23   Attorney's manual.  We cite it in our reply brief.

24             So ultimately, we don't think that this

25   challenge applies only to Mr. Higgs, but rather we have a

1    clear and credible threat that the government will invoke

2    this new authority to try to set dates without the

3    involvement of Article III courts in violation of the

4    separation of powers --

5              THE COURT:  Ms. Prelogar, let me ask you this

6    question again focusing on a practical issue.  So with

7    your theory that the delegation from the court is

8    necessary, for purposes of Mr. Higgs, that delegation has

9    occurred.  Is -- you would agree with?

10             MS. PRELOGAR:  That's my understanding that

11   there was a 26.2 order in place before DOJ set his date.

12             THE COURT:  So if B.O.P. changed because of

13   practical considerations changed the date from the 15th to

14   the 17th, under your theory that it requires the

15   delegation of the court, that would not be problematic --

16             MS. PRELOGAR:  I have to go back and look at the

17   specific judgment and order that was issued in his case.

18   Sometimes the judgment and order specifically addresses

19   the issue that if the date passes for reasons like a stay

20   is in place or ongoing litigation or for other reasons,

21   the execution can't be carried out, the judgment and order

22   specifically then authorizes the resetting of the dates.

23   And I'm sorry that I don't have the specific language of

24   Mr. Higgs' judgment and order in front of me.  But it's

25   possible it addresses this issue.

1          THE COURT:  Okay.  So if you can answer that

2     question on Monday, that would be helpful.

3          MS. PRELOGAR:  Yes.  I'll make a note to myself

4     to look that up.

5          THE COURT:  Okay.  Thank you.

6          MS. PRELOGAR:  So ultimately, we think that down

7     the line we are likely to succeed on the merits of our

8     challenges to the final rule and we would ask the Court to

9     issue a preliminary injunction.

10         THE COURT:  Thank you.

11         MR. HUMPHREYS:  Would you mind if I respond to a

12    couple of those points?

13         THE COURT:  As I said earlier, this is an

14    important issue.  The stakes couldn't be higher.  So I'm

15    not going to hang on procedures here.  I'll hear

16    everything everyone wants to say.

17         MR. HUMPHREYS:  Thank you, Your Honor.  I would

18    just point out that we very much disagree that the court

19    order in terms of the proposed order and judgment is

20    required for B.O.P. to set the execution date.  We think

21    B.O.P. after a lawful sentence is entered has that

22    authority from the FDPA itself and we explain that in our

23    brief.

24         And as a practical matter, the government

25    doesn't think it's actually true that in each case of the

1    executions that occurred in the last year that there has

2    actually been a proposed order.  My understanding is it

3    varies court by court and sometimes there may just be a

4    form that the court has the parties fill out.

5              But anyway, the larger point is that we disagree

6    that a court order is necessary even under the 1993 rules

7    to set the execution date which is reflected in the fact,

8    one, that the proposed judgment order only says that

9    B.O.P. shall set the execution date and then a separate

10   provision in the regulation, 26.3(A) which says unless a

11   court orders, otherwise, B.O.P. shall set the execution

12   date.  I disagree with plaintiffs on that.

13             The second point is obviously the rules require

14   notice of 20 days.  But the protocol itself gives 50 days

15   notice for setting of executions and the government has

16   complied with that in the recent executions in the past

17   year.

18             And in terms of -- the final point in terms of

19   the sort of speculation that 26.1(b) could be broader than

20   we're representing here, in the example of Domineque Ray

21   where Alabama officials deviated based on unpublished

22   rule, that it's pure speculation that anything like that

23   would happen.  We would represent there's nothing in

24   Indiana that would apply to Mr. Higgs and that consistent

25   with the government's view of the scope of the FDPA,

1    there's only a narrow range of state laws that would

2    require a variance under 26.1(b).

3              THE COURT:  All right.  Thank you.  Ms.

4    Prelogar, do you want the last word?

5              MS. PRELOGAR:  I feel like I ought to take it,

6    Your Honor.  I'll just say one quick point on the 26.2

7    issue in response to the government's suggestion that

8    B.O.P. has the authority unilaterally to set the date, it

9    conflicts with every aspect of the historical tradition

10   and every execution as far as we're aware that has

11   occurred in history.  We strongly disagree that the

12   executive branch can strip the court out of the process of

13   setting execution dates.

14             THE COURT:  Well, I'm hoping that I don't have

15   to research 200 years of history on an emergency basis.

16             So okay.  I'll take the matter under advisement.

17   The briefs were very good and very clear as well as the

18   advocacy.  It's a pleasure for this Court to have cases

19   that are important and interesting and have good advocates

20   on both sides.  This case certainly fits under that

21   scenario.

22             And for Ms. Prelogar, I'm sure this is not your

23   specialty at Cooley.  So I appreciate your service to the

24   public and to the Court.

25             So we'll talk again on Monday and hopefully, we

1    can nail down some of these issues.  Hopefully, we will

2    get a decision from the Fourth Circuit that may

3    crystallize some of these issues and I will work on this

4    in the interim.  Thank you so much.  You are excused.

5              (Proceedings concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   <u>CERTIFICATE OF REPORTER</u>

2

3            I, Lisa K. Bankins, an Official Court Reporter

4    for the United States District Court for the District of

5    Columbia, do hereby certify that I reported, by machine

6    shorthand, in my official capacity, the proceedings had

7    and testimony adduced upon the motions hearing in the case

8    of the Federal Capital Habeas Project versus Jeffrey A.

9    Rosen, et al., Civil Action Number 20-cv-3742, in said

10   court on the 7th day of January, 2021.

11           I further certify that the foregoing 63 pages

12   constitute the official transcript of said proceedings, as

13   taken from my machine shorthand notes, together with the

14   backup tape of said proceedings to the best of my ability.

15           In witness whereof, I have hereto subscribed my

16   name, this 8th day of January, 2021.

17

18

19                                 Lisa K. Bankins

20                                 Lisa K. Bankins
                                   Official Court Reporter
21

22

23

24

25