# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

FEDERAL CAPITAL HABEAS PROJECT,
Federal Public Defender for the District of
Maryland, Southern Division
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770;

KENNETH EUGENE BARRETT
Register Number 04342-063
U.S. Penitentiary Terre Haute
Terre Haute, IN 47802

NORRIS HOLDER
Register Number 26902-044
U.S. Penitentiary Terre Haute
Terre Haute, IN 47802;

REJON TAYLOR
Register Number 41070-074
U.S. Penitentiary Terre Haute
Terre Haute, IN 47802;

MARVIN CHARLES GABRION II
Register Number 09184-055
U.S. Penitentiary Terre Haute
Terre Haute, IN 47802;

                    Plaintiffs,

        v.

MONTY WILKINSON, in his official capacity
as Acting Attorney General of the United States
U.S Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530;

MICHAEL CARVAJAL, in his official
capacity as Director of the Federal Bureau of Prisons
U.S. Department of Justice
320 First Street, NW
Washington, D.C. 20534

                    Defendants.

Case No. 20-cv-03742

**FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF**

## BACKGROUND

1.      In the history of the federal death penalty, the past year was the deadliest in more than a century: From July 2020 to January 2021, the U.S. government executed more than three times as many people than were executed in the last *six decades combined*.  It appears this rush was calculated to carry out as many executions as possible before President Biden, who supports abolishing the death penalty, took the oath of office.

2.      As it proceeded with this rapid pace of executions, the federal government resisted court oversight and sought to avoid providing constitutionally necessary process.  For example, counsel for Daniel Lee was informed that his execution date had been reset in the middle of the night, only hours before he was executed on July 14, 2020, and despite the fact that Mr. Lee had unaddressed legal claims still pending in the U.S. District Court for the District of Columbia.  Two days later, Wesley Purkey was executed under similar circumstances.  The government told Mr. Purkey's lawyers with just ninety minutes' notice that the execution was rescheduled for that same day at 4:30 a.m. and that the government would "not delay the execution further" despite a pending motion to stay.  (Ex. 1.)

3.      Amid this explosion of executions, the Department of Justice ("DOJ") recently revised its regulations governing the manner of federal executions, touting those amendments as providing it with "greater flexibility to conduct executions."  85 Fed. Reg. 75,846 (Nov. 27, 2020) ("Manner of Execution Rule" or "Final Rule").  (Ex. 2.)  But the federal death penalty is already implemented out of sight from the public and, at times, even from the attorneys for the individuals sentenced to death.  DOJ's new regulations unlawfully eliminate critical safeguards restricting how the federal government executes individuals by granting wide-ranging powers to the Attorney General to depart from the regulations without notice or further rulemaking, to delegate

responsibility for implementing death sentences as he sees fit without regard to statutory constraints, and to insulate DOJ's actions in setting execution dates from automatic judicial review in conflict with nearly 200 years of precedent. DOJ rushed to publish the Final Rule the day after Thanksgiving, and it took effect December 28, 2020. The Manner of Execution Rule violates the Constitution, the Federal Death Penalty Act ("FDPA"), and the Administrative Procedure Act ("APA") in multiple respects.

4.      First, the Manner of Execution Rule purports to empower the Attorney General to "vary" from *any* of the regulations governing implementation of death sentences to the extent the Attorney General deems "necessary to comply with applicable law." 28 C.F.R. § 26.1(b). The Final Rule contains no guidelines for the Attorney General to follow in deciding unilaterally to "vary" from the regulations and provides no procedural protections or checks on the Attorney General's invocation of that authority. Federal death row prisoners and their attorneys will have no way of knowing when the Attorney General may decide to vary, and there is no guarantee that notice will be given of the Attorney General's decision to override the regulations. This provision violates the APA and raises grave constitutional concerns.

5.      Second, the Manner of Execution Rule entirely eliminates 28 C.F.R. § 26.2, which previously governed the procedures for setting an execution date and required the government to "promptly file with the sentencing court a proposed Judgment and Order" identifying, among other things, the date, place, and method of execution. The elimination of this requirement would permit the Bureau of Prisons ("BOP") to unilaterally set an execution date without obtaining federal court approval—even though the Executive Branch's authority to set an execution date derives solely from the courts. This attempt to evade judicial oversight of the setting of execution dates and

automatic review of whether a death-sentenced individual has exhausted judicial remedies sharply departs from nearly two centuries of historical practice and violates the separation of powers.

6.    Third, the Rule departs from Congress's specification in the FDPA that the "United States marshal . . . shall supervise implementation of the [death] sentence."  18 U.S.C. § 3596(a). In violation of that clear statutory command, the regulations add a new provision, 26 C.F.R. § 26.1(c), stating that the Attorney General may delegate "any task or duty assigned to any [DOJ] officer or employee . . . to any other [DOJ] officer or employee"—apparently designed to give the Attorney General power to provide that BOP, instead of the United States Marshal, shall supervise executions.  But the Attorney General lacks authority to override Congress's own delegation of this weighty responsibility—let alone to claim sweeping authority to alter Congress's scheme without any notice to affected individuals.

7.    Other provisions of the Manner of Execution Rule also violate the APA in numerous additional ways, with the revisions all intended to place an unprecedented amount of authority over the execution process in the Attorney General's hands, free from all constraints.

8.    Under the Manner of Execution Rule, DOJ—which is already responsible for prosecuting the defendant and choosing whether to seek a death sentence—will unilaterally decide when an individual's judicial remedies are exhausted, choose his or her execution date without court involvement or approval, determine whether and how to vary from execution procedures and whether to provide any notice of ad hoc changes, select who will supervise the execution without regard to Congress's delegation of that duty, and carry out the executions.  The Final Rule seeks to claim authority that DOJ does not have under the Constitution, the FDPA, or the APA.

9.     Plaintiffs seek an injunction preventing DOJ and BOP from following the illegal Final Rule, vacatur of the Final Rule, and declarations of the Final Rule's illegality.

## PARTIES

10.    Plaintiff Federal Capital Habeas Project ("§ 2255 Project") was created by the United States Judicial Conference Committee on Defender Services.  Since 2006, the § 2255 Project has assisted federal courts with appointing counsel in federal death penalty habeas proceedings pursuant to 28 U.S.C. § 2255.  The § 2255 Project's goal is for every individual sentenced to death in federal court to receive post-conviction representation consistent with the highest standards of the legal profession.  To that end, § 2255 Project staff offer assistance and training to capital § 2255 counsel nationwide.  The § 2255 Project also provides consultation and assistance to courts upon request, monitors case proceedings and legal developments around the country, maintains current data on the composition of the federal death row, and provides direct representation in a limited number of cases.

