# EXHIBIT 4

September 4, 2020

Laurence E. Rothenberg
Deputy Assistant Attorney General
Office of Legal Policy
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530

*Submitted online via regulations.gov*

      Re:  Manner of Federal Executions, OAG Docket No. 171; AG Order No.
4749–2020; RIN 1105–AB63

Dear Mr. Rothenberg:

      The Department of Justice proposes to amend the federal regulations governing the implementation of federal death sentences. Counsel submit these comments on behalf of ourselves and our undersigned clients who are federally death-sentenced prisoners. Counsel and our clients have a substantial interest in the proposed rules.

## Proposed Amendments to 28 C.F.R. § 26.1

      The Department proposes to amend 28 C.F.R. § 26.1 to add the following two subsections:

      *(b) Where applicable law conflicts with any provision of this part, the Attorney General may vary from that provision to the extent necessary to comply with the applicable law.*

      *(c) Any task or duty assigned to any officer or employee of the Department of Justice by this part may be delegated by the Attorney General to any other officer or employee of the Department of Justice.*

### Comments on proposed subsection (b)

      The proposed amendment would allow the Attorney General broad authority to vary from the federal regulations governing the implementation of death sentences at will. There are a number of problems with this proposal.

      1. The Department has not provided any explanation for why this amendment was proposed or why such a rule change is necessary. As such, we have insufficient information to comment on the Department's rationale for the proposal. *See, e.g.*, *Honeywell Int'l., Inc. v. EPA*, 372 F.3d 441, 445 (D.C. Cir. 2004) (holding that an agency must "provide sufficient factual detail and rationale for the rule to permit interested parties to comment meaningfully") (citation omitted); *Connecticut Light & Power Co. v. Nuclear Regulatory Comm.*, 673 F.2d 525, 530

1

(D.C. Cir. 1982) (holding that notice must "provide an accurate picture of the reasoning that has led the agency to the proposed rule … and make available technical studies and data that it has employed in reaching the decisions to propose particular rules").

2. The Department has not identified the legal authority under which the rule is proposed. Without such information, we are unable to assess the legality or appropriateness of the amendment. *See, e.g.*, 5 U.S.C. § 553(b) (requiring agency to provide "reference to the legal authority under which the rule is proposed").

3. The proposal would function as a catch-all regulation allowing the Attorney General to change the federal regulations governing the implementation of death sentences at will without subjecting such changes to further process. There is no authority that allows the Department to arrogate to itself the federal rulemaking power. *See, e.g.*, 5 U.S.C. § 706(2) (setting forth judicial review of agency rulemaking violations). In fact, Congress instituted a number of procedural controls on agencies, such as ensuring that the public would have an opportunity for participation through the public comment process required by the Administrative Procedure Act (APA), before any rule changes could be given the force of law. The proposed rule would constitute an unprecedented abrogation of the statutorily required procedures that all agencies must follow whenever they create, amend, or repeal a rule. *See, e.g.*, *Oregon v. Ashcroft*, 368 F.3d 1118, 1133 (9th Cir. 2004) (applying the APA to the Attorney General); *Radack v. U.S. Dep't of Justice*, 402 F. Supp. 2d 99, 104 (D.D.C. 2005) (same). Indeed, that would subvert the very process in which we are now engaging.

4. The Attorney General cannot be allowed to re-write the rules *ad hoc* because the Department has an inherent conflict of interest in this area of federal rulemaking; the same party that capitally prosecutes defendants and seeks to carry out their executions should not also have the power to create, amend, or repeal the regulations that govern the process by which the death sentence is implemented. *See infra* Comments on Proposed Amendments to 28 C.F.R. § 26.2. Indeed, allowing the Attorney General to unilaterally determine whether "applicable law conflicts with any provision of this part" and what variances are "necessary to comply with applicable law" is a further arrogation of unchecked authority. *See, e.g.*, 5 U.S.C. § 706(2). This raises a potential Separation of Powers issue between the Executive and Judicial branches, as questions about what the law requires should be left to the courts.

5. Similarly, the proposal creates the potential that the Attorney General could deviate from the regulations in individual cases for impermissible reasons. The notion that the Attorney General could re-write the rules governing executions *ad hoc* in specific cases, without following notice-and-comment rulemaking, is deeply troubling given the Department's inherent conflict of interest.

This provision also contains no requirement that the Attorney General provide notice even to those directly affected by his deviation from the regulations before implementing and applying such changes in their particular cases. This is a concern as to notice and on account of the Department's inherent conflict of interest as well. The problems with this provision are further compounded by the fact that pursuant to this proposal, the Attorney General could change

2

the regulations and apply them imminently in a changed execution date, within a matter of hours and without appropriate notice, if any, to counsel.

**Comments on proposed subsection (c)**

The proposed amendment would give the Attorney General unlimited power to re-delegate authority and reassign duties among various DOJ components. There are a number of problems with this proposal.

1. This proposal suffers from the same problem identified as to subsection (b): it would allow the Attorney General to make changes to the federal regulations at will without subjecting such changes to the required notice-and-comment procedure under the APA.

2. The proposal violates the Federal Death Penalty Act ("FDPA"). Congress explicitly assigned responsibility for implementing federal death sentences to the United States Marshals Service in the FDPA. Section 3596(a) provides that "a United States marshal . . . shall supervise implementation of the sentence." 18 U.S.C. § 3596(a). Section 3597(a) provides that, among other things, the "United States marshal charged with supervising the implementation" of a death sentence "may use appropriate State or local facilities for the purpose." *Id.* § 3597(a). Neither section grants any authority to the Attorney General to reassign this duty. And the Department cannot change a statute passed by Congress with a contrary regulation. *See, e.g.*, *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842-43 (1984) (holding that "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress").

In connection with its proposed rule change, the Department asserts that:

When sections 3596 and 3597 of title 18 assign certain duties to a component of DOJ, those assignments are initial, default assignments. However, those duties are legally vested in the Attorney General, and because of this, the Attorney General may also assign those duties to other DOJ components, as is expressly permitted by long-standing Federal law.

85 Fed. Reg. 47325. The Department's position is legally incorrect.

Federal law does not authorize the Attorney General to reassign at will the responsibilities Congress delegated to the Marshals Service. Congress has consistently and unambiguously recognized the Marshals Service and the BOP as "entit[ies] distinct and independent within [their] own sphere[s]." *Roe v. United States Attorney*, 489 F. Supp. 4, 7 (E.D.N.Y. 1979). Moreover, the FDPA expressly instructs the Attorney General to "release" the prisoner to a Marshal's custody for execution. 18 U.S.C. § 3596(a). Because the statute requires the Attorney General to use a particular agency within the DOJ, the Attorney General cannot reassign that duty to a different agency. *See United States v. Giordano*, 416 U.S. 505, 514 (1974) (Attorney General cannot redelegate authority where "the matter of delegation" is "expressly

addressed")[1]; *United States v. Libby*, 498 F. Supp. 2d 1, 13–14 (D.D.C. 2007) (a "general" statute that "permits the delegation of any function of the Attorney General . . . cannot trump the clear language of the more specific prohibition on delegation") (internal quotation marks omitted).

Ultimately, the Department's proposed rule would turn Congress's explicit designation of the Marshals Service into a nullity and rewrite Section 3596 to say that "[w]hen the sentence is to be implemented, the Attorney General shall release the person sentenced to death to the custody of ~~a United States marshal~~ *the Attorney General or his designee*, who shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed." The proposed rule is thus contrary to law. Indeed, there is no clearer precept of administrative law than the rule that an agency "literally has no power to act . . . unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). "When an agency has acted beyond its delegated authority," a reviewing court will hold such action invalid as "a violation of the [APA], 5 U.S.C. § 706(2)(C)." *Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 497 (D.C. Cir. 2010) (Brown, J., concurring); *see Manhattan Gen. Equip. Co. v. Comm'r of Internal Revenue*, 297 U.S. 129, 134 (1936) (explaining that an *ultra vires* rule "is a mere nullity").