11.    Plaintiff Kenneth Eugene Barrett is an individual on federal death row who was sentenced to death by the District Court for the Eastern District of Oklahoma in 2005.  Mr. Barrett is incarcerated at USP Terre Haute in Indiana, under the control and supervision of BOP, an agency within DOJ.  Mr. Barrett filed a § 2255 motion in 2009, which was denied by the district court. The Tenth Circuit reversed and remanded for an evidentiary hearing on the issue of ineffective assistance of counsel.  The district court adopted the magistrate judge's recommendation that Mr. Barrett's counsel's performance was constitutionally deficient, but denied Mr. Barrett's claim for ineffective assistance of counsel and denied a new sentencing trial.  In January 2021, the Tenth Circuit again reversed, vacating Mr. Barrett's death sentence and remanding to the district court for resentencing.

12.     Plaintiff Marvin Charles Gabrion II is an individual on death row who was sentenced to death by the District Court for the Western District of Michigan.  Mr. Gabrion is incarcerated at USP Terre Haute in Indiana, under the control and supervision of BOP, an agency within DOJ.  Michigan does not have the death penalty, and did not have the death penalty at the time of Mr. Gabrion's sentencing, but the crime for which Mr. Gabrion was convicted occurred on federal land.  Mr. Gabrion's § 2255 motion was denied in 2018, and his appeal is currently pending in the Sixth Circuit.

13.     Plaintiff Norris Holder is an individual on federal death row who was sentenced to death by the District Court for the Eastern District of Missouri in 1998.  Mr. Holder is incarcerated at USP Terre Haute in Indiana, under the control and supervision of BOP, an agency within DOJ.

14.     Plaintiff Rejon Taylor is an individual on federal death row who was sentenced to death by the District Court for the Eastern District of Tennessee in 2008.  *United States v. Rejon Taylor*, 583 F. Supp. 2d 923 (E.D. Tenn. 2008).  Mr. Taylor is incarcerated at USP Terre Haute in Indiana, under the control and supervision of BOP, an agency within DOJ.  Mr. Taylor filed a § 2255 motion in May 2019 that raised numerous challenges to his conviction, including that the predicate for his firearms murder charge was unconstitutionally vague.  *United States v. Rejon Taylor*, No. 1:04-cr-160-CLC-CHS (E.D. Tenn.).  That motion is currently pending before the district court.  Mr. Taylor's execution date has not yet been set.

15.     Defendant Monty Wilkinson is sued in his official capacity as Acting Attorney General of the United States.  Mr. Wilkinson is the current head of DOJ, the agency that promulgated the regulation at issue.

16.     Defendant Michael Carvajal is sued in his official capacity as the Director of the Federal Bureau of Prisons.  Mr. Carvajal is the head of BOP, the agency that will assist in

implementing the unlawful regulations at issue.

**JURISDICTION AND VENUE**

17.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1346 because the claims arise under the United States Constitution and federal law and the claim is against the United States.  Plaintiffs seek equitable and declaratory relief directly under the Constitution and pursuant to 28 U.S.C. §§ 2201 and 2202.  Judicial review of the Manner of Execution Rule is authorized by the APA, 5 U.S.C. §§ 702, 704, and 706.

18.    The § 2255 Project, Mr. Gabrion, Mr. Holder, and Mr. Taylor timely submitted detailed comments on the proposed rule.

19.    The Manner of Execution Rule constitutes final agency action judicially reviewable within the meaning of the APA, 5 U.S.C. §§ 704 and 706.

20.    Venue is proper in this district under 28 U.S.C. §§ 1391(c)-(e) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

**FACTUAL ALLEGATIONS**

**A.  The Federal Death Penalty Act Provides Certain Protections to Persons on Death Row**

21.    The FDPA authorizes, in certain limited circumstances, that an individual charged with federal crimes can be sentenced to death—but provides a number of protections before a death sentence can be imposed or carried out.  18 U.S.C. § 3594.  Among other things, the prosecutor must provide adequate notice before trial of the government's intent to seek the death penalty, *see* 18 U.S.C. § 3593, and the trier of fact must consider certain mitigating factors before imposing a death sentence.  *See id.* § 3592.  Further, the statute requires a court of appeals to consider whether a death sentence was arbitrarily imposed as part of its review in a timely-filed appeal.  *Id.* § 3595.

22.    Section 3596 of the FDPA addresses the implementation of a death sentence, providing that:

> A person who has been sentenced to death pursuant to this chapter shall be committed to the custody of the Attorney General until exhaustion of the procedures for appeal of the judgment of conviction and for review of the sentence.  When the sentence is to be implemented, the Attorney General shall release the person sentenced to death to the custody of a United States marshal, who shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed. If the law of the State does not provide for implementation of a sentence of death, the court shall designate another State, the law of which does provide for the implementation of a sentence of death, and the sentence shall be implemented in the latter State in the manner prescribed by such law.

18 U.S.C. § 3596(a).  This section also provides that "[a] sentence of death shall not be carried out upon" a person who lacks the mental capacity to understand the death penalty or why it was imposed, or "upon a woman while she is pregnant."  *Id.* § 3596(b)-(c).

23.    Today, there are 49 people on federal death row, and most of them are imprisoned in Terre Haute, Indiana.[1]

## B.  In the Last Year, DOJ Implemented Executions at an Unprecedented Pace

24.    For the last six decades, the federal government has rarely executed people—putting to death just four individuals between 1963 and 2003, and then pausing all federal executions until 2019.[2]  In July 2019, the Attorney General announced that DOJ would resume executing individuals on federal death row.[3]  He heralded the return of executions and derided the

---

[1] *See* DEATH PENALTY INFORMATION CENTER, https://deathpenaltyinfo.org/state-and-federal-info/federal-death-penalty (last visited Feb. 9, 2021).

[2] *See* FEDERAL BUREAU OF PRISONS, https://www.bop.gov/about/history/federal_executions.jsp (last visited Feb. 9, 2021).

[3] *See* Press Release No. 19-807, DOJ (July 25, 2019), https://www.justice.gov/opa/pr/federal-government-resume-capital-punishment-after-nearly-two-decade-lapse.