3. Permitting the Attorney General to reassign all responsibilities for an execution to another agency, such as the BOP, would be "wholly at odds" with the broader statutory scheme. *Giordano*, 416 U.S. at 523. Congress specifically assigned federal execution authority to U.S. Marshals, who are appointed by the President and confirmed by the Senate, and who are supervised by a Director who is appointed by the President and confirmed by the Senate. 28 U.S.C. § 561(a), (c). The BOP is led by a Director who is appointed by the Attorney General and who is not confirmed by the Senate. 18 U.S.C. § 4041. Congress chose to delegate execution authority to the more accountable agency. *See NLRB v. SW Gen., Inc*., 137 S. Ct. 929, 935 (2017) ("The Senate's advice and consent power is a critical 'structural safeguard of the constitutional scheme.'" (quoting *Edmond v. United States*, 520 U.S. 651, 659 (1997))). That difference in accountability is a relevant factor in determining which agency has authority. *See Giordano*, 416 U.S. at 520 (emphasizing Congress's desire to vest authority in a person "responsive to the political process"); *see also* Exh. A, Senators McConnell, Lee, Sinema, Paul Introduce Bipartisan Bill to Increase Accountability at Federal Prisons (Oct. 30, 2019) (proposal to require that the BOP Director be confirmed by the Senate to provide for greater accountability).

---

[1] In *Giordano*, the Supreme Court held that a statute providing that the "Attorney General" or "any Assistant Attorney General specially designated by the Attorney General" may authorize wiretap applications did not permit the Attorney General's Executive Assistant to authorize such an application. 416 U.S. at 513 (quoting 28 U.S.C. § 2516(1) (1970)). The Court explained that because "the matter of delegation" was "expressly addressed" in the statute, the statute "was intended to limit the power to authorize wiretap applications" to the persons mentioned in the statute. *Id*. at 514. It also "appear[ed] wholly at odds" with the statutory scheme, the Court noted, "to permit the Attorney General to delegate his authority at will" to someone else in the Department of Justice not specifically mentioned in the statute. *Id*. at 523.

Additionally, implementing executions falls squarely within the "primary role and mission" of the Marshals Service to "execute" and "enforce" orders of the federal courts. *See* 28 U.S.C. § 566(a). The Marshals Service is also uniquely suited to implement executions in a de-centralized execution system because it functions in each district where sentences are imposed. *See* Frederick S. Calhoun, *The Lawmen: United States Marshals and Their Deputies*, 2–3, 5–6 (1990) (noting the Marshals Service's established history of enforcing the law in localities). The prescribed role of the BOP, by contrast, is to provide for the "safekeeping," "care," "subsistence," and "protection" of prisoners. 18 U.S.C. § 4042(a). And the BOP is a centralized national agency whose presence in any local community is mere happenstance. It therefore makes sense that Congress vested the Marshals Service with the authority to oversee federal executions.

Finally, the Government itself has recognized the U.S. Marshals Service's role in implementing death sentences under the FDPA. Indeed, in a 1994 memo contemporaneous with the passage of the FDPA, the General Counsel of the Marshals Service wrote that "U.S. Marshals will be responsible for the implementation of death sentences" under the statute. *See* Exh. B, Memorandum from Deborah Westbrook to Director Gonzalez (Sept. 9, 1994).

## Proposed Amendments to 28 C.F.R. § 26.2

The Department proposes to repeal § 26.2, which states:

(a) Whenever this part becomes applicable, the attorney for the government shall promptly file with the sentencing court a proposed Judgment and Order. The proposed Judgment and Order shall state, in addition to any other matters required by law or otherwise appropriate, that:

> (1) The sentence shall be executed by a United States Marshal designated by the Director of the United States Marshals Service;

> (2) The sentence shall be executed by intravenous injection of a lethal substance or substances in a quantity sufficient to cause death;

> (3) The sentence shall be executed on a date and at a place designated by the Director of the Federal Bureau of Prisons; and

> (4) The prisoner under sentence of death shall be committed to the custody of the Attorney General or his authorized representative for appropriate detention pending execution of the sentence.

(b) The attorney for the government shall append to the proposed Judgment and Order a Return by which the designated United States Marshal may inform the court that the sentence of death has been executed.

**<u>Comments</u>**

1. The Department has provided no explanation for why it proposes to repeal § 26.2 in full, or why such a rule change is necessary. As such, we have insufficient information to comment on the Department's rationale for the proposal. *See supra, Honeywell Int'l., Inc.*, 372 F.3d at 445; *Connecticut Light & Power Co*, 673 F.2d at 530.

Indeed, the notice of proposed rulemaking contains an extensive discussion of eliminating the requirement that executions be carried out by lethal injection—which is relevant to the repeal of § 26.2(a)(2)—but contains no similar analysis of the other provisions of § 26.2, which are not in any way tied to whether an execution occurs by lethal injection or other means. The Department cannot leverage its analysis of that particular provision as a basis to repeal all of § 26.2, which contains many additional requirements that have nothing to do with whether a change to the rules is warranted to address the possibility that a State in the future will not authorize lethal injection as a permissible means of execution.

2. As a preliminary matter, to the extent that the Department now characterizes § 26.2 as "unnecessary and redundant," 85 Fed. Reg. 47326, this is directly contrary to the Department's legal rationale when it first promulgated these rules. *See* 58 Fed. Reg. 4898-01 (Jan. 19, 1993) (codified at 28 C.F.R. pt. 26). The rules—which went into effect on February 18, 1993, when signed by then-Attorney General William Barr—clearly reflect the Department's understanding that BOP's authority to set an execution date is solely derivative of the longstanding power of the federal district court.

For instance, in response to a comment during the rulemaking process suggesting that the implementation regulations were an improper delegation of congressional authority in violation of *Chevron U.S.A., Inc. v. National Resources Defense Council, Inc.,* 467 U.S. 837 (1984), the Department stated that no such problem existed because it was not based on congressional authorization *at all*:

> As for the Justice Department's "delegated authority," the Department does not need explicit authority to issue regulations establishing death penalty procedures. The Department is authorized *to rely on the authority of the federal courts*, acting pursuant to the All Writs Act, 28 U.S.C. 1651(a), *to order* that their sentences be implemented. *Thus, § 26.2 directs the government's attorney in a capital case to file with the court a proposed Judgment and Order consistent with the regulations.*

58 Fed. Reg. 4898-01, 4899-900 (emphasis added). In other words, the Department did not need Congress to delegate authority because its authority came from the courts when they issued the necessary orders to that effect.

Indeed, BOP's authority to set an execution date derives solely from a federal court's judgment implementing the sentence, pursuant to the All Writs Act. Section 26.2 is therefore neither "redundant" nor "unnecessary"; it is a codification of the practice that must be followed lest the agency's action run afoul of established law recognizing the judiciary's exclusive

authority to implement a death sentence. The proposed rule change—which would allow the BOP to issue a letter setting an execution date on its own, unilaterally usurping a federal court's authority to control its own judgments, and rendering the All Writs Act a legal nullity—would thus represent a gross violation of the Separation of Powers between the Judicial and Executive branches. *See, e.g.*, *Stern v. Marshall*, 564 U.S. 462, 483 (2011) (holding that federal courts' Article III judicial power cannot be divided and shared with the other branches of government. According to "'the basic concept of separation of powers . . . [the judicial power] can no more be shared' with another branch than 'the Chief Executive, for example, can share with the Judiciary the veto power, or the Congress share with the Judiciary the power to override a Presidential veto.'") (quoting *United States v. Nixon*, 418 U.S. 683, 704 (1974)); *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 58 (1982) (noting that Article III is "an inseparable element of the constitutional system of checks and balances" that "both defines the power and protects the independence of the Judicial Branch") (plurality opinion).

The Department's responses to other comments made during previous rulemaking further document its recognition that its date-setting authority is derivative of and subordinate to the authority of federal district courts. Indeed, it expressly acknowledged that that the Department must comply with § 26.2 to avoid acting outside the scope of its legal power and that the district court retains the inherent authority to modify or nullify the Department's proposed action:

> …*far from contemplating the unilateral exercise of executive authority…the proposed rule directs government attorneys to seek a court order directing that execution be by lethal injection, and at a date and place determined by the Department of Justice. § 26.2.* Indeed, the very provision the comments find an "invasion" of the prerogatives of the federal judiciary begin with the qualifying language, "Except to the extent a court orders otherwise * * *" § 26.3(a)(1). Section 26.4 also begins with that qualifier.