"nearly two decade lapse" during which no federal executions had occurred.[4]  He also announced that BOP was revising its Execution Protocol including with respect to which drug to use, how much to use, and how to inject it.[5]  On the same day, BOP noticed the executions of five individuals.[6]  DOJ's announcement was met with criticism from various corners, including from the families of 175 murder victims and from dozens of former judges, prosecutors, and correctional professionals.[7]

25.    In the year after the Attorney General announced that DOJ planned to resume federal executions, those executions were delayed by legal challenges related to the revised Execution Protocol as well as the individual circumstances of each case.  In response to DOJ's decision to proceed with executions with truncated notice to affected individuals and their counsel, several lawsuits were filed.  Among other challenges, individuals contended that DOJ's actions did not comply with limits on the federal government's authority to set execution dates without court involvement and approval.  *See United States v. Lee*, No. 4:97-cr-00243, 2020 WL 3921174, at *3 (E.D. Ark. July 10, 2020); *cf. LeCroy v. United States*, 975 F.3d 1192, 1195-96 (11th Cir. 2020).[8]  Other challenges concerned DOJ's effort to shift some tasks in implementing federal

---

[4] *See id.*

[5] *See* Addendum to BOP Execution Protocol (effective July 25, 2019), https://files.deathpenaltyinfo.org/documents/Federal-Execution-Protocol-Addendum-7-25-19.pdf.

[6] *See* Press Release No. 19-807, DOJ (July 25, 2019), https://www.justice.gov/opa/pr/federal-government-resume-capital-punishment-after-nearly-two-decade-lapse.

[7] *See* DEATH PENALTY INFORMATION CENTER, *The Federal Government Restarts Federal Executions Amid Procedural Concerns and a Pandemic* (July 20, 2020), https://deathpenaltyinfo.org/facts-and-research/dpic-reports/the-federal-governments-2019-attempt-to-restart-federal-executions-an-analysis.

[8] In *Lee*, the issue was rendered moot because the court simultaneously issued an order setting the execution date pursuant to 28 C.F.R. § 26.2.  2020 WL 3921174, at *5.  In *LeCroy*, the Eleventh Circuit recognized that "courts historically played some concurrent role in—had some shared responsibility for—setting execution dates in the first instance," but the case did not involve that issue and instead concerned whether the court could postpone an execution date that had already been set without a showing that the traditional stay favors were satisfied.  975 F.3d at 1196.

executions from the United States Marshal's Service to BOP.  *See In re Fed. Bureau of Prisons' Execution Protocol Cases*, No. 19-mc-145, 2020 WL 5594118, at \*10-12, \*12 n.12 (D.D.C. Sept. 20, 2020).

26.    Despite the many legal challenges that were filed, in July of last year DOJ began executing individuals at an unprecedented pace.  In the last seven months, the federal government has executed **thirteen** individuals:

a. Daniel Lee was killed on July 14, 2020;

b. Wesley Purkey was killed on July 16, 2020;

c. Dustin Honken was killed on July 17, 2020;

d. Lezmond Mitchell was killed on August 26, 2020;

e. Keith Nelson was killed on August 28, 2020;

f. William LeCroy was killed on September 22, 2020;

g. Christopher Andre Vialva was killed on September 24, 2020;

h. Orlando Hall was killed on November 19, 2020;

i. Brandon Bernard, the youngest person to be sentenced to death by the federal government in 68 years, was killed on December 10, 2020;

j. Alfred Bourgeois was killed on December 11, 2020;

k. Lisa Montgomery was killed on January 13, 2021;

l. Corey Johnson was killed on January 14, 2021; and

m. Dustin Higgs was killed on January 16, 2021.[9]

---

[9] *See* DEATH PENALTY INFORMATION CENTER, *Outcomes of Death Warrants in 2020* (last updated Dec. 11, 2020), https://deathpenaltyinfo.org/stories/outcomes-of-death-warrants-in-2020 and DEATH PENALTY INFORMATION CENTER, *Outcomes of Death Warrants in 2021* (last visited Feb. 16, 2021), https://deathpenaltyinfo.org/stories/outcomes-of-death-warrants-in-2021.

27.    It appears DOJ rushed to execute as many people on federal death row as possible before a new administration assumed power in January 2021.  Alarmed at the number and pace of executions, several members of Congress asked the Attorney General to suspend federal executions, to no avail.

28.    The executions carried out since November 2020 were the first in over a century that have occurred during a presidential transition period.  In 1889, three executions took place between the election of Benjamin Harrison in November 1888 and his inauguration in March 1889.[10]  Since then, every outgoing administration had halted federal executions during the transition period—until November 2020.  The federal government executed six individuals during the transition period before the inauguration of President Biden.

29.    As part of its race to execute, DOJ gave individuals on death row less advance notice of their scheduled execution dates.  Over the prior two decades, every individual who received an execution notice from BOP was given at least 120 days between the notice date and the scheduled date for their execution.[11]  Not so with the recent executions.  In sharp contrast, BOP routinely gave individuals less than 60 days' notice.  For example, Orlando Hall received his notice of execution on September 30, 2020, and he was put to death 50 days later on November 19, 2020.  Brandon Bernard received his notice on October 16, 2020, and was executed just 55 days later, on December 10, 2020.  Dustin Higgs received only 56 days' notice of his execution date.

30.    As it proceeded with executions over the last year, the federal government has resisted court oversight and sought to avoid providing constitutionally required process to the

---

[10] *See* Austin Sarat, *William Barr's Lame-Duck Execution Spree Is Unprecedented*, SLATE (Nov. 24, 2020), https://slate.com/news-and-politics/2020/11/william-barr-lame-duck-execution-spree-is-unprecedented.html.

[11] *See* Complaint at 20, *Hall v. Barr*, No. 20-cv-03184 (D.D.C. Nov. 3, 2020), ECF No. 1.

individuals put to death.  The bungled execution of Daniel Lee illustrates the point.  Mr. Lee's execution was scheduled for July 13, 2020, but had been enjoined by the U.S. District Court for the District of Columbia.  At approximately 2:00 a.m. on July 14, 2020, the United States Supreme Court dissolved that injunction.  Although Mr. Lee's execution date had passed, upon information and belief, Mr. Lee was still transferred from his prison cell to the execution facility in the middle of the night.  At 2:34 a.m. on July 14, 2020, a BOP attorney sent an email to Mr. Lee's counsel with an attached letter, dated July 14, 2020, which purported to be the new notice given to Mr. Lee that his execution would take place on the same day.  The purported notice, however, did not specify the *time* that the execution would take place.  In fact, BOP commenced the execution process approximately 90 minutes later without notifying counsel, including restraining Mr. Lee in a gurney and inserting IV lines into his arms.