58 Fed. Reg. 4898-01, 4900 (emphasis added).

The Department has not provided any explanation for its apparent change in position, despite the fact that it bears a particular obligation to do so. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983) ("[A]n agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance"); *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973) (an agency has a duty to "explain its departure from prior norms").

3. To the extent the Department's proposal rests on the notion that the "Executive Branch" in fact has authority to set an execution date, its rationale is mistaken. First, the Department has provided no authority for such an assertion. *See, e.g.*, 5 U.S.C. § 553(b) (requiring agency to provide "reference to the legal authority under which the rule is proposed"). Second, that view lacks any legal support. Historically, the only person in the Executive Branch with such authority was the President himself. An agency cannot assume the President's authority simply because it is in the same branch of government.

Moreover, courts have had sole authority to set execution dates since 1830. *See* Exh. C, Caleb Cushing, 7 Op. Att'y Gen. 561, 562 (1885). In 1830, President Jackson pronounced that the Executive Branch would no longer set execution dates via death warrants and proclaimed the judiciary would exercise power over "the execution of the sentence of the law" in "all cases." *See* Exh. D, J.N. Macpherson Berrien, 20 Op. Atty. Gen. 344 (1830). President Jackson's executive directive has never been revoked by any subsequent President. The judiciary's sole prerogative to fix a day and time of execution to carry out its judgment is now—and has been since 1830—"the established practice." *See* Exh. C, Caleb Cushing, 7 Op. Atty. Gen. 561 (1855).

The Department openly acknowledged this in a 1991 memorandum from Ted Calhoun to then-Director of the United States Marshals Service Henry Hudson, which concluded,

> [T]here is no historical example, save perhaps in time of war or national emergency, where the president, acting through the Attorney General or the Bureaus of the Department of Justice, determined the date of an execution and its method independent of any orders of the court or laws of Congress…
> Consequently, since 1830, the trial judge alone has set the date of the execution…

*See* Exh. E.

Even if the President still retained the power to fix a date and time for execution, this power: (1) would be the President's alone to exercise; and (2) could only be exercised by formally issuing a warrant of execution fixing the date and time.

Before the practice of judicial date-fixing was established by President Jackson, United States Attorney General Wirt explained in 1818 that "[t]he President will issue death-warrants in order to give effect to the laws ***in cases where they are necessary*** by the practice of the State in which the sentence is passed." Exh. F, William Wirt, 1 U.S. Op. Atty. Gen. 228 (1818) (emphasis added). Attorney General Wirt expressed that it was President Monroe's view "that it was the duty of the court which passed the sentence to fix the day for the execution." *Id*. at 228. In the absence of a law passed by Congress directing a specific entity to fix the date, however, "the courts of the United States have adopted, in this particular, the practice of the State courts in which they hold their sessions, and these are various: death-warrants from the governor being required in several of the States; and in others the courts fixing the day." *Id*. For that reason, "the President must, of necessity, to give effect to our laws, follow that which the courts have adopted." *Id*.

In short, any authority the President has to issue a death warrant is not inherent to the Executive Branch but flows directly from the courts themselves. By applying the practices of the states of conviction to implement federal death sentences, the *judiciary* was requiring the President to issue a death warrant when the state in which the conviction was obtained fixed the date and time of executions by gubernatorial proclamation.

Moreover, Attorney General Wirt's opinion establishes that execution warrants—orders to execute—have always been required in the United States before an execution may occur. The historical practice was for the President to issue the warrant only while Congress has been

silent—which it continues to be—and only when it is necessary to enforce the judgment of death, i.e., when the law of the state in which the conviction was obtained designates issuance of the warrant to the state's governor. But, in every case, a warrant—a formal directive issued by either a court or the President—is required. Thus, even if the Executive Branch had the authority to set execution dates, a "notice" from a BOP warden, absent specifically delegated authority, cannot substitute for a Presidential warrant.

4. Under 18 U.S.C. § 3596(a), "A person who has been sentenced to death pursuant to this chapter shall be committed to the custody of the Attorney General *until exhaustion of the procedures for appeal of the judgment of conviction and for review of the sentence*." (Emphasis added). The Department's proposal to repeal § 26.2 would eliminate any judicial oversight over when and whether death-sentenced prisoners have exhausted their judicial remedies and an execution date can be set; it instead permits the Attorney General to usurp all power to make that decision unilaterally and without oversight. This presents a clear conflict of interest: the same entity that has capitally prosecuted a prisoner and is seeking to execute him would have plenary power to decide whether an extant legal challenge should be allowed to proceed to completion before an execution date is set. *See, e.g.*, *Boumediene v. Bush*, 553 U.S. 723, 742 (2008); *In re Guantanamo Bay Detainee Continued Access to Counsel*, 892 F. Supp. 2d 8, 19 (D. D.C. 2012) ("If the separation-of-powers means anything, it is that this country is not one ruled by Executive fiat. Such blanket, unreviewable power over counsel-access by the Executive does not comport with our constitutional system of government."). The Attorney General could therefore moot any pending legal challenge to a prisoner's death sentence that would ordinarily be entitled to review by a federal court by simply setting an execution date on the prisoner. With the judiciary's authority thus usurped, a prisoner would have no authority to turn to regarding any improper action by the agency which is also seeking his death.

## Proposed Amendments to 28 C.F.R. § 26.3

The Department has proposed a number of changes to the federal regulation that details the date, time, place, and method of execution. We offer the following comments on each subsection and note not only problems with the proposed rules, but also problems with the current regulations that should be remedied, but which the Department's proposal fails to address.

### Comments on subsection (a)(1)

1. The regulation provides that the Director of the Federal Bureau of Prisons will designate the date and time of the execution. However, as noted in the comments to § 26.2, *supra*, the BOP has no independent authority to set an execution date. Indeed, it cannot validly do so absent a court order or a Presidential warrant.

2. The regulation provides that: "If the date designated for execution passes by reason of a stay of execution, then a new date shall be designated promptly by the Director of the Federal Bureau of Prisons when the stay is lifted." The regulation, however, does not define the phrase "when a stay is lifted," or provide any criteria for making that determination. Nor does it identify who has the authority to make that determination.

9

The failure to provide sufficient criteria or "definitional content" for terms guiding agency action in implementing the statute renders the rule arbitrary and capricious. *See, e.g., Pearson v. Shalala*, 164 F.3d 650, 661 (D.C. Cir. 1999) (holding arbitrary and capricious agency regulations that failed to define the phrase "significant scientific agreement," which formed the basis for agency decisions whether to authorize applications for dietary supplement labeling); *South Terminal Corp. v. EPA*, 504 F.2d 646, 670 (1st Cir. 1974) (finding promulgation of regulation lacked "needed specifics" in allowing for denial of permits based on "interference" with air quality control standards without indicating "how 'interference' is to be judged, nor does it state who must bear the burden of showing noninterference. The prospective applicant for a permit is utterly without guidance as to what he must prove, and how. And the standard is so vague that it invites arbitrary and unequal application.").

Moreover, the need for express standards for determining when a stay is lifted and an execution may lawfully proceed is demonstrated by the recent execution of Daniel Lee. Mr. Lee's execution—scheduled for July 13, 2020—was enjoined by a D.C. district court. At around 2:00 a.m. (EDT) on July 14, 2020, the United States Supreme Court dissolved that injunction. Although Mr. Lee's execution date had passed, upon information and belief, Mr. Lee was taken from his prison cell in the Special Confinement Unit at USP-Terre Haute approximately 20 minutes later and transferred to the execution facility. At 2:34 a.m. (EDT) on July 14, 2020, BOP Senior Attorney Katherine Siereveld sent an email to Mr. Lee's counsel with an attached letter, dated July 14, 2020, which purported to be the new notice given to Mr. Lee that his execution was now scheduled for July 14, 2020. *See* Exh. G.