31.    Despite that newly-issued notice, another stay prohibiting Mr. Lee's execution issued by the U.S. District Court for the Eastern District of Arkansas remained in place.  Mr. Lee's counsel warned DOJ that it must comply with the stay.  It was only under the threat of being held in contempt of court that DOJ paused the execution until the stay issued by the Eastern District of Arkansas could be addressed.  The BOP left Mr. Lee strapped to the gurney for nearly four hours, with the IV lines inserted to start the execution process still in his arms, before finally killing him on the morning of July 14, just hours after telling him and his counsel that he would die that day.  Mr. Lee and his counsel were not provided with adequate time to pursue available legal remedies; nor were counsel able to properly consult with Mr. Lee for the rest of the night.  DOJ did not notify counsel when the federal government actually proceeded to execute Mr. Lee at 7:30 a.m., and while legal claims were still pending; counsel learned that information only because journalists who were on site to witness the execution posted it on Twitter.

32.    A similar course of events occurred with the execution of Mr. Purkey.  After the Supreme Court vacated the injunction preventing his execution, DOJ sent an email to counsel for Mr. Purkey at 2:03 a.m. informing counsel "as a courtesy" that Mr. Purkey would be executed less than two-and-a-half hours later, at 4:30 a.m.  (*See* Ex. 1.)  DOJ acknowledged in this email correspondence that it knew Mr. Purkey had filed another stay motion but asserted that DOJ was not going to delay the execution further for this legal process to play out.  Mr. Purkey was executed just hours later.

33.    Lisa Montgomery was executed on January 13, 2021, despite having stays of execution granted by two different circuit courts in the days before her execution. After the Supreme Court vacated those stays on January 12, Ms. Montgomery should have been granted the dignity of having her execution proceed as she had planned.  Ms. Montgomery had requested a spiritual advisor to be present in the execution chamber with her. But at the last minute, BOP denied Ms. Montgomery's request and prevented her spiritual advisor from being with her as she was executed.  (Ex. 5, Declaration of Amy Harwell.)  This sudden denial illustrates Plaintiffs' concerns about last-minute changes to procedures when an individual is about to be put to death.

34.    DOJ also sought to rush the executions of Corey Johnson and Dustin Higgs.  With respect to Mr. Johnson, he was executed despite substantial evidence that he was intellectually disabled under modern diagnostic standards and while litigation was pending over whether his sentence should be reduced under the First Step Act of 2018.  In the case of Mr. Higgs, this meant that his execution took place despite critical litigation still pending in the Fourth Circuit concerning whether the government had authority to put Mr. Higgs to death under a federal judgment and order designating a state that does not permit the death penalty today.

35.    This rush of executions was truly unprecedented.  Last year marked the first time *ever* that the federal government has carried out more executions than all states combined.  And it was the first time in more than a century—since 1896—that the federal government put ten individuals to death in one year.

**C.  DOJ Proposes a New Rule Regarding the Manner of Executions**

36.    On August 5, 2020, in the midst of the federal government's wave of executions, DOJ published a notice of proposed rulemaking ("NPRM") to revise the regulations governing the "manner of executions," located in 28 C.F.R. § 26.  The NPRM asserted that amendments to the regulations were necessary to "provide the Federal Government with greater flexibility to conduct executions."  NPRM, 85 Fed. Reg. 47,324, 47,325 (Aug. 5, 2020).  (Ex. 3.)

37.    The NPRM observed that while the FDPA "provides that Federal executions are to be carried out in the manner prescribed by the law of the relevant State," the existing regulations "provide that Federal executions are to be carried out by lethal injection."  *Id.*  Because "some States currently authorize execution by other means in certain circumstances, and more States may authorize execution by other means in the future," the NPRM asserted, amendments to the regulations were warranted to provide that "Federal executions are to be carried out by lethal injection 'or by any other manner prescribed by the law of the State in which the sentence was imposed or which has been designated by a court in accordance with 18 U.S.C. 3596(a).'"  *Id.*  According to the NPRM, "[t]he proposed rule thus ensures that the Department is authorized to use the widest range of humane manners of execution permitted by law."  *Id.*

38.    While the NPRM described the reason for the proposed rule as increasing the *methods* of execution available to the federal government, many of the proposed amendments had nothing whatsoever to do with that rationale.  Those changes instead appeared to be designed to

preempt further legal challenges to executions, like the ones that had been raised during the summer of 2020, by granting the Attorney General more expansive authority and cutting courts out of the process of setting execution dates.  The NPRM did not explain the legal basis for DOJ's claimed authority to make those changes.  Indeed, the NPRM did not explain the reasons for many of those amendments at all.

### D.  DOJ Ignores Comments to the Proposed Rule and Issues Its Final Rule

39.    DOJ received 23 public comments to the proposed rule.  The § 2255 Project and counsel for inmates on death row, including many of the individuals who are Plaintiffs here, submitted detailed comments. (Ex. 4.)  Among other things, Plaintiffs' comments criticized DOJ for not providing any explanation or legal authority for its proposed amendments; for improperly arrogating federal rulemaking power to the Attorney General, outside of the required process under the APA and without judicial review; for violating the FDPA; and for improperly eliminating judicial oversight in various ways.

40.    On November 27, 2020, DOJ published the Final Rule without any material changes.  DOJ declined to respond to numerous public comments on grounds that they "reflected general opposition to the death penalty."  Final Rule, 85 Fed. Reg. 75,846.  DOJ also failed to correct deficiencies in the Final Rule that the comments identified, including the multiple problems that Plaintiffs had brought to DOJ's attention in detailed comments.

41.    The Final Rule took effect on December 28, 2020, shortly before the three executions that took place in January 2020.

### _New Sub-Section (b) in 28 C.F.R. § 26.1_

42.    DOJ amended 28 C.F.R. § 26.1 to add the following new subsection (b):

(b) Where applicable law conflicts with any provision of this part, the Attorney General may vary from that provision to the extent necessary to comply with the

applicable law.