Despite that newly-issued notice, another stay prohibiting Mr. Lee's execution remained in place. At 3:08 a.m. (EDT) on July 14, 2020, Mr. Lee's counsel emailed Ms. Siereveld, as well as several other DOJ lawyers, about this stay:

> On December 6, 2019, the District Court of the Eastern District of Arkansas entered an order granting a stay of execution and directing that the sentence of death as to Daniel Lewis Lee not be carried out until further order of the Court. *See United States v. Lee*, 4:97-cr243, Dkt. 1356 (E.D. Ark. Dec. 6, 2019). The Government appealed this order. The Eighth Circuit issued an opinion on June 1, 2020 vacating the stay. However, the mandate has not yet issued, and will not issue until July 16, 2020. *See United States v. Lee*, No. 19-3618 (8th Cir. June 12, 2020) (docket entry noting that mandate will not issue until July 16, 2020). Because the mandate has not yet issued, the Eighth Circuit's opinion has not taken legal effect, and the December 6, 2019 order staying the execution remains in place. Thus, per the District Court order:
>
> > Counsel for the Government are responsible for ensuring that the Warden of the United States Penitentiary in Terre Haute, Indiana, the United States Marshal for this District and the appropriate Indiana District, and all other officials who would have any involvement in Mr. Lee's execution are notified of this stay and comply with its requirements.

*See* Exh. H.

Unbeknownst to Mr. Lee's counsel, the Department planned to execute Mr. Lee at 4 a.m. (EDT) that day.[2] In fact, when counsel emailed Ms. Siereveld about the stay that remained in place, BOP had already commenced the execution by strapping Mr. Lee to a gurney and inserting IV lines into his arms. It was only under the threat of being held in contempt of court that the Department paused the execution process until the stay issued by the Eastern District of Arkansas could be addressed. *See* Exh. I.

At 5:30 a.m. (EDT), the Government filed an emergency motion to expedite the issuance of the mandate in the Eighth Circuit. *See* Exh. J. The Department elsewhere took the position that the lack of a mandate was not a legal impediment to carrying out the execution,[3] which is plainly incorrect as a matter of law. Indeed, the Department ultimately waited until after the mandate was issued by the Eighth Circuit to proceed with the execution. By then, Mr. Lee had been left strapped to the gurney, with IV lines inserted into his body, for nearly four hours.

In order to comply with the APA and avoid a repeat of the unconscionable circumstances of Mr. Lee's execution, the Department must withdraw the proposed rule and replace it with one that sufficiently defines the circumstances under which an execution may lawfully proceed. Specifically, the proposed rule should expressly provide that no part of the execution procedure itself that involves the defendant's body, including the transfer of an inmate to an execution chamber or device, such as a gurney, may proceed while a stay of execution or injunction is in effect. And the regulation should be amended to explicitly state that a stay is not lifted until a valid mandate lifting such a stay has been issued by an authorized federal court.

3. The regulation does not establish the procedures to be followed in the event of a stay. The deeply disturbing facts of Mr. Lee's execution underscore the need for such direction. Quite apart from the fact that the Department had no authority to commence the execution while a valid court order to the contrary was still in place, the Department should not have kept Mr. Lee in the execution chamber, strapped to a gurney for hours, until the stay was lifted. At a minimum, he should have been kept in a holding cell until the issue was fully resolved. Accordingly, the regulations should be amended to specify that until a stay has been lifted by the issuance of an appropriate mandate, the Department is prohibited from taking any steps to

---

[2] The notice provided to counsel (at 2:34 a.m. (EDT)) did not state the time of the execution, nor were counsel ever informed when BOP intended to carry out the execution. Failure to require informing counsel of the time, and giving counsel adequate time to respond if necessary, nullifies any notion of notice and is another problem with the regulations.

[3] *See e.g.*, *Barr et al., v. Purkey et al.*, No. 20A10 (Supreme Court), United States' Reply in Support of Application for a Stay of Execution or Vacatur of the Injunction Issued by the United States District Court for the District of Colombia at 14 n. * (filed July 15, 2020) ("But that stay had been vacated by the Eighth Circuit on June 1, 2020. *See United States v. Lee*, No. 19-3618. The stay order was therefore no longer operative as of that date, and once this Court vacated the preliminary injunction entered July 13 by the district court in this case, *see* No. 20A8, no impediments prevented Lee's execution.")

commence the execution, including strapping the prisoner to the execution gurney and inserting IV lines into his body, and that if a stay is entered after the commencement of the process, the prisoner shall be released from the execution chamber until such time as the new stay is lifted.

4. The regulation currently states that if the execution date passes due to a stay, then a new date shall be designated "promptly." The regulation, however, does not define the key term "promptly." The failure to provide sufficient criteria or "definitional content" for terms guiding agency action in implementing the statute renders the proposed rule arbitrary and capricious. *See supra Pearson*, 164 F.3d at 661; *South Terminal Corp*, 504 F.2d at 670 (1st Cir. 1974). Moreover, as set out more fully below in the comment to § 26.4(a), the regulation does not adequately define what constitutes sufficient notice of a new execution date to comply with the APA and the Due Process Clause of United States Constitution. The proposed rules are insufficient to guarantee that prisoners and their counsel are given adequate notice of the new execution date, as well as the new time, so that they can meaningfully pursue any process available in the courts. Moreover, providing notice of the new execution date *on the date itself* is not adequate or meaningful notice. In order to comport with Due Process, any new notice must also afford a prisoner and his counsel adequate time to pursue available legal remedies. *See infra*, Comments to § 26.4(a).

### Comments on subsection (a)(2)

The proposed rule would strike the word "federal" from the current version to read as follows: "At a penal or correctional institution designated by the Director of the Federal Bureau of Prisons."

1. Although the Department states that no federalism concerns are implicated by this proposal, and that it would impose no requirements for action or costs on the States, *see* 85 Fed. Reg. 47326, this seems implausible. According to the BOP, the executions carried out at USP-Terre Haute required extensive arrangements involving nearly 100 federal employees and outside contractors, as well as planning and coordinating security and other measures to address public protestors who wished to assemble near the prison's grounds. *See* Exh. K ("Declaration of Rick Winter"). It is inconceivable that carrying out a federal execution at a state or local facility—which would have to host such a large assembly of federal personnel—would not significantly disrupt the operations of that facility and impose requirements for action and/or costs on the States. Indeed, as Mr. Winter explained in his declaration, staff members at the prison would have to "cease their normal duties several days in advance of a scheduled execution, in order to give the team time to practice and prepare for their role in an execution," while even operations as mundane as preparation of inmate meals would have to be altered at a "greatly increased cost" to the facility. *Id*. The federalism concerns are self-evident, as is the possibility that such operations might run afoul of the commandeering prohibitions of the Tenth Amendment. At the very least, there is a lack of information concerning cost estimates for carrying out federal executions in state and local facilities, as required by Executive Orders 12866, 13563, and 13771.

2. The proposed rule appears to conflict with 18 U.S.C. §§ 3596 and 3597(a). By Congressional mandate, the U.S. Marshal is to supervise implementation of the death sentence

and, pursuant to § 3597(a) may use state and/or local facilities as necessary. The revision conflicts with statutory law in that it purports to give the BOP Director a power reserved for the more accountable position of U.S. Marshal. *See supra* Comments on § 26.1(c).

### Comments on subsection (a)(3)

The proposed rule would require that "qualified" personnel must be used for any manner of execution. The proposal, however, fails to define the key term "qualified," or establish objective criteria for assessing whether personnel are qualified. The Department must provide a definition that would allow for the implementation of this regulation. The absence of clear and objective criteria to govern the selection of such personnel would make it impossible to determine compliance with the regulation. (The word "qualified" also appears at § 26.4(g), and it is not defined there, either.)

### Comments on subsection (a)(4)

1. This regulation provides that the execution is to be carried out by lethal injection, or by any other manner prescribed by the law of the State in which the sentence was imposed or which has been designated by a court in accordance with 18 U.S.C. 3596(a). The proposal, however, does not identify what guidelines will be followed to ensure the humaneness of the execution and to ensure that the prisoner is not tortured. For example, the regulation does not require that the Department certify the identity, potency and purity of the drug(s) used in the execution. Nor does it require that execution personnel have specific qualifications and currency to establish IV access. For example, the regulation should specify that peripheral IV access be the default and that IVs may be placed in central veins only if the execution personnel are qualified and competent to perform central IV access. The proposal also does not specify what procedures will be followed in the event that standard intravenous access to the prisoner is impractical or unobtainable. For example, if the execution team cannot access a vein, will it use a more invasive "cut-down" procedure to obtain venous access? The regulation simply provides insufficient information to ensure that the Department will employ procedures that do not subject prisoners to an inhumane execution.