43.    The NPRM's only explanation for this new provision was that it would "provide the Attorney General the flexibility to vary from the regulation in the event that applicable law (such as controlling State law) requires different procedures, stating that where applicable law conflicts with any provision of Part 26, the Attorney General may vary from that provision to the extent necessary to comply with the applicable law."  NPRM, 85 Fed. Reg. 47,326.  DOJ did not explain why it believed it had legal authority to authorize the Attorney General, in his sole discretion, to "vary" from binding regulations that have the force and effect of law without further rulemaking and why any such expansive departure from ordinary rulemaking processes was warranted.

44.    Plaintiffs objected to § 26.1(b), observing that by its plain terms it would allow the Attorney General to deviate from the federal regulations governing the implementation of death sentences at will, without notice, and without following required rulemaking processes.

45.    Notwithstanding the problems that had been identified with § 26.1(b), DOJ adopted that provision as proposed.  DOJ explained in the Final Rule that this new authority to "vary" from the regulations without further process is "intended only to ensure that the Attorney General can comply with State statutes that contradict the regulations."  Final Rule, 85 Fed. Reg. at 75,849.  According to the Final Rule, "[i]t is possible that at some point in the future a State statute that applies to the execution of a Federal inmate may differ, even in a minor respect, from the regulations," but "[t]he specifics of such a difference are not currently foreseeable." *Id.*  According to DOJ, § 26.1(b) was added to grant new authority to ensure that "execution[s] [can] proceed without undue delay." *Id.*

46.    Section 26.1(b) is unlawful, and DOJ lacked authority to promulgate it.  Under § 26.1(b), the Attorney General can literally rewrite the rules governing executions—either in

-15-

specific cases or en masse for all prisoners on federal death row—so long as the Attorney General asserts a "conflict" with "applicable law." Notably, the text of the Final Rule does not even specify what "applicable law" the regulation is referring to, allowing the Attorney General to cite any source of law. While the commentary accompanying the Final Rule refers to "State statutes," § 26.1(b) more broadly refers to "applicable law" without limitation. Final Rule, 85 Fed. Reg. at 75,849. Moreover, the commentary accompanying the Final Rule contemplates that this authority could be triggered based on *any* difference between state and federal law—presumably even when federal law is more protective of an individual's rights and compliance with the federal requirement would not actually *violate* state law. This suggested potential state/federal conflict does not create any real limitation on the Attorney General's power. Nor does § 26.1(b) require the Attorney General to provide any notice to individuals on federal death row (or their counsel) when he decides to "vary" from a regulation in his sole discretion, and the commentary indicates notice may not be provided in the effort to proceed with executions "without undue delay." *Id.*

47.    In short, § 26.1(b) purports to add to DOJ's already mighty power to prosecute crimes and execute defendants the power to create or amend the regulations governing those executions without providing notice or engaging in statutorily required processes for amending binding rules. With § 26.1(b), DOJ has effectively afforded itself a "good cause" exception to the revision of federal regulations devoid of the procedural requirements that the APA imposes on agencies that seek to deviate from their established procedures. But DOJ lacks authority to exempt itself from constitutional and statutory constraints on its rulemaking power based on perceived inconvenience to its ability to carry out executions without any delay.

### ***New Sub-Section (c) in 28 C.F.R. § 26.1***

48.    DOJ further amended 28 C.F.R. § 26.1 to add the following new subsection (c):

(c) Any task or duty assigned to any officer or employee of the Department of Justice by this part may be delegated by the Attorney General to any other officer or employee of the Department of Justice.

49.    This new provision appears to have been designed to preempt litigation that had challenged the Attorney General's delegation of tasks involved in the supervision of executions to the BOP notwithstanding Congress's specification in the FDPA that the "United States marshal . . . shall supervise implementation of the [death] sentence."  18 U.S.C. § 3596(a).  The NPRM's only explanation for this change was that it "reiterate[d] the Attorney General's authority to manage the Department's execution process, by stating that any task or duty assigned to any officer or employee of the Department of Justice under part 26 may be delegated by the Attorney General to any other officer or employee of the Department of Justice."  Final Rule, 85 Fed. Reg. at 75,849.

50.    Plaintiffs objected to the new § 26.1(c) in their comments, explaining that it would impermissibly allow the Attorney General to make changes to the regulations at will and outside of the notice-and-comment process.  Plaintiffs also observed that § 26.1(c) violates the FDPA by authorizing the Attorney General to assign any task or duty related to federal executions to any DOJ employee, notwithstanding Congress's explicit directive that the "United States marshal . . . shall supervise implementation of the [death] sentence."  18 U.S.C. § 3596(a).

51.    Notwithstanding the problems that had been identified with new § 26.1(c), DOJ adopted that provision as proposed.  DOJ dismissed concerns "that the Attorney General could change regulations without notice" on the theory that "this provision itself is notice to the public that the Attorney General may re-designate responsibilities to other officials."  Final Rule, 85 Fed. Reg. at 75,849.  And DOJ asserted that it had authority to override the FDPA's explicit designation that federal executions must be supervised by the United States Marshal.  *Id.* at 75,849-75,850.

52.    Section 26.1(c) is unlawful and DOJ lacks authority to promulgate it.  Providing notice of a general claim of authority to deviate from regulations at will is an impermissible end-

run around the APA's procedural requirements.  Moreover, the FDPA prohibits the Attorney

General from delegating authority to implement the death penalty to officers or employees

different from those Congress itself selected for this weighty responsibility.  DOJ cannot override

a statute passed by Congress with a contrary regulation.

### *Repeal of 28 C.F.R. § 26.2*

53.    DOJ repealed the judicial notice procedure in 28 C.F.R. § 26.2 in its entirety.  That

provision had provided:

> (a) Whenever this part becomes applicable, the attorney for the government shall promptly file with the sentencing court a proposed Judgment and Order.  The proposed Judgment and Order shall state, in addition to any other matters required by law or otherwise appropriate, that:
>> (1) The sentence shall be executed by a United States Marshal designated by the Director of the United States Marshals Service;
>> (2) The sentence shall be executed by intravenous injection of a lethal substance or substances in a quantity sufficient to cause death;
>> (3) The sentence shall be executed on a date and at a place designated by the Director of the Federal Bureau of Prisons; and
>> (4) The prisoner under sentence of death shall be committed to the custody of the Attorney General or his authorized representative for appropriate detention pending execution of the sentence.
>
> (b) The attorney for the government shall append to the proposed Judgment and Order a Return by which the designated United States Marshal may inform the court that the sentence of death has been executed.