The Department has a responsibility to adhere to the Constitution and avoid torturing prisoners in carrying out executions. *See Baze v. Rees*, 553 U.S. 35, 48-49 (2008). At the very least, the proposed rule should include such a provision.

This omission is particularly problematic because these proposed rules contemplate that executions may be carried out at State facilities, possibly by staff not trained by the U.S. Marshal.

The proposed regulation also fails to require that the prisoner be provided proper notice of the means by which the government intends to execute him.

2. Many prisoners on the federal death row suffer from chronic health conditions that create particularized risks of complications in a lethal injection execution. Others take medications that are necessary to control serious health conditions and that create the potential

for dangerous interactions with the lethal agent or agent specified in the proposed regulations. For example, at least one federal death row prisoner takes a medication to control epilepsy that is necessary to prevent seizures that could cause brain damage or death. That medication metabolizes in such a way as to create a problematic interaction with pentobarbital, the lethal agent specified in the current execution protocol. Because the anti-convulsant will, in effect, decrease the potency or efficacy of pentobarbital when injected into this prisoner, an execution attempt with pentobarbital would create a grave risk that the prisoner either will not be killed but will be rendered permanently brain damaged, or will suffer the excruciating pain and terror of flash pulmonary edema while still conscious and sensate. This risk cannot be eliminated by ceasing the prisoner's anti-convulsant medication, because doing so would create an intolerable risk that he would suffer a catastrophic seizure that could result in his death or serious brain damage. *See* Exh. L & Exh. M.

The proposed regulation does not contemplate or address the possibility of a prisoner having a medical condition or medication requirement that creates a particularized risk of unconstitutional pain and suffering during an execution conducted according to the specified procedures. The proposed regulation also does not contemplate or address the use of an alternative execution method where a prisoner's particularized medical condition or medication requirement creates such a risk. Further study should be conducted to evaluate alternative execution methods and at least one method that does not involve any form of lethal injection, such as the firing squad, should be carefully considered.

## Proposed Amendments to 28 C.F.R. § 26.4

The Department has proposed a number of changes to the federal regulation that governs "other execution procedures," including the notice provided for designation of an execution date, visitation procedures in the days leading up to the execution, and persons permitted to be present at the execution. We offer the following comments on each subsection.

### Comments on Preamble to § 26.4

The Department proposes to delete the current preamble to § 26.4, which reads: "Except to the extent a court orders otherwise…"

1. The Department has not provided any explanation for why it proposes to repeal this language, or why such a rule change is necessary. As such, we have insufficient information to comment on the Department's rationale for the proposal. *See supra, Honeywell Int'l., Inc.*, 372 F.3d at 445; *Connecticut Light & Power Co*, 673 F.2d at 530.

2. This proposal is also contrary to the Department's explanation when it first promulgated these rules. As noted in the comments on §26.2, the Department specifically relied on this preamble to answer the concern that its promulgation of these rules was without authority and invaded the prerogatives of the federal judiciary. *See supra* and 58 Fed. Reg. 4898-01, 4900; *see also supra Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 42 (1983); *Atchison, Topeka & Santa Fe Ry. Co.*, 412 U.S. at 808.

3. As with the Department's proposal to repeal § 26.2, the rule change would unnecessarily and improperly eliminate judicial oversight over critical aspects of the execution process that implicate fundamental constitutional and statutory rights, such as access to counsel, religious protections, and adequate notice, including any rescheduling of an execution date. These issues are discussed in more detail below. Suffice it to say, the Department's proposal to remove the courts from exercising authority over these matters is deeply troubling and, at a minimum, presents grave concerns about the Separation of Powers between the Executive and Judicial branches.

### Comments on § 26.4(a)

(a) The Director of the Federal Bureau of Prisons or his designee shall notify the prisoner under sentence of death of the date designated for execution at least 20 days in advance, except when the date follows a postponement of fewer than 20 days of a previously scheduled and noticed date of execution, in which case the Director of the Federal Bureau of Prisons or his designee shall notify the prisoner as soon as possible.

1. The regulation provides that when the previously scheduled execution date has been postponed, the Director of the BOP "shall notify the prisoner as soon as possible" of the new execution date. As the Department is well aware, all federally death-sentenced prisoners are legally entitled to be—and are in fact—represented by counsel. *See* 18 U.S.C. § 3599(a) & (e). Thus, this regulation must be amended to provide that notice of the date and time of the new execution must also be given to the prisoner's counsel.

Such an amendment is necessary because the Department has apparently taken the position that it is under no legal obligation to provide notice to counsel. For example, when Mr. Wesley Purkey's July 15, 2020 execution date was postponed due to a preliminary injunction, counsel for Mr. Purkey received an email from the Department stating that he was being notified of the new execution date only "as a courtesy." *See* Exh. N. The Department, however, should not be allowed to treat notice to counsel as voluntary. Allowing the Department to issue a new notice at any moment and proceed with haste to carry out an execution, without any notice to counsel, would irreparably deprive prisoners of their right to counsel and to access the courts to pursue any available legal remedies which still remain. (Indeed, both Mr. Lee and Mr. Purkey had unaddressed legal claims pending in the courts when they were executed.)

2. The regulation does not adequately define what constitutes sufficient notice of a new execution date to comply with the APA and the Due Process Clause. Under the APA, a regulation is impermissibly vague when it fails to "indicate how the permitting authority is to judge" whether the regulation's conditions are met. *Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 224 (D.C. Cir. 2007); *see also West Virginia Pub. Servs. Comm'n v. U.S. Dep't of Energy*, 681 F.2d 847, 863 n.75 (D.C. Cir. 1982) ("an exercise of unfettered flexibility too often results in ad hoc judgments and arbitrary decisions, both of which are counterproductive to the greater regulatory goals of consistency in decisions and reasoned guidance upon which affected parties may rely."). Similarly, the Department's notification of a new execution date must comport with the U.S. Constitution. *See, e.g.*, *Mullane v. Central Hanover Bank & Trust Co.*,

339 U.S. 306, 314 (1950) (notice that satisfies due process must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action[,] afford them an opportunity to present their objections[, and] . . . be of such nature as reasonably to convey the required information.") (internal citations omitted). Among other infirmities, a rule that informs counsel of the "date" *on that date* is not providing notice.

Again, Mr. Lee's case is demonstrative of the need for a clear and adequate definition of the notice to be provided. The only notice his counsel received that a new execution date had been set was by way of an email sent at 2:34 a.m. (EDT) on July 14, 2020—a time at which most people would not be expected to be awake and checking email. The Department made no attempt to reach counsel by phone or otherwise ascertain whether counsel knew that it intended to execute their client in less than 90 minutes. Indeed, the Department never notified counsel that it intended to execute Mr. Lee at 4 a.m. (EDT), or when it actually proceeded with his execution at 7:30 a.m. (EDT); counsel only learned that information because journalists who were on site to witness the execution posted it on Twitter after being notified of that fact by BOP. The Department did not hesitate to inform the media, however. *See* Liliana Segura, "Blood in the Water; Disregarding the Virus and Victims' Families, Trump Rushes to Execute," The Intercept, August 2, 2020 ("But at 2 a.m., an unexpected ruling came from the Supreme Court. In a 5-4 decision, the justices vacated the stay. 'Please make your way back to the Media Center,' a Bureau of Prisons staffer texted a reporter with the Indianapolis Star, who was at a motel near the prison. 'We will be resuming the execution at approximately 4 a.m.'") (available online at: https://theintercept.com/2020/08/02/federal-executions-indiana-trump-coronavirus/) (last visited Sept. 2, 2020). If the Department can tell media the specific time that the execution is to take place, it can and must tell counsel as well. And, of course, counsel must be given *more* notice than the media.