54.    Focusing on the language in § 26.2(a)(2) stating that a sentence of death "shall be

executed by intravenous injection of a lethal substance or substances in a quantity sufficient to

cause death," the NPRM stated that the amendments in the proposed rule were necessary to

"provide the Federal Government with greater flexibility to conduct executions in any manner

allowed by federal law."  NPRM, 85 Fed. Reg. at 47,324-47,325.  But this rationale does not

support wholesale deletion of § 26.2, including the requirement that the federal government

"promptly file with the sentencing court a Proposed Order and Judgment" to set an execution date

stating the "date" and "place" of the execution and specifying that "[t]he sentence shall be executed

by a United States Marshal."  28 C.F.R. § 26.2(a)(1) and (3).  Nor did DOJ provide *any* rationale

for the elimination of those provisions: the NPRM addressed the deletion in a single sentence,

stating without elaboration that "the proposed rule would eliminate unnecessary and redundant

language in the regulations by striking the entirety of § 26.2 and reserving that section for future

use."  NPRM, 85 Fed. Reg. at 47,326.

55.     Plaintiffs objected to the outright repeal of § 26.2, observing that DOJ had failed to

explain the elimination of provisions that "are not in any way tied to whether an execution occurs

by lethal injection or other means."  (Ex. 4 at 6.)  Plaintiffs further observed that the statement in

the NPRM that § 26.2 was "unnecessary and redundant" contradicted statements DOJ had made

in first promulgating the regulation in 1993.  (*Id.*)  Plaintiffs additionally opposed the deletion of

the requirement that the federal government file a Proposed Order and Judgment with the

sentencing court to set an execution date.  Plaintiffs explained that BOP's authority to set execution

dates derives solely from a federal court's judgment implementing the sentence and any attempt

to set a date unilaterally without obtaining a court order under § 26.2(a) would impermissibly usurp

the federal court's authority and violate the separation of powers.  Plaintiffs demonstrated that

DOJ had itself recognized in promulgating the prior rule that "its date-setting authority is

derivative of and subordinate to the authority of federal district courts" and had provided no

explanation for its change of position in the NPRM.  (*Id.* at 7.)

56.     Indeed, in the initial rulemaking to promulgate the regulations governing the

manner of executions in 1993, DOJ observed that its authority to issue the regulations was derived

from "the authority of the federal courts, acting pursuant to the All Writs Act, 28 U.S.C. § 1651(a),

to order that their sentences be implemented."  Implementation of Death Sentences in Federal

Cases, 58 Fed. Reg. 4898, 4899 (Jan. 19, 1993).  "Thus, § 26.2 directs the government's attorney

in a capital case to file with the court a proposed Judgment and Order consistent with the regulations" and triggers "the duty and authority to comply with such orders pursuant to the statutory instruction to the Marshals Service to 'obey, execute, and enforce all orders of United States District Courts,' 28 U.S.C. 566(a)." 58 Fed. Reg. at 4899. That prior rule observed that "[t]he authority and duty of the Marshals Service to execute court orders includes the authority to specify procedures for execution *consistent with the court order*." *Id.* (emphasis added). The prior rule further reiterated that "far from contemplating the unilateral exercise of executive authority" in fixing execution dates, "the proposed rule directs government attorneys to seek a court order" that approves the date of the execution. *Id.* at 4900.

57.     In the current rulemaking proceeding, notwithstanding the problems that had been identified with repealing § 26.2 in full, DOJ proceeded with that repeal as proposed. With respect to the elimination of the requirement that the federal government file a Proposed Order and Judgment with the sentencing court to set an execution date, the Final Rule asserted that § 26.2 is "unnecessary" because the regulations separately provide that "a sentence of death shall be executed . . . [o]n a date and at a time designated by the Director of the Federal Bureau of Prisons," "[e]xcept to the extent a court orders otherwise," 28 U.S.C. § 26.3(a)(1). 85 Fed. Reg. at 75,850. The Final Rule further asserted that BOP has unilateral authority to set execution dates without involving federal courts in that process at all. *Id.* The Final Rule did not acknowledge or explain DOJ's prior conflicting analysis in promulgating the prior manner of execution regulations.

58.     The repeal of § 26.2 is unlawful. As a result of this repeal, BOP will be able to unilaterally set execution dates in conflict with the separation of powers and nearly two centuries of historical practice. Nor did DOJ adequately explain its change in position on this issue. DOJ

lacks authority to usurp power from the federal courts and eliminate their role in setting execution dates.

### *Remaining Provisions*

59.    DOJ altered the regulations in numerous additional ways that violate the APA and are contrary to law.  Those changes include:

- Amending parts of § 26.3(a)(2) to allow for the use of "State and local facilities and personnel . . . in carrying out Federal executions," while simultaneously asserting that the Final Rule "will not have substantial direct effects on the States."  Final Rule, 85 Fed. Reg. at 75,847.

- Amending § 26.3(a)(3) to provide that a sentence of death shall be executed "[u]nder the supervision of a United States Marshal, assisted by additional qualified personnel selected by the Director of the United States Marshals Service and the Director of the Federal Bureau of Prisons, or their designees, and acting at the direction of the Marshal," without defining the necessary qualifications for personnel or specifying the process by which the United States Marshals Service and the Director of the BOP will select personnel, including how to resolve any disagreement in that selection process. *Id.* at 75,854.

- Amending § 26.3(a)(4) to provide that the sentence of death shall be executed by lethal injection "or by any other manner prescribed by the law of the State in which the sentence was imposed or which has been designated by a court in accordance with 18 U.S.C. 3596(a)," without limiting the sweep of this law based on archaic or inhumane methods of execution or identifying any guidelines to be followed to insure the humaneness of the execution. *Id.*

- Amending 28 C.F.R. § 26.4(c)(1) by transferring authority for selecting "necessary personnel" to be present at the execution from the "Marshal and Warden" to the "Marshal and the Director of the Federal Bureau of Prisons or his designee," without placing limits on permissible designees or identifying how to resolve any conflicts in the determination of necessary personnel.  *Id.*

- Revising 26 C.F.R. § 26.4(a) to provide that the BOP Director "or his designee shall notify the prisoner under sentence of death of the manner of execution and the date designated for execution at least 20 days in advance, except when the date follows a postponement of fewer than 20 days of a previously scheduled and noticed date of execution, in which case the Director of [BOP] or his designee shall notify the prisoner as soon as possible"—without requiring that the notice of the new date and time for the execution be provided to defense counsel or otherwise adequately defining what constitutes sufficient notice of a new execution date.  *Id.*

60.    These changes were all inadequately explained, arbitrary and capricious, contrary to law, and in excess of DOJ's statutory authority to implement the FDPA.