The Department's behavior did not comport with even the most basic requirements for adequate notice. It quite literally sought to execute Mr. Lee in the wee hours of the night, while his counsel were presumably asleep, and before the clerk's office for any court would be open for business and any court would be expected to adjudicate any remaining legal challenges. (As noted, Mr. Lee did, in fact, have unaddressed legal claims still pending in the district court for the District of Columbia when he was executed. Moreover, there was also a stay still in effect, and counsel had to inform the Department of that fact and remind it of its duty not to execute Mr. Lee with a stay still in place. And even then, the Department rushed to execute Mr. Lee within minutes of the issuance of the mandate by the Eighth Circuit.) The proposed rules are insufficient to guarantee that prisoners and their counsel are given adequate notice of the new execution date *and time* so that they can meaningfully pursue any process available in the courts. Moreover, providing notice of the new execution date *on that same date* is not adequate and meaningful notice. In order to comport with Due Process, any new notice must also afford a prisoner and his counsel adequate time to pursue available legal remedies.

3. The regulation states that a "designee" of the BOP Director shall notify the prisoner of an execution date, but it does not set any limits on which designees can properly serve notice or how that notice is to be made. For example, under the proposed rule, a line correctional officer could be designated to orally notify a prisoner that an execution date has been set. This could create significant confusion over whether a valid execution date has, in fact, been set. In order to

avoid such confusion, the regulation should: (a) require that the notice be in writing, and (b) specifically identify, by title, which BOP employees are authorized to serve such notice on the prisoner.

4. The proposed rule unfairly curtails prisoners' access to the executive clemency process. It states that only 20 days' notice of an execution date is required. However, subsection (b) of 28 C.F.R. § 1.10 ("Procedures applicable to prisoners under a sentence of death imposed by a United States District Court") states that prisoners shall have 30 days in which to file a petition for commutation of sentence, and an additional 15 days to submit supplemental papers in support of the petition. And subsection (c) of § 1.10 states that a prisoner may request and receive the opportunity to make "an oral presentation of reasonable duration to the Office of the Pardon Attorney in support of the clemency petition." The proposed rule therefore nullifies the clemency regulations. The execution rule should be amended to ensure that prisoners are given the full time period in which to submit the clemency petition and additional supplements, make an oral presentation in support of the petition, and any other process afforded as part of the executive clemency proceedings.

5. The proposed rule does not limit the ability of the BOP to simply continue the noticed execution date ad infinitum. This is not an abstract concern. In the cases of Mr. Lee and Mr. Purkey, the BOP simply extended the execution period into the next day when their original execution dates had passed. Under the interpretation given these rules by the Department of Justice, nothing prevents BOP from simply extending the original date for as long as it wishes. This effectively negates any concept of either an execution "date" or notice.

### Comments on § 26.4(b)

§ 26.4(b) – Beginning seven days before the designated date of execution, the prisoner shall have access only to his spiritual adviser (not to exceed two), his defense attorneys, members of his family, and the officers and employees of the institution designated in § 26.3(a)(2). Upon approval of the Director of the Bureau of the Federal Prisons, the prisoner may be granted access to such other persons as the prisoner may request.

This subsection of the proposed rules is presumably designed to define visitation rights of the condemned prisoner in the seven days before the scheduled execution in order to ensure all parties have clarity on this point. However, the language, much of which remains the same as that carried over from the previous regulation, has several points of ambiguity which are likely to lead to confusion and unnecessary, last-minute litigation.

A failure to address and correct these issues now, during the notice-and-comment period, would be unreasonable and reflect arbitrary and capricious decision-making.

Clarity here is critical because, at the end point of this seven-day window, it is contemplated that the condemned prisoner will be executed. There will be no "do-overs." And there is no rational basis for restricting the types of visitors a condemned prisoner should be entitled to have to his attorney to the exclusion of other members of the defense team; to his

sister to the exclusion of his second cousin; to his brother to the exclusion of his life-long friend—so long as the proposed visitor can pass the security clearances separately (and always) required by the BOP.

We offer four comments on § 26.4(b), and three suggested changes to it, to remedy these issues, for the reasons set forth below:

1. The word "only" should be deleted from the first sentence. It undermines the intent of the provision. Presumably this sentence is supposed to mean that a prisoner shall have access to his spiritual adviser, his defense attorneys and to members of his family. This seems to be the likeliest meaning of the sentence, given that the prisoner "*may* be granted access" to other persons not on the list. Use of the word "only," however, seems to suggest that the list describes a restricted universe that includes these persons, but that the prisoner is not necessarily entitled to all of them. The meaning of the sentence, and the entitlement it confers, would be clear and leave no room for misinterpretation if the word "only" were deleted.

To the extent the DOJ chooses not to make this change, we request an explanation as to what function the word "only" serves in that sentence, so we can better understand what the Department intends by its inclusion.

2. The term "defense attorneys" should be changed to "members of the defense team." A defense team in a death penalty case is typically (and should be) made up not only of lawyers, but also of a mitigation specialist, a fact investigator, a paralegal, and often one or more experts. The work on behalf of a client in the seven days preceding his scheduled execution may require the expertise of any one of these team members in consultation with the client, and may depend upon the relationships certain members of the team have established with the client, often over the course of years.

During this last week, the role of the defense team expands to include: assessing the client's evolving mental health; explaining to the client all matters pertaining to litigation, which at this stage often moves extraordinarily quickly; addressing with the client on-the-ground developments; helping prepare the client to make end-of-life decisions; serving as liaison with prison staff and counsel for the prison; and bearing witness to his final days, particularly for a client whose family cannot be with him. *See, e.g.*, ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases §§ 10.7, 10.15.1(B), (E), 10.15.2(B), (C) (rev. ed. 2003), 31 Hofstra L. Rev. 913 (2003).

Claims raised at this stage nearly always require factual development and may require consultation between the client and the case investigator, mitigation specialist, and/or expert witnesses. For some claims, especially those that focus on the client's declining mental or physical health, it is usually necessary that a defense mental health or medical expert interview or examine the client during that final week. Often, this end-stage factual development is complicated and must be flawlessly put together over a very short period of time.

Beyond the need to confer on litigation, this typically makes in-person visits from his legal team the condemned prisoner's only source of contact with people he knows well enough to confide in or seek counsel from (assuming they have family to visit them).[4]

The intense nature of litigation in the final week before an execution date typically demands the full attention of the lawyers on the team, and the demands on the attorneys' time cannot easily be apportioned between the client and preparation of legal pleadings. To place the entire time burden of this final week's visits on defense counsel is unreasonable and an arbitrary limitation. This is especially true given that the mitigation specialist, investigator, and paralegal often develop close bonds with the client over the years as they are often charged with meeting together frequently during the course of representation to learn the client's life history, and with maintaining regular visits with the client.

As the proposed rules are currently written, the client would need to seek permission from the Director of the Bureau of Prisons, which could take precious time, result in an arbitrary refusal, and create an unnecessary and unreasonable burden on the client and defense team while conferring no benefit on the Department or the Bureau of Prisons.

3. The word "all" should be added before the phrase "members of his family" to clarify that the term is not restricted to immediate family or those family members who were granted permission to visit before the execution date was set. It makes sense to clarify now that a condemned prisoner is entitled to visits from "all" members of his family during the seven-day window this regulation covers. This change would provide important assurances for the condemned and his or her family members. It would also provide clarity to prison officials and courts so as to prevent the need for unnecessary litigation in that final week.

4. The final sentence of this subpart should be changed to the following: "Unless the Director of the Federal Bureau of Prisons denies access to a particular visitor, the prisoner shall be granted access to such other persons as the prisoner may request."[5]

The previous version of this regulation vested authority to grant approval for additional visitors in the prison warden, which is more practical. The Director of the BOP oversees 122 federal correctional facilities, housing approximately 170,000 prisoners. BOP staff numbers in the tens of thousands. With all of the responsibility vested in the Director, including

---

[4] Because virtually every prisoner in the Special Confinement Unit at USP-Terre Haute previously resided in other states, the prison is not easily accessible to family and friends of our clients. Our clients' families often lack the financial means to travel to the prison, leaving the legal team to undertake various functions for the prisoner.