**E.  The Final Rule Harms Plaintiffs**

61.    The Final Rule has had, and will continue to have, significant impact on the § 2255 Project's ability to achieve its principal objectives.  The § 2255 Project is staffed by six attorneys, a paralegal, a mitigation specialist, and an administrative assistant.  Their activities include 1) recruitment and recommendation of § 2255 counsel; 2) monitoring of pending § 2255 litigation and cases coming into post-conviction review; 3) consulting with § 2255 attorneys and other practitioners; 4) direct representation of federal prisoners who have been sentenced to death; 5) training; and 6) assistance to courts and court personnel.  Without proper notice of executions, which regulations will apply, and which DOJ officers or employees will be responsible for the supervision of executions, the § 2255 Project will be substantially impaired in its ability to represent its clients, assist defense counsel for federally death-sentenced individuals, and support the courts.

62.    Individuals facing execution also will be irreparably harmed if the Final Rule remains in effect.  The individual Plaintiffs face significant harm stemming from the Final Rule, which will fundamentally impact their access to timely legal advice and their ability to assert their constitutional rights.  Furthermore, the Final Rule deprives individual Plaintiffs of constitutionally necessary court oversight and involvement in setting their execution dates.

63.    Ultimately, individual Plaintiffs face significant uncertainty over the way in which the government may choose to put them to death.  This uncertainty itself supports a finding of "significant harm."  *A.O. v. Cuccinelli*, 457 F. Supp. 3d 777, 795 (N.D. Cal. 2020) (holding that "feelings of fear and uncertainty" constitute harms that "will not be remedied by an award of

damages and are, therefore, irreparable") (quotation omitted); *see also Chalk v. U.S. Dist. Court. Ct. Dist. of Cal.*, 840 F. 2d 701, 709-10 (9th Cir. 1988).

## CAUSES OF ACTION

## COUNT I: VIOLATION OF SEPARATION OF POWERS
### (U.S. Const. art. III; Section 1)

64.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

65.     Article III, Section 1 of the Constitution vests the judicial power of the United States "in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."

66.     Article III "establishes the Judiciary's independence by giving the Judiciary distinct and inviolable authority." *Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1330 (2016). Accordingly, any attempt by the Executive to claim aspects of that authority for itself is a violation of Article III. For example, the political branches "may not 'withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty.'" *Stern v. Marshall*, 564 U.S. 462, 484 (2011) (citing *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 284 (1856)).

67.     The practices of courts during the founding era are strong evidence of what constitutes the "judicial power." *Oil States Energy Services, LLC v. Greene's Energy Group, LLC*, 138 S. Ct. 1365, 1376–77 (2018). Additionally, a "systematic, unbroken" judicial practice of performing a certain function provides strong evidence that the function belongs exclusively to the Judiciary. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–11 (1952).

68.     As a matter of history and longstanding practice, setting execution dates is an Article III judicial function. For the first federal execution carried out in 1790, the Article III

District Court set the date and time of the execution.  And for nearly two centuries, it has been well established, and the Executive Branch has repeatedly recognized that federal courts have exclusive authority to set execution dates for federal prisoners sentenced to death.  DOJ has acknowledged this aspect of judicial power on multiple occasions.  Indeed, DOJ's previous regulations expressly recognized the authority of courts to set execution dates by "direct[ing] the government's attorney in a capital case to file with the court a proposed Judgement and Order consistent with the regulations."  58 Fed. Reg. 4899.

69.    By repealing 28 C.F.R. § 26.2 in the Final Rule, DOJ is impermissibly attempting to remove the Judiciary from the process of setting execution dates.  The attempted repeal of § 26.2 usurps the Judiciary's power to control its own judgments and thus violates Article III. Furthermore, under Section 706 of the APA, a reviewing court must set aside any agency action that is "contrary to constitutional right, power, privilege or immunity."  5 U.S.C. § 706(2).

70.    The unlawful Final Rule irreparably harms Plaintiffs and thus should be declared unlawful, set aside, vacated, stayed, and enjoined.

## COUNT II: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
### (Agency Action that Is Contrary to Law and *Ultra Vires*)

71.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

72.    Under Section 706(2) of the APA, a reviewing court must hold unlawful and set aside any agency action that is "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," or "contrary to constitutional right, power, privilege or immunity." 5 U.S.C. § 706(2).

73.    An agency has acted "contrary to law" when its action is "'inconsistent with the statutory mandate or . . . frustrate[s] the policy that Congress sought to implement.'"  *Hudson v.*

*Zinke*, 453 F. Supp. 3d 431, 436 (D.D.C. 2020) (quoting *Ill. Com. Comm'n v. ICC*, 749 F.2d 875, 880 (D.C. Cir. 1984)).  An agency has acted "*ultra vires*" when it has "exceeded its statutory authority."  *Mittleman v. Postal Regul. Comm'n*, 757 F.3d 300, 307 (D.C. Cir. 2014) (internal citations omitted).

74.    The Final Rule is a "legislative rule" that has the "force and effect of law." Accordingly, DOJ can amend the requirements of the Final Rule only by using the three-step notice and comment process specified by the APA.  *See* 5 U.S.C. § 553 (requiring three-step process for all "[r]ule making"); *id.* § 551(5) (defining "[r]ule making" to include the "agency process for formulating, amending, or repealing a rule").

75.    Section 26.1(b) of the Final Rule—which purports to grant the Attorney General authority to "vary" from the regulations in his sole discretion and to the extent he deems necessary—is *ultra vires* and contrary to law.  The Attorney General has no authority to exempt himself from the notice and comment process with respect to future deviations from the requirements of the Final Rule.  DOJ cannot "grant itself a valid exemption to the APA for all future regulations[] and be free of [the] APA's troublesome rulemaking procedures forever after." *United States v. Picciotto*, 875 F.2d 345, 346 (D.C. Cir. 1989).