[5] Alternatively, though not ideally, the phrase "such permission to be granted promptly and not to be unreasonably withheld" should be added after "Upon approval of the Director of the Federal Bureau of Prisons, the prisoner may be granted access to such other persons as the prisoner may request." In any case, it is presumed that any such visitor would have to be approved after submitting to a background check and undergoing other security measures to be applied for visitor entry.

responsibility for every other aspect of the planned execution, considering a request from a condemned prisoner for access to a visitor may not be deemed a high priority. While waiting for this approval, the seven days will be expiring. This problem will be heightened if, as happened this summer (2020), executions are scheduled back to back.

This problem could be ameliorated by simply—and by regulation—permitting the prisoner access to any person the prisoner requests, subject to the request being denied by the BOP Director for good cause. This change would shift the burden to the BOP to specifically deny access. If the Director of the BOP is sufficiently concerned about visitors the prisoner has requested, those concerns may prompt the Director to pay the necessary attention to, and refuse, the request.

The change we propose does not diminish the Director's authority to deny the condemned prisoner's requests for access to visitors. Nor does it seek to change BOP rules for background checks or other security measures to be applied for visitor entry. It does not establish a right to visit in a person who wishes to visit but whom the prisoner has not specifically requested. It does not alter the prison's ability to regulate visitation hours or the number of hours permitted for visitation. It merely places the burden on the Director to deny permission when a prisoner requests a visit from someone other than a family member, spiritual adviser or defense team member, rather than affirmatively requiring the Director's grant of permission for such a visit.

### Comments on § 26.4(c)(1)

1.  The Department seeks to amend subsection (c)(1) by transferring authority for selecting "necessary personnel" to be present at the execution from the "Marshal and Warden" to the "Marshal and the Director of the Federal Bureau of Prisons or his designee." This change is subject to the same concerns we have already expressed about vesting authority for this decision-making with the BOP Director instead of the Warden and additionally to an unknown "designee."

2. By requiring the choice of necessary personnel to be made by the Marshal "and" the BOP Director, it is unclear whether such decisions must be agreed upon by the two or whether decisions can be made by one or the other. If such decisions require the agreement of both, no provision is made for how any disagreements might be reconciled or how quickly.

3. This lack of detail takes on heightened concern because the BOP Director is given the authority in this proposed subsection to delegate his or her decision-making powers to a "designee," with no express limitation on whom that designee might be and what minimum qualifications he or she might be required to have.

Given that the "necessary personnel" are those people charged with the on-the-ground responsibility of carrying out the execution itself, their choice is critical to the smooth, humane, and constitutionally acceptable operation of the execution process. If this regulation is to be changed, it should provide a definition of "designee," to ensure the person entrusted with this

task has a level and type of training commensurate with the decisions he or she will be required to make.

Leaving open-ended authority of the BOP Director to designate a person to select such necessary personnel is arbitrary, capricious, and not in accordance with law.

### Comments on § 26.4(c)(3)

The proposed text of § 26.4(c)(3) remains unchanged from the previous regulation. But the language of subsection (3) was problematic to begin with and by leaving it intact, those problems have not been addressed or remedied.

1.  Presumably, the purpose of this section is to identify those persons the condemned prisoner is entitled to have present at his or her execution. This seems to be the clear intent of the regulation, which begins by saying that the persons listed "*shall* be present at the execution."

But the language of subsection (3) introduces ambiguity by then using the expression "not more than the following numbers of persons selected by the prisoner" before listing the categories of persons the prisoner is entitled to have. This language suggests an upper limit exists on the number of people the prisoner selects but that the floor could be lower or zero.

We propose that the language be changed to the following: "Persons selected by the prisoner, not to exceed the numbers identified below."

This would clarify that the prisoner has the right to have a spiritual adviser, two attorneys, and three adult friends or relatives present at the execution, and that the prisoner does not have the right to have more than this number of persons present, which is what we believe the regulation intends. At the same time, it would eliminate any confusion that might permit the Marshal to say that, so long as one defense attorney or one friend or relative has been given permission to be present, the Government has fulfilled its guarantee to the prisoner. Or worse, it would eliminate the possibility the Government could say this regulation is not intended to provide the prisoner with the right to have *any* spiritual adviser, defense lawyer or friend or family present.

Interpretation of this subsection featured prominently in litigation stemming from the executions scheduled on July 13, 15 and 17, 2020. In each of these cases, condemned prisoners challenged the setting of execution dates in the midst of a resurgence of the coronavirus pandemic. These lawsuits (and others brought on behalf of victims' family members) were accompanied by declarations of public health experts and epidemiologists, attesting to the dangers of travel, particularly for people of a certain age and those with underlying health conditions. (The Centers for Disease Control and Prevention ("CDC") itself has discouraged travel during the COVID-19 pandemic.[6])

---

[6] *See* CDC, "Travel during the COVID-19 pandemic," Aug. 26, 2020 ("Travel increases your chance of getting and spreading COVID-19. **Staying home is the best way to protect**

Despite the enormous rise in COVID-19 cases nationwide in the weeks leading up to these executions, the execution dates were not postponed despite grave concerns raised by defense attorneys and a spiritual adviser that their health conditions put them at increased risk for the virus were they to travel by air, use public restrooms, stay in hotels, and/or spend time in a closed environment such as a prison (which were shown this past Spring to be particularly pernicious incubators of the coronavirus, and to have caused super-spreader events). *See* Exh. O (Declaration of Chris Beyrer, MD., MPH). Claims raised in litigation failed at least in part because the Department was able to argue successfully that subsection (c) did not guarantee a prisoner any right to have his attorneys or spiritual adviser present at his execution.[7]

Contrast the federal response to concerns over the coronavirus outbreak with the responses to challenges brought by state prisoners with execution dates during the summer of 2020. In response to COVID challenges to execution dates set in states in Tennessee, Texas and Ohio—the only three states to have executions scheduled this summer—all executions scheduled from July 9 through the end of October were stayed or reprieved because of issues related to COVID. This includes two executions previously scheduled in Tennessee, one in Texas, and at least five in Ohio.[8] (Several had already been rescheduled in the spring; by July, the virus was resurgent in numerous places in the country.)

It would be arbitrary and capricious for the Department not to make this change, which would clarify a prisoner's rights to have the enumerated people witness his execution. As it currently stands, this regulation is also "not in accordance with law" or the Constitution as it interferes with the prisoner's statutory and constitutional rights to freedom of religion and to the assistance of counsel. *See* 18 U.S.C. § 3599(e); 42 U.S.C. § 2000bb *et seq*.; 42 U.S.C. §§ 2000cc-2000cc-5; U.S. Constitution, Amend. 1 and 6.

### Comments on § 26.4(f)

This provision states: "No photographic or other visual or audio recording of the execution shall be permitted."

1. When this regulation was first proposed in 1992, the press challenged it, seeking to be allowed to record executions. The Department responded that recording an execution and then

---

**yourself and others from COVID-19.**") (emphasis in original). Available online at: https://www.cdc.gov/coronavirus/2019-ncov/travelers/travel-during-covid19.html (last visited Sept. 2, 2020).

[7] *See*, *e.g.*, *Peterson et al. v. Barr et al.,* No. 2:20-cv-00350-JMS-DLP (S.D. Ind.); *Hartkemeyer v. Barr et al.*, No. 2:20-cv-00336-JMS-MJD (S.D. Ind.); *Lee v. Barr et al.*, 2:20-cv-00357-JRS-DLP (S.D. Ind.).

[8] *See* "Upcoming Execution," Death Penalty Information Center, https://deathpenaltyinfo.org/executions/upcoming-executions (last visited August 31, 2020).

broadcasting it publicly would be inappropriate and against the public interest. The proposed rule was thereafter adopted without change.

Counsel and their clients now challenge this regulation on the grounds that, without audio and visual recording of executions, neither the courts nor legislative bodies have any record by which to adjudge the humaneness of the execution method in general—a touchstone of its constitutionality—or whether the particular execution was performed in the manner contemplated by the Constitution, by statute, regulation and protocol, and by the courts, or by medical and execution experts. This is critical information to have and is not information that can be duplicated under "laboratory" conditions.

Counsel do not seek to have the press record executions. Rather, we believe counsel should be able to record the execution, or the Marshal should be required to record it and provide a recording of it to counsel, in order to preserve a record of the execution for future analysis. Such a recording—from inside the execution chamber, as well as from inside the drug room— is necessary to accurately capture what actually transpires during an execution and, if necessary, provide a foundation for subsequent challenges based on events that unfolded in the execution chamber.