76.    In the FDPA, Congress explicitly assigned responsibility for implementing federal death sentences to the United States Marshals Service, directing that "a United States marshal . . . shall supervise implementation of the sentence."  18 U.S.C. § 3596(a).

77.    Section 26.1(c) of the Final Rule—which provides that the Attorney General may delegate any task in implementing federal death sentences assigned to any DOJ officer or employee to another DOJ officer or employee—is *ultra vires* and contrary to law.  The FDPA specifically assigns authority for implementing federal death sentences to the United States Marshal, and the

Attorney General lacks authority to reassign that duty in contravention of Congress's directive. *See United States v. Giordano*, 416 U.S. 505, 514 (1974) (Attorney General cannot reassign authority where "the matter of delegation" is "expressly addressed" in a statute.).

78.     The Final Rule's repeal of Section 26.2 impermissibly removes the Judiciary from the process of setting execution dates in violation of Article III and the separation of powers and is therefore "contrary to constitutional right, power, privilege or immunity."  5 U.S.C. § 706(2).

79.     Other provisions of the Final Rule likewise are contrary to law and *ultra vires*.

80.     Consequently, the Final Rule is contrary to law and *ultra vires* and must be rejected.

81.     The unlawful Final Rule irreparably harms Plaintiffs and thus should be declared unlawful, set aside, vacated, stayed, and enjoined.

### COUNT III: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
**(Agency Action that Is Arbitrary, Capricious, or an Abuse of Discretion)**

82.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

83.     Section 706(2)(A) of the APA forbids agency action in rulemaking that is arbitrary, capricious, or an abuse of discretion.  Section 706(2) requires a reviewing court to "set aside" any agency action that violates this standard.  Among other things, this prohibition requires a federal agency to articulate a reasoned basis for any final agency action as well as to consider and respond to any public comments submitted and, where appropriate, revise the Final Rule accordingly. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (noting that an agency must "engage in reasoned decisionmaking") (quotation omitted).

84.     An agency's rule is arbitrary and capricious when the agency has "entirely failed to consider an important aspect of the problem."  *Motor Vehicle Mfrs. Ass'n v. State Farm Ins.*, 463 U.S. 29, 43 (1983).  In addition, when an agency changes position, it additionally must adequately

explain the reasons for that change. *Id.* at 42 ("[A]n agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance."); *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973) (an agency has a duty to "explain its departure from prior norms").

85.    The Final Rule is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.  DOJ failed to articulate a reasoned basis for the challenged provisions, failed to adequately respond to comments, failed to consider important aspects of the issues, and failed to adequately explain changes in its position.

86.    For example, DOJ failed to provide a reasoned or adequate basis for its decision to add 28 C.F.R. §§ 26.1(b) and 26.1(c).  DOJ has also failed to explain why it was necessary to repeal all of 28 C.F.R. § 26.2 and why it had changed positions on that issue.

87.    DOJ further failed to respond adequately—or at all—to numerous public comments.  DOJ also failed to correct deficiencies in the Final Rule that the comments identified.  For example, DOJ failed to address the problems with the 20 days' notice provided in § 26.4(a), as well as the lack of notice to counsel in that subsection.

88.    Accordingly, in issuing the proposed rule and promulgating the Final Rule, DOJ violated the APA, and the Final Rule should be set aside pursuant to 5 U.S.C. § 706(2).

89.    These arbitrary and capricious actions and DOJ's abuse of discretion irreparably harm plaintiffs and the Final Rule thus should be declared unlawful, set aside, vacated, stayed, and enjoined.

## JURY DEMAND

Plaintiffs demand a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter the following relief:

1.      A stay under 5 U.S.C. § 705 postponing the effective date of the Final Rule;

2.      A preliminary and permanent injunction preventing DOJ and BOP from implementing or otherwise applying the Final Rule;

3.      An order setting aside the Final Rule;

4.      An order declaring the Final Rule violates Article III, Section 1, of the United States Constitution;

5.      An order declaring the Final Rule violates the FDPA;

6.      An order declaring the Final Rule violates the APA;

7.      Vacatur of the Final Rule; and

8.      Any such other equitable relief as this Court deems just and proper.

Respectfully submitted,

Dated:  February 16, 2021

By: */s/ Kathleen Hartnett*
Kathleen Hartnett (DC Bar No. 483250)
Colin Scott (*pro hac vice*)
COOLEY LLP
101 California Street, 5th Floor
San Francisco, CA  94111-5800
Telephone: (415) 693-2000
Facsimile: (415) 693-2222
khartnett@cooley.com
cscott@cooley.com

Elizabeth Wright (*pro hac vice*)
Jennifer Elkin (*pro hac vice*)
COOLEY LLP
550 Boylston street
Boston, MA  02116-3736
Telephone: (617) 937-2300
Facsimile: (617) 937-2400
ewright@cooley.com
jelkin@cooley.com

Elias S. Kim (*pro hac vice*)
COOLEY LLP
1299 Pennsylvania Ave., NW, Suite 700
Washington, DC  20004-2400
Telephone: (202) 842-7800
Facsimile: (202) 842-7899
ekim@cooley.com

*Counsel for Plaintiff Federal Capital Habeas Project*

David Autry (*pro hac vice*)
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone: (405) 521-9600
Facsimile: (405) 521-9669
dbautry77@gmail.com

*Counsel for Plaintiff Kenneth Eugene Barrett*

Scott W. Braden (DC Bar No. 2007123)
FEDERAL PUBLIC DEFENDER,
E.D. ARKANSAS
1401 West Capitol Street
Little Rock, AR 72201
Tel: (501) 324-6114
scott_braden@fd.com

*Counsel for Plaintiff Norris Holder*

Alexis Hoag (*pro hac vice*)
ERIC HOLDER INITIATIVE FOR
CIVIL & POLITICAL RIGHTS
Columbia University
1130 Amsterdam Ave
202 Hamilton Hall
New York, NY 10027
Tel: (203) 645-4918
ajh2233@columbia.edu

*Counsel for Plaintiff Rejon Taylor*

Monica Foster(*pro hac vice* motion
forthcoming)
INDIANA FEDERAL COMMUNITY
DEFENDERS, LLC
111 Monument Circle, Ste. 3200
Indianapolis, IN 46208
Tel: (317) 383-2520
monica_foster@fd.org

*Counsel for Plaintiff Marvin Charles
Gabrion II*