Having such a recording is especially important because neither counsel nor the press is permitted to be present in the execution chamber itself but must watch through windows; they are likewise not permitted to watch the IV insertion process or cut-down procedures. Even after the execution has begun, curtains are drawn that block the view of crucial portions of the execution procedures.

Moreover, counsel never have access to information about what the actual executioners are doing or saying. While counsel disagree with the position taken in litigation by the Department that those who perform executions are entitled to anonymity, we do not contest that here. We do contest the inability to learn what is being said and done in the course of executing our clients. The only way to provide a (figurative) window into what has taken place, or a record of any concerns expressed by any participant in the process, is by making a recording.

Finally, in the period leading up to the execution of Daniel Lee in the early morning hours of July 14, 2020, it was reported by remote witnesses talking by phone to Mr. Lee that he was kept on his back, strapped to a gurney, while stays of his execution were still in effect. It was reported that IV lines were inserted into Mr. Lee's hands while these stays were still in effect. It was reported that the Government sought to execute him at 4 a.m. while stays were still in effect and before a mandate dissolving those stays had been issued by the Eighth Circuit Court of Appeals. Having a transcript of a recording from inside the execution chamber, which would reflect precisely what Mr. Lee was being told during this period, is critical information that his lawyers and the public are entitled to know.

Recording the execution would not be for purposes of creating spectacle. It would be for the express purpose of creating a clear record of precisely how the imposition of the ultimate punishment is occurring, what exactly is taking place in the execution chamber and being done to

the prisoner, and for determining whether the Government is acting within the bounds of the law--information that is now solely in the possession of the Government itself.

2.  As the proposed rules currently stand, an unprecedented amount of authority over the execution process will be put into the hands of the Attorney General. The Attorney General has the authority to seek a death sentence in the first instance. The Attorney General oversees the FBI, the agency that investigates federal crime. The Attorney General has the ability to decide whether to take over a prosecution of a case where state or tribal authorities have concurrent jurisdiction. The Attorney General chooses whom to execute and now seeks to be able to set dates for execution without giving the courts the ability to scrutinize and if necessary countermand his orders. The Department's execution practices have been subject to a high degree of secrecy.

If the Department fails even to provide a complete record of the execution, by prohibiting any recordings, it will have succeeded in preventing appropriate oversight and review of these executions by permitting them to proceed without necessary safeguards.

The Department should review the recording policy before issuing final regulations and should permit audio and video recording, with the caveat that no such recordings will be released to the general public.

### Other comments on § 26.4

1. The regulations do not address numerous practical problems implicating a prisoner's access to counsel and the courts. For example, counsel who are present for the execution are not permitted to have their mobile phones with them. Counsel are thus essentially *incommunicado* while at the prison; in the event of a legal emergency, counsel have no practical way to communicate with other members of the legal team, a clerk, or a judge. The regulation should be amended to permit counsel to have their mobile phones with them, or alternatively, specify that counsel will have access to a dedicated, easily accessible phone line while on site. Given that various executions in the states have been halted due to serious problems, the ability of counsel to respond and act where necessary is not a theoretical one.

2. Conversely, counsel who are off site have limited access to their client once he is moved to the execution facility. Counsel have no meaningful way to communicate with the client, or update and obtain guidance from the client about how to proceed with remaining legal challenges. The regulation should be amended to specify that prisoners will have guaranteed and continuous access to their counsel by phone after they are transferred to the execution facility.

Sincerely,

Claudia van Wyk
*Counsel on behalf of Shannon Agofsky*
BOP Reg. No. 06267-045

Eric Montroy
*Counsel on behalf of Billie Allen*
BOP Reg. No. 26901-044

Leticia Marquez
Lindsey Layer
*Counsel on behalf of Brandon L. Basham*
BOP Reg. No. 98940-071

John Carpenter
Rob Owen
*Counsel on behalf of Brandon Bernard*
BOP Reg. No.  91908-080

Jennifer Merrigan
Kelly Miller
*Counsel on behalf of Robert Bolden*
BOP Reg. No. 29702-044

Alex Kursman
*Counsel on behalf of Alfred Bourgeois*
BOP Reg. No. 98911-079

Juval Scott
Tim Gabrielson
*Counsel on behalf of Carlos Caro*
BOP Reg. No. 37786-079

Rob Owen
*Counsel on behalf of Wesley Coonce*
BOP Reg. No. 30011-039

Leor Veleanu
*Counsel on behalf of Odell Corley*
BOP Reg. No. 07303-027

Jean E. Giles
F. Italia Patti
*Counsel on behalf of Joseph Duncan*
BOP Reg. No. 12561-023

Jennifer Chiccarino
*Counsel on behalf of Joseph Ebron*
BOP Reg. No. 08655-007

Hunter Labovitz
*Counsel on behalf of Edward Fields*
BOP Reg. No. 04136-063

F. Italia Patti
Jean E. Giles
*Counsel on behalf of Sherman Fields*
BOP Reg. No. 15651-180

Joseph Luby
*Counsel on behalf of Chadrick Fulks*
BOP Reg. No.16617-074

Monica Foster
*Counsel on behalf of Marvin Gabrion*
BOP Reg. No. 09184-055

Blair G. Brown
Julie Brain
*Counsel on behalf of Thomas Hager*
BOP Reg. No. 08596-007

Marcy Widder
Rob Owen
*Counsel on behalf of Orlando Hall*
BOP Reg. No. 26176-077

Matthew Lawry
*Counsel on behalf of Dustin Higgs*
BOP Reg. No. 31133-037

Scott Braden
*Counsel on behalf of Norris Holder*
BOP Reg. No. 26902-044

Andrew Childers
*Counsel on behalf of Richard Jackson*
BOP Reg. No. 16669-058

Timothy J. Foley
Jean E. Giles
F. Italia Patti
*Counsel on behalf of Jurijus Kadamovas*
BOP Reg. No. 21050-112

Amy Donnella
George Kouros
John Nidiry
*Counsel on behalf of Daryl Lawrence*
BOP Reg. No. 66476-061

C. Pamela Gómez
Ajay Kusnoor
*Counsel on behalf of Iouri Mikhel*
BOP Reg. No. 23675-112

Beth Mulhauser
April Otterberg
Leane Renee
*Counsel on behalf of Ronald Mikos*
BOP Reg. No. 20716-424

Amy Harwell
Kelley Henry
Lisa Nouri
*Counsel on behalf of Lisa Montgomery*
BOP Reg. No. 11072-031

Shawn Nolan
*Counsel on behalf of Jeffery Paul*
BOP Reg. No. 10517-042

Joanne Heisey
*Counsel on behalf of James Roane*
BOP Reg. No. 32923-083

Celeste Bacchi
Jon Aminoff
*Counsel on behalf of Julius Robinson*
BOP Reg. No. 26190-177

Annie Fisher
*Counsel on behalf of Alfonso Rodriguez*
BOP Reg. No. 08720-059

Michele Brace
Susanne Bales
Dana Hansen
*Counsel on behalf of David Runyon*
BOP Reg. No. 57997-083

Dana Hansen
Stephen Kissinger
*Counsel on behalf of Ricardo Sanchez*
BOP Reg. No. 75820-004

Robert Lee
Kathryn Nester
*Counsel on behalf of Mark Snarr*
BOP Reg. No. 11093-081

Kelley Henry
Alexis Hoag
Amy Harwell
*Counsel on behalf of Rejon Taylor*
BOP Reg. No. 41070-074

Reginald King
*Counsel on behalf of Richard Tipton*
BOP Reg. No. 32922-083

Katherine Thompson
*Counsel on behalf of Jorge Torrez*
BOP Reg. No. 16054-084

D. Todd Doss
Steve Malone
*Counsel on behalf of Daniel Troya*
BOP Reg. No. 75817-004

Kelly Miller
*Counsel on behalf of Alejandro Umana*
BOP Reg. No. 23077-058

Monica Foster
Steve Wells
*Counsel on behalf of Bruce Webster*
BOP Reg. No. 26177-077

Ruth E. Friedman
*On behalf of the Federal Capital Habeas Project